LATHAM & WATKINS LLP
Daniel M. Wall (Bar No. 102580)
Timothy L. O'Mara (Bar No. 212731)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: Dan.Wall@lw.com
Email: Tim.OMara@lw.com

Attorneys for Defendant
ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

GEOFFREY PECOVER and JEFFREY LAWRENCE, on Behalf of Themselves and All Others Similarly Situated,

Plaintiffs,

v.

ELECTRONIC ARTS INC., a Delaware Corporation

Defendant.

CASE NO. C 08-02820 VRW

**DEFENDANT ELECTRONIC ARTS INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT**

Date: December 4, 2008
Time: 2:30 P.M.
Place: Courtroom 6, 17th Floor
Judge: The Honorable Vaughn R. Walker

# TABLE OF CONTENTS

**PAGE**

I. Introduction ..... 1

II. Statement Of Issues To Be Decided ..... 2

III. Legal Standard ..... 3

IV. Plaintiffs' Antitrust Allegations Fail To State A Claim ..... 4

- A. The Material Allegations ..... 4
- B. Plaintiffs' Section 2 Claim Is Barred by the *Illinois Brick* Doctrine ..... 5
- C. Plaintiffs' Monopolization Claim Fails Because the Alleged Harm Arises from Lawful Exclusive Licenses of Intellectual Property Rights ..... 6
- D. Plaintiffs Fail to State a Plausible Claim that EA Has Enhanced Its Market Power Through the Unlawful Acquisition of Allegedly Related IP Rights ..... 9
- E. Plaintiffs' Alleged Violation of the California Cartwright Act Fails to Plead Facts Sufficient to State a Plausible Conspiracy Claim under *Twombly* ..... 11
- F. Plaintiffs' State Antitrust Claims Fail – Substantively and/or for Lack of Standing ..... 13

V. Plaintiffs' Claims Under The State Consumer Protection Statutes Must Be Dismissed ..... 15

- A. Plaintiffs Fail to Allege the Necessary Elements of a Claim Under the Consumer Protection Statutes of California and the District of Columbia ..... 16
- B. Plaintiffs Lack Standing to Assert Consumer Protection Claims under the Laws of the Eighteen States Where Neither Resides ..... 18

VI. Plaintiffs' Attempt To Bring A Nationwide Class Action Under California Law Fails The Supreme Court's *Shutts* Test ..... 20

VII. Plaintiffs' Fourth Cause Of Action For Unjust Enrichment Is Improper And Must Be Dismissed ..... 23

VIII. Conclusion ..... 24

# TABLE OF AUTHORITIES

## CASES

*Agular v. Atlantic Richfield Co.*,
25 Cal. 4th 826 (Cal. 2001)............................................................................................ 17

*American Needle, Inc., v. New Orleans Louisiana Saints*,
496 F. Supp. 2d 941(N.D. Ill. 2007) ..................................................................................... 7

*American Needle, Inc., v. NFL*,
No. 07-4006, 2008 U.S. App. LEXIS 17553, 2008 WL 3822782
(7th Cir. Aug. 18, 2008)........................................................................................ 2, 6, 7, 8, 11

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007)...................................................................................................... 3, 12

*Biljac Assoc. v. First Interstate Bank*,
218 Cal. App. 3d 1410 (1990) ............................................................................................. 12

*Chamberlain v. Am. Honda Fin. Corp.*,
931 A.2d 1018 (D.C. 2007) ................................................................................................. 17

*Chicago Prof. Sports Ltd. v. NBA*,
95 F.3d 593 (7th Cir. 1996) ................................................................................................... 7

*Conley v. Gibson*,
355 U.S. 41 (1957).................................................................................................................. 4

*Cook Inc. v. Boston Sci. Corp.*,
333 F.3d 737 (7th Cir. 2003) .................................................................................................. 8

*Davis v. Pac. Bell*,
204 F. Supp. 2d 1236 (N.D. Cal. 2002)................................................................................ 12

*Dist. Cablevision Ltd. P'shp v. Bassin*,
828 A.2d 714 (D.C. 2003) ................................................................................................... 17

*Fleer Corp. v. Topps Chewing Gum*,
658 F.2d 139 (3d Cir. 1981)........................................................................................ 7, 8, 10, 11

*Freeman v. San Diego Association of Realtors*,
77 Cal. App. 4th 171 (Cal. Ct. App. 1999) .......................................................................... 11

*Genentech, Inc. v. Eli Lilly & Co.*,
998 F.2d 931 (Fed. Cir. 1993)................................................................................................. 8

*Griffin v. Dugger*,
823 F.2d 1476 (11th Cir. 1987) ............................................................................................ 14

*Hoyte v. Yum! Brands, Inc.*,
489 F. Supp. 2d 24 (D.D.C. 2007)........................................................................................ 17

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)........................................................................................................... 5, 20

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) .......... 14, 18

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) .......... 4

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......... *passim*

*In re Netflix Antitrust Litigation*,
506 F. Supp. 2d 308 (N.D. Cal. 2007) .......... 3, 11

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) .......... 3

*In re Terazosin Hydrochloride Antitrust Litig.*,
160 F. Supp. 2d 1365 (S.D. Fla. 2001) .......... 18

*Ingels v. Westwood One Broadcasting Services, Inc.*,
129 Cal. App. 4th 1050 (2005) .......... 16

*International Norcent Technology v. Koninklijke Philips Electronics N.V.*,
No. 07-00043, 2007 U.S. Dist. LEXIS 89946, 2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) .......... 4

*Jack Russell Terrier Network v. American Kennel Club, Inc.*,
407 F.3d 1027 (9th Cir. 2005) .......... 12

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .......... 4

*Kobe v. Dempsey*,
198 F.2d 416 (10th Cir. 1952) .......... 11

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (Cal. 2003) .......... 23

*Krantz v. BT Visual Images*,
89 Cal. App. 4th 164 (Cal. Ct. App. 2001) .......... 17

*Lawlor v. National Screen Service Corp.*,
270 F.2d 146 (3d Cir. 1959) .......... 10, 11

*McBride v. Boughton*,
123 Cal. App. 4th 379 (Cal. Ct. App. 2004) .......... 23

*McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*,
No. 08-00080, 2008 U.S. Dist. LEXIS 47428, 2008 WL 2437739 (D. Haw. June 17, 2008) .......... 4

*Melchior v. New Line Productions, Inc.*,
106 Cal. App. 4th 779 (Cal. Ct. App. 2003) .......... 23

*Mich. Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008) .......... 4

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) .... 3

*North Star Int'l v. Arizona Corp. Comm'n*,
720 F.2d 578 (9th Cir. 1983) .... 3

*Paddock Publications, Inc. v. Chicago Tribune Company*,
103 F.3d 42 (7th Cir. 1997) .... 9

*Person v. Google, Inc.*,
No. 06-7297, 2007 U.S. Dist. LEXIS 47920, 2007 WL 1831111 (N.D. Cal. June 25, 2007) .... 4

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) .... 20

*Redwood Theaters, Inc. v. Festival Enterprise*, Inc.,
908 F.2d 477 (9th Cir. 1990) .... 12

*Riggs Nat'l Bank of Washington D.C. v. D.C.*,
581 A.2d 1229 (D.C. 1990) .... 17

*Royal Printing Co. v. Kimberly-Clark Corp.*,
621 F.2d 323 (9th Cir. 1980) .... 5

*Scripps Clinic v. Sup. Ct.*,
108 Cal. App. 4th 917 (Cal. Ct. App. 2003) .... 16

*Levi Case Co. v. ATS Prods.*,
788 F. Supp. 428 (N.D. Cal. 1992) .... 12

*St. Paul v. FMC Corp.*,
No. 89-0466, 1990 U.S. Dist. LEXIS 18142, 1990 WL 265171 (D. Minn. Feb. 26, 1990) .... 21

*State Farm Fire & Cas. Co. v. Superior Court*,
45 Cal. App. 4th 1093 (Cal. Ct. App. 1996) .... 16

*Sullivan v. NFL*,
34 F.3d 1091 (1st Cir. 1994) .... 5

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
536 F. Supp. 2d 1191 (C.D. Cal. 2008) .... 4

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
964 F.2d 186 (2d Cir. 1992) .... 8

*United States v. Microsoft Corp.*,
87 F. Supp. 2d 30 (D.D.C. 2000) .... 14

*United States v. Westinghouse*,
648 F.2d 642 (9th Cir. 1981) .... 8

*Util. Consumers' Action Network v. Powernet Global Commc'n*,
No. 06-1773, 2006 U.S. Dist LEXIS 78546 (S.D. Cal. Oct. 20, 2006) .... 22

*Verizon Comm. v. Law Offices of Curtis V. Trinko*
540 U.S. 398, 407 (2004) .......... 9

*Vinci v. Waste Mgmt., Inc.*,
36 Cal. App. 4th 1811 (Cal. Ct. App. 1995) .......... 13

*WAKA, LLC v. DC Kickball*,
517 F. Supp. 2d 245 (D.D.C. 2007) .......... 14

## STATUTES

California Business & Professions Code § 16700 .......... 11, 13

California Business & Professions Code § 16720 .......... 15, 20

California Business & Professions Code § 17200 .......... 15, 16, 20

## OTHER AUTHORITIES

Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 4.1.2 (1995) .......... 7

Gregory J. Werden, *Antitrust Analysis of Joint Ventures*, 66 Antitrust L.J. 701, 730 (1998) .......... 6

*IP and Antitrust* §13.2b (2002 ed. & Supp. 2007) .......... 6, 7

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §18.48 (2008) .......... 8

Sherman Act, 15 U.S.C. § 2 .......... 1, 2, 6, 8

## RULES

Federal Rules of Civil Procedure 12 .......... 1, 3

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on December 4, 2008 at 2:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, San Francisco Division, located at San Francisco, CA, Courtroom 6, before the Honorable Vaughn R. Walker, Defendant Electronic Arts Inc. will, and hereby does, move to dismiss each claim for relief asserted in plaintiffs' Class Action Complaint ("Complaint") on the grounds that they fail to state a claim upon which relief can be granted. This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings on file in this action, and upon such other matters presented to the Court at the time of the hearing.

## RELIEF SOUGHT

Defendant Electronic Arts Inc. seeks dismissal of each claim asserted in plaintiffs' Complaint with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: August 25, 2008

Respectfully Submitted,

LATHAM & WATKINS LLP
Daniel M. Wall
Timothy L. O'Mara

By /s/ Daniel M. Wall
Daniel M. Wall
Attorneys for Defendant
ELECTRONIC ARTS INC.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Electronic Arts Inc. ("EA"), headquartered in Redwood City, is one of the leading developers and publishers of videogames. EA is accused of monopolizing an alleged market for interactive football software because it bid on and was awarded the exclusive rights to make videogames using the trademarks and other intellectual property rights of the National Football League ("NFL") and its Players' Association, the Arena Football League ("AFL"), and the National Collegiate Athletic Association ("NCAA"). That is all EA is accused of. The conduct alleged in the Complaint is strikingly simple:

- In December 2004, EA entered into an exclusive agreement with the NFL and its Players Association.
- In January 2005, EA entered into an exclusive agreement with the AFL.
- In April 2005, EA entered into an exclusive agreement with the NCAA, through its licensing arm.

The antitrust theory of the Complaint is that EA "killed off" its only football competition by entering into the NFL exclusive (the NFL being "[b]y far the most important football league from the perspective of interactive football software makers"), and then raised entry barriers by also acquiring the AFL and NCAA licenses. This, allegedly, allowed EA to raise the price of its NFL video game, *Madden NFL*, above competitive levels.

The two plaintiffs and proposed class representatives are indirect purchasers of *Madden NFL*. The proposed class is defined to exclude direct purchasers such as Best Buy and Gamestop, the retailers from which plaintiffs bought *Madden NFL*. Despite their indirect purchaser status, plaintiffs advance a claim of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2. This is followed by twenty state antitrust claims, twenty state consumer protection and unfair competition claims, and a common law claim of unjust enrichment.

Plaintiffs' case is fatally flawed on multiple levels, not the least of which is that plaintiffs' alleged market of "interactive football software" is untenable. It is far-fetched, to say the least, for anyone to claim that NCAA and AFL branded football games are unique and better constraints on *Madden NFL* than the many other—more popular—video games released in the same time frame.

But the gerrymandered market aside, the Complaint is facially deficient for two reasons. First, the federal antitrust claim is clearly barred by the *Illinois Brick* doctrine. With few exceptions, only direct purchasers may bring federal antitrust claims, and plaintiffs plead no facts that come close to any exception. Second, it is not illegal—under any theory—for EA to bid on exclusive licenses that intellectual property owners choose to offer. Exclusive intellectual property licenses are commonplace, and widely accepted in commerce and under the law as one legitimate way for an intellectual property rights holder to maximize the value of its property. Highly analogous case law holds that a sports league—in particular, the NFL—has the right to enter into exclusive rights agreements, and potential licensees have a right to bid on such licenses. *See American Needle, Inc. v. NFL*, No. 07-4006, 2008 U.S. App. LEXIS 17553, 2008 WL 3822782 (7th Cir. Aug. 18, 2008) (dismissing antitrust claims against the NFL and its exclusive apparel licensee, Reebok). Under this authority, it is clear that the NFL-EA agreement is perfectly lawful.

It makes no difference that EA also bid on and obtained exclusives from the AFL and NCAA. Plaintiffs do not put much weight on these licenses, conceding that the NFL license is much more significant commercially. Regardless, those leagues also had legal rights to license exclusively, and EA had a right to compete for those licenses. Antitrust law does not limit EA's pursuit of the license rights that sports leagues and others offer videogame developers. It is distinctly anticompetitive for plaintiffs to suggest otherwise, as any such rule would deny the licensors the benefits of bidding competition.

Accordingly, all of plaintiffs' claims are deficient as a matter of law, and plaintiffs have no prospect of amending them to cure the defects. The Court should dismiss the Complaint.

## II. STATEMENT OF ISSUES TO BE DECIDED

1. Whether plaintiffs' Sherman Act § 2 claim is barred by the *Illinois Brick* doctrine, which prohibits indirect purchasers from recovering overcharges premised on the anticompetitive conduct of manufacturers or remote sellers;
2. Whether it was an unlawful act of monopolization (under state or federal law) for EA to acquire exclusive licenses of intellectual property rights from three football leagues;

3. Whether plaintiffs lack standing to maintain state antitrust claims under the laws of the eighteen states where none of the plaintiffs reside; and whether plaintiffs have stated a claim under any such statutes;
4. Whether plaintiffs have stated a claim under the consumer protection statutes of California and the District of Columbia;
5. Whether plaintiffs lack standing to maintain state consumer protection claims under the laws of the eighteen states where none of the plaintiffs reside; and whether plaintiffs have stated a claim under any such statutes;
6. Whether plaintiffs' attempt to bring an action on behalf of a nationwide class under California law fails the Supreme Court's *Shutts* test; and
7. Whether plaintiffs' Fourth Cause of Action for unjust enrichment is improper under California law.

## III. LEGAL STANDARD

A motion to dismiss tests the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6); *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). A complaint should be dismissed under Rule 12(b)(6) "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In ruling on a motion to dismiss, a court must accept as true all material allegations of fact in the complaint, but need not accept conclusory allegations or unwarranted inferences. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996); *see also In re Netflix Antitrust Litigation*, 506 F. Supp. 2d 308, 313-14 (N.D. Cal. 2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

The Supreme Court recently addressed pleading standards in general—and antitrust pleading standards in particular—in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007). Stressing the dangers of permitting costly antitrust litigation to proceed based on speculation and conclusory allegations, the Court held that a complaint must contain "enough facts to state a claim to relief that is plausible on its face," *id.* at 1974, and that "raise a right to relief above the

speculative level." *Id.* at 1965. Stated simply, the Court required plaintiffs to plead facts sufficient to "nudge[] their claims across the line from conceivable to plausible," or suffer dismissal. *Id.* at 1974. The Court "retired" the oft-quoted statement from *Conley v. Gibson*, 355 U. S. 41, 45-46 (1957), that a complaint cannot be dismissed on the pleadings "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S.Ct. at 1968 ("[A]fter puzzling the profession for 50 years, this famous observation has earned its retirement.").

In the single year since *Twombly* was decided, courts have become noticeably less tolerant of improperly pleaded complaints, including antitrust complaints that contain conclusory or implausible market definitions.[1] As one court noted, "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsels against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *International Norcent Technology v. Koninklijke Philips Electronics N.V.*, No. 07-00043, 2007 U.S. Dist. LEXIS 89946, at *17, 2007 WL 4976364, at *5 (C.D. Cal. Oct. 29, 2007) (citing *Twombly*).

## IV. PLAINTIFFS' ANTITRUST ALLEGATIONS FAIL TO STATE A CLAIM

### A. The Material Allegations

The material allegations stated in the Complaint are sparse, at best. Plaintiffs are consumers who purport to sue on behalf of a putative class of "all persons in the United States who purchased and/or licensed from Electronic Arts a copy of interactive football software with a release date of August 2005 or later." Compl. ¶ 22. The proposed class is specifically defined to exclude direct purchasers. *Id*. The heart of the Complaint is that: "Through an unlawful and anticompetitive series of exclusive agreements with the National Football League, the NFL

---

[1] *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191 (C.D. Cal. 2008); *McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*, No. 08-00080, 2008 U.S. Dist. LEXIS 47428, 2008 WL 2437739 (D. Haw. June 17, 2008); *Person v. Google, Inc.*, No. 06-7297, 2007 U.S. Dist. LEXIS 47920, 2007 WL 1831111 (N.D. Cal. June 25, 2007); *see also Mich. Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726 (6th Cir. 2008); *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007).

Players Union, Arena Football League and the National Collegiate Athletic Association ("NCAA"), Electronic Arts has driven its competition out of the market for interactive football software … and has prevented additional competitors from entering the market." *Id*. ¶ 1. The Complaint alleges that EA entered into an exclusive agreement with the NFL and its Players Association in December 2004, with the AFL in January 2005, and with the NCAA in April 2005. *Id*. ¶ 13-14. The Complaint also alleges that "[a]s a direct result of this anticompetitive conduct, the price of interactive football software has soared…." *Id*. ¶ 1.

### B. Plaintiffs' Section 2 Claim Is Barred by the *Illinois Brick* Doctrine

Plaintiffs allege that they purchased *Madden NFL*—the allegedly monopolized product developed and distributed by EA—from Best Buy and Gamestop retail stores. Comp. ¶¶ 2-3. Plaintiffs do not claim that they had any direct dealings with EA. Additionally, plaintiffs purport to sue on behalf of a class of consumers who also purchased EA "interactive football software," *excluding* "persons purchasing directly from Electronic Arts." *Id*. ¶ 22. In short, plaintiffs admit that they and the class they seek to represent are indirect purchasers.

Thirty years ago in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that federal antitrust laws prohibit indirect purchasers from recovering overcharges premised on the anticompetitive conduct of remote sellers. The *Illinois Brick* doctrine continues to be applied vigorously by the federal courts, resulting in the routine dismissal of claims by indirect purchasers for damages under federal law. *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp. 2d 1011, 1025 (N.D. Cal. 2007) ("[T]here is virtually no monetary federal antitrust remedy for indirect purchasers.").

There are a few narrow exceptions to the *Illinois Brick* doctrine, where indirect purchasers might be permitted to press forward under federal antitrust law.[2] However, these exceptions are implausible in the case at hand. Plaintiffs have not even attempted to plead the

[2] For example, indirect purchasers may be able to obtain damages under federal antitrust law if (i) the defendant either owns and controls the direct purchaser, *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326-27 (9th Cir. 1980), or (ii) plaintiffs have expressly secured the right to pursue such claims on the direct purchaser's behalf, *Sullivan v. NFL*, 34 F.3d 1091, 1106 (1st Cir. 1994). *See also* ABA Section of Antitrust Law, Antitrust Law Developments 832-33 (6th ed. 2007).

facts necessary to trigger any such exception. Consequently, plaintiffs' First Cause of Action, alleging a Sherman Act § 2 claim, must be dismissed.

### C. Plaintiffs' Monopolization Claim Fails Because the Alleged Harm Arises from Lawful Exclusive Licenses of Intellectual Property Rights

All of plaintiffs' antitrust claims (both federal and state) fail for yet another reason: it is not illegal—under any theory—for EA to bid on exclusive licenses that intellectual property owners choose to offer. The crux of the plaintiffs' monopolization theory is that EA entered into an exclusive license with the NFL to end competition with Take-Two Interactive ("Take-Two"), thereby allowing EA to raise the price of *Madden NFL* above competitive levels. Stated simply, the plaintiffs claim that EA and the NFL contracted to create an unlawful monopoly.[3] The claim that EA's exclusive license with the NFL harmed competition by enhancing EA's market power is fatally flawed. Indeed, this very proposition—involving essentially the same intellectual property rights—was recently addressed and rejected by the Seventh Circuit in *American Needle, Inc. v. NFL*, No. 07-4006, 2008 U.S. App. LEXIS 17553, 2008 WL 3822782 (7th Cir. Aug. 18, 2008).

In *American Needle*, the plaintiffs challenged the NFL's decision to end all intra-brand competition for NFL-branded apparel, by agreeing to license its trademarks and other intellectual

[3] Under plaintiffs' theory of the case, the NFL was obligated to continue licensing its bundle of IP rights to Take-Two, even if the NFL determined that Take-Two's pricing policies (i) undervalued its IP rights (from which it derives royalty income) and (ii) was fundamentally inconsistent with its brand image. Moreover, under plaintiffs' theory, the NFL would be left with no recourse to revisit its licensing strategy if it believed that intra-brand competition was decreasing the ability or incentive of its licensees to invest in research and development at optimal levels. For the reasons discussed more fully below, *see infra*, there is simply no support in the law for any argument that the rights of an IP owner are compromised in this way. To the contrary, antitrust law "does not itself impose an obligation" to license intellectual property rights; "such an obligation would … conflict directly with the rights granted to an intellectual property owner by the intellectual property laws." Herbert Hovenkamp, et al., *IP and Antitrust* §13.2b (2002 ed. & Supp. 2007). Indeed, it is universally accepted that an IP holder is free to select the licensing partner(s) that it believes will prove to be the best steward of its brand. *See, e.g.*, Gregory J. Werden, *Antitrust Analysis of Joint Ventures*, 66 Antitrust L.J. 701, 730 (1998) (noting that antitrust law does not prevent an owner of valuable trademarks from licensing exclusively to a desired partner, because any rule to the contrary is "particularly likely to impede rather than promote competition when the access sought is to a brand. The value of the brand can be significantly reduced by the conduct of a single licensee.").

property to Reebok on an exclusive basis. In previous years, the NFL had licensed the same bundle of rights to multiple clothing manufacturers. The Seventh Circuit held that the plaintiff had "no colorable claim that the NFL teams and NFL Properties created a monopoly by awarding Rebook the exclusive" license, 2008 U.S. App. LEXIS 17553, at *22-23, 2008 WL 3822782, at *8, because the NFL teams are "free under § 2 [of the Sherman Act] to license their intellectual property on an exclusive basis," even if that decision "reduce[s] the number of companies to whom they grant licenses." *Id*. (citing *Chicago Prof. Sports Ltd v. NBA*, 95 F.3d 593, 598 (7th Cir. 1996) (holding that "the producers of Star Trek may decide to release two episodes a week and grant exclusive licenses to show them, even though this reduces the number of times episodes appear on TV in a given market.").[4]

*American Needle* confirms that even if the grant of an exclusive license has the potential to enhance the market power of a single developer—or hinder the ability of unlicensed developers to compete in the market—the conduct is not actionable where the license is between non-competitors.[5] Rather, any such "exclusionary effects" fall properly within the exclusionary scope of the IP rights conferred and, therefore, are beyond reproach. *Id*.; *see also Fleer Corp. v. Topps Chewing Gum*, 658 F.2d 139, 154 (3d Cir. 1981) (holding that although an exclusive license with MLB Players Association "might depress the overall sales of baseball products," the exclusive license "is not evidence of [illegal] monopoly power. Rather, it reflects that not every opportunity for a publicity license must be used. The right to withhold and negotiate publicity

---

[4] *See also American Needle, Inc. v. New Orleans Louisiana Saints*, 496 F. Supp. 2d 941, 942 & n.2 (N.D. Ill. 2007) (dismissing the complaint on the grounds that "the owner or licensor of intellectual property can grant a license to one or to many," and whether the designated exclusive licensee "urged, solicited, or vigorously argued for the change [from a non-exclusive to exclusive license] is irrelevant."), *aff'd sub nom. American Needle, Inc. v. NFL*, No. 07-4006, 2008 U.S. App. LEXIS 17553, 2008 WL 3822782 (7th Cir. Aug. 18, 2008).

[5] The U.S. antitrust agencies recognize that exclusive licenses between parties that stand in a vertical relationship rarely, if ever, generate antitrust concerns. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 4.1.2 (1995) ( "Generally, an exclusive license may raise antitrust concerns only if the licensees themselves, or the licensor and its licensees, are in a horizontal relationship."); *see also* Herbert Hovenkamp, et al., *IP and Antitrust* §13.2c (2002 ed. & Supp. 2007) ("An antitrust violation is even less likely where the intellectual property owner does not compete directly with the disfavored licensee.").

selectively for economic gain is implicit in the very nature of the right of publicity."). For this reason, courts readily acknowledge that "there is no argument that [a licensor] would have violated antitrust law … had it granted an exclusive, nonassignable license." *Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 74 (7th Cir. 2003).[6]

*American Needle* is not an aberration. In fact, exclusive licensing of IP rights by professional sports leagues is common place, and federal courts have consistently rejected challenges to these exclusive licensing arrangements. *See, e.g., Fleer Corp.*, 658 F.2d at 140, 150-54 ("[S]eries of interlocking exclusive licensing contracts" relating to trademarks did not violate the Sherman Act; "as a licensor, the MLBPA is free to grant licenses to any competitor, or none at all."); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186 (2d Cir. 1992) (affirming dismissal of a § 2 challenge involving exclusive licensing of trademarks by the NFL and other professional sports leagues); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 775 F. Supp. 536 (N.D.N.Y. 1991) (holding that licensee could protect interests in legitimate exclusive licenses).[7] Consequently, plaintiffs' Complaint fails—as a matter of law—at the threshold.

---

[6] *See also United States v. Westinghouse*, 648 F.2d 642, 647 (9th Cir. 1981) ("The right to license [a] patent, exclusively or otherwise, or to refuse to license at all, is the 'untrammeled right' of the patentee."); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 949 (Fed. Cir. 1993) ("[T]he grant of an exclusive license is a lawful incident of the right to exclude…. The University's right to select its licensees, the decision to grant exclusive or non-exclusive licenses … and the pursuit of optimum royalty income, are not of themselves acts in restraint of trade."); 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 711b (2d ed. 2002) ("All forms of intellectual property have in common that the holder, even a monopolist, is ordinarily free either to license the property right to others or to use it exclusively. Antitrust compels licensing of copyrights, trademarks, or trade secrets even less often than it compels the licensing of patents."); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §18.48 (2008) (noting that trademark law, unlike copyright and patent laws, requires the trademark owner to maintain tight control over its trademark or else the trademark may become invalidated: "Uncontrolled licensing may well cause a designation to lose its meaning as a trademark.").

[7] It should come as no surprise that antitrust law allows IP holders to engage in exclusive licensing strategies. There are compelling, pro-competitive justifications in favor of exclusive licensing. Most notably, the strategy is widely recognized as the best method of encouraging licensees to invest heavily in the development and dissemination of the IP rights. *See, e.g., Cook, Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 740 (7th Cir. 2003) (emphasizing that an owner of intellectual property "can ordinarily be expected … to grant an exclusive license in order to encourage the licensee to invest in the further development of the licensed process or product.").

### D. Plaintiffs Fail to State a Plausible Claim that EA Has Enhanced Its Market Power Through the Unlawful Acquisition of Allegedly Related IP Rights

As indicated, the grant of an exclusive license alone cannot form the basis of a monopolization claim. Accordingly, to survive summary dismissal, plaintiffs must adequately allege that EA has engaged in other actions that have unlawfully enhanced its ability to raise prices on *Madden NFL*—over and above—any such power that may have been lawfully conferred through its exclusive license with the NFL.[8] Presumably, plaintiffs will assert that EA's licenses with the NCAA and AFL, when coupled with its NFL license, qualify as the requisite anticompetitive conduct, on the theory that EA erected "substantial barriers to entry and expansion," Compl. ¶ 34, by "prevent[ing] Take-Two and others from re-entering the market with non-NFL branded interactive software." *Id.* ¶ 16. Such a theory is completely inadequate. There is simply no basis in antitrust law to support a claim that, if successful, would abridge the rights of the NCAA and AFL to solicit and accept an offer of an exclusive license from its preferred development and distribution partner.[9]

To the contrary, federal courts have consistently held that where, as here, the IP licenses at issue are for a short-duration, and subject to regular rebidding, the law should promote, rather than prohibit, competition among prospective licensees for such exclusive contracts. The Seventh Circuit's opinion in *Paddock Publications, Inc. v. Chicago Tribune Company*, 103 F.3d

---

[8] In *Verizon Comm. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004) the Supreme Court held that a monopolization claim cannot be premised on the exercise of market power that is lawfully obtained, such as that which flows from superior business acumen or a proper grant of exclusive IP rights; rather, only illegal, anticompetitive conduct that enhances market power can trigger Sherman Act Section 2 claim. *Id*. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an importantly element of the free-market system…. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.") (emphasis in original).

[9] The plaintiffs' premise, if allowed, would lead to the perverse result of prohibiting the NCAA and AFL from soliciting and accepting competitive offers from their preferred licensees, and denying them the opportunity to partner with the licensee they deem to be best positioned to develop, disseminate, and monetize their intellectual property rights. There is no support in the law indicating that Section 2 was intended to abrogate the value of a licensor's IP rights in this way. To the contrary, antitrust tribunals should not proscribe a legitimate owner of intellectual property from maximizing its innovation profits. 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 720a, 720b (2d. ed. 2002).

42 (7th Cir. 1997), is particularly instructive. In *Paddock*, Judge Easterbrook illustrated the point with a hypothetical, stating:

> Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common. Every year or two, General Motors, Ford, and Chrysler invite tire manufacturers to bid for exclusive rights to have their tires used in the manufacturers' cars. *Exclusive contracts make the market hard to enter in mid-year but cannot stifle competition over the long run, and competition of this kind drives down the price of tires, to the ultimate benefit of consumers*.

*Id*. at 45 (emphasis added). Showing little sympathy for the claim that defendants had monopolized the market for supplemental news services by locking up a number of exclusive licenses, Judge Easterbrook went on to conclude that "this case does not involve a single facility that monopolizes one level of production and creates a potential to extend the monopoly to others…. Other firms that want to enter the market can do so by competing at intervals for these contracts." *Id*. Therefore, plaintiffs "should try to outbid [defendants] in the marketplace, rather than to outmaneuver them in court." *Id*. at 47.

In a case analogous to the matter at hand, the Third Circuit tackled the issue of whether Section 2 precluded a manufacturer of baseball cards from securing exclusive licenses from all Major League Baseball players and its Players Association. *See Fleer Corp. v. Topps Chewing Gum*, 658 F.2d 139, 140, 154 (3d Cir. 1981). The Court concluded that "merely because Topps, through individual contracts with every minor league player, managed to obtain license agreements with all major league players does not make the aggregation of these contracts an unlawful combination in restraint of trade." *Id.* at 149-50. A critical factor in the Court's decision was that the exclusive licenses at issue were for only five years; consequently, the defendant had not absolutely foreclosed competition for subsequent contracts with (i) the players union, (ii) major league players who may wish not to renew their contracts, or (iii) minor league players yet to reach the major leagues. *Id*. Notably, the court emphasized the fact "that such a program of head-to-head competition might take six or seven years to bear fruit does not make Topps' agreements anticompetitive." *Id.*; *see also Lawlor v. National Screen Service Corp.*, 270 F.2d 146, 154 (3d Cir. 1959) (holding that an accumulation of exclusive licenses with major film

studios to create and distribute promotional materials were not anticompetitive, in part because exclusive licenses were limited in duration to five years).[10]

Here, plaintiffs allege no facts suggesting that Take-Two or any other video game publishers are incapable of competing for future licenses with the NFL, NCAA, or AFL. To the contrary, plaintiffs acknowledge that the challenged licenses will be renegotiated in the next four years, Compl. ¶ 17, making them shorter in duration than those at issue in *Fleer* or *Lawlor*. Consequently, the fact that EA has an exclusive license with not only the NFL, but also the NCAA and the AFL, does not change the analysis; under controlling law, these exclusive licenses are immune from antitrust challenge. *American Needle*, 2008 U.S. App. LEXIS 17553, at *22-23, 2008 WL 3822782, at *8.

### E. Plaintiffs' Alleged Violation of the California Cartwright Act Fails to Plead Facts Sufficient to State a Plausible Conspiracy Claim under *Twombly*

Plaintiffs fail to allege a recognizable claim under California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*. (the "Cartwright Act").

The Cartwright Act prohibits agreements to restrain trade. *Id*. §§16720, 16726. California law requires a "high degree of particularity in the pleading of Cartwright Act violations," and generalized allegations of antitrust violations usually are insufficient. *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 196 (1999) (summarizing Cartwright Act law). Cartwright Act claims "are properly dismissed where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities maintaining separate and independent interests combined for the purpose of restraining trade." *In re Netflix Antitrust Litigation*, 506 F. Supp. 2d 308, 320-321 (N.D. Cal. 2007) (citation omitted) (dismissing Cartwright allegations). This is consistent with the recent U.S. Supreme

---

[10] Cases such as *Kobe v. Dempsey*, 198 F.2d 416 (10th Cir. 1952), which deal with the permanent acquisitions of all relevant patents in an industry, some of which were acquired from competitors, are not on point. *Kobe* and similar cases are readily distinguishable from the case at hand, where the IP licenses in question are (i) between non-competitors; (ii) for a short-duration (i.e., not a purchase of the underlying IP right); and (iii) limited to branding rights (i.e., trademarks and publicity licenses), which unlike patents or copyrights, do not foreclose entry or the manufacture of identical products.

Court precedent in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), where the Court established that in order to plead a sufficient conspiracy claim under Section 1 of the Sherman Act in federal court, a plaintiff must plead a "plausible" conspiracy grounded in some minimum facts necessary to satisfy the Rule 8 requirement that the plaintiff is entitled to relief. *See id.* at 1964-65 (2007) (finding that in pleading a Section 1 claim, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

Here, plaintiffs have not pleaded any plausible conspiracy for which they would be entitled to relief under a Cartwright Act claim. The sum total of plaintiffs' conspiracy allegations are that, "by signing the exclusive agreements as alleged above," EA has "conspired, and agreed and continues to combine, conspire and agree to unreasonably restrain and monopolize the market for interactive football software." Compl. ¶ 42. This cursory allegation is hopelessly vague, being nothing more than a mere recitation of the language in the statute, and fails even to clearly identify with which entity or entities EA is alleged to have conspired.

Moreover, there is no possibility of amending to cure this defect. As explained above, the alleged conduct simply is not, as a matter of law, a restraint of trade that entitles plaintiffs to relief. Rather, it is a lawful act by the NFL, NCAA, and AFL to practice their intellectual property as they see fit. *See supra* Section IV.C. In fact, this Court has held that parties to an exclusive license who are not competitors are legally incapable of "conspiring" in violation of the antitrust laws. *See Levi Case Co. v. ATS Prods.*, 788 F. Supp. 428, 431-32 (N.D. Cal. 1992); *see also Jack Russell Terrier Network v. American Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) (citing with approval *Levi Case Co.* as a logical extension of the *Copperweld* rule baring antitrust conspiracy challenges to contracting parties that lack independent economic interests).[11] Plaintiffs' Cartwright Act claim therefore must be dismissed with prejudice.

---

[11] This Court has held that: "It is established that the interpretation of Sherman Act and Cartwright Act are to be interpreted in harmony with one another. Interpretation of federal antitrust law is, moreover, applicable to the Cartwright Act." *Davis v. Pac. Bell*, 204 F. Supp. 2d 1236, 1243 (N.D. Cal. 2002) (citing *Redwood Theaters, Inc. v. Festival Enterprise*, Inc., 908 F.2d 477, 481 (9th Cir. 1990)); *see also*

### F. Plaintiffs' State Antitrust Claims Fail – Substantively and/or for Lack of Standing

In Count Five of the Complaint, plaintiffs' allege that EA has violated the antitrust laws of nineteen different states and the District of Columbia, based on the exact same facts alleged in support of the federal monopolization charge. Compl. ¶¶ 50-69. Notably, plaintiffs only seek to incorporate these state antitrust allegations into the Complaint if the Court does not apply California law to the purported nationwide class. *Id*. Regardless, each of plaintiffs' state antitrust claims set forth in Count Five fails as a matter of law.

First, plaintiffs' claim with regard to California Bus. & Prof. Code §§ 16700, *et seq*., as stated in ¶ 51, is wholly duplicative of Count Two of the Complaint (alleging a violation of the California Cartwright Act), and therefore, should be dismissed for the reasons already noted above. *See supra* Sections IV.C, IV.D, and IV.E.

Second, plaintiffs' claim with regard to the District of Columbia's antitrust statute, as stated in ¶ 52, should be dismissed for the same reasons that plaintiffs' federal monopolization claim fails. The structure and language of the District of Columbia's antitrust statute is virtually identical to analogue sections of the Sherman Act.[12] More importantly, the District of Columbia's antitrust statute provides that federal antitrust case law is authoritative when interpreting the companion provisions of the District of Columbia antitrust code.[13] Accordingly,

---

*Biljac Assoc. v. First Interstate Bank*, 218 Cal. App. 3d 1410, 1420 (1990) ("In antitrust actions brought under the Cartwright Act, we look to Interpretations of its federal law counterpart the Sherman Act… since the federal act was a model for our own in most respects."); *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 (1995) ("Because the Cartwright Act has objectives identical to the federal antitrust acts, the California courts look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act."); State Bar of California, *California Antitrust and Unfair Competition*, § 1.06 (3d. 2003) ("[T]he Cartwright Act was directly based on the Sherman Act and that Sherman Act cases are of great significance in the interpretation of the Cartwright Act.").

[12] *Compare* D.C. Code Ann. § 28-4503 ("Monopolization": "It shall be unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the District of Columbia.") *with* the Sherman Act § 2 ("Monopolizing trade": It shall be unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . .").

[13] D.C. Code Ann. § 28-4515 (courts "may use as a guide interpretations given by federal courts to comparable antitrust statutes.").

courts have relied on the well-developed body of federal case law when interpreting the District of Columbia's antitrust statute, and not one court—state or federal—has construed the relevant provisions in a manner that purports to expand or contract the conduct proscribed by the Sherman Act.[14]

Finally, the plaintiffs lack standing to pursue the remainder of the state antitrust claims set forth in Count Five. The named plaintiffs purport to have purchased copies of *Madden NFL* at retail stores in California and Washington, DC, their respective places of residence. Compl. ¶¶ 2-3. The Complaint contains no other allegations that plaintiffs have lived in, or purchased additional copies of *Madden NFL*, in states other then their places of residence during the relevant time frame. This Court has squarely held that plaintiffs may not avail themselves of the protections of the antitrust laws of states for which they are not residents. *See In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (granting motion to dismiss; holding that indirect purchasers lacked standing to assert state antitrust claims for states in which they do not reside).[15] Because "at least one named plaintiff must have standing with respect to each claim the class representatives seek to bring," claims based on state laws where no named plaintiff resides must be dismissed. *Id.* Here, the Court must dismiss—as a matter of law—plaintiffs' claims relating to the eighteen states for which the named plaintiffs' are non-residents.

---

[14] *See United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 54 (D.D.C. 2000) (same evidence relevant to the Court's determination under Section 2 of the Sherman Act controls under the comparable D.C. Code); *WAKA, LLC v. DC Kickball*, 517 F. Supp. 2d 245, 253 (D.D.C. 2007) ("Because defendants have not sufficiently alleged a violation of Section 1 of the Sherman Antitrust Act in their counterclaims, they also fail to state a claim under D.C. law prohibiting contract, combination, or conspiracy to restrain trade.").

[15] *See also In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1368-71 (S.D. Fla. 2001). In *Terazosin*, indirect purchasers sued under the Sherman Act and eighteen state antitrust laws. The Court summarily dismissed the Sherman Act claim under *Illinois Brick*, as well as the state antitrust claims where the *Illinois Brick* had not been expressly repealed. For the remaining states, the named plaintiffs argued that they could sue under state laws where they did not reside "in a representative capacity without personally having standing to assert them." *Id*. at 1371. The district court disagreed. *Id*. at 1371-72 & n.5. The court noted that each state law "claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Id*. at 1371 (quoting *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987)). For states where there was not a named plaintiff, the court held there was not a plaintiff who was within the state statute's zone of interest and dismissed those claims on standing grounds. *Id*.

EA further submits that even if the plaintiffs had standing to assert antitrust claims of non-resident states—which they do not—such claims would fail for a host of additional reasons, including:

- Plaintiffs cannot state a claim under the antitrust laws of California, Kansas, New York, and Tennessee because those state statutes refer only to concerted action and have been interpreted by courts in those states as inapplicable to unilateral conduct.[16]
- Plaintiffs' claim under the antitrust law of New York also fails because private persons are precluded from bringing a class action under the New York statute.[17]
- Mississippi, Nevada, South Dakota, Tennessee, and Wisconsin have expressly limited the purview of their antitrust statutes to conduct that is predominantly intrastate in nature.[18]
- Any antitrust claim asserted under the laws of Arizona, the District of Columbia, Iowa, Maine, Michigan, Nebraska, New Mexico, North Dakota, South Dakota, Vermont, West Virginia, and Wisconsin fails for the same reasons that plaintiffs federal monopolization claim fails, as there is no appreciable difference between the conduct prescribed by Section 2 of Sherman Act and the conduct proscribed by the companion provisions of these states.[19]

## V. PLAINTIFFS' CLAIMS UNDER THE STATE CONSUMER PROTECTION STATUTES MUST BE DISMISSED

Count Three of the Complaint alleges that EA violated the consumer protection law of California, Cal. Bus. & Prof. Code § 17200, and Count Six alleges that EA violated the consumer protection statutes of eighteen states and the District of Columbia. Compl. ¶¶ 44-45, 73-91. These allegations are premised on the exact same facts alleged in support of the federal

---

16 *See e.g.*, Cal. Bus. & Prof. Code §§ 16720, 16726 (providing that, under the California antitrust statute, plaintiff must allege a "combination."); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (holding that a challenge to unilateral conduct is not cognizable under California's Cartwright Act because it does not involve a combination); Kan. Stat. Ann. §50-132 (prohibiting combinations and conspiracies only); Tenn. Code. Ann. §47-25-101 (prohibiting "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations… ."). *See also* Appendices I and III.

17 *See e.g., Cox v. Microsoft Corp.*, 737 N.Y.S.2d 1, 2 (N.Y. App. Div. 2002) ("Private persons are precluded from bringing a class action under the Donnelly Act… ."). *See also* Appendices I and III.

18 *See, e.g., In re Microsoft Corp. Antitrust Litig.*, Nos. MDL 1332, 2003 U.S. Dist. LEXIS 15612, at * 7-8, 2003 WL 22070561, *2 (D. Md. Aug. 22, 2003) (dismissing Mississippi antitrust claims where plaintiffs failed to allege that monopoly was accomplished "by any transactions lying wholly within the state"). *See also* Appendices I and III.

19 *See, e.g.*, Iowa Code § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter."). *See also* Appendices I and III.

monopolization charge and the California Cartwright Act claim. *Id.* With respect to Count Six, plaintiffs only seek to incorporate into the Complaint the state consumer protection statutes listed if the Court does not apply California law to the purported nationwide class. *Id.* ¶ 72. Regardless, each of the state consumer protection claims set forth in Counts Three and Six fails as a matter of law.

Plaintiffs summarize their consumer protection allegations as follows: "[a]s a direct and proximate result of Electronic Arts' unlawful conduct, class members in each of [the named] states have been injured in that they paid more for interactive football software than they would have but for the anticompetitive conduct alleged…." Compl. ¶ 92. Plaintiffs' alleged violations of the consumer protection laws fail for two reasons: first, plaintiffs have failed to state a cognizable cause of action under the laws of California and the District of Columbia, the only two consumer protection statutes under which they plausibly have standing to proceed; and second, plaintiffs lack standing to pursue claims under the laws of the eighteen states where no named plaintiffs resides.

### A. Plaintiffs Fail to Allege the Necessary Elements of a Claim Under the Consumer Protection Statutes of California and the District of Columbia

Plaintiffs' Third Cause of Action purports to allege a violation of the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200. Compl. ¶ 45. Plaintiffs alleged Section 17200 claim is expressly predicated on the alleged violations of the Sherman Act and the Cartwright Act that comprise plaintiffs' First and Second causes of action. *Id.* Consequently, plaintiffs' Section 17200 claim is limited—by its own terms—to the "unlawful" prong of that statute. Section 17200's unlawful prong borrows violations of other laws and treats them as independently actionable under the UCL. *See State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1103 (1996). It is hornbook law that where, as here, the complaint fails to state a violation of an underlying law, the Section 17200 claim on which it is premised also fails. *See, e.g., Ingels v. Westwood One Broadcasting Services, Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("[I]f the [underlying] claim is dismissed, then there is no unlawful act upon which to base the derivative Unfair Competition claim."); *Scripps Clinic v. Sup. Ct.*, 108 Cal. App. 4th

917, 938-939 (2003) (holding that the extinguishment of the borrowed violation extinguishes the UCL claim); *Krantz v. BT Visual Images*, 89 Cal. App. 4th 164, 178 (2001) (holding that the viability of an "unlawful" UCL claim will "stand or fall depending on the fate of the" underlying claim).[20] Several cases have applied this principle in the antitrust arena. *See, e.g., Agular v. Atlantic Richfield Co.*, 25 Cal. 4th 826, 866-67 (2001) (holding where a claim alleging conspiracy to violate the antitrust laws fails, it cannot be repled under the UCL).

Plaintiffs' allegation regarding Section 28-3904 of the District of Columbia Consumer Protection Procedures Act ("DCCPPA") also fails as a matter of law. The DCCPPA covers a number unlawful trade practices that are specifically defined in the statute, as well as all "[t]rade practices that violate other laws, including the common law." *Dist. Cablevision Ltd. P'shp v. Bassin*, 828 A.2d 714, 723 (D.C. 2003). If the alleged violation is not one of DCCPPA's specifically enumerated unlawful trade practices—none of which are remotely relevant in this case—then the plaintiff must allege, at a minimum, a violation of some other law in order for DCCPPA to have any remaining relevance. As such, any DCCPPA claims must be dismissed if plaintiffs fail to plead with specificity the enumerated practice or other legal violation necessary to trigger its application. *See, e.g., Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1025 (D.C. 2007); *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 30 (D.D.C. 2007) (dismissing plaintiff's DCCPPA claim on the ground that plaintiffs failed to allege facts to trigger liability under a separate, independent claim). Further, this Court has held that, with regard to DCCPPA claims premised on alleged antirust violations, not all types of anticompetitive conduct fall within DCCPPA's purview. To the contrary, the plaintiff must plead deceptive or unconscionable conduct in order to survive a motion to dismiss on such claims. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007) (noting that the mere allegation of price fixing is insufficient to trigger the "unconscionable conduct" element of DCCPPA, because "pleading unconscionability requires something more

---

[20] In addition, it is well settled that California's UCL does not apply to actions occurring outside of California that injured non-residents. *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222, 228 (1999); *Churchill Village v. General Electric*, 169 F. Supp. 2d 1119 (N.D. Cal. 2000).

than merely alleging that the price of a product was unfairly high.") (*citing Riggs Nat'l Bank of Washington D.C. v. D.C.*, 581 A.2d 1229, 1251 (D.C. 1990)). Here, plaintiffs' Complaint contains no allegations in support of its alleged violation of the DCCPPA, let alone the requisite allegations of deceptive or unconscionable conduct. Compl. ¶ 75. Accordingly, this claim fails as a matter of law.

### B. Plaintiffs Lack Standing to Assert Consumer Protection Claims under the Laws of the Eighteen States Where Neither Resides

As indicated, the two plaintiffs named in the Complaint reside in California and the District of Columbia. Compl. ¶¶ 2-3. As a matter of law, plaintiffs lack standing to pursue claims under the other eighteen state consumer protection laws identified in the Complaint because no named plaintiff resides in those states. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (granting motion to dismiss claims brought under states' consumer protection and antitrust laws where no named plaintiff resided); *see also In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1106-07 (N.D. Cal. 2007); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1370-72 (S.D. Fla. 2001).

Plaintiffs' lack of standing to assert a consumer protection claim under the law of the eighteen states where no plaintiff resides ends the inquiry for those state claims. It bears mentioning, however, that plaintiffs have failed to allege the necessary elements of a claim under many, if not all, of the state UCL laws cited:

- Plaintiffs have not alleged that EA has engaged in fraudulent or deceptive conduct, as required by the state consumer protection laws in Maine, Nevada, New York, and Vermont.[21]
- Plaintiffs have not alleged that EA has engaged in fraudulent or deceptive conduct, or an unconscionable trade practice as required by the consumer protection law in Arkansas, the District of Columbia, Idaho, Kansas, New Mexico, and Utah.[22]

---

[21] *See, e.g.*, Me. Rev. Stat. Ann. tit. 5, § 207; Nev. Rev. Stat. §§ 598.0915-918 (prohibiting deceptive trade practices, including making "false representations" and using "deceptive representations"); *Stutman v. Chemical Bank*, 731 N.E.2d 608, 611-12 (N.Y. 2000) (prevailing under N.Y. Gen. Bus. Law requires proof that defendant engaged in a "deceptive practice" that is "likely to mislead a reasonable consumer acting reasonably under the circumstances"). *See also* Appendix II and IV.

[22] *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) (holding that the DCCPPA prohibits deceptive and unconscionable conduct in consumer transactions,

- Plaintiffs fail to state a claim under the laws of Louisiana, New Mexico, and Rhode Island because those states' consumer protection laws bar consumer protection claims by indirect purchasers.[23]
- Plaintiffs fail to state a claim under the consumer protection laws of New Hampshire, North Carolina, and New York because those laws require predominately intrastate commerce to invoke their consumer protection acts.[24]
- Plaintiffs failed to comply with the statutory pre-filing notice requirements required under the consumer protection laws of Maine, Massachusetts, and West Virginia.[25]
- Plaintiffs have based their consumer protection claims solely upon their allegations that EA has violated antitrust laws. Under the consumer protection laws of California, Florida, Massachusetts, Nebraska, and New Hampshire, however, consumer protection claims based solely on alleged antitrust violations must be dismissed when the antitrust claim fails.[26]
- Plaintiffs' consumer protection claims fail under West Virginia and Rhode Island law, because those states' consumer protection laws do not provide causes of action for price restrictions and antitrust violations, respectively.[27]
- Plaintiffs' consumer protection claims under New York and Utah laws fail because

---

and that the plaintiff must plead deceptive or unconscionable conduct in order to survive a motion to dismiss); Kan. Rev. Stat. Ann. §§ 50-626, 50-627 (requiring that plaintiff prove a supplier "engage[d] in a deceptive act or practice in connection with a consumer transaction" or an "unconscionable act or practice in connection with a consumer transaction"). *See also* Appendix II and IV.

23 *See, e.g.*, *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 7 (D.D.C. 1999) (refusing to permit Louisiana plaintiff to state a claim for damages on behalf of indirect purchasers because to do so "would provide an end run around the Fifth Circuit's decision in" *Free v. Abbott Labs.*, 176 F.3d 298 (5th Cir. 1999) (holding that under Louisiana law, indirect purchasers do not have standing to bring antitrust claims after *Illinois Brick*)). *See also* Appendix II and IV.

24 *See, e.g.*, *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 504 (D.N.H. 1996) (holding that the use of the "within this state" language in the NHCPA "clearly indicates that the statute is only applicable if the offending conduct took place within the territorial borders of [New Hampshire]"); N.C. Gen. Stat. § 75-1, *et. seq.* (requiring that a plaintiff allege a substantial in-state injury). *See also* Appendix II and IV.

25 *See, e.g.*, Me. Rev. Stat. Ann. tit. 5, § 213(1-A) (requiring "a written demand for relief, identifying the claimant and reasonably describing the unfair and deceptive act or practice relied upon and the injuries suffered" at least thirty days before filing an action). *See also* Appendix II and IV.

26 *See, e.g.*, *Chavez v. Whirlpool Corp*., 93 Cal. App. 4th 363, 375 (2002) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."); *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-CV-1585-T-24MAP, 2005 U.S. Dist. LEXIS 43122, at *62-63, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005) (dismissing Florida consumer protection act claim because it was based on the same allegations as the antitrust claims and the court found no violation of the antitrust laws). *See also* Appendix II and IV.

27 *See, e.g.*, *In re Dynamic Random Access Memory ("DRAM") Antitrust Litig.*, 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007); *ERI Max Entertainment, Inc. v. Streisand*, 690 A.2d 1351 (R.I. 1997). *See also* Appendix II and IV.

those states' consumer protection laws bar class actions.[28]

## VI. PLAINTIFFS' ATTEMPT TO BRING A NATIONWIDE CLASS ACTION UNDER CALIFORNIA LAW FAILS THE SUPREME COURT'S *SHUTTS* TEST

In their Second and Third Claims for Relief, plaintiffs purport to bring an action on behalf of a nationwide class of indirect purchasers of "interactive football software" for violations of the Cartwright Act, Cal. Bus. & Prof. Code § 16720, and the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200. Compl. ¶¶ 41-45. (This is a thinly veiled attempt to end-run the limitations of *Illinois Brick*.) For the reasons discussed above, plaintiffs' Second and Third Causes of Action fail as a matter of law. Although the analysis can and should end here, plaintiffs' attempt to bring a nationwide class under California law fails for an additional, independent reason.

The Supreme Court's decision in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), definitively forecloses plaintiffs' effort to use California law as a substitute for a nationwide Sherman Act claim for damages.[29] In *Shutts*, the Supreme Court held that the application of Kansas law to the claims of plaintiffs in a nationwide class who were not from Kansas violated the defendants' due process rights because (1) applying Kansas law would yield a different outcome than would otherwise result if the nonresident plaintiffs brought their claims in their states of residence, and (2) the absence of the non-resident plaintiffs' connection to Kansas meant the parties had no reason to believe that Kansas law would control their conduct. *Id*. at 816-18, 822-23. Thus, before a nationwide class can invoke the law of a particular state under *Shutts*, the state's law must both (1) not conflict with the law of another jurisdiction that has an

---

[28] *See, e.g., Cunningham v. Bayer AG*, N.Y. Sup. Ct. Index No. *603820/00,* at 13 (Oct. 15, 2003), *aff'd* 804 N.Y.S.2d 924 (N.Y. App. Div. 2005); Utah Code § 13-11-19(4)(a). *See also* Appendix II and IV.

[29] Therefore, this Court should strike any references to the purported "nationwide class" that plaintiffs seek to represent under the Cartwright Act and the UCL from the Complaint. *Canon U.S.A., Inc. v. Superior Court*, 79 Cal. Rptr. 2d 897, 900 (Cal. Ct. App. 1998) (reversing denial of motion to strike references to a nationwide class at the pleading stage because "where the invalidity of the class allegations is revealed on the face of the complaint, and/or by matters subject to judicial notice, the class issue may be properly disposed of by demurrer or motion to strike."); *Util. Consumers' Action Network v. Powernet Global Commc'ns*, No. 06-1773, 2006 U.S. Dist LEXIS 78546, at *2 (S.D. Cal. Oct. 20, 2006) (same).

interest in the case, and (2) "have a significant contact or significant aggregation of contacts" to the claims asserted by each member of the plaintiff class, "contacts creating state interests," in order to ensure that the choice of the forum state's law "is neither arbitrary nor unfair." *Id.* at 818. Plaintiffs' Complaint fails on both scores.

First, the application of California law to claims brought by California nonresidents nationwide would pose dramatic conflicts.[30] In stark contrast to California law, the antitrust laws of *more than half* of all states preclude indirect purchasers from bringing a private claim.[31] To allow residents of these states to nevertheless seek damages from defendants under California's Cartwright Act where they did not live in California or buy their product in California would directly subvert the laws of the states in which they reside. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) is squarely on point. In *In re Graphics*, this court granted a motion to strike "all references to a nationwide class in indirect purchaser's claims under California's Cartwright Act and California's unfair-competition law." *Id*. at 1028. Although the complaint purported to name a nationwide class, the court held that under *Shutts*, application of California law to a nationwide class was unconstitutional. *Id*. at 1027-28. The court reasoned, in part, that although California allowed suits by indirect purchasers, application of California's antitrust law would conflict with the laws of states that do not. *Id*.[32]

---

[30] In ruling on plaintiffs' state law claims, this Court follows the rulings of the respective states' highest appellate courts. *See, e.g., Johnson v. Fankell*, 520 U.S. 911, 916 (1997) (noting that no federal court "has any authority to place a construction on a state statute different from the one rendered by the highest court of the State."). In the absence of a controlling decision by the state's highest court, the Court must also follow the holdings of a state's appellate court if those decisions are binding on all state trial courts. *See Gooding v. Wilson*, 405 U.S. 518, 525-26 n.3 (1972). Where the controlling courts in a state have not yet ruled on an issue—or where their rulings are ambiguous—the Court "must predict how the highest state court would decide the issue . . . ." *S.D. Myers, Inc. v. County of San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001).

[31] Alaska, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, New Hampshire, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Vermont, Virginia, Washington and Wyoming do not allow indirect purchasers to bring private suits under the state antitrust laws. ABA Section of Antitrust Law, *Indirect Purchaser Litigation Handbook* 305-341 (2007).

[32] *See also St. Paul v. FMC Corp*., No. 89-0466, 1990 U.S. Dist. LEXIS 18142, at *3, 1990 WL 265171, at *1 (D. Minn. Feb. 26, 1990) (granting motion to limit class allegations of an indirect

Second, plaintiffs fail to plead sufficient facts to show “significant” contacts with California such that application of California law to nonresidents would not be arbitrary or unfair. Again, *In re Graphics* is squarely on point. In striking the purported nationwide class, the court reasoned: “It is hard to see why the laws of other sates should be tossed overboard and their residents remitted to California law for transaction that, for individual consumers, are local in nature.” *Id*. at 1028. In this respect, *Util. Consumers’ Action Network v. Powernet Global Commc’n*, No. 06-1773, 2006 U.S. Dist LEXIS 78546, at *16 (S.D. Cal. Oct. 20, 2006), is also instructive. There, a putative nationwide class of plaintiffs alleged, among other things, violations of California’s Business and Professions Code in conjunction with overcharges that appeared on their long distance communications bills. *Id.* at *2-5. Defendants moved to strike the nationwide class allegations on the grounds that plaintiffs lacked sufficient contacts with California. *Id*. at *15-16. The court agreed. The court determined that “[a]pplying the forum state’s laws to parties located beyond the state’s borders, who have no relationship with the forum state, would abrogate the parties’ rights under the Due Process and Full Faith and Credit Clauses.” *Id.* at *16 (citing *Shutts*, 472 U.S. at 822).

The same result is required here. Plaintiffs do not allege that each member of the purported nationwide class has a sufficient contact to California to permit them to invoke California law. Moreover, the Complaint does not allege that the non-California plaintiffs actually bought “interactive football software” in California, nor does it allege that they ever agreed to be bound by California law. *See Shutts*, 472 U.S. at 822 (noting that in considering fairness, an important element is the expectation of the parties). In fact, for the portion of the class that does not reside in California and allegedly bought “interactive football software” manufactured by EA, plaintiffs do not plead that they had *any contact with California*, let alone a “significant contact” with California. *See Shutts*, 472 U.S. at 799, 822-23 (refusing to allow class to proceed under Kansas law where defendant was headquartered in Delaware, plaintiffs

---

purchaser complaint to cover residents of Minnesota only; holding that although the complaint named a nationwide class, application of Minnesota antitrust law to a nationwide class was unconstitutional under *Shutts*).

were spread out nationwide, and there was no evidence that when plaintiffs executed leases they intended to be bound by Kansas law).

Plaintiffs unpersuasively attempt to conceal the absence of "substantial contacts" with a handful of conclusory allegations. Specifically, plaintiffs broadly allege that "the unlawful course of conduct … was created, adopted, ratified and/or implemented in the corporate headquarters of Electronic Arts located in Redwood City, California. Upon information and belief, the Electronic Arts executives responsible for the series of anticompetitive agreements outlined above are based in California and a substantial part, if not all, the anticompetitive conduct took place in California." Compl. ¶ 19. These conclusory allegations are indistinguishable from those made and rejected in *In re Graphics* and *Util. Consumers' Action Network*.

Accordingly, this Court must dismiss plaintiffs' allegations that purport to bring a nationwide class action under California law. A decision to the contrary would not only render the substantive policy decisions made by the majority of the remaining forty-nine states and the District of Columbia ineffectual, but would create tremendous incentives for prospective indirect purchaser plaintiffs to forum shop for the most favorable law. The law, however, prohibits this outcome.

## VII. PLAINTIFFS' FOURTH CAUSE OF ACTION FOR UNJUST ENRICHMENT IS IMPROPER AND MUST BE DISMISSED

There is no cause of action in California for "unjust enrichment." The California appellate courts have expressly held that "[u]njust enrichment is not a cause of action… or even a remedy, but rather a general principle, underlying various legal doctrines and remedies…. It is synonymous with restitution." *McBride v. Boughton,* 123 Cal. App. 4th 379, 388 (2004); *see also Melchior v. New Line Productions, Inc.*, 106 Cal. App. 4th 779, 793 (2003) ("[T]here is no cause of action in California for unjust enrichment. The phrase 'unjust enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so."). Here, plaintiffs have not alleged any misconduct besides that which purportedly forms the basis for their antitrust and consumer protection claims.

Accordingly, the Fourth Cause of Action is simply a prayer for restitution, not an independent claim for relief that is not available pursuant to plaintiffs' statutory claims. As such it is complete surplusage and must be dismissed. Moreover, plaintiffs cannot seek restitution from EA—under any theory—because they have not conferred a direct and immediate benefit on EA, as they did not purchase EA's *Madden NFL* game directly from EA. *See, e.g.*, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003) (holding restitution under California law is limited to either "money or property that defendants took directly from plaintiff" or "money or property in which [the plaintiff] has a vested interest.").

## VIII. CONCLUSION

For the reasons stated above, the Court should dismiss plaintiffs' Complaint with prejudice.

Dated: August 25, 2008

Respectfully Submitted,

LATHAM & WATKINS LLP
Daniel M. Wall
Timothy L. O'Mara

By /s/ Daniel M. Wall
Daniel M. Wall
Attorneys for Defendant
ELECTRONIC ARTS INC.

SF\668092