IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GEOFFREY PECOVER and JEFFREY LAWRENCE, on Behalf of Themselves and All Others Similarly Situated,** | No   C 08-2820 VRW |
| Plaintiffs, | ORDER |
| v | |
| **ELECTRONICS ARTS INC, a Delaware Corporation** | |
| Defendant. | |

Plaintiff Geoffrey Pecover purchased an interactive video game software product entitled Madden NFL from a Best Buy store in Washington, D C; plaintiff Jeffrey Lawrence purchased a licensed copy of Madden NFL from a store in California.  Together plaintiffs now seek to represent a class and prosecute an action on behalf of all Madden NFL purchasers in the United States.  Electronic Arts, Inc (EA) produces Madden NFL.

Plaintiffs allege that EA foreclosed competition in a market for interactive football software by acquiring, in separate agreements, exclusive rights to publish video games using the trademarks and other intellectual property of "the only viable sports football associations and leagues in the United States." Doc #1 at 4. Plaintiffs allege six causes of action relating to this conduct: (1) violation of section 2 of the Sherman Act, 15 USC § 2; (2) violation of California's Cartwright Act, Cal Bus & Prof Code § 16700 et seq; (3) violation of California's Unfair Competition Act, Cal Bus & Prof Code § 17200 et seq; (4) unjust enrichment; and, in the event that the court does not apply California law on a nationwide basis, (5) violation of various other state antitrust and restraint of trade laws; and (6) violation of various state consumer protection and unfair competition laws.

EA moves to dismiss the complaint under FRCP 12(b)(6) on a variety of grounds. EA first attacks the section 2 claim as barred by the indirect purchaser doctrine set forth in <u>Illinois Brick Co v Illinois</u>, 431 US 720(1977). Second, EA argues that the conduct alleged in the complaint —— obtaining multiple exclusive licenses —— cannot violate antitrust laws as a matter of law because such a rule would deny licensors the benefit of bidding competition. Third, EA alleges that plaintiff's Cartwright Act claim fails because the relationships between the NFL, NCAA and the AFL and EA —— licensors and their exclusive licensee —— renders them incapable of conspiring to violate the antitrust laws. Finally, EA argues that plaintiffs do not have standing to bring state antitrust and unfair competition claims under the law of the eighteen states in which neither named plaintiff resides.

For the reasons stated herein, the motion to dismiss is GRANTED IN PART and DENIED IN PART. The court DENIES EA's motion to dismiss plaintiffs' Sherman Act section 2 claim, Cartwright Act claim and other claims under California and District of Columbia law. The court GRANTS EA's motion to dismiss claims five and six as they relate to states other than California and the District of Columbia.

I

A motion to dismiss under FRCP 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim." Navarro v Block, 250 F3d 729, 732 (9th Cir 2001). Because FRCP 12(b)(6) focuses on the sufficiency of a claim — and not the claim's substantive merits — "[o]rdinarily[] a court may look only at the face of the complaint to decide a motion to dismiss." Van Buskirk v Cable News Network, Inc, 284 F3d 977, 980 (9th Cir 2002).

A motion to dismiss should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp v Twombly, 550 US 544, 127 S Ct 1955, 1966 (2007). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Balistreri v Pacifica Police Dep't, 901 F2d 696, 699 (9th Cir 1990). Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Cahill v Liberty Mutual Ins Co, 80 F3d 336, 337–38 (9th Cir 1996). Moreover, all inferences reasonably drawn from these facts must be construed in favor of the responding party.

General Conference Corp of Seventh-Day Adventists v Seventh-Day Adventist Congregational Church, 887 F2d 228, 230 (9th Cir 1989).

A

The theories advanced by EA for dismissal of plaintiffs' claim under section 2 of the Sherman Act miss their mark.

EA's first attack —— that the Illinois Brick indirect purchaser doctrine bars plaintiffs' section 2 claim —— fails because the Illinois Brick indirect purchaser bar only bars antitrust claims for damages by indirect purchasers, whereas plaintiffs' section 2 claim seeks only injunctive relief. Doc #1 ¶ 40 at 7. In Illinois Brick, the Supreme Court reasoned that such suits would force courts to allocate illegal overcharges between middlemen and the ultimate consumers and thus add "whole new dimensions of complexity to treble damages suits and seriously undermine their effectiveness." 431 US at 737. The Court further reasoned that allowing damages suits by indirect purchasers would open the door to duplicative recovery from both direct and indirect purchasers. Id. Apportionment challenges and duplicative recovery simply do not come into play in suits seeking injunctive relief and thus Illinois Brick does not apply. See United States Gypsum Co v Indiana Gas Co, 350 F3d 623, 625-28 (7th Cir 2003) ("[T]he direct purchaser doctrine does not foreclose equitable relief * * * ."); Dickson v Microsoft Corp, 309 F3d 193, 213 n 24 (4th Cir 2002) ("Illinois Brick's indirect purchaser rule, when applicable, bars only compensatory damages relief and does not apply to injunctive relief."); In re Warfarin Sodium Antitrust Litig, 214 F3d 395, 399-400 (3d Cir 2000) ("Illinois Brick does not bar indirect purchasers' injunction claim.").

4

Next, EA contends that plaintiffs have not adequately alleged that interactive video football software —— the product market in which plaintiffs allege Madden NFL trades —— is a recognizable product market for Sherman Act purposes. The court disagrees. Paragraphs 15-16 contain plaintiffs' product market allegations:

> 15. As Electronic Arts well knew, consumers demand that the teams and players in interactive football software be identified with actual teams and players. This is only achievable through a license with a sports league and associated players associations. There is essentially no demand and therefore no market for interactive football software that is not based on real life teams and/or players. Electronic Arts recognizes this fact in its annual report to investors where it notes that if it were "unable to maintain" licenses with "major sports leagues and players associations" its "revenue and profitability will decline significantly."
>
> 16. By signing the exclusive agreement with the NFL, Electronic Arts immediately killed off Take Two's NFL 2K5 software, the only competing interactive football product of comparable quality to its Madden NFL franchise. Through its agreements with the NCAA and AFL, Electronic Arts prevented Take Two and others from re-entering the market with non-NFL branded interactive football software. Once again without a competitor, Electronic Arts raised its prices dramatically. Specifically, Electronic Arts raised the price of the Madden 2006 videogame (released in August of 2005) nearly seventy percent to $49.95. Electronic Arts currently sells interactive football software for up to $59.95.

Doc #1 at 4-5.

As the court understands these allegations, interactive football software will not sell if it does not use the names, logos and other markers of teams that actually compete in the NFL; there is, in effect, no market for interactive football software in a virtual or fictitious setting. If true —— as the court must at this point accept —— this adequately alleges that there are no

substitutes for interactive football software without the markers of actual teams and players.

Plaintiffs do not, however, allege that there are no substitutes for interactive football software. One does not need to be a devotee of video games to recognize that any such claim would be implausible and possibly subject to dismissal under the instructions of the Supreme Court in <u>Bell Atlantic Corp v Twombly</u> to allege antitrust claims with a measure of plausibility. The court qualified this statement because <u>Twombly</u> involved a claim that conduct parallel in nature violated section 2. As parallel conduct is not itself illegal, the Supreme Court held that enough plausible facts must be alleged to take the conduct or issue out of the realm of legality. <u>Twombly</u>, 550 US at 556. Recently, the Supreme Court extended this reasoning to a case involving a somewhat analogous safe harbor from liability: qualified immunity. <u>Ashcroft v Iqbal</u>, ___ US ___, 129 S Ct 1937, 1949-51 (2009). Whether the plausibility requirement will be imposed in cases not involving safe harbors of this kind remains to be seen. In any event, no such safe harbor appears in the facts before the court here and the court presumes that other forms of interactive video game software would substitute for interactive video football software. So the question is whether interactive football software is sufficiently distinct or appealing to consumers to constitute a recognizable product market.

In attempting to allege a distinct product market, plaintiffs appear to adopt the market definition approach of the <u>Horizontal Merger Guidelines</u> propounded by the United States Department of Justice and the Federal Trade Commission in 1997. The Guidelines define a market by asking whether a potential monopolist

6

could profitably impose a "small but significant and nontransitory increase" in price. Horizontal Merger Guidelines § 1.11. A positive response suggests very limited functional interchange-ability for the product in question and, for antitrust purposes, a distinct product market.

Plaintiffs allege that EA's exclusive agreement with the NFL "killed off" the only other allegedly competitive interactive software and allowed EA to raise its prices "dramatically." Doc #1 at 5. For purposes of pleading the claims at bar, these allegations suffice to allege a product market.

EA devotes much of its attention to American Needle, Inc v National Football League, 538 F3d 736 (7th Cir 2008), which held that an exclusive licensing contract between the NFL and Reebok, which manufactures football headwear, did not constitute an unreasonable restraint of trade in violation of section 1. The plaintiff had contended that the individual teams in the NFL were separate entities, so that the league's agreement with Reebok was unlawful horizontal or coordinated conduct. Id at 741. The district court, granting summary judgment, had found that the NFL was a "single-entity" in that "the teams' individual success is necessarily linked to the success of the league as a whole" and hence rejected plaintiff's contention that the license represented coordinated action. Id at 737. Without definitively resolving the single-entity question for all purposes, the court of appeals focused on whether the agreement before it "deprived the market of independent sources of economic power" and, affirming, concluded that the agreement did not do so. Id at 743-44. The court reached this conclusion because it viewed the joint licensing of NFL

7

intellectual property as intended to promote NFL football as against other forms of entertainment. Id at 744. The court opined:

> [T]he failure of American Needle's §1 claim necessarily dooms its §2 monopolization claim. As a single entity for the purpose of licensing, the NFL teams are free under §2 to license their intellectual property on an exclusive basis even if the teams opt to reduce the number of companies to whom they grant licenses.

Id (citations omitted).

American Needle is inapposite here. The defendants there were the licensors of intellectual property, not, as in the case at bar, the licensees. Furthermore, plaintiff's claim in American Needle foundered on the court's conclusions that at least for purposes of promotional licensing, the NFL was a single entity. The single-entity rationale is, of course, persuasive in the context of NFL's role as a competitor in the entertainment business. An individual team can offer no entertainment value without the other teams in the league. Although this single-entity theory is somewhat less persuasive (to the undersigned, at least) when it comes to licensing NFL team logos on headware (after all, individual teams could make their own license agreements), nonetheless the court of appeals viewed licensing headware as simply an extension of the NFL's competition in promoting the entertainment it provides. This points to the most notable distinction between American Needle and the present case. The exclusive contract in American Needle involved only one provider of football entertainment: the NFL. The present case involves what are alleged to be a number of such providers, if not all the major ones, namely the NFL, AFL and NCAA.

8

EA also draws on another line of cases which begins with Paddock Publications, Inc v Chicago Tribune Co, 103 F3d 42 (7th Cir 1996) and Fleer Corporation v Topps Chewing Gum, Inc, 658 F2d 139 (3d Cir 1981). In Paddock, a suburban daily newspaper in the Chicago metropolitan area, the Daily Herald, asserted claims under section 1 against the two major dailies in Chicago, the Tribune and the Sun-Times, that they had "locked up" the most popular or best supplemental services or features through exclusive agreements with the New York Times and Los Angles Times/Washington Post news and features syndicates. 103 F3d at 44. The Herald did not contend that the Tribune and Sun-Times had conspired nor that the news and features syndicates had coordinated their conduct. Id. The district court dismissed. Judge Easterbrook recognized that the plaintiff's theory was fundamentally an "essential facilities" claim, but noted that the complaint lacked allegations of "any essential facility." Id. By contrast, the present complaint alleges that the names and logos of actual teams and players are essential to market interactive football software. Doc #1 ¶ 15 at 4-5. Whether plaintiffs will be able to back this allegation up with evidence is a matter left for another day.

The Fleer case is more factually analogous to the present case. The parties, Fleer Corporation and Topps Chewing Gum, produced bubble gum and similar products. Fleer, 658 F2d at 141. Topps had acquired exclusive licenses to the photographs and statistics of baseball players for use in producing baseball trading cards and, at the time of the case, Topps was the only seller of baseball trading cards sold in connection with bubble gum. Fleer, 658 F2d at 141. The district court found the relevant

9

product market to be "'pocket-size pictures of active major league baseball players, sold alone or in combination with a low cost premium, at a price of 15 to 50 cents.'"  Id at 145.  Although the court of appeals assumed without deciding that this market definition was correct, the court noted (and perhaps was influenced by the fact) that baseball trading cards accompany "a variety of other non-confectionary products."  Id at 142.  The court also pointed out that Fleer had left the baseball trading card business nine years before the suit was filed by selling its existing baseball player licenses to Topps.  Id at 150.  The court then opined that because "Fleer or any other trading card manufacturer [] may compete with Topps for minor league players or even persuade the present major league players not to renew their Topps' contracts" the accumulation of exclusive licenses in that case failed to restrict competition sufficiently to violate section 1.  Id.  In other words, Fleer failed to show the "bottleneck" that an essential facilities claim requires.  See <u>Paddock Publications</u>, 103 F3d at 44-45.

Importantly, the Third Circuit decided <u>Fleer</u> on a motion for summary judgment rather than on a motion to dismiss.  The court noted that the determination whether the defendant's conduct excluded all meaningful competition was a mixed question of law and fact.  <u>Fleer</u>, 658 F2d at 154.  Here, on EA's motion to dismiss, the court must take as true plaintiff's factual allegations that the series of exclusive deals between EA and the NFL, AFL and NCAA "killed off" competition and "prevented [competitors] from re-entering the market."  Doc #1 ¶ 16 at 5.  These allegations distinguish this case from <u>Fleer</u>.

10

Accordingly, EA's motion to dismiss plaintiffs' claim for violation of section 2 of the Sherman Act is DENIED.

B

EA next moves to dismiss plaintiffs' Cartwright Act claim. EA argues, consistent with its argument against the section 2 claim, that signing multiple exclusive agreements cannot constitute a restraint of trade. EA continues that if the exclusive agreements are not the "conspiracy" alleged in the complaint, then the complaint lacks the requisite factual details of the alleged Cartwright Act violation. Doc #17 at 18-19.

The Cartwright Act makes unlawful a "trust," defined as "a combination of capital, skill, or acts by two or more persons" for the purposes of restraining commerce and preventing market competition in the variety of ways listed in the statute. Cal Bus & Prof Code § 16720. See also Lowell v Mother's Cake & Cookie Co, 79 Cal App 3d 13, 22 (1978), citing Bondi v Jewels by Edwar, Ltd, 267 Cal App 2d 672, 678 (1968). The Cartwright Act generally codifies the common law prohibition against the restraint of trade. Kolling v Dow Jones & Co, 137 Cal App 3d 709, 717 (1982).

California courts have determined that vertical restraints of trade, such as exclusive dealing arrangements, can violate the Cartwright Act, though they are not illegal per se. See Fisherman's Wharf Bay Cruise Corp v Superior Court, 114 Cal App 4th 309, 334-35 (2004). "The law conclusively presumes manifestly anticompetitive restraints of trade to be unreasonable and unlawful, and evaluates other restraints under the rule of reason." Id. Vertical restraints, including exclusive dealing arrangements,

11

are proscribed when it is probable that performance of the arrangements will foreclose competition in a substantial share of the affected line of commerce.  Id.  The rule of reason analysis requires a factual analysis of the line of commerce, the market area and the affected share of the relevant market.  See Id.  Such a factual inquiry is improper at this stage in the proceedings.

As described above relating to plaintiffs' section 2 claim, the complaint at bar alleges that EA entered into exclusive agreements with multiple football leagues to "kill[] off" competition and "raise[] prices dramatically."  While these exclusive agreements are not per se illegal under the Cartwright Act, they could plausibly be found to restrain trade after applying the rule of reason analysis.  Accordingly, the exclusive licenses themselves, described adequately in the complaint, constitute the conduct giving rise to the Cartwright Act claim.

EA cites this court's decision in <u>Levi Case Co v ATS Products</u>, 788 F Supp 428 (ND Cal 1992) for the proposition that parties to an exclusive license who are not competitors are legally incapable of conspiring in violation of the antitrust laws.  Doc #17 at 19.  While <u>Levi Case</u> involved the federal Sherman Act, "it is established that the Sherman Act and Cartwright Act are to be interpreted in harmony with one another."  <u>Davis v Pacific Bell</u>, 204 F Supp 2d 1236, 1243 (ND Cal 2002), citing <u>Redwood Theaters, Inc v Festival Enterprises, Inc</u>, 908 F2d 477, 481 (9th Cir 1990). <u>Levi Case</u> relied on the Supreme Court's ruling in <u>Copperweld Corp v Independence Tube Corp</u>, 467 US 752, 768 (1984) that a corporation and its subsidiaries were incapable of conspiring for the purposes of section 1.  <u>Levi Case</u>, 788 F Supp at 430-31.  <u>Copperweld</u> reasoned

**12**

that coordinated activity by parties who lack independent sources of economic power and separate interests does not warrant antitrust scrutiny. Copperweld, 467 US at 771. Levi Case applied that same principle to the relationship between a patent holder and the sublicensee to whom the patent holder had conveyed an exclusive license. Levi Case, 788 F Supp at 431. In that circumstance, the patent holder's only rights relating to the patent after the exclusive license were to receive royalties and approve sublicenses. Id. The patent holder, by virtue of the exclusive license, could not compete in the market covered by the patent and neither could anyone else because a patent is a legally-sanctioned restraint on trade.

Levi Case is distinguishable from the instant complaint, which alleges the aggregation of multiple exclusive agreements to choke off competition in a way that is not legally sanctioned, unlike the exclusive agreement involving a single patent. Moreover, the NFL, AFL and NCAA may each have exclusive agreements with EA, but they are competitors with each other. A series of agreements between EA and each of these entities could plausibly deprive the marketplace of independent sources of economic power.

Accordingly, EA's motion to dismiss plaintiffs' second cause of action for violation of the Cartwright Act is DENIED.

II

Finally, EA moves to dismiss plaintiff's claims for unfair competition and unjust enrichment under California law, violation of the District of Columbia Consumer Protection Procedures Act and violation of the antitrust and consumer protection laws of eighteen

13

states in which plaintiffs did not purchase the Madden NFL video game. Doc #17 at 25-26.

EA argues that plaintiffs' unfair competition and unjust enrichment claims under California law fail because the Cartwright Act claim on which they are based also fails. Because the court finds that the Cartwright Act survives EA's motion to dismiss, the court will not dismiss plaintiffs' other California law claims on that basis. The court also denies the motion to dismiss the claim under the District of Columbia Consumer Protection Procedures Act.

As for the remaining state law claims, plaintiffs have effectively conceded, by failing to address the issue in their opposition memorandum (Doc #22), that their claims under the laws of states in which plaintiffs did not purchase the Madden NFL video game should be dismissed. The named plaintiffs in this action purchased the video game at issue in California and the District of Columbia and have alleged no basis for standing to bring claims under the laws of other states. In re Graphics Processing Units Antitrust Litigation, 527 F Supp 2d 1011, 1026-27 (N D Cal 2007). Accordingly, EA's motion to dismiss plaintiff's fifth and sixth claims for violations of the laws of states other than California and the District of Columbia is GRANTED.

III

In summary, EA's motion to dismiss is GRANTED IN PART and DENIED IN PART. While the court GRANTS EA's motion to dismiss claims five and six as they relate to states other than California and the District of Columbia, the court DENIES EA's motion to dismiss plaintiffs' Sherman Act section 2 claim, Cartwright Act

14

claim and other claims under California and District of Columbia law.  The court will reserve judgment on choice of law issues until the class certification stage.

Additionally, the court approves the following modified schedule for plaintiffs' motion for class certification, as stipulated by the parties (Doc #39): motion filed September 24, 2009; opposition filed November 23, 2009; reply filed December 23, 2009; hearing January 14, 2010

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge