1  LATHAM & WATKINS LLP
   Daniel M. Wall (Bar No. 102580)
2     Timothy L. O'Mara (Bar No. 212731)
  505 Montgomery Street, Suite 2000
3  San Francisco, California 94111-6538
  Telephone: +1.415.391.0600
4  Facsimile: +1.415.395.8095
  Email: Dan.Wall@lw.com
5  Email: Tim.OMara@lw.com

6  Attorneys for Defendant
  ELECTRONIC ARTS INC.
7

8            UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10           SAN FRANCISCO DIVISION

11

12 GEOFFREY PECOVER and JEFFREY     CASE NO. C 08-02820 VRW
  LAWRENCE, on Behalf of Themselves and
13 All Others Similarly Situated,        **DEFENDANT ELECTRONIC ARTS INC.'S**
                            **OPPOSITION TO PLAINTIFFS' MOTION**
14           Plaintiffs,           **FOR CLASS CERTIFICATION**

15      v.

16 ELECTRONIC ARTS INC., a Delaware
  Corporation,
17
          Defendant.
18

19

20

21

22

23              [Redacted Version]

24

25

26

27

28

TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| | A. | Exclusive Trademark Licensing Does Not Result In A "Common Impact" To All Or Even Most Members Of The Putative Class | 2 |
| | B. | The Putative Class Has Antagonistic Interests | 4 |
| | C. | Plaintiffs Have Not Shown That The Theory They Presented To The Court On EA's 12(b)(6) Motion—About A *Series* Of Exclusive Licenses—Is Susceptible To Class-Wide Adjudication | 5 |
| | D. | Plaintiffs' Effort To Certify A Nationwide Class Under California Law Is Unconstitutional Under *Phillips v. Petroleum Co. v. Shutts* | 6 |
| II. | FACTUAL BACKGROUND | | 7 |
| | A. | The Market Setting | 7 |
| | B. | Industry Standard Launch Pricing And Discounting Based On Sell-Through | 10 |
| | C. | Take-Two's One Time Pricing Promotion In 2004 | 12 |
| | D. | Pricing Before And After 2004 Demonstrates That Standard Launch Pricing Continues Regardless Of Licensing Structure | 14 |
| | E. | The Challenged Exclusive Licenses Did Not Meaningfully Change Industry Dynamics | 15 |
| | | 1. The NFL | 16 |
| | | 2. The NCAA (CLC) License | 19 |
| | | 3. The AFL | 20 |
| | F. | Investments In Quality Increase Under Exclusivity | 21 |
| III. | DISCUSSION | | 22 |
| | A. | Plaintiffs Have Failed To Show That Common Issues Predominate | 23 |
| | | 1. Rule 23(b)(3) Requirements For Antitrust Damages Class | 23 |
| | | 2. Plaintiffs Abdicate The First Step Of The Requisite Analysis | 26 |
| | | a. Plaintiffs Fail To Offer A Theory Of Common Impact That Accounts For Industry Standard Launch Prices And Inter-Temporal Pricing | 26 |
| | | 3. Plaintiffs' Fallback Claims Of "Reduced Choice" And "Decreased Quality" Cannot Establish Common Impact | 30 |
| | | 4. The Court Cannot "Assume" The Existence Of Antitrust Injury | 33 |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

B.  Because, At Worst, Exclusive Licensing Would Benefit Some Consumers While Injuring Others, Intra-Class Conflicts Preclude Class Certification ............................................................ 34

C.  Plaintiffs Have Failed To Offer A Theory Of Common Impact Regarding The Incremental Effect Of The NCAA And AFL Licenses ................................................................................ 37

D.  Plaintiffs Are Not Typical of Consumers Who May Have Been Injured By The Alleged Series Of Anticompetitive Exclusive Licenses ................................................................................ 39

E.  Plaintiffs' Attempt To Bring A Nationwide Class Action Under California Law Fails ........................................................ 40

    1.  The *Shutts*' Constitutional Analysis Prohibits A Nationwide Class ............................................................ 40

    2.  California's Choice Of Law Analysis Prohibits A Nationwide Class ............................................................ 43

F.  Certification Of State Subclasses Where There Is No State Claim And No Plaintiff With Standing Would Be Improper ....................... 44

    1.  Plaintiffs' Proposed 20 State Sub-Classes Are Unmanageable ................................................................ 46

G.  A Nationwide Damages Class Is Not Superior ................................. 47

H.  A Rule 23(b)(2) Injunction Class Cannot Be Certified Where Plaintiffs' Primarily Seek Damages ........................................ 48

IV.   CONCLUSION ............................................................................. 50

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alabama v. Blue Bird Body Co., Inc.*

    573 F.2d 309 (5th Cir. 1978) ........................................................................................... 24

*Alaska Elec. Pension Fund v. Flowserve Corp.,*

    572 F.3d 221 (5th Cir. 2009) ........................................................................................... 23

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP,*

    247 F.R.D. 156 (C.D. Cal. 2007) ................................................................ 23, 24, 34, 35

*Allison v. Citgo Petroleum,*

    151 F.3d 402 (5th Cir. 1998) ........................................................................................... 49

*Amchem Products, Inc. v. Windsor,*

    521 U.S. 591, 625 (1997) ........................................................................................... 35, 36

*Bell Atlantic v. AT&T Corp.,*

    339 F.3d 294 (5th Cir. 2003) ........................................................................................... 24

*Bishop v. Petro-Chemical Transp., LLC,*

    582 F. Supp. 2d 1290 (E.D. Cal. 2008) ......................................................................... 37

*Blades v. Monsanto,*

    400 F.3d 562 (8th Cir. 2005) ........................................................................................... 24

*Boggs v. Alto Trailer Sales,*

    511 F.2d 114 (5th Cir. 1975) ........................................................................................... 48

*Castano v. Am. Tobacco Co.,*

    84 F.3d 734 (5th Cir. 1996) ....................................................................................... 47, 48

*Cipro I and II,*

    121 Cal. App. 4th 402, 413 (2004) ............................................................................ 33, 34

*Cook Inc. v. Boston Sci. Corp.,*

    333 F.3d 737 (7th Cir. 2003) ...................................................................................... 22, 37

*Exhaust Unlimited, Inc. v. Cintas Corp.,*

    223 F.R.D. 506, 523 (N.D. Ill. 2004) ............................................................................ 31

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

TABLE OF AUTHORITIES

Page(s)

1   *Gariety v. Grant Thornton, LLP,*
2       368 F.3d 356 (4th Cir. 2004) ........................................................................ 23
3   *Gartin v. S&M Nutec, LLC,*
4       245 F.R.D. 429 (C.D.Cal. 2007) .............................................................. 24, 46
5   *Gen. Tel. Co. of Sw. v. Falcon,*
6       457 U.S. 147 (1982) ..................................................................................... 23
7   *Griffin v. Dugger,*
8       823 F.2d 1476 (11th Cir. 1987) .................................................................... 45
9   *Hall v. Time Inc.,*
10      158 Cal. App. 4th 847 (2008) ...................................................................... 31
11  *Hobbs v. Northeast Airlines, Inc.,*
12      50 F.R.D. 76 (E.D. Penn 1970) .................................................................... 47
13  *Image Technical Servs., Inc. v. Eastman Kodak Co.,*
14      125 F.3d 1195 (9th Cir. 1997) ...................................................................... 39
15  *In re Charles Schwab Corp. Sec. Litig.,*
16      No. 08-01510, 2009 WL 2591389 (N.D. Cal. Aug. 21, 2009) ...................... 44
17  *In re Ditropan XL Antitrust Litig.,*
18      529 F. Supp. 2d 1098 (N.D. Cal. 2007) ........................................................ 45
19  *In re Flash Memory Antitrust Litig.,*
20      643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................................ 46
21  *In re Grand Theft Auto Video Game Consumer Litig. (In Re GTA),*
22      251 F.R.D. 139 (S.D.N.Y. 2008), ................................................................ 43
23  *In re HP Inkjet Printer Litigation,*
24      No. 05-3580, 2008 WL 2949265 (N.D. Cal. July 25, 2008) ......................... 49
25  *In re Hydrogen Peroxide,*
26      552 F.3d at 307 ............................................................................ 23, 24, 34, 47
27  *In re Initial Pub. Offering Sec. Litig. (In re IPO),*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

TABLE OF AUTHORITIES

Page(s)

1  471 F.3d 24 (2d Cir. 2006)............................................................................................ 23

2  *In re Med. Waste Servs.,*

3  2006-1 Trade Cases P 75, 215 (D. Utah Mar. 3, 2006) ............................................. 29

4  *In re New Motor Vehicles Canadian Exp. Antitrust Litig. (In re New Motor*

5  *Vehicles), 522 F.3d 6 (1st Cir. 2008)* ....................................................................... 3

6  *In re Relafen Antitrust Litig.,*

7  221 F.R.D. 260 (D. Mass. 2004)................................................................................ 41

8  *Kline v. Coldwell Banker & Co.,*

9  508 F.2d 226 (9th Cir. 1974) ..................................................................................... 24

10  *Kohen v. Pacific Investment Management Co. LLC,*

11  571 F.3d 672 (7th Cir. 2009) ................................................................................. 3, 29

12  *Levi Case Co. v. ATS Prods,*

13  788 F. Supp. 428 (N.D. Cal. 1992) ........................................................................... 38

14  *LG Electronics U.S.A. v. Whirlpool Corp.,*

15  661 F.Supp.2d 940 (N.D. Ill. 2009) .......................................................................... 32

16  *Marchman v. NCNB Texas Nat'l Bank,*

17  898 P.2d 709 (N.M. 1995) ......................................................................................... 41

18  *Morgan Distrib. Co. v. Unidynamic Corp.,*

19  868 F.2d 992 (8th Cir. 1989). .................................................................................... 45

20  *Navellier v. Sletten,*

21  262 F.3d 923 (9th Cir. 2001) ..................................................................................... 35

22  *Oshana v. Coca-Cola Co.,*

23  472 F.3d 506 (7th Cir. 2006........................................................................................ 25

24  *Paddock Pub. v. Chicago Tribune Co.,*

25  103 F.3d 42 (7th Cir. 1996) .......................................................................................... 2

26  *Phillips v. Klassen,*

27  502 F.2d 362 (D.C. Cir. 1974)................................................................................... 35

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

TABLE OF AUTHORITIES

Page(s)

1 | *Phillips v. Petroleum Co. v. Shutts,*
2 | 472 U.S. 797 (1985)............................................................................................. 6, 40
3 | *Rivera v. Bio Engineered Supplements & Nutrition, Inc.,*
4 | 2008 WL 4906433 (C.D. Cal. Nov. 13, 2008)............................................... 44, 46
5 | Robinson v. Tex. Auto. Dealers Ass'n,
6 | 387 F.3d 416, 422 (5th Cir. 2004) ...................................................................... 31
7 | *Romberio v. Unumprovident Corp.,*
8 | No. 07-6404, 2009 WL 87510 (6th Cir. Jan. 12, 2009)................................... 25, 49
9 | *Sample v. Monsanto Co.,*
10 | 218 F.R.D. 644 (E.D. Mo. 2003) ........................................................................ 29
11 | *Szabo v. Bridgeport Machs., Inc.,*
12 | 249 F.3d 672 (7th Cir. 2001) .............................................................................. 23
13 | *Teamsters Local 445 Freight Pension Fund v. Bombardier,*
14 | 546 F.3d 196 (2d Cir. 2008)............................................................................... 23
15 | *Theee Movies of Tarzana v. Pacific Theaters,*
16 | 828 F.2d 1395 (9th Cir. 1987) ....................................................................... 4, 33
17 | *Thompson v. Jiffy Lube Intern., Inc.,*
18 | 250 F.R.D. 607 (D. Kan. 2008)........................................................................... 44
19 | *U.S. Care, Inc. v. Pioneer Life Ins. Co.,*
20 | 244 F. Supp. 2d 1057 (C.D. Cal. 2002) .............................................................. 45
21 | *United States v. Oracle Corp,*
22 | 331 F. Supp. 2d 1098 (N.D. Cal. 2004 .................................................................. 8
23 | *Util. Consumers' Action Network v. Powernet Global Commc'n,*
24 | No. 06-1773, 2006 U.S. Dist LEXIS 78546 (S.D. Cal. 2006)............................. 41
25 | *Utility Consumers' Action Network v. Sprint Solutions,*
26 | 259 F.R.D. 484 (S.D. Cal. 2009) ........................................................................ 46
27 | *Valley Drug Co. v. Geneva Pharms, Inc.,*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

TABLE OF AUTHORITIES

Page(s)

350 F.3d 1181 (11th Cir. 2003) ............................................................................ 35

*Vinci v. Waste Management, Inc.*,

    36 Cal. App. 4th 1811 (1995) ......................................................................... 31

*Vulcan Golf v. Google Inc.*,

    254 FRD 521 (N.D. Ill. 2008)........................................................................ 44

*Walsh v. Ford Motor Co.*,

    130 F.R.D. 260 (D.D.C. 1990)....................................................................... 47

*Washington Mutual v. Sup. Ct.*,

    24 Cal. 4th 906 (2001) ............................................................................ 40, 46

*Wiener v. Dannon Co., Inc.*,

    255 F.R.D. 658 (C.D. Cal. 2009)................................................................... 37

*Wren v. RGIS Inventory Specialists*,

    256 F.R.D. 180 (N.D. Cal. 2009).................................................................... 45

*Zinser v. Accufix Research Inst., Inc.*,

    253 F.3d 1180 (9th Cir. 2001) ..................................................... 22, 23, 46, 47

**STATUTES**

Cal. Bus & Prof Code § 17204 ........................................................................... 31

Fed. R. Evid. 803 ............................................................................................... 32

Haw. Rev. Stat. § 480.13-3 ................................................................................. 46

LATHAM&WATKINS␣␣␣
ATTORNEYS AT LAW
SAN FRANCISCO

vii

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1  **I.    INTRODUCTION**

2       Electronic Arts Inc. ("EA") opposes plaintiffs' motion for class certification for four

3  principal reasons:

4       ▪  First, plaintiffs have improperly assumed that EA's acquisition of exclusive

5          trademark licenses raised videogame prices to all direct purchasers at all relevant

6          times.  That is indisputably false, and thus assuming a price increase undermines

7          plaintiffs' entire class certification showing.  There is no basis in the record upon

           which the Court could find that EA's alleged conduct had a "common impact" on

8          direct purchasers in the first instance and thereafter on the proposed class.

9       ▪  Second, the putative class is composed of consumers with antagonistic interests.  In

10         fact, most members of the putative class are either unaffected by exclusive licensing,

11         or affirmatively benefit from it.  They would not generally share plaintiffs' desire to

           outlaw exclusive licensing.  The consumers who do oppose exclusive licensing would

12         not all litigate the case in the same way.

13
        ▪  Third, plaintiffs have impermissibly changed theories to bolster the prospects of class
14
           certification.  When EA moved to dismiss this case, plaintiffs promised they were not
15
           challenging EA's license with the National Football League ("NFL") alone, but rather
16
           a series of licenses by which EA supposedly locked up all options for videogames
17
           simulating football.  Plaintiffs' class certification arguments, and their economist's
18         testimony in particular, presume the EA-NFL agreement itself is unlawful.  The

19         alleged "common impact" flows entirely from that agreement, and plaintiffs'

           economist did not even study the incremental effects of EA's other football licenses.
20
           Consequently, plaintiffs have defaulted on showing that *the theory this Court allowed*
21
           *to proceed* is conducive to class certification.
22
        ▪  Fourth, it is unconstitutional for indirect purchasers such as plaintiffs to bring a
23
           nationwide class action under California's Cartwright Act and Unfair Competition
24
           Law ("UCL").  Judge Alsup's recent decision in *In re Graphics Processing Units*
25         *Antitrust Litig.,* 527 F. Supp. 2d 1011, 1027-28 (N.D. Cal. 2008), is right on point,

26         holding that California is required to respect the laws of the States where the product

27         at issue was purchased, most of which do not allow indirect purchaser actions.

           Plaintiffs' back-up proposal to certify 20 state subclasses is also inappropriate
28
           because no claims under the laws of these states have been pleaded, and litigating

           under 20 state laws would be unmanageable.

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

A.    **Exclusive Trademark Licensing Does Not Result In A "Common Impact" To All Or Even Most Members Of The Putative Class**

This case is about exclusive trademark licensing—a practice that has, at worst, uncertain competitive effects.  The practice is not *per se* illegal, and there is no basis in either law or economics to presume that in every market setting exclusive licensing of trademarks raises prices, restricts output, or harms consumers.  *See, e.g., Paddock Pub. v. Chicago Tribune Co.,* 103 F.3d 42, 45 (7th Cir. 1996) (exclusive licensing of news content increased market diversity). At any trial in this case, a core issue would be whether consumers of videogames really are, as alleged, worse off because of EA's exclusive football licenses, and whether that is true as to any given consumer plaintiff.  Nothing dictates that exclusive licensing can only harm or benefit consumers *as a group*, as opposed to hurting some but benefiting others.  A full Rule of Reason analysis in this case would have to account for the interests of consumers who affirmatively benefit from the practice—because in this market setting many do—and balance those against any alleged adverse effects.  Then, only those consumers who can demonstrate that they were injured-in-fact would be entitled to recover damages.

Despite this, plaintiffs have filed a class certification motion that treats this case as if the conduct at issue were akin to price-fixing, which the law presumes harms consumers generally. The motion simply asserts—with no economic analysis whatsoever—that in the absence of the challenged licenses, EA would have lowered the price for its *Madden NFL* videogames to all of EA's customers ("direct purchasers") at all relevant times.  Based on this *assumption*, plaintiffs' economist concludes that some or all of the alleged overcharge would have been passed-through to the putative class of indirect purchasers.  This is the foundation for plaintiff's argument that there was "common impact," and that all issues in the case can be addressed through "common proof."

Plaintiffs have completely defaulted on the threshold issue: the effects of EA's conduct on the *direct purchasers*.  The law is clear that in an indirect purchaser action, the Court begins by asking whether there is a common impact on *direct purchasers*, and only if there is turns to how that impact is transferred, or passed-through, to indirect purchasers.  *In re New Motor Vehicles*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1   *Canadian Exp. Antitrust Litig. (In re New Motor Vehicles)*, 522 F.3d 6, 26-28 (1st Cir. 2008).

2   Furthermore, the plaintiffs cannot just assert harm to direct purchasers; they must put on evidence

3   demonstrating "the existence of the facts necessary for the theory to succeed." *Id.* at 26.  Here,

4   plaintiffs skipped the first step.  Their expert conducted no analysis of EA's wholesale pricing in a

5   world without exclusive licenses, choosing to devote 100% of his attention to how a *presumed*

6   overcharge would be passed-through at retail.  The resulting analysis is divorced from the facts of

7   the case and fundamentally circular, amounting to little more than the claim that if we assume

8   EA's conduct hurt everyone, then it is fair to conclude that everyone in the class was hurt.

9          The class certification analysis in this case turns on how exclusive licensing affects

10  *wholesale prices*, not on pass-through dynamics.  The key point developed below is that even if

11  one presumes that EA's exclusives are on balance anticompetitive, there is no basis to find that

12  EA would have lowered wholesale prices *generally* if it faced competition from another NFL or

13  NCAA licensee.  The videogame industry produces many "natural experiments" of this thesis,

14  because both exclusive and non-exclusive trademark licensing are common, and it is easy to

15  compare pricing across both scenarios.  The evidence shows beyond doubt that for premium

16  games on the newest consoles (*e.g.*, Xbox 360 or PlayStation 3), *all videogame titles*—

17  irrespective of genre, theme, or the closeness of competition—launch at the same industry-

18  standard retail prices.  The great majority of consumers pay those standardized launch prices

19  because discounting does not typically begin until demand for the title begins to wane.  This

20  pattern, reflecting what economists call "inter-temporal price discrimination," is evident even

21  when there are multiple licensees of the same trademarks, the best examples being videogames

22  simulating NBA basketball and NHL hockey.  Exclusivity has *no* discernable effect on the

23  wholesale prices videogame publishers charge retailers at launch, or the retail prices paid by

24  most members of the putative class.

25         Accordingly, there is no basis for consumers who bought *Madden NFL* at or near the time

26  of launch—which is when most sales are made—to claim any injury from exclusive licensing.

27  This is dispositive, because a class may not be certified "if it is apparent that it contains a great

28  many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pacific*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3          DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    *Investment Management Co. LLC,* 571 F.3d 672, 677 (7th Cir. 2009). Furthermore, plaintiffs

2    cannot fill this gap in their case by saying everyone suffered an injury from lower game

3    "quality." Assessing quality is the ultimate individual-specific issue—and the last thing that is

4    appropriately addressed by common proof. The quality argument just hurts plaintiffs' case.

5              **B.      The Putative Class Has Antagonistic Interests**

6              This phenomenon of industry-standard launch pricing also has important ramifications

7    for whether the members of the class have aligned interests. Plaintiffs claim they do because

8    they were all injured by higher prices. But since that is not true for those consumers who

9    purchased *Madden NFL* at or near launch, the class fractures in a number of ways.

10             First, many consumers, particularly the majority of consumers who would pay the same

11   price either way, would likely *prefer* exclusive licensing because of its effects on investments in

12   game quality. When a trademark licensor decides to grant an exclusive license, it is often

13   because it believes exclusivity increases licensee incentives to innovate, and therefore makes the

14   licensee more competitive. *See, e.g., Theee Movies of Tarzana v. Pacific Theaters,* 828 F.2d

15   1395, 1399-1400 (9th Cir. 1987). The NFL and NCAA granted EA exclusives to encourage

16   more investment in game quality, and EA in fact increased investments. It is presumptuous for

17   plaintiffs to assume that all putative class members would second-guess the leagues' judgment as

18   they do. At the very least, those class members whose prices would be the same anyway are

19   likely to share the leagues' perspective. Plainly, a class with antagonistic interests as to the core

20   purpose of the litigation—whether it is good or bad for them—ought not be certified.

21             Second, given industry-standard launch pricing, the only consumers who could plausibly

22   claim injury are those who purchased *Madden NFL* well after launch, when discounting

23   commences. That is, one can imagine claims that *Madden NFL* would have been discounted

24   earlier and more deeply on account of competition from another football licensee. But a serious

25   class conflict comes in with respect to where one draws the line, because for any given class

26   member there is a unique trade-off between ensuring themselves a recovery while not taking on

27   undue litigation risk. Late buyers (say in December, when discounting is routine) have an

28   inherent litigation advantage over early buyers, because they do not need to prove that but for

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4                    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
                     MOTION FOR CLASS CERTIFICATION
                     CASE NO. C-08-02820 VRW

1    exclusivity, football titles would cost less at or near the time of launch; they need only propose a

2    lower "but for" price than they paid at the time they purchased.  Early buyers—like the named

3    plaintiffs—have no choice but to allege very early discounting, earlier discounting than anyone

4    has ever seen in this industry.  By combining all consumers in the same class, plaintiffs are

5    saddling late buyers with litigation risk they have no need to take.  This is the kind of conflict of

6    interest that precludes class certification.

7         The short of it is that given the pricing dynamics in this industry and the plausible effects

8    of exclusive licensing, there is no group of *Madden NFL* purchasers with the homogeneity that is

9    required of a class.  Most are neither injured nor opposed to exclusive licensing.  Those who

10   might claim injury should litigate in their own names, not conscript all consumers in their cause.

11        **C.   Plaintiffs Have Not Shown That The Theory They Presented To The Court
             On EA's 12(b)(6) Motion—About A *Series* Of Exclusive Licenses—Is**

12        **Susceptible To Class-Wide Adjudication**

13        Plaintiffs survived a motion to dismiss by arguing that this case was about an

14   anticompetitive *series* of exclusive videogame licenses that allowed EA to monopolize the entire

15   category of videogames that simulate football.  Plaintiffs stated repeatedly—because they had to

16   in order to distinguish otherwise dispositive case law—that they were not just challenging EA's

17   exclusive videogame license with the NFL, the license that underlies *Madden NFL,* but rather a

18   series of exclusive licenses that EA obtained from multiple football-related licensors.    Indeed,

19   plaintiffs criticized EA for "incorrectly stating that Plaintiffs' theory is that … 'EA and the NFL

20   contracted to create an unlawful monopoly.'"  *See Opposition to Defendant's Motion to Dismiss*

21   *Class Action Complaint*, Oct. 14, 2008, at 3 n.3 (Doc. # 22).  The Court allowed the case to go

22   forward on the theory that the "series of exclusive deals between EA and the NFL, AFL and

23   NCAA 'killed off' competition and 'prevented [competitors] from reentering the market.'"

24   Order, June 6, 2009, at 10 (Doc. # 40).

25        If that is indeed plaintiffs' case, the antitrust injury that follows would be from the

26   *incremental market power* that EA supposedly obtained by acquiring the NCAA and AFL

27   licenses.  The "but for world" would assume that EA lawfully obtained the first exclusive, with

28   the NFL, but not the additional exclusives with the NCAA and AFL.  The class certification

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5        DEFENDANT'S OPPOSITION TO PLAINTIFFS'
         MOTION FOR CLASS CERTIFICATION
         CASE NO. C-08-02820 VRW

1   analysis would then focus on whether competition from additional NCAA or AFL licensees

2   would alter EA's pricing of football videogames.   This focus on incremental market power

3   follows from the rule that a plaintiff "must be able to sort out the effects of any permissible

4   [conduct] from the effects of the alleged, impermissible … [conduct]."   *In re New Motor*

5   *Vehicles*, 522 F.3d at 27.

6        Plaintiffs have violated this rule.   While they mention the series of licenses in their

7   statement of facts, it is crystal clear that the "but for world" in their expert's class certification

8   report is one without *any* exclusive licenses, even the NFL license.   *See, e.g.,* MacKie-Mason

9   MacKie-Mason Dep. 75:14-16, Dec. 17, 2009 ("I understood the counterfactual relevant to this

10   to be that they didn't have exclusives in any of them…").   It is equally clear that plaintiffs'

11   expert did not address incremental market power at all (*see infra* note 75), and that the driving

12   force in his analysis is his assumption that if Take-Two Interactive Software had continued to sell

13   its NFL football game (*ESPN NFL 2K*), then EA would have been forced to sell *Madden NFL* at

14   a lower price.

15        This is nothing short of a default on plaintiffs' burden to prove that the theory of the case

16   that the Court allowed to proceed supports class certification.   Under Rule 23, predominance of

17   common issues must be established in reference to what the law requires the plaintiff to prove.

18   The Court has addressed that:   plaintiffs are limited to arguing that the series of licenses "'killed

19   off' competition and 'prevented [competitors] from reentering the market.'"   Order, June 5,

20   2009, at 10 (Doc. #40).   Plaintiffs also foreswore any argument that "EA and the NFL contracted

21   to create an unlawful monopoly."   Plaintiffs cannot now base their entire class certification

22   case—or any part of it for that matter—on the assumption that the EA-NFL contract is unlawful.

23       **D.   Plaintiffs' Effort To Certify A Nationwide Class Under California Law Is**

24           **Unconstitutional Under** *Phillips v. Petroleum Co. v. Shutts*

25        Plaintiffs are asking the Court to certify a nationwide class to pursue claims under

26   California state law, namely the Cartwright Act and UCL.   Regardless of all other considerations,

27   this request fails legally under the Supreme Court's holding in *Phillips v. Petroleum Co. v. Shutts*,

28   472 U.S. 797, 821-22 (1985), because under the *Shutts* analysis it is unconstitutional to apply

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1  California law to a nationwide class of indirect purchasers. Judge Alsup's recent decision in *GPU*

2  addresses the same issue on substantively identical facts and so holds.

3        Even were that not the case, the controlling choice of law analysis would require the

4  application of the laws of the 50 states where the products at issue were actually purchased—

5  thereby defeating predominance.  Plaintiffs' fall back argument—that the Court should certify 20

6  state law subclasses—fails because (i) the Court cannot certify classes for causes of action that

7  are not pled in the operative complaint and where no named plaintiff has standing, and

8  (ii) plaintiffs fail to (and cannot) show that 20 state law subclasses would be manageable.

9        An injunctive relief class is also not a viable fall-back.  It never is when an action

10  primarily seeks damages, as this one does.  Furthermore, if plaintiffs really want an injunction

11  (presumably nullifying the EA-NCAA license), they can litigate for that in their own names.

12  Any such injunction would affect all members of the proposed class automatically, and the case

13  would lay a collateral estoppel foundation for anyone deserving of damages.  That is the superior

14  way to litigate this case.

15  **II.      FACTUAL BACKGROUND**

16        Plaintiffs have chosen to begin their brief with an argumentative statement of facts that

17  attempts to portray EA's exclusive licenses as highly anticompetitive.  It is an ironic narrative,

18  since class certification plaintiffs invariably argue that merits considerations should not influence

19  class certification.  All that really matters for present purposes is how the alleged anticompetitive

20  conduct would affect members of the putative class (consumers) and, especially, how allegations

21  of adverse effects would be adjudicated at trial.

22        **A.      The Market Setting**

23        This case arises in the intensely competitive market for videogames.  There are more than

24  twenty publishers of videogame titles today.  EA is the second largest with a 21.2% market share.

25  The market leader is Nintendo (21.9%), followed by EA, Activision (16.1%), and Ubisoft (5.9%).[1]

26

27  [1]  Schatz Declaration ISO EA's Opp. to Mot. for Class Cert. Ex. 1, January 2009 Video Game Market Update (Feb. 2009), at EA00878424 [hereinafter Schatz Decl.].

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    Plaintiffs allege that the relevant market is no broader than league-licensed football

2  games.[2]  EA accepts that for purposes of this motion we must assume that is correct, but we

3  neither must nor will accept that *pricing dynamics*—a key to understanding how exclusive

4  licensing might affect members of the putative class—are explained solely by interactions among

5  football games.  The competitive dynamics in the industry are all aimed toward the ultimate goal

6  of creating and launching a "hit" game, regardless of genre, that will sell briskly and therefore stay

7  on retailers' shelves.  In other words, expanding the market for a title through its quality is the

8  primary driver of competition, not just shifting share from similar games.  Videogame genres,

9  such as the sports or action genres, simply describe categories of content in the same way that

10  comedies and dramas describe movies; they do not dictate or limit competition.

11    Like movies, videogames are highly differentiated, leading to what is known as

12  "monopolistic competition."[3]  Every game is to some degree unique, even though the underlying

13  idea and gameplay may be quite similar.  For example, Activision's *Call of Duty: World at War*

14  is one of dozens of "first person shooters" set in World War II, every one of which simulates an

15  individual soldier's experience fighting historic battles.  Nevertheless, in the same way that

16  *Saving Private Ryan* and *The Longest Day* (both about D-Day) are in their own ways unique,

17  *Call of Duty: World at War* is unlike—and far outsells—any other World War II shooter.  The

18  same is true of sports games like *Madden NFL*.  Videogames simulating the same league sport

19  *must be similar*, because by definition they must all have the same teams, players, league

20  structure and football game play.  Nonetheless, *before* EA acquired an exclusive license from the

21  NFL, it had an 85% share of sales of NFL football simulations.[4]  The competing NFL simulation

22  game, Sega's *ESPN NFL 2K,* was perceived by consumers to be a much less satisfactory

23  experience than *Madden NFL*, and sales results showed it.

24    Game quality is the primary determinant of a videogame's success.  Top-rated, high

25  _____

[2]  Plaintiffs' Motion for Class Certification at 4 [hereinafter Pls.' Mot.].

26

[3]  *See United States v. Oracle Corp,* 331 F. Supp. 2d 1098, 1113 (N.D. Cal. 2004).

27

[4]  Declaration Janusz Ordover ISO EA's Opp. To Mot. for Class Cert. ¶ 36, [Figure 6] [hereinafter Ordover Decl.]; Schatz Decl. Ex. 6, NPD Data.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1   quality games directly translate into increased sales.[5]  Consequently, for EA (and all publishers),

2   the critical goal is to create a highly-rated game that ranks in the top 10 or 20 in sales.  Frank

3   Gibeau, President of EA Games, put it this way in a February 2008 document: "There's a simple

4   message and mission inside of our label, and that is, we create hits.  It is the filter through which

5   we make all decisions....[E]verything we look at is how do we get into the top-20, how do we

6   make this a multi-million unit seller, how do we make it a hit?"[6]  From 2000 to 2008,

7   approximately 43% of the industry's revenue was generated by top 20 titles, and 31% was

8   generated by top 10 titles.[7]

9       A key reason for the industry emphasis on hits is the behavior of retailers.  Retailers are

10   content- and genre-agnostic and almost singularly motivated by "sell-through," meaning the pace

11   at which videogame titles sell.  Jill Hamburger—the president of Vida Gaming, Inc., and former

12   V.P. of Games for Best Buy—explains in her accompanying declaration that retailers are

13   singularly concerned with extracting maximum revenue from limited shelf space, and do not care

14   about specific genres or titles as long as a game is selling well.  Hamburger Decl. Ex. 1, at 12-14

15   & 28.[8]  Consequently, retailers first aim to stock their shelves with hit games, and then conduct a

16   weekly "sell-through" analysis that ranks all games based on weekly performance.  If sell-

17   through is low for a certain game on a certain platform, that game risks getting "pushed off the

18   _____

19   [5] *See* Hamburger Declaration ISO EA's Opp. to Mot. for Class Cert. Ex. 1, at 32 [hereinafter Hamburger Decl.]; Schatz Decl. Ex. 2, Metacritic Study (June 2005), at EA00009875
        REDACTED

20   [6] Schatz Decl. Ex. 3, Transcript of Electronic Arts Analyst Meeting (Feb. 2008), at

21   EA00875585 (Frank Gibeau, EVP of EA Games).  R*See also id.* Ex. 4, FY09 GPO Title Forecast (Feb. 2008), at EA00027939

22          Ex. 5, at EA00243443            REDACTED

23   [7] Schatz Decl. Ex. 6, NPD Data.  *See also* Ex. 7, FY09 NA Plan (Apr. 2008), at EA00008236

24   (discussing disproportionate market share of "top 10" games); Hamburger Decl. Ex. 1, at 27; Ordover Decl. ¶ 19.

25   [8] Retailers like Target and Wal-Mart are concentrating more and more on "hits" and stocking

26   fewer SKUs across genres.  *See* Schatz Decl. Ex. 4, FY09 GPO Title Forecast (Feb. 2008), at EA00027943        REDACTED                      Ex. 8, EA Retail

27   Frame Up (Mar. 2008), at EA00036214            REDACTED
                                                    Quality, timing, market

28   investment, and retail differentiation will influence purchase decisions.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    shelf" (and replaced by another game). *Id.* at 14. This is when discounting comes into play, as

2    explained below.

3        **B.    Industry Standard Launch Pricing And Discounting Based On Sell-Through**

4        Pricing in the videogame industry is characterized by one striking and indisputable fact:

5    release prices for premium titles on the latest generation platforms are identical across all

6    genres.[9] The market has established a standard retail launch price from which no publishers

7    deviate. Currently, that standard is $59.99 for Xbox 360 and PS3 games, and $49.99 for Wii

8    games. Prior to 2005, when the "next generation" platforms were the PS2 and Xbox, the

9    standard retail launch price on those platforms was $49.99 per game.[10] Even the most prolific,

10   best-selling games—such as *Halo*, *Grand Theft Auto*, and *Call of Duty*—adhere to this

11   standardized launch pricing, notwithstanding the fact that each title commands a core group of

12   highly inelastic consumers who are not only willing to pay full price, but are also willing to stand

13   in line for hours to purchase these titles at or near launch.[11]

14       Moreover, there is essentially no discounting for newly-released titles. Plaintiffs admit

15   that the industry is characterized by "inter-temporal price discrimination," meaning that prices fall

16   over time, so that consumers who buy a game early in its product life cycle tend to pay more than

17   consumers who buy late.[12] In fact, the extent of inter-temporal price discrimination is so great in

18   _____

19   [9] Schatz Decl. Ex. 9, Miele Dep. 12:3-13:23, Nov. 3, 2009        REDACTED

20                                                        Plaintiff G. Pecover also
21   acknowledged this fact. *See id.* Ex. 10, Pecover Dep. 60:8-9, Jan. 12, 2010 ("[M]ost games
     are the same price, around 59 or $60").

22   [10] Hamburger Decl. Ex. 1, at 7; Schatz Decl. Ex. 9, Miele Dep. 13:11-18.

23   [11] Ordover Decl. ¶¶ 24, 76-77; Hamburger Decl. Ex. 1, at 10-11.

24   [12] MacKie-Mason Declaration ISO Pls.' Mot. for Class Cert. ¶¶ 26-27 [hereinafter MacKie-
     Mason Decl.]. For a discussion of inter-temporal price discrimination, *see* Luke M. Froeb &
25   Brian T. McCann, Managerial Economics: A Problem Solving Approach 172 (2009)
     (explaining how firms can use time-of-availability as a product feature: "The premium
26   version comes with the 'feature' of being available now. The lower-valued version is the
     same but it's not available until sometime in the future." By discounting the product over
27   time, the firm can appeal to consumers who value price more than availability without
     sacrificing its ability to charge premium prices to inelastic customers.). *See also* Ordover
28   Decl. ¶ 25.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

10        DEFENDANT'S OPPOSITION TO PLAINTIFFS'
          MOTION FOR CLASS CERTIFICATION
          CASE NO. C-08-02820 VRW

1   this industry that there are essentially two consumer groups—those who purchase *at full price*

2   within the first few months after launch, and those who purchase several months after launch,

3   when price discounting generally begins. Ordover Decl. ¶¶ 25, 93; Hamburger Decl. Ex. 1, at 11-

4   12.    Importantly, the vast majority of consumers fall into the former group, *i.e.,* the price

5   insensitive consumers. This is undisputed. Plaintiffs' economist admitted that "[p]ricing does not

6   vary much across retailers, especially in the first few months after a game is released, *when the*

7   *vast majority of a product's sales occur.*"  MacKie-Mason Decl. ¶ 136 (emphasis added). *See*

8   *also* Ordover Decl. ¶¶ 24, 76-77, 89; Hamburger Decl. Ex. 1, at 11.

9          Publishers generally begin to discount a few months post-launch in order to capture the

10  remaining price sensitive / non-core consumers.  Hamburger Decl. Ex. 1, at 8-9 & 11; ; Ordover

11  Decl. ¶¶ 25, 93.  These non-core or more "casual gamers" are not committed to a specific

12  videogame; rather, they consider a mix of several titles.   Consequently, their patronage is

13  contestable with familiar substitution-inducing strategies like discounting.  Virtually all of the

14  discounting one sees in this industry is targeted at these non-core, elastic customers.  Hamburger

15  Decl. Ex. 1, at 11.  Conversely, one virtually never sees premium titles discounted early in the

16  product life cycle when the core customers tend to buy.

17         EA's price discounting methodology follows this model:

R
E
D
A
C
T
E
D

23

24

---

13 Schatz Decl. Ex. 9, Miele Dep. 20:11-14                     REDACTED

25

26 14 *Id.* 19:21-21:23                          REDACTED

27                                                                       *See*
   *also* Schatz Decl. Ex. 11, NAPO Markdown Process (Apr. 2009), at EA00803677 ( REDACTE
                                                                              D
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
                                          11                    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
                                                               MOTION FOR CLASS CERTIFICATION
                                                               CASE NO. C-08-02820 VRW

1  REDACT <sup>15</sup>
       ED

                                                    It makes no sense to discount a title that is selling

4  strong just because similar games are cheaper.                  REDACTED


                                                    Hamburger Decl. at 11.  In this environment, retailers,

8  not competitors, wield the most influence over any eventual decision to discount, because

9  retailers analyze weekly sell-through in making decisions regarding which games will maintain

10  shelf space. *Id.* at 14.

11        The football titles relevant to this case, *NCAA Football* and *Madden NFL*, launch in July

12  and August, respectively, shortly before the start of the Fall football season.[16]  History indicates

13  that demand for them begins to wane, and sell-through begins to slow, at or about the time that

14  the Christmas holiday shopping period begins.  This also corresponds to an influx of price-

15  sensitive, brand-agnostic "holiday gifters"—people who are buying games for others, and thus

16  are not greatly influenced by their own affinity to a title.  Thus, in the case of *NCAA Football*

17  and *Madden NFL*, EA's sales forecasts plan for price discounts during holiday shopping periods.

18  *Id.* at 9.  EA also makes end of season discounts for annual releases, like *NCAA Football* and

19  *Madden NFL*, to re-stimulate demand, clean out inventory, and make shelf space for next

20  season's game.  Otherwise, *Madden NFL* and *NCAA Football* are not discounted.

21        **C.      Take-Two's One Time Pricing Promotion In 2004**

22        Plaintiffs' case begins—and really ends—with its narrative about how in 2004 Take-Two

23  Interactive launched *ESPN NFL 2K* (and several other sports titles) at $19.99, inducing a price

24  response from EA.  Plaintiff would have the Court believe that this episode predicts a sustainable

25  _____

26  [15] Schatz Decl. Ex. 9, Miele Dep. 21:16-23              REDACTED

27                                ).

28  [16] The AFL game launched in the Spring, which is one reason why it is irrelevant to this case.

1    competitive equilibrium that was interrupted only by EA's acquisition of exclusive licenses.

2    Plaintiffs have badly distorted the facts relevant to this event.

3         Concurrent with this memorandum, EA is filing a declaration from Paul Eibeler, former

4    CEO, President, and Director of Take-Two Interactive—the rival publisher that plaintiffs claim

5    EA illegally excluded from the football videogame market.[17]  Mr. Eibeler oversaw the 2004

6    pricing event. Eibeler Decl. ¶¶ 3-8. As Mr. Eibeler explains, Take-Two's $19.99 pricing was a

7    one-time loss-leader strategy aimed at getting consumers to try the floundering Sega sports game

8    portfolio that Take-Two was in the process of acquiring.  Sega had decided to exit this segment

9    of the market.  *Id.*  Take-Two made a deal to co-distribute Sega's sports games, the terms of

10   which required Take-Two to cover only Sega's licensing and distribution costs, not development

11   costs.  *Id.* ¶¶ 5-6.  As Mr. Eibeler explains, this allowed Take-Two to drop the retail on all the

12   Sega sports titles price to $19.99 for that year—and that year only—in order to entice consumers

13   to try the Take-Two products, either by switching games or, given the low price, purchasing a

14   second game of that type.  *Id.*  The one-time absence of development costs was key.  *Id.* ¶ 6. "In

15   any other year or for any prolonged period, Take-Two could not have launched sports games at

16   $19.99 because that price point would not have allowed Take-Two to cover the significant

17   development and license costs on the premium sports titles at issue." *Id.* ¶ 5.

18        Take-Two never intended to depart from industry-standard pricing permanently.  The

19   plan was to devote 2004 to gaining a foothold in the genre by dropping the price that year, and

20   then returning to normal industry pricing once consumers had sampled Take-Two's product.  *Id.*

21   "Take-Two's plan was always to raise the price on the Sega sports titles back to prevailing

22   industry prices for the next generation of videogame consoles…. Take-Two knew—and publicly

23   acknowledged—that $19.99 was not a sustainable price point." *Id.* ¶ 6.  Take-Two executives

24   disclosed and discussed the short-term, promotional nature of their pricing strategy with retailers

25   and the sports leagues, including the NFL.  *Id.*; *see also* Gertzog Decl. ¶ 11; Hamburger Decl.

26   Ex. 1, at 15.  Indeed, in December 2004, Take-Two publicly announced that "when next-gen

27

---

[17] Eibeler Declaration ISO EA's Opp. to Mot. for Class Cert. [hereinafter Eibeler Decl.].

28

1    hardware comes out, we would expect to introduce the sports products at premium prices."[18]

2    Take-Two did exactly that, pricing their NBA and NHL games post-2004 at the industry

3    standard $59.99 for Xbox 360 and PS3. *See* Eibeler ¶ 7; Ordover ¶ 103.

4        Even in 2004, Take-Two's $19.99 pricing *did not affect the launch prices* of either

5    *Madden NFL* or *NCAA Football*. Take-Two announced that it would release its sports titles at

6    $19.99 in June 2004, before *Madden NFL 2005* and *NCAA Football 2005* were launched.

7    Nevertheless, EA released both games at the then-standard $49.99 retail price. The games were

8    both discounted later that year, which for present purposes we can assume was partly a reaction to

9    Take-Two's promotional pricing. Even so, millions of copies of *Madden NFL* and *NCAA*

10   *Football* were sold for $49.99. Ordover ¶ 80, [Figure 12]. Take-Two's 2004 pricing had no effect

11   on the prices paid by early buyers, and thus no common impact on consumers generally.

12
13       **D.**    **Pricing Before And After 2004 Demonstrates That Standard Launch Pricing Continues Regardless Of Licensing Structure**

14       While plaintiffs focus on the Take-Two episode in 2004, the fact is that there are many

15   "natural experiments" of how licensing structure—specifically, exclusive or non-exclusive

16   licensing—affects videogame pricing. Every data point indicates that retail launch pricing is the

17   same either way, and that the great majority of consumers pay the full launch prices.

18       What plaintiffs portray as "competitive conditions," *i.e.,* non-exclusive licensing, persisted

19   for many years before EA acquired the exclusive licenses at issue—not just in 2004. EA had

20   NFL-licensed football competition every year from 2000 to 2004, and it always launched *Madden*

21   *NFL* on Xbox and PS2 at $49.99.[19]

22       After 2004, premium games across all genres continued to adhere to industry standard

23   launch pricing—$59.99 for the Xbox 360 and PS3 consoles (the latest generation platforms,

24   _____

25   [18] Schatz Decl. Ex. 12, Feldman, *Take Two preps industry for ESPN sports game price hike: Execs make it clear that time is running out on the $20 price tag*, GameStop (Dec. 2004), at
26   EA00869705.

27   [19] Ordover Decl. ¶¶ 79-80, [Figure 11]; Schatz Decl. Ex. 9, Miele Dep. 13:11-18 ("[T]here was an industry standard price for PlayStation 2 products that consumers paid 49.99 for new release ... premium products.").

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1  which were launched in 2005 and 2006, respectively).[20]  A key data point is that since 2005, both

2  Take-Two and EA have released their NBA and NHL games at $59.99 on lastest-gen

3  platforms.[21]  The NBA and NHL have not adopted exclusive licensing; Take-Two was and

4  remains a league licensee.  Nevertheless, while Take-Two also priced its 2004 NBA and NHL

5  games at $19.99, it has always released the Xbox 360 and PS3 versions of those games at

6  $59.99.  Take-Two also re-entered the football category with the release of *All-Pro Football 2K8*

7  in 2007, and priced that game at $59.99.[22]  Intra-sport, head-to-head competition has not led to

8  the kind of price competition the plaintiffs assume.

9        There was one notable market reaction to Take-Two's promotional pricing that persists

10  today.  It concerns the NBA, which before and after 2004 has licensed its IP non-exclusively RE
                                                                                                   DA
                                                                                                   CT
                                                                                                   ED

        This is another reason one cannot reasonably assume that non-exclusive

16  licensing would lead to generalized price competition.

17        **E.    The Challenged Exclusive Licenses Did Not Meaningfully Change Industry
18              Dynamics**

19        Plaintiffs have characterized the exclusive league licenses at issue as a way for EA to

20  quell price competition.  In fact, the licenses changed very little about the markets in which EA

21  competes.  Mindful that this is not the time to argue the merits (even though plaintiffs clearly

22  have), we try below to put the licenses in perspective.

23  ─────────────
    [20] Ordover Decl. ¶ 77, [Figure 9]; Hamburger Decl. Ex. 1, at 4.  *See also* supra note 1 at
24    EA00878448 (top 10 selling games are priced at approximately $59; the only exceptions are
      higher-priced games that are packaged with peripherals, such as Rock Band); Schatz Decl. Ex.
25    6, NPD Data (indicating that premium next-generation titles, such as BioShock, Call of Duty
      4, and NBA 2K8, launch at $59).

26  [21] Schatz Decl. Ex. 6, NPD Data; *see also* Hamburger Decl. Ex. 1, at 15; Eibeler Decl. ¶ 7.

27  [22] *See id.* Ex. 6, NPD Data; Ex. 13 (advertising $59.99 launch price).

28  [23] Schatz Decl. Ex. 14, Amendment to NBA License Agreement (Mar. 2005), at EA00766340.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15        DEFENDANT'S OPPOSITION TO PLAINTIFFS'
          MOTION FOR CLASS CERTIFICATION
          CASE NO. C-08-02820 VRW

1

### 1.    The NFL

2       The NFL—not EA—chose to move from non-exclusive to exclusive licensing.[24]

3       Prior to 2005, the NFL licensed its IP to videogame publishers on a non-exclusive basis.

4   In 2004, there were four licensees, down from eight in 2001 and twelve in 1998.   Other than

5   *Madden NFL,* none of the games sold well.  By 2003,                REDACTED

6                                                                                    ),

7   Atari's sales were *de minimus*, and Sega's sales were declining quickly every year.[25]  Further, the

8   NFL had                                REDACTED

9                                          and concluded that EA dominated due to its superior investment,

10  marketing, and game quality.[27]   *Madden NFL*'s share of NFL football titles was over 85%[28]; EA

11  had, in the NFL's view, a        REDACTED                        REDACTED

12

13       EA's non-exclusive license with the NFL was due to expire in March 2004.   REDACTED

14                                                                          REDACTED

---

15  [24] Gertzog Declaration ISO EA's Opp. to Mot. for Class Cert. ¶ 12 [hereinafter Gertzog Decl.].
16  Gary Gertzog is the NFL's Senior V.P. of Business Affairs and General Counsel.  *See also*
    Linzner Declaration ISO EA's Opp. to Mot. for Class Cert. ¶¶ 2 & 4 [hereinafter Linzner
17  Decl.].

    [25] O'Mara Declaration ISO EA's Opp. to Mot. to Class Cert. Ex. 1, at NFL 001915 & NFL
18  001925; Ex. 2, Electronic Arts (Mar. 4, 2004), at NFL 000156 [hereinafter O'Mara Decl.];
    Gertzog Decl. ¶ 5.

19  [26] Gertzog Decl. ¶ 7; O'Mara Decl. Ex. 2, at NFL 000156.

20  [27] Gertzog Decl. ¶¶ 5 & 13; O'Mara Decl. Ex. 3, at NFL000187         REDACTED
                                                                    ; Ex. 1, at NFL
21  001925                          REDACTED

22  [28] Ordover Decl. ¶ 36, [Figure 5]; Schatz Decl. Ex. 6, NPD Data.

23  [29] O'Mara Decl. Ex. 4, at NFL 001546              REDACTED

24              Ex. 5, at NFL 000259 (same); Ex. 6, at NFL 001256 (   REDACTED

25  [30] *Id.*

26  [31] Gertzog Decl. ¶ 6; O'Mara Decl. Ex. 7, at NFL 000196          REDACTED

27                                      ; Ex. 1, at NFL 001925; Ex. 8, at NFL 000054
    ("        REDACTED        Ex. 2, at NFL 000158 (depicting a mock "EA NFL P&L"); Ex.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16                    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
                      MOTION FOR CLASS CERTIFICATION
                      CASE NO. C-08-02820 VRW

1
REDACTED

The NFL's evaluation led it to three conclusions:

4
■   REDACTED

5

6

7

8

9     Sometime in the spring of 2004, the NFL approached EA and other publishers about the

10   possibility of moving toward a new licensing model.[34]  Contrary to plaintiffs' assertion, the NFL

11   was the first to raise the possibility of an exclusive license with EA—not the other way around.[35]

12   EA responded by proposing an exclusive on May 25, 2004, one month *before* Take-Two

13   announced its intention to release sports titles at $19.99.[36]  The NFL decided it was not ready to

14   make a decision on exclusivity and therefore granted EA (and others) a one-year non-exclusive

15   in June 2004 to cover that year's product cycle.[37]

16        Throughout the summer of 2004, the NFL continued to evaluate its licensing strategy.[38]

17   9, at NFL 000062-63 (                          REDACTED

18          Ex. 10, at NFL 001633              REDACTED

19                          Ex. 11, at NFL 000070 (            REDACTED

20   [32] Gertzog Decl. ¶¶ 6 & 8; O'Mara Decl. Ex. 1, at NFL 001925.

21   [33] Gertzog Decl. ¶¶ 8 & 15; O'Mara Decl. Ex. 7, at NFL 000196-199; Ex. 9, at NFL 000057; Ex.
22   12, at NFL 001827.

     [34] Gertzog Decl. ¶¶ 9 & 10; O'Mara Decl. Ex. 11, at NFL 000070 ("       REDACTED
23                          Ex. 13, at NFL 000026 (        REDACTED          );
     Linzner Decl. ¶ 2.

24   [35] Gertzog Decl. ¶¶ 12 & 13. *See also supra* note 31; Linzer Decl. ¶ 2; Schatz Decl. Ex. 15, at
25   EA00311293 ("NFL [is] hinting at going exclusive.").

26   [36] O'Mara Decl. Ex. 11, at NFL 000076; Linzer Decl. ¶ 2.

     [37] Gertzog Decl. ¶ 9; Linzner Decl. ¶ 2.

27   [38] Gertzog Decl. ¶ 10; O'Mara Decl. Ex. 4, at NFL 001546 (        REDACTED
                          Ex. 14, at NFL 001282          REDACTED

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

17        DEFENDANT'S OPPOSITION TO PLAINTIFFS'
          MOTION FOR CLASS CERTIFICATION
          CASE NO. C-08-02820 VRW

1    Meanwhile, Take-Two entered into its co-distribution agreement with Sega and in July 2004

2    released *ESPN NFL 2K5* at $19.99.  Plaintiffs suggest this was the motivation for the exclusives,

3    but the NFL knew through conversations with Take-Two's management that it was a temporary

4    pricing strategy, and that Take-Two intended to charge industry-standard prices on the soon-to-

5    be-released Xbox 360 and PS3 platforms.[39]    Plus, the NFL's move toward exclusivity was

6    already underway.

7         In the fall of 2004, the NFL completed its strategic analyses and concluded that an

8    exclusive with EA would best promote the NFL brand and maximize the value of its IP rights.[40]

9    The NFL was also well aware that it could not practically grant an exclusive to anyone *other*

10   than EA.  The NFL knew that the *Madden NFL* title had become iconic; it was by far the most

11   popular NFL videogame, its reviews were strong, and EA's marketing was outstanding.[41]

12   Consequently the NFL                                 REDACTED

13   EA was also the only potential licensee with the '                REDACTED

     So, wanting the benefits of an exclusive license, the NFL really only

15

16

                                 REDACTED
17

18   [39] Gertzog Decl. ¶ 11; Eibeler Decl. ¶ 6.  *See also* supra note 18.

19   [40] Gertzog Decl. ¶ 12.  *See also* O'Mara Decl. Ex. 16, at NFL 000270-282; Ex. 7, at NFL 000198
                                 REDACTED
20

21   [41] Gertzog Decl. ¶ 13: O'Mara Decl. Exs. 5. at NFL 000259: Ex. 7. at NFL 000198  REDACTED

22         Ex. 3, at NFL 000187 (same).

23   [42] O'Mara Decl. Ex. 5, at NFL000259.
     [43] O'Mara Decl. Ex. 5. at NFL 000259                REDACTED

25

26         *See also id.* Ex. 15. at NFL 000253              REDACTED

27                 Gertzog Decl. ¶ 13.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
                                 18    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
                                       MOTION FOR CLASS CERTIFICATION
                                       CASE NO. C-08-02820 VRW

1   had EA as a potential exclusive partner.[44]

2          In 2007, the NFL decided to renew its license with EA   REDACTED   [45]   The NFL

3   determined that the existing license had been financially optimal for the NFL, maximized EA's

4   investments in innovation and marketing, and successfully promoted the NFL brand, with

5   *Madden NFL* being one of the top-selling videogames in a very competitive, crowded market.

6   Gertzog Decl. ¶¶ 15-16.

7                    **2.    The NCAA (CLC) License**

8          Plaintiffs' story that EA acquired the NCAA license to squelch competition borders on

9   the frivolous.  No videogame maker other than EA even published an NCAA football game at

10  the time EA acquired this exclusive.

11         Between 1994 and 2005, the Collegiate Licensing Company ("CLC"), the NCAA's

12  licensing arm, entered into a series of non-exclusive licenses with EA, Sega, and Sony.  Drucker

13  Declaration ISO EA's Opp. to Mot. for Class Cert. ¶¶ 4-5 [hereinafter Drucker Decl.].  During

14  this time, EA obtained a 90+ percent share of the collegiate football category.  *Id.* ¶ 7.  By

15  contrast, Sega and Sony's NCAA-branded games had minimal sales.  *Id.* ¶ 7-8.   REDACTED

16                                                        as well as the obvious under-performance of their games, the

17  CLC determined that Sega and Sony were not committed to the category.  *Id.* ¶ 8.  2004 left no

18  doubt.  Neither Sega nor Sony published an NCAA-branded football game in 2004, choosing to

19  exit the category instead.  *Id.*  Consequently, EA was the only publisher to produce an NCAA-

20  branded football game in 2004, giving EA another "de facto" exclusive.  *Id.* ¶ 8.[46]

21

22  [44]                                     REDACTED

23                                                                                  Gertzog
    Decl. ¶ 14.
24  [45] The renewal is also a limited exclusive.  The NFL continues to   REDACTED
                                                                          O'Mara Decl. Ex. 17,
25  at NFL 000359.

26  [46] *See also* Schatz Decl. Ex. 16, GameSpot.com, The History of Football Games ("A year after
        Sega … gave up on college football, Sony followed suit, making NCAA GameBreaker 2004
27      [sold in 2003] the last in a promising series that just didn't evolve fast enough for the times.
        That left EA all alone, with a de facto monopoly on college football.").
28

1       This was the context of the EA-NCAA exclusive, and again the licensor—the CLC in this

2   case—approached EA.  *Id.* ¶ 9; *see also* Linzner Decl. ¶ 7.  The CLC raised exclusivity with EA

3   sometime in late-2003 or early-2004, well before Take-Two priced other sports titles at $19.99.

4   Drucker Decl. ¶ 9.  The CLC exclusive with EA was not executed until February 2005 simply

5   because the CLC had to approach more than 140 separate properties—colleges, bowl games,

6   conferences, etc.—before it was in a position to execute the deal.  Linzner Decl. ¶ 8.

7       After going exclusive in 2005, EA increased its R&D and marketing spends, and *NCAA*

8   *Football* sales skyrocketed.  Drucker Decl. ¶¶ 17-18.  EA grew the category from approximately

9   REDACTED       [47]    In other words, output increased under exclusivity.[48]

10  ### 3.    The AFL

11      Plaintiffs' allegations about EA's license with the Arena Football League ("AFL") *are*

12  *frivolous*; there is no two ways about it.  The AFL was an indoor, spring football league until it

13  suspended operations in 2008.[49]  In 2004, the AFL approached EA, and offered EA a license for

14  essentially nothing—no minimum guarantees and no royalties for game sales—along with an

15  option to purchase an AFL team.  Linzner Decl. ¶ 11.  The AFL's motivation was to promote

16  itself and obtain an air of legitimacy by having an EA-produced videogame like the NFL had.

17  *Id.*  At that time, no AFL videogame was being produced.  EA produced two AFL games

18  pursuant to this deal before the AFL suspended operations in 2008.  The AFL games, like the

19  league, never attained any real popularity and sales were miniscule.  *Id.* ¶ 13.  Consequently, it is

20  absurd to suggest that by agreeing to take the AFL license, EA monopolized the alleged

21  interactive football software market.  The AFL license was competitively meaningless.

---

24  [47] Ordover Decl. ¶ 123 n. 215; Schatz Decl. Ex. 6, NPD data.

25  [48]                       REDACTED

                                                       Drucker

26  Decl. ¶ 22; Linzner Decl. ¶¶ 6 & 10; Schatz Decl. Exs. 17, License Agreement: NCAA Football (Jul. 1, 2005), at EA00000097; Ex. 18, License Agreement: NCAA Football (Jul. 1, 2008), at EA00768664.

27  [49] Linzner Decl. ¶ 13; Schatz Decl. Ex. 19, AFL Suspends 2009 Season (Dec. 15, 2008).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20      DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1

2    **F.    Investments In Quality Increase Under Exclusivity**

3         Plaintiffs argue that, since EA acquired these exclusives, game quality has suffered.  Pl.

4    Motion at 35.  They present an entirely *ex post* argument, premised on a purported drop in

5    "Metacritic scores," an amalgam of game reviews.[50]  Plaintiffs seem oblivious to the class

6    certification ramifications of this argument.  There could hardly be anything more individual-

7    specific, and therefore less susceptible to class-wide adjudication, than injury claims rooted in

8    subjective assessments of a game's "quality."  Videogames are entertainment, the quality of

9    which is mostly in the eye of the beholder, and obviously individuals will differ in what they like

10   or dislike.  This is clear in the reviews that underlie the Metacritic scores plaintiffs cite.

11   Compare the following two reviews for *Madden NFL 07* on Xbox 360:

12        ▪   The Good:  "It's no surprise that this next-gen Madden is a graphic powerhouse,
              but with so many deep and innovative gameplay additions, it also might be the
13            best Madden game to date."  GamePro's Review of *Madden NFL 07* on Xbox
              360.      GamePro.com,    *Madden     NFL    07*,    Aug.    22,    2006,
14            http://www.gamepro.com/article/reviews/79475/madden-nfl-07/.

15        ▪   The Bad:  "As far as this game rates versus my expectations of a football game on
              the 360, it is a major disappointment."  GameShark's Review of *Madden NFL 07*
16            on Xbox 360.  GameShark.com, *Madden NFL 07* Review, Sept. 8, 2006,
              http://www.gameshark.com/reviews/2443/p_0/Madden-NFL-07-Review.htm.

17   Perhaps the six-to-ten *million* consumers who buy EA's football videogames each year will not

18   disagree as profoundly as these two professional reviewers, but the point is that no individual's

19   take on quality can speak for or bind consumers as a whole.  Measuring quality *ex post* by how

20   people react to the games would be fatal to class certification.[51]

21

22   ─────────────────
     [50] Metacritic provides scores for videogames are based on weighted average of critic and user
23   reviews gathered from various sources; videogames are scored from 1 to 100.  Hamburger
     Decl. Ex. 1, at 40.

24   [51] Moreover, technology challenges, variations in taste, and numerous other exogenous factors
     influence the final product and how consumers react to it.  For example, Metacritic scores
25   drop across-the-board during industry transitions to new platforms.  That is relevant here
     because a new generation of consoles was introduced in Nov. 2005 (Xbox 360) and Nov. 2006
26   (PS3).  The drop in Metacritic ratings plaintiffs cite is directly related to this transition and
     affected much more than football titles.  Ordover Decl. ¶¶ 117-121; Hamburger Decl. Ex. 1, at
27   41-42.  What one person views as disappointing might be the best that anyone could have
     produced, no matter how competitive the market.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    In all events, the antitrust question about how exclusive licensing affects quality should be

2    how, *ex ante*, it affects *investments* in quality. Economic theory predicts that intellectual property

3    licensors will often opt for an exclusive licensing structure in order to maximize a licensee's

4    incentive to invest in the product.[52]  Both the NFL and CLC viewed exclusivity that way.  Gertzog

5    Decl. ¶ 8; Drucker Decl. ¶¶ 9-10 & 13.   If the licensee responds accordingly and increases

6    investment levels, it does not matter if it produces *Avatar* or *Ishtar*, both of which in their day

7    were among the most expensive movies ever made.  The effort to produce quality is what matters.

8    EA has increased its research and development spends REDACTED  for *Madden NFL* and

9    REDACTED  for *NCAA Football* since entering into those exclusives.[53]   That improved both actual

10   and perceived quality.  Since 2005, sports games with exclusive league licenses (e.g., *Madden*

11   and *NCAA*) have generated higher overall Metacritic scores than sports games with non-

12   exclusive league licenses (e.g., NBA and NHL).  Hamburger Decl. Ex. 1, at 42-43.  If plaintiffs

13   Pecover and Lawrence want to testify for themselves that quality has suffered, they may offer

14   their opinions.  But they do not and cannot speak for other members of the putative class.

15   **III.    DISCUSSION**

16   A class may be certified only if the party seeking certification has (i) established the

17   prerequisites of Rule 23(a) (commonality, typicality, numerosity, and adequacy of

18   representation) and (ii) shown that the action is maintainable under Rule 23(b).  *Zinser v. Accufix*

19   *Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Here, plaintiffs seek an injunctive

20   class under Rule 23(b)(2) and a damages class under 23(b)(3).  A Rule 23(b)(3) damages

---

[52] *See, e.g., Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 740 (7th Cir. 2003) (stating that an owner of intellectual property "can ordinarily be expected … to grant an exclusive license in order to encourage the licensee to invest in the further development of the licensed … product."); 1 Eckstrom, Licensing In Foreign & Domestic Operations § 1:8.50 (2008) (exclusive licenses "encourage the licensee to invest in the further development of the licensed process or product").

[53] Schatz Decl. Ex. 20, Madden Summary P&Ls by Ship Year, EA00786413 (    REDACTED

Ex. 21, NCAA Summary P&Ls by Ship Year, EA00787451
REDACTED

Hamburger Decl. Ex. 1, at 34; Ordover Decl. ¶ 122.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22       DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    may only be certified if, in addition to the requirements of Rule 23(a), "the questions of law or

2    fact common to class members predominate over any questions affecting only individual

3    members, and ... a class action is superior to other available methods for fairly and efficiently

4    adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3).

5         Plaintiffs carry the burden of meeting all of Rule 23's requirements. *Zinser*, 253 F.3d at

6    1186. The trial court must conduct a "rigorous analysis" to determine whether plaintiffs have

7    met this burden. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982). The trial court

8    must "probe behind the pleadings" and consider all of the evidence necessary to determine

9    whether common issues will predominate at trial. *Id.* at 160. Furthermore, "the court must

10   resolve all factual or legal disputes relevant to class certification, even if they overlap with the

11   merits—including disputes touching on elements of the cause of action." *In re Hydrogen*

12   *Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).[54] The days when plaintiffs could

13   insulate any assertion from scrutiny by claiming it was "a merits issue" are over.[55]

14        "[T]he court's obligation to consider all relevant evidence and arguments extends to

15   expert testimony, whether offered by a party seeking class certification or by a party opposing

16   it." *Id.* at 307. It is no longer the case that "an expert's report will sustain a plaintiff's burden so

17   long as it is not fatally flawed." *In re IPO*, 471 F.3d at 40. *See also Allied Orthopedic*

18   *Appliances v. Tyco Healthcare Group*, 247 F.R.D. 156, 165-72 (C.D. Cal. 2007) (same).

19   **A.    Plaintiffs Have Failed To Show That Common Issues Predominate**

20        **1.    Rule 23(b)(3) Requirements For Antitrust Damages Class**

21        Plaintiffs begin their argument with the claim that EA's conduct cannot be illegal as to

22   some members of the class but not others. Pls.' Mot. at 2. If "illegal" means actionable, that is

23   flat wrong. It is well understood that "the issue of liability in antitrust cases includes not only the

---

[54] *See also In re Initial Pub. Offering Sec. Litig. (In re IPO)*, 471 F.3d 24, 32 (2d Cir. 2006) (same); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004) (same); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001) (same).

[55] Plaintiffs must prove each element of Rule 23's prerequisites by "a preponderance of the evidence." *In re Hydrogen Peroxide,* 552 F.3d at 307.*See also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228-29 (5th Cir. 2009) (same); *Teamsters Local 445 Freight Pension Fund v. Bombardier*, 546 F.3d 196, 202 (2d Cir. 2008) (same).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    question of violation, but also the question of fact of injury, or impact." *Alabama v. Blue Bird*

2    *Body Co.*, 573 F.2d 309, 320 (5th Cir. 1978); *see also In re New Motor Vehicles*, 522 F.3d at 19

3    n.18 ("The element of injury in the antitrust context ... requires both injury-in-fact and a

4    showing that the injury is the result of the antitrust activity.").[56]  In other words, "[p]roof of

5    injury is an essential substantive element of" an antitrust claim.  *Kline v. Coldwell, Banker &*

6    *Co.*, 508 F.2d 226, 233 (9th Cir. 1974).

7            This has turned out to be the decisive issue in most antitrust class action decisions.  The

8    "violation"—what happened and whether it is anticompetitive under the applicable substantive

9    standards—is almost always susceptible to common proof.  Nevertheless, it is self-evident that

10   individualized proof of impact on each class member would make any class trial wholly

11   unmanageable.  Thus the rule has developed that "[i]n antitrust class actions, common issues do

12   not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be

13   established through common proof."  *In re New Motor Vehicles*, 522 F.3d at 20 (reversing

14   certification of 20 state subclasses); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311

15   ("In antitrust cases, impact often is critically important for the purpose of evaluating Rule

16   23(b)(3)'s predominance requirement because it is an element of the claim that may call for

17   individual, as opposed to common, proof.").  Unless common proof is sufficient to fully and

18   fairly adjudicate impact for each class member, such that individualized proof can be dispensed

19   with, class certification is improper.[57]

20           Plaintiffs must also show that the challenged conduct had a "common impact," meaning

21   that most if not all members of the putative class were hurt by it.  The case law is somewhat

22   _____

[56] A "showing of injury in fact" is also required under California's UCL law.  *See, e.g., Gartin v.*
23   *S&M Nutec, LLC*, 245 F.R.D. 429, 440 (C.D.Cal. 2007) (denying nationwide and California
     class).

24   [57] *See Blades v. Monsanto*, 400 F.3d 562, 572-74 (8th Cir. 2005) (affirming denial of class
     certification where plaintiffs' expert "did not show that injury could be proven on a class wide
25   basis with common proof"); *Bell Atlantic v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)
     ("where fact of damage cannot be established for every class member through proof common
26   to the class, the need to establish antitrust liability for each class member defeats Rule 23(b)
     predominance."); *Allied Orthopedic*, 247 F.R.D. at 165 ("In the class action context, class
27   certification is precluded where plaintiffs have not shown that the fact of injury element can be
     proven for all class members with common evidence.").

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24          DEFENDANT'S OPPOSITION TO PLAINTIFFS'
            MOTION FOR CLASS CERTIFICATION
            CASE NO. C-08-02820 VRW

1    unclear about how high this bar is, i.e.,  whether a plaintiff must really prove that everyone was

2    injured, but the fine points do not matter here.  Even the most plaintiff-friendly cases hold that a

3    class may not be certified "if it is apparent that it contains a great many persons who have

4    suffered no injury at the hands of the defendant."  *Kohen v. Pacific Investment Management Co.*

5    *LLC*, 571 F.3d 672, 677 (7th Cir. 2009).  *See also Romberio v. Unumprovident Corp.*, No. 07-

6    6404, 2009 WL 87510, at *8 (6th Cir. Jan. 12, 2009) (class certification not proper "where a

7    class definition encompasses many individuals who have no claim at all to the relief requested");

8    *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (class certification improper where

9    "[c]ountless members of … putative class could not show any damage").

10    Because these plaintiffs are *indirect* purchasers, they must solve the impact puzzle *twice*:

11    first establishing that there was a common impact on direct purchasers, and then establishing that

12    pass-through can be determined through common proof.  *See In re Graphics Processing Units*

13    *Antitrust Litig.*, 253 F.R.D. 478, 503 (N.D. Cal. 2008) ("In order to even begin to demonstrate

14    widespread injury to the indirect-purchaser class, however, plaintiffs must first demonstrate that

15    there is a way to prove injury to direct purchasers on a common, formulaic basis."); *see also*

16    *Infineon Technologies AG*, No.06-4333, 2008 WL 4155665 at *6 (Sept. 5, 2008 N.D. Cal.)

17    ("where, as here, the proposed class includes indirect purchasers, proof of impact requires a two-

18    fold showing: first, that defendants caused the prices paid by direct purchasers … to be

19    artificially high; and second, that the overcharge paid by the direct purchasers was 'passed on' to

20    the indirect purchasers.").

21    *In re New Motor Vehicles*, 522 F.3d 6 (1st Cir. 2008), is instructive.  In that case indirect

22    purchasers tried to certify a class of car buyers allegedly hurt because the defendant auto makers

23    collectively restricted imports from Canada.  In support of their motion for class certification,

24    plaintiffs cited all the usual cases about how impact from collusion can be presumed, and then

25    proceeded to address pass-through.  The First Circuit held this was error because the price effects

26    of the import restrictions on direct purchasers (U.S. dealers) were questionable.  Plaintiffs'

27    theory assumed that "gray marketing" cars from Canada would require U.S. automakers to lower

28    prices to all U.S. auto dealers.  That was anything but certain:  "As plaintiffs themselves note,

1   without a very large number of cars poised to cross the border, a nationwide impact on the

2   automobile market of the sort required by plaintiffs' theory is implausible, and the theory

3   collapses." *Id.* at 27.  Plaintiffs' theory also assumed there were no permissible vertical restraints

4   by which gray marketing could be controlled absent collusion.  *Id.*  The First Circuit held that

5   when harm to consumers turns on a complex theory of causation and impact, a district court

6   "must engage in a searching inquiry into the viability of that theory and the existence of the facts

7   necessary for the theory to succeed." *Id.* at 26.  It reversed the class certification order because

8   plaintiffs had failed to define "the pivotal elements of their theory" and establish that the facts to

9   pursue the theory existed. *Id.*

10      Where plaintiffs have not established common impact to direct purchasers, the court need

11   not reach the sufficiency of any proposed common proof of pass-through.  *In re Graphics*

12   *Processing Units Antitrust Litig.,* 253 F.R.D. at 503; *Am. Seed Co. v. Monsanto Co.,* 238 F.R.D.

13   394, 402 (D. Del. 2006) (denying certification to indirect purchasers because "[e]ven assuming

14   overcharges were in fact passed through *in toto* in all cases, negating any need for individualized

15   inquiry, the premise of plaintiffs' theory ... rests upon the presumption of impact on the direct

16   purchasers.").  In other words, without proof of an increase in wholesale prices, plaintiffs'

17   hypothetical "pass through" analysis is simply irrelevant.

18          **2.      Plaintiffs Abdicate The First Step Of The Requisite Analysis**

19      Remarkably, plaintiffs have approached this case as if pass-through, the second step in

20   the analysis, is the only issue.  They have simply assumed that exclusive licensing has a market-

21   wide price effect on direct purchasers and do not offer any economic evidence that the alleged

22   antitrust violation had a common impact on wholesale prices.  The total failure to address

23   wholesale pricing is fatal to the request for class certification.

24          a.      **Plaintiffs Fail To Offer A Theory Of Common Impact That Accounts
                    For Industry Standard Launch Prices And Inter-Temporal Pricing**

25

26   Plaintiffs' economist, Prof. MacKie-Mason, provides no analysis of wholesale prices in

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1  any "but for" world.[58] He concedes that he did not study the issue, but merely *assumed* that

2  wholesale prices were higher.[59]

3       In fact, the two irrefutable characteristics of the videogame industry discussed above,

4  industry-standardized launch prices and inter-temporal price discrimination, ensure that millions

5  of members of the putative class were not injured by the challenged conduct. Plaintiffs'

6  economist concedes the existence of inter-temporal price discrimination,[60] and that whether

7  competitive pressure would cause EA to change its "launch price strategy or ... change the

8  timing and the rate of its post launch discounting strategy" are "questions relevant to calculating

9  what the but-for price would be." MacKie-Mason Dep. 115:4-13. He also concedes that there

10 needs to be an effect on EA's launch prices for early consumers to suffer any overcharge injury.

11 *Id.* 30:21-31:9 (conceding that if there was "no difference in EA's [launch] price without an

12 exclusive license .... then there would be no actual damage suffered by people who bought at

13 launch because they would have paid the same price either way"). Plaintiffs' economist

14
15 [58] Schatz Decl. Ex. 22, MacKie-Mason Dep. 12:20-23 ("I have not measured whether or not
there was actually wholesale price increase that can be causally attributed to the signing of
exclusives."); *id.* 27:4-6 ("I haven't done an analysis of whether or not those specific prices
16 were higher than they would have been."); *id.* 91:15-18 ("Q: you have not conducted an
analysis of what EA's but-for pricing would have been, right? A: That's correct."); *id.*
17 135:20-22 ("I have not calculated but-for prices at launch, at wholesale or at retail"); *id.*
82:1-10 ("Q: [H]ave you reached any professional opinions...as to whether the wholesale
18 prices would have been lower throughout the entire sales cycle? A: No...I have not
measured the but-for world."); *id.* 91:13-92:3 ("Q: [Y]ou can't say whether ... the price
19 actually paid is above the but-for price for a minority or a majority of the class? A: As I sit
here now, I have not done that study.").

20 [59] *Id.* 191:15-17 ("It is true that I assumed that there would be an overcharge because that's
what's alleged in the Complaint..."); *id.* 85:24-86:20 ("Q: Is it correct to say that you have
21 not reached any professional conclusions to which you can testify as an expert as to whether
most consumers of EA's interactive football software were injured by way of an overcharge?
22 A: I have not done a study of how much overcharge there actually is and whether or not that
overcharge in fact was sustained throughout the year...That's what's alleged in the
23 Complaint, and I've taken that as given."); *id.* 134:21-135:3 ("I haven't assessed whether
there was an anti-competitive impact."); *see also id.* 12:20-13:6, 87:10-12 & 135:7-10. The
24 Court is not faced with the usual "battle of experts" over whether plaintiffs can establish
class-wide impact by common proof. Rather, Prof. MacKie-Mason concedes he has only
25 done half the analysis—his opinion is limited to whether any overcharge that *might* exist
would have been "passed through" to indirect purchasers.
26 [60] MacKie-Mason Decl. at ¶ 26-27; Schatz Decl. Ex. 22, MacKie-Mason Dep. 15:17-21 ("Q:
27 [T]he pricing of video games is characterized by inter-temporal price discrimination, right?
A: Yes."); *see also id.* 83:10-18.
28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

27

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    nevertheless concedes that he has undertaken no analysis—zero—regarding how EA would have

2    priced its football videogames in the but for world.

3        *No Evidence That Exclusive Licenses Impact Launch Price.*  The record irrefutably shows

4    that exclusive licensing does not cause videogame publishers to deviate from industry standard

5    launch prices.  Even in plaintiffs' test year of 2004, when Take-Two priced its NFL game at

6    $19.99, *Madden NFL* launched at the industry-standard price of $49.99.  Complaint ¶ 11.  Even

7    if one assumes that the $19.99 Take-Two game affected some later purchasers by accelerating

8    EA's usual practice of holiday discounting,[61] there is no evidence that EA or others have ever

9    discounted a premium title like *Madden NFL* at launch because of competitive pressures.

10       Take-Two's 2004 pricing, moreover, is the exception that proves the rule, because it is

11   the only known instance of a premium title not launching at industry-standard pricing, even in

12   the face of competition from within a sub-genre.  The best evidence is Take-Two's own pricing

13   of NBA and NHL titles.  Plaintiffs' expert testified that the NBA and NHL titles are "reasonable

14   benchmarks," and concedes that "if the only material difference between these two markets

15   [NFL / NCAA and NBA / NHL] was the lack or existence of exclusive licenses and the pricing

16   was the same, that might suggest that for entry pricing the exclusive licenses don't matter."

17   MacKie-Mason Dep. 145:5-147:25.  Well, Take-Two priced its NBA and NHL games at $19.99

18   in 2004.  However, post 2004, Take-Two and EA have without exception released their NBA

19   and NHL titles for the Xbox 360 and PS3 platforms at $59.99—the exact same price at which

20   *Madden NFL, NCAA Football*, and every other premium game launches on these platforms.

21   Consequently, these "reasonable benchmarks" indicate that even in a "but for" world where there

22   are no exclusive football licensees, competition between EA and Take-Two would not affect

23

24

25   _____

26   [61]   EA did not discount Madden in 2004 until the holiday sale period in November, over two
     months after its release, in order to compete for the traditionally price-sensitive holiday
     shoppers.  Notably, plaintiffs' economist concedes that "it's possible that that might happen
27   again in the future in the but-for world."  Schatz Decl. Ex. 22, MacKie-Mason Dep. 125:9-
     19.

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    launch prices.[62]

2          This is key: plaintiffs concede that the vast majority of consumers purchase at or near

3    launch at full release prices. MacKie-Mason Decl. ¶ 136; MacKie-Mason Dep. 117:13-18.[63] It is

4    thus apparent from the launch pricing phenomenon alone that the class "contains a great many

5    persons who have suffered no injury at the hands of the defendant." *Kohen*, 571 F.3d at 677. The

6    law does not allow plaintiffs to merely *assume* otherwise.[64]

7          The only quasi-factual argument that plaintiffs offer on this issue is a citation to one EA

8    document that contemplates a lower launch price for *Madden NFL 2006* (which would launch in

9    2005). Pls.' Mot. at 12. This badly misses the mark. This November 2004 document assumed

10   that Take-Two would charge $19.99 for its sports games in the future. But two weeks later

11   Take-Two publicly announced that it would charge regular premium prices when the new Xbox

12   360 and PS3 games came out. Schatz Decl. Ex. 12; *see supra* Section II.C. So the proposal,

13   which may or may not have been accepted anyway, became moot. If this is the best plaintiffs

14   can do, it speaks volumes about their case.

15          *No Evidence That Exclusive Licenses Shifted The Discount Curve.* Plaintiffs have also

16   failed to address the alternative injury theory that discounting would have occurred sooner and /

17   or been steeper. Professor Mackie-Mason admitted this: "Q: Do you have any basis to believe

18   that in 2005 and '6 and '7 [EA] would have lowered prices any earlier? A: I haven't done that

19

20   [62] Plaintiffs' expert also agreed that if in the "but for" world the NFL imposed an NBA-style
21   contractual restraint on discounted launch prices, "that leads to zero damages for most
     plaintiffs." *Id.* 115:21-119:1. But he did not factor that into his analysis either.

22   [63] Plaintiff Geoffrey Pecover is illustrative of the inelastic video game consumer for whom
     "price isn't that big of a factor." Schatz Decl. Ex. 10, Pecover Dep. 68:3-14. Mr. Pecover
23   testified that he always purchases Madden at or near launch, that he's "never gotten to a point
     where [he] thought a game was too expensive to buy," and he would pay more than $59.99
24   for the game. *Id.* 60:20-61:21, 62:18-23 & 68:13-14.

     [64] *See, e.g., In re Med. Waste Servs.*, 2006-1 Trade Cases P 75,215, at *7 (D. Utah Mar. 3,
25   2006) ("Regarding the issue of common impact, Plaintiffs' expert merely *assumed* what
     needed to be demonstrated to establish the propriety of class certification.") (emphasis in
26   original); *Sample v. Monsanto Co.*, 218 F.R.D. 644, 651 (E.D. Mo. 2003) (refusing to certify
     where "plaintiffs *presume* class-wide impact without any consideration of whether the
27   markets or the alleged conspiracy at issue here actually operated in such a manner so as to
     justify that presumption") (emphasis in original), *aff'd sub nom. Blades*, 400 F.3d 562.

28

1  study, so I haven't reached a conclusion about that."[65] This is despite Professor Mackie-Mason's

2  acknowledgment that in the but for world EA must have charged lower wholesale prices at the

3  time a given consumer bought a videogame for there to be any damages.  MacKie-Mason Dep.

4  79:5-11, 88:1-7 & 192:7-11.  Indeed, Professor Mackie-Mason concedes that there are many "but

5  for" pricing scenarios where some consumers are impacted by an overcharge and others are not.

6  *Id.* 78:14-79:11, 94:15-95:11, 98:9-11, 102:13-21 & 126:2-9.

7      In fact, the evidence does not show that *Madden NFL* and *NCAA Football* have been

8  discounted less or later since EA obtained the exclusive licenses at issue; in some cases the

9  opposite is true.  Ordover Decl. at ¶¶ 104-107.  This is because sell-through determines the timing

10 and extent of discounting, and depending on what sells and what does not, discounting varies by

11 SKU, platform, time of purchase, and year of sale.  *See* Mackie-Mason Dep. 192:12-193:4

12 (acknowledging that discount curves vary by year, and stating, "there is some price variation

13 across platforms.... There is some price variation throughout the year for sure."); *see also id.*

14 84:5-10.  Plaintiffs have completely failed to show that these differences can be accounted for

15 with common proof in determining what impact, if any, the license agreements had.

16          3.    **Plaintiffs' Fallback Claims Of "Reduced Choice" And "Decreased**
17                **Quality" Cannot Establish Common Impact**

18     Plaintiffs allege that even if all class members did not pay higher prices, they have been

19 commonly harmed by a "lack of choice" and a decrease in game quality.  Pls.' Mot. at 34.  These

20 arguments are meritless, and the "quality" argument actually hurts plaintiffs' case.

21     *Choice.*  The "choice" argument is just rhetoric.  Plaintiffs provide no discussion, much

22 less evidence, to support this, and their expert had no idea what choice meant.  Revealing

23 absolutely no understanding of the basic facts of the record, Professor Mackie-Mason testified

24 that Take-Two produced a NCAA branded football game in 2004, which the market "lost."

25

26 [65] *Id.* 122:6-13; *see also id.* 82:1-24 (Q: "[W]hether [in but-for world] wholesale prices would
   have been lower throughout the entire sales cycle?  A: I have not measured the but-for
27 world...EA's specific reasons for picking a specific month, using a particular pattern of price
   change over time, I have not studied in depth.").

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
30
DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    MacKie-Mason Dep. 63:5-6.   In fact, neither Take-Two nor any other publisher besides EA

2    released a NCAA branded football game in 2004.[66]   Likewise, despite Prof. MacKie-Mason's

3    incorrect assumption to the contrary (*see* MacKie-Mason Dep. 183:8-13), no publisher produced

4    an AFL title in 2004.  In fact, no publisher produced an AFL title in the six years before EA did.

5    There is no credible argument that the CLC and AFL licenses reduced choice.

6         With respect to NFL-branded games, of course the NFL's decision to go exclusive with

7    EA meant that there were no other non-EA choices in NFL games going forward.  That does not

8    mean, however, that all or even most members of the putative class suffered a cognizable

9    "choice injury."  Business and Professions Code § 16750 provides a private right of action to

10   "[a]ny person who is injured in his or her business or property" by a violation of the Cartwright

11   Act.  An indirect purchaser plaintiff only suffers an "injury to business or property" when he

12   pays a higher price than he otherwise would have paid in the absence of the alleged violation.[67]

13   There is no authority of which we are aware that permits a loss of choice alone to meet this test.

14   Thus this argument fails at the start.[68]

15        Furthermore, *Madden NFL* was the overwhelming market choice for NFL videogames

16   *before the exclusive*.  Less than 15% of consumers chose either the Take-Two / Sega game or the

17

18

19   _____

   [66]   *See* Schatz Decl. Ex. 6 (NPD data).

20   [67]   *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004) (to demonstrate
21        impact, each plaintiff must prove a "purchase at a price higher than the competitive rate");
         *Blades*, 400 F.3d at 573 (to obtain class certification "each plaintiff must be able to present
22        evidence from which a jury could reasonably infer that the competitive price was less than
         the price that plaintiff paid"); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513
23        (S.D. Ill. 2004) ("If the total invoice price is equal to the but-for price, the customer would
         not be injured.").  California courts have repeatedly held that "California courts look to cases
24        construing the federal antitrust laws for guidance in interpreting the Cartwright Act." *Vinci
         v. Waste Management, Inc.*, 36 Cal. App. 4th 1811, 1814 n.1 (1995).

25   [68]   The same analysis applies to plaintiffs' UCL claim.  *See* Cal. Bus & Prof Code § 17204
         (restricting standing to "a person who has suffered injury in fact and has lost money or
26        property as a result of the unfair competition."  Injury in fact exists only where a party has
         (a) expended money due to defendant's acts of unfair competition; (b) lost money or
27        property, or (c) was denied money to which he or she has a cognizable claim. *Hall v. Time
         Inc.*, 158 Cal. App. 4th 847, 854 (2008).

28

1    even less popular Sony game.[69]   It makes no sense to claim that all class members suffered a

2    choice injury when very few cared about the other choices that were available to them.[70]

3         *Quality.*   Plaintiffs' arguments regarding a decrease in quality are even less availing.

4    Plaintiffs' only "evidence" of an alleged decrease in quality is a single citation to a third party

5    aggregation of critic reviews (i.e., Metacritic scores).   Critics' reviews are *ex post* measures of

6    *subjective* quality.   Subjective quality is something that inherently is in the eye of the beholder

7    and therefore varies individual to individual.   Indeed, Metacritic averages reviews precisely

8    because critics tends to differ in their subjective reactions to games, making any one review an

9    unreliable indicator of how others might react to the game.[71]   The wildly differing reviews of

10   *Madden NFL 07* quoted above are a telling case in point.   *See supra* Section II.F.

11         It is impossible to prove an injury to one person's subjective view of quality (assuming

12   that is cognizable) with common proof.   Obviously anyone claiming such an injury would need

13   to testify for him or herself.   For example, plaintiff Geoffrey Pecover affirmed in his deposition

14   that he thinks the game quality of *Madden NFL* has improved over time, *Madden NFL* is "more

15   realistic" and more challenging than it used to be, and that he enjoys it at least as much as he

16   always has.   Pecover Dep. 67:1-9 & 68:21-69:4.   That is the essence of individualized proof,

17   which in this case would defeat the claim of qualitative injury.   EA could not possibly be

18   prevented from challenging quality claims one at a time, rendering any class trial unmanageable.

---

19   [69]   ESPN NFL 2K5 released on PS2 and Xbox only.   Sony's NFL Gameday 05 released only on
20   the outdated PS platform, with sales amounting to roughly 0.3% of Madden 05 sales.   Schatz
     Decl. Ex. 6 (NPD data).

21   [70]   For the record, choice increased during exclusivity.   In 2006, EA alone produced six league
22   branded football games—Madden NFL 07, NFL Street 3, NFL Head Coach, NCAA Football,
     Arena Football, and Madden NFL: Hall of Fame—and released those games on ten platforms
23   (PS2, PS3, Xbox, Xbox 360, PSP, GBA, GCN, NDS, PC, and Wii).   *See* Schatz Decl. Ex. 6
     (NPD data).

24   [71]   Metacritic scores would not even be admissible at trial.   Third party consumer reviews are
25   inadmissible under Fed. R. Evid. 803.   *See, e.g., LG Electronics U.S.A. v. Whirlpool Corp.*,
     661 F.Supp.2d 940, 948 (N.D. Ill. 2009) ("[E]vidence from *Consumer Reports* articles and
26   the like is inadmissible…to prove the truth of the matters asserted therein.").   Metacritic
     scores are an uncertified numerical average of consumer report statements not subject to
27   cross-examination.   Since the scores are being offered to prove the matter they assert, namely
     the quality assessments which the scores purport to aggregate, they are inadmissible as
     hearsay.

28

1     Of course plaintiffs' economist has done no *analysis* concerning innovation or quality of

2  the products at issue, even though he concedes that "people value quality differently," i.e., it is

3  largely subjective, and "[t]here are situations in which an exclusive right might lead to more

4  innovation." MacKie-Mason Dep. 162:23-24 & 41:22-23; *see also id.* 37:25-38:17, 42:20-43:7,

5  160:6-15, 168:13-19 & 170:8-20.   The latter point is important, because the quality effects of

6  exclusive licensing are not necessarily *bad*.   Exclusive licensing gets relatively favorable

7  treatment under antitrust law because it usually leads to greater investments in quality. *Theee*

8  *Movies of Tarzana,* 828 F.2d at 1399-1400.   In fact, EA's R&D spend increased exponentially

9  after it entered into the licenses at issue. *See supra* Section II.F.   The bottom line is that

10 plaintiffs cannot shore up their monetary damages case, which is based solely on an assumption

11 of higher wholesale prices, with just *a point of view* that subjective quality has declined.

12          **4.     The Court Cannot "Assume" The Existence Of Antitrust Injury**

13     Having completely failed to address wholesale pricing, plaintiffs argue that they need not

14 show common impact at all—rather, it may be assumed under California law. Pls.' Mot. at 34.

15 This argument has two subparts.

16     *First*, plaintiffs argue that Cal. Code Civ. Proc. §384 does not require a plaintiff seeking

17 class certification to demonstrate common impact.   *Id.* at 34.   This argument is frivolous.

18 Rule 23 governs this motion; state procedural rules are irrelevant.   Moreover, this statutory

19 provision has nothing to do with whether indirect purchasers in a purported class action must

20 show antitrust impact through common proof.   By its own terms, it addresses "distribution of

21 unpaid residuals in class action litigation" after a judgment. Cal. Code Civ. Proc. §384.

22     *Second*, plaintiffs argue that injury may be presumed "when a horizontal market-wide

23 restraint of trade is alleged." Pls.' Mot. at 34.   In support of that argument, plaintiffs cite a single

24 case, *In re Cipro I and II*, 121 Cal. App. 4th 402, 413 (2004).   Plaintiffs' reliance on *Cipro* is

25 also misplaced.   *Cipro* held—unremarkably—that injury to a class can be established by

26 common proof.   *Id.* at 412.   In reaching this holding, the court considered whether injury can be

27 presumed when a *horizontal market-wide* restraint (e.g., price fixing) is alleged.   *Id.* at 413.

28 This, however, is not a horizontal restraint case. As the Court's Order on EA's motion to dismiss

1   states, this is a vertical restraint case subject to a rule of reason analysis. Order at 12. EA is

2   accused of locking up "inputs" into videogames in the form of trademark licenses. There is no

3   claim that EA conspired with its competitors, nor that the licensees conspired with theirs.

4      This fact alone makes *Cipro* irrelevant. EA is aware of no vertical, rule of reason case

5   where a court has adopted and applied the doctrine that antitrust impact may be "presumed." By

6   contrast, a number of federal court cases are directly on point and squarely reject plaintiffs'

7   argument. In *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. at 503, Judge Alsup

8   held that indirect purchaser plaintiffs in California "cannot proceed on a *mere presumption* that

9   impact on direct purchasers is proven by market data." In *In re Hydrogen Peroxide*, 552 F.3d at

10   326, the court held that antitrust injury cannot be presumed where there is a dispute regarding

11   "the price structure in the industry" and thus it is not "clear the violation resulted in harm to the

12   entire class." And in *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group*, 247 F.R.D.

13   156 (C.D. Cal. 2007), the court denied plaintiffs' motion to certify because "[p]laintiffs have not

14   met their burden of showing they can prove 'fact of injury' or 'impact' on all class members

15   through common evidence." *Id.* at 157. The Court declined to treat the practices at issue like

16   "an illegal price fixing agreement that directly inflates prices." *Id.* 165-69. It required proof that

17   the alleged indirect effects on price would cause generalized injury, and seeing none, denied

18   class certification. In sum, *Cipro* does not remotely support the plaintiffs' position.[72]

19
20   **B.   Because, At Worst, Exclusive Licensing Would Benefit Some Consumers While Injuring Others, Intra-Class Conflicts Preclude Class Certification**

21      So far we have primarily focused on how exclusive licensing might hurt consumers, and

22   therefore how plaintiffs might prove common impact by common proof. But that sells exclusive

23

[72] Further, although *Cipro was* a horizontal price fixing case, it did *not* allow a mere presumption of harm. To the contrary, the court squarely rejected any class wide presumption of harm by reversing certification for putative class members that the record indicated were not likely harmed (i.e., "flat copayers"). *Id.* at 418. The *Cipro* court also emphasized that the trial court "did not merely *assume* the existence of class-wide injury," (emphasis in original) but rather correctly relied upon expert opinion that was supported by substantial evidence "that the class members had *in fact* been injured as a result of the higher prices." *Id.* at 413 (emphasis added).

1   licensing short, because the practice is clearly beneficial to consumers in important respects.

2   Plaintiffs' expert concedes this can be true (MacKie-Mason Dep. 41:21-23) and it is a fact that

3   EA's R&D investments in quality games          REDACTED          *See supra*

4   Section II.G.  And that leads to the next problem with plaintiffs' motion, which is that plaintiffs

5   are asking the Court to conscript all consumers in a war against a practice that many if not most

6   would favor.  That is not permissible.

7          "A fundamental conflict" sufficient to preclude class certification "exists where some

8   party members claim to have been harmed by the same conduct that benefited other members of

9   the class." *Valley Drug Co. v. Geneva Pharms, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). *See*

10  *also Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) (intra-class conflict is sufficient

11  independent ground for denying class certification). As stated in *Allied Orthopedic*, 247 F.R.D.

12  at 177, "a class cannot be certified when its members have opposing interests or when it consists

13  of members who benefit from the same acts alleged to be harmful to other members of the class."

14  *See also Phillips v. Klassen,* 502 F.2d 362, 367-68 (D.C. Cir. 1974) (class of retired government

15  employees could not maintain a class action for coerced retirement where some members of the

16  class gained from the alleged wrongdoing: "[w]hen … the [challenged] action may be taken as

17  conferring economic benefits or working economic harm, depending on the circumstances of the

18  individual, the foundations of maintenance of a class action are undermined.").

19          In fact, under the "adequacy" standards of Rule 23(a)(4), substantially less antagonistic

20  interests than these preclude certification.  "The adequacy inquiry under Rule 23(a)(4) serves to

21  uncover conflicts of interest between named parties and the class they seek to represent."

22  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  In *Amchem*, the Supreme Court

23  held that conflicts of interests among a settlement class of current and future asbestos-related

24  claimants precluded certification where "[i]n significant respects, the interests of those within the

25  single class are not aligned." *Id.* at 596-97, 627-28.  The problem was that, while both groups

26  could be expected to have similar interests generally (favoring asbestos recoveries), they would

27  not agree on many particulars.  "Currently injured" class members would seek to obtain

28  "generous immediate payments," while "exposure-only plaintiffs" would seek to "ensur[e] an

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

35          DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1   ample, inflation-protected fund for the future." *Id.* at 626. That was enough to destroy the

2   required cohesiveness of the class. *Id.*

3       In the ordinary antitrust class action such as the price-fixing case, the required unity of

4   interest is typically established by the fact that everyone prefers lower prices. But here, the vast

5   majority of consumers (absent class members) have no stake in videogame pricing because they

6   buy hit games like *Madden NFL* at or near launch when, exclusivity or not, the price is at the

7   industry-standard retail launch price for that year. That means that for most videogame

8   purchasers, their preference (or not) for exclusive licensing would not turn on price, but rather on

9   how exclusivity affects game quality. Those who share the NFL's and CLC's perspective that

10  exclusivity enhances game quality would likely side with EA in this dispute—and view class

11  counsel as litigating against their interests. Those like plaintiff Pecover, who testified that he

12  does not care about innovation and is pursing this lawsuit because he believes *Madden NFL* is

13  overpriced (Pecover Dep. 20:17-19 & 78:7-9); those who think that intra-trademark competition

14  enhances quality; and perhaps those who buy late in the product lifecycle and therefore have a

15  plausible claim to lower prices but for exclusivity, would side with plaintiffs. The one thing

16  clear on these facts is that it is not economically rational to assume that all members of the class

17  would have *the same preference* for exclusive or non-exclusive licensing schemes.

18      There is a more nuanced but equally important conflict concerning how those who have

19  plausible damage claims would litigate. It is a conflict between customers who buy *Madden

20  NFL* early, near launch, and those who buy *Madden NFL* in November or later during the normal

21  discounting season. Much like the "current and future asbestos" claimants in *Amchem*, the two

22  would make different litigation choices in attacking exclusivity. The early buyer—like the

23  proposed class representatives[73]—would have to take on the very difficult argument that, but for

24  exclusivity, September prices would have been lower; otherwise it would recover nothing. The

25  later buyer does not care about that issue and would not risk its credibility arguing about what

26  _____

    [73] Plaintiffs both purchased *Madden* at the full launch price. Schatz Decl. Ex. 23 Geoffrey
27  Pecover's Response to Interrogatory No. 1; Schatz Decl. Ex. 24 Andrew Owens' Response to
    Interrogatory No. 1.

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

36                          DEFENDANT'S OPPOSITION TO PLAINTIFFS'
                           MOTION FOR CLASS CERTIFICATION
                           CASE NO. C-08-02820 VRW

1    might have happened at or near launch.  By combining the two in one class, class counsel are

2    saddling the December purchaser with litigation risk it has no need to take.  The two may not

3    have *opposing* interests, but they do have *conflicting interests in the conduct of the litigation.*

4    Under *Amchem* that is enough to defeat class certification.

5         Given these various competing class interests, the class representatives fail the typicality

6    requirement and class certification must be denied.  *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658,

7    666 (C.D. Cal. 2009) (class certification denied where plaintiff bought one of three products at

8    issue; "In cases involving a variety of products, courts, emphasizing that different products have

9    different functions and different consumers, have held that a named plaintiff that purchased a

10   different product than that purchased by unnamed plaintiffs fails to satisfy the typicality

11   requirement of Rule 23(a)(3)."); *Bishop v. Petro-Chemical Transp., LLC*, 582 F. Supp. 2d 1290,

12   1306 (E.D. Cal. 2008) (denying certification where representative's claims were typical of some

13   class members but were atypical of others).

14         C.    **Plaintiffs Have Failed To Offer A Theory Of Common Impact Regarding**
15               **The Incremental Effect Of The NCAA And AFL Licenses**

16         The grant of a single exclusive license cannot form the basis of a monopolization claim.

17   *See, e.g., Cook  v. Boston Sci. Corp.*, 333 F.3d 737, 740 (7th Cir. 2003) ("[T]here is no argument

18   that [a licensor] would have violated antitrust law … had it granted an exclusive, nonassignable

19   license.").[74]

20         To avoid this principle and survive EA's motion to dismiss, plaintiffs unequivocally

21   stated it was the "series of exclusive agreements" that constituted the requisite anticompetitive

22   conduct in this case.  Pl. Opp. To EA Motion To Dismiss at 3, n. 3.  This Court's denial of EA's

23   motion to dismiss was based in large part on this reasoning.  Order at 8 (holding *American*

24   *Needle* inapposite because "the exclusive contract in *American Needle* involved only one

---

[74]  *See also Am. Needle, Inc. v. NFL*, 538 F.3d 736, 744 (7th Cir. 2008) ("no colorable claim that
the NFL teams and NFL Properties created a monopoly by awarding Rebook the exclusive"
license, because the NFL teams are "free under § 2 [of the Sherman Act] to license their
intellectual property on an exclusive basis," even if that decision "reduce[s] the number of
companies to whom they grant licenses.").

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    provider of football entertainment:  the NFL.  The present case involves what are alleged to be a

2    number of such providers, if not all the major ones, namely the NFL, AFL, and NCAA.").[75]

3         If that's plaintiffs' case, then plaintiffs must stay true to it now.  They cannot say one

4    thing to avoid dismissal and another to seek class certification.  A plaintiff advancing a theory of

5    consumer injury for class certification purposes is also legally required "to sort out the effects of

6    any permissible vertical restraints from the effects of the alleged, impermissible … conspiracy."

7    *In re New Motor Vehicles*, 522 F.3d at 27 (reversing class certification where plaintiffs assumed

8    that only horizontal restraints could control gray marketing).  Consequently, the fact that a single

9    exclusive license standing alone would be lawful is pivotal.  The injury addressable in this case

10   is not that caused by Take-Two's inability to sell an NFL videogame; that is a consequence of

11   the NFL license alone, which is not actionable.  Instead, the question is whether the alleged

12   incremental restraints on competition in the form of the NCAA / CLC and AFL licenses (i.e., the

13   "series" of allegedly anti-competitive agreements) raised prices.  Plaintiffs' evidence of common

14   impact must respect this distinction.  As the First Circuit has explained:  "If plaintiffs do not have

15   a viable means for distinguishing between these two sets of effects, they cannot show that it was

16   the [alleged anti-competitive agreements] that caused the impact on the [relevant] market upon

17   which their theory depends."  *Id.*

18        Plaintiffs here have made *no attempt*—none whatsoever—to distinguish the permissible

19   effects of a single exclusive with the NFL from the effects of the alleged, impermissible "series

20   of exclusive agreements."  Plaintiffs' entire analysis incorrectly assumes that the "but for" world

21   is a world with *no* exclusives.  And Prof. MacKie-Mason admits that he had not conducted *any*

22   *analysis* of the incremental effects of obtaining multiple licenses.[76]  Thus, there is no analysis

---

23

24   [75]  The Court also distinguished *Levi Case Co. v. ATS Prods*, 788 F. Supp. 428 (N.D. Cal.
25        1992), on grounds that "the instant complaint…alleges the aggregation of multiple exclusive
          agreements…unlike the exclusive agreement [in *Levi*] involving a single" licensee. Order at
          12-13.

26   [76]  Schatz Decl. Ex. 22, MacKie-Mason Dep. 48:18-22 ("I didn't do a separate study of how one
27        would go about doing common impact or whether the impact would be common if some
          license had been signed but not others."); *id.* 44:24–45:2 (I haven't done an analysis to
28        measure incremental effects or whether it was relevant."); *id.* 59:17–60:1 ("I have not done a

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

38    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
      MOTION FOR CLASS CERTIFICATION
      CASE NO. C-08-02820 VRW

1    and no evidence that the alleged market power of the NFL exclusive was enhanced by the NCAA

2    and AFL licenses.[77]

3           There is nothing more than needs to be said about this.  The requirement that damages

4    estimates account for the defendant's lawful options in the "but for world" has been a

5    fundamental part of antitrust litigation for years.  *See Image Technical Servs., Inc. v. Eastman*

6    *Kodak Co.,* 125 F.3d 1195, 1224 (9th Cir. 1997) ("[plaintiffs] must segregate damages

7    attributable to lawful competition from damages attributable to Kodak's monopolizing

8    conduct").  Unless the Court is prepared to allow plaintiffs to ignore this rule and proceed on a

9    theory that, at least implicitly, it foreclosed in deciding EA's motion to dismiss, plaintiffs have

10   entirely defaulted on their burden to prove that a case *about a series of licenses* is amenable to

11   class certification.

12   **D.    Plaintiffs Are Not Typical of Consumers Who May Have Been Injured By**
13   **      The Alleged Series Of Anticompetitive Exclusive Licenses**

14          If plaintiffs are held, as they should be, to an attack on the series of EA exclusive football

15   licenses, as opposed to the NFL license, this case also presents a severe typicality issue under

16   Rule 23(a)(3).  The class representatives purchased *Madden NFL,* but did not purchase either of

17   the other games encompassed by the class definition (*NCAA Football* and *AFL*).  In fact, both

18   named plaintiffs testified that they do not follow college football or the AFL, they have no

19   interest in those games, and they do not think those games compete with *Madden NFL*.  Pecover

20   Dep. 53:5-14, 74:19-23 & 75:17-19; Owens Dep. 64:16-22 & 126:19-127:1, Jan. 10, 2010.  Mr.

21   Owens even testified that he's never played an NCAA branded football game (and has no idea

22

23   _____

     separate study of impact for the three licenses in isolation or for any subset of them in
     isolation"); *see also id.* 7:2-16, 8:10-9:16, 61:7-11, 62:16-19 & 195:8-17.

24   [77]  Any such argument would be implausible.  Madden NFL commands one of the strongest and
     most loyal followings in the videogame industry and it is very doubtful that anyone could

25   seriously challenge Madden NFL with its core customers with any other football game.
     Indeed, historically, the NCAA game launches a month ahead of the NFL game to avoid

26   Madden NFL's wildly popular launch.  In essence, the college game tries to capture audience
     before Madden NFL comes out.  It is quite fantastic to think that the same videogame

27   publishers who abandoned college football altogether in 2004 would use an NCAA license to
     take on Madden NFL directly.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

39                                    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
                                       MOTION FOR CLASS CERTIFICATION
                                          CASE NO. C-08-02820 VRW

1    what its price is since "I don't even look at that game"), and he did not know an AFL game

2    existed or even what it was. Owens Dep. 64:16-22, 74:5-12 & 88:13-89:9.

3        That makes plaintiffs very odd class representatives for a case that is supposed to be

4    about how a "series" of exclusive licenses and how competition in a category of interactive

5    football software was restrained. If the named plaintiffs do not care about the games based on

6    the other licenses in the "series of anticompetitive exclusives," how can they be typical of those

7    injured by that conduct? They cannot. And they certainly are not typical of class members who

8    purchased *NCAA* or *Arena Football*, or any combination of the three games.

9    **E.    Plaintiffs' Attempt To Bring A Nationwide Class Action Under California
            Law Fails**

10

11       Plaintiffs' request for a nationwide class action fails for an additional, independent

12   reason. Courts must apply a two-step analysis to determine whether a particular state's law—

13   here, California's—may be applied to a nationwide class of indirect purchasers. The court must

14   first determine whether the application of California law would be constitutional. If so, the court

15   must then determine whether the application of California law is permissible pursuant to

16   California's choice of law analysis. Plaintiffs' purported nationwide class fails under both steps.

17       **1.    The *Shutts*' Constitutional Analysis Prohibits A Nationwide Class**

18       Under *Phillips v. Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985), a state may

19   apply its own law to the claims of out-of-state plaintiffs only if there is no conflict with those

20   laws or, if there is, the state has a "significant contact or significant aggregation of contacts to the

21   claims asserted by each member of the plaintiff class, contacts creating state interests, in order to

22   ensure that the choice of law is not arbitrary or unfair." The plaintiff bears the burden to show

23   these significant contacts. *Washington Mutual v. Sup. Ct.*, 24 Cal. 4th 906, 921 (2001).

24       In *GPU*, 527 F. Supp. 2d at 1027-28, Judge Alsup addressed what is practically speaking

25   the precise issue here, and held that *Shutts* bars indirect purchaser plaintiffs from bringing a

26   nationwide class action under California's Cartwright Act and UCL. First, the Court held that

27   although California allowed suits by indirect purchasers, application of California's antitrust law

28

1   would conflict with the laws of states that do not. *Id.*[78] Second, the Court held that even though

2   the defendants, like EA, were headquartered in California, produced products in California, and

3   held meetings at the heart of the litigation in California, there were not sufficient contacts to pass

4   constitutional muster. That is because the location of the alleged injury—i.e., where the product

5   at issue was purchased—is the controlling factor in the significant contacts analysis:

> Even where substantial contacts to the forum state have been pled, courts
> have declined to apply a single state's laws to a nationwide antitrust class.
> *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 276-77 (D. Mass. 2004)
> (Young, J.). In *In re Relafen Antitrust Litigation*, the plaintiffs attempted
> to apply Pennsylvania law to a nationwide class because the company
> producing the drug was headquartered in Pennsylvania and the product
> was sold and distributed from that state. *Relafen* noted that because 'the
> primary aim of antitrust and consumer protection laws generally—and
> those of indirect purchaser states particularly—is compensating
> consumers, not policing corporate conduct,' the court determined that the
> more significant factor was the location of the injury, or where the
> plaintiff was located when the injury occurred from purchasing the
> products. Most of the sales happened outside Pennsylvania, so the court
> declined to apply Pennsylvania law to out-of-state sales. *Id.* at 277. The
> *Relafen* decision seems persuasive. It is hard to see why the laws of other
> states should be tossed overboard and their residents remitted to California
> law for transactions that, for individual consumers, are local in nature.

15  *Id.* at 1028. This dooms plaintiffs' attempt to bring a nationwide damages class under California

16  law.[79] There is no credible argument that the same constitutional analysis should not control

17  here. The videogames at issue are sold in every state in the nation with most sales occurring

18  outside of California. Linzner Decl. ¶ 17. Consequently, the Court should decline to certify a

19  nationwide indirect purchaser class under California law.

20      Ignoring *GPU* entirely, plaintiffs argue that there are sufficient constitutional contacts in

21  this case. Specifically, plaintiffs argue that (a) EA's contracts select California law, and (b) EA

---

[78] *See also* Appendices A, B (illustrating conflicts of state antitrust laws). Similarly, state consumer protection claims raise material conflicts—e.g., Rhode Island and New Mexico bar consumer protection claims by indirect purchasers. *Marchman v. NCNB Texas Nat'l Bank*, 898 P.2d 709, 716-19 (N.M. 1995) (holding that indirect purchasers of stock do not have standing to bring claims under New Mexico's Unfair Trade Practices Act); *In re GPU*, 527 F. Supp. 2d at 1030. *See also* Appendix C.

[79] *See also Util. Consumers' Action Network v. Powernet Global Commc'n*, No. 06-1773, 2006 U.S. Dist LEXIS 78546, at *16 (S.D. Cal. Oct. 20, 2006) ("applying the forum state's laws to parties located beyond the state's borders, who have no relationship with the forum state, would abrogate the parties' rights under the Due Process and Full Faith and Credit clauses") (citing *Shutts*, 472 U.S. at 822).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

41

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    has extensive contacts with the state of California. Pls.' Mot. at 24-31. These arguments are

2    meritless.

3         *First*, plaintiffs argue "each contract produced by Electronic Arts in this litigation

4    contains a choice-of-law provision requiring the application of California law." *Id.* at 24. This is

5    blatantly false, and even more misleading. The exclusive contracts at issue in this case—the

6    league licenses—all contain enforceable choice of law clauses for states *other than* California.

7    The NFL and NFLPA contracts have New York choice of law provisions,[80] and the CLC

8    contract has a Georgia choice of law provision.[81] By contrast, there are no relevant contacts

9    between EA and consumers. Plaintiffs base their argument in End User License Agreements

10   ("EULAs"), which as they well know only apply to PC games where the user "clicks and

11   accepts" the agreement once the individual game disc is loaded onto the user's computer. There

12   are *zero* EULAs that apply to any football SKUs at issue in this case.[82]

13        *Second*, although EA is headquartered in California, (i) consumers purchase the games at

14   issue predominately outside of California from non-California retailers; (ii) the games are

15   designed, developed, manufactured, and distributed outside of California, (iii) EA's sales team is

16   located throughout the U.S. (iv) the license agreements at issue were executed (and largely

17   negotiated) in person in New York and Georgia; and (v) the other parties to the license

18   agreements (the NFL, NFLPA, and CLC) are headquartered in New York and Georgia. *See*

19   Miele Dep. 29:5-7; Linzner Decl. ¶¶ 5, 9, 17; Gertzog Decl. ¶¶ 2, 13; Drucker ¶ 15. This case is,

20   if anything, much less California-centered than *GPU*.

21

22   _____

     [80]  Schatz Decl. Exs. 25, Agreement Regarding Promotional Rights and Packaged Goods (Dec.
23   9, 2004), at EA00000263; Ex. 26.

     [81]  Schatz Decl. Ex. 17, License Agreement: NCAA Football (Jul. 1, 2005), at EA00000115
24
     [82]  EULAs have only been used by EA for PC games sold since December 2007, and EA has not
25   published any football SKUs for the PC in that time period. Schatz Decl. Ex. 27, Schatz
     Dep. 26:12-13 & 44:24-45:3, Sept. 9, 2009. Similarly, EA's "online" terms and conditions
26   only apply to the use of online features on EA's website. *Id.* 13:13-14 & 13:25-14:1. The
     online terms and conditions do not apply to the purchase of games, and many consumers—
27   including the two named plaintiffs—never sign on at all. Schatz Decl. Ex. 10, Pecover Dep.
     40:21-23; Schatz Decl. Ex. 28, Owens Dep. 50:22-23.
28

**2. California's Choice Of Law Analysis Prohibits A Nationwide Class**

Plaintiffs also lose under California's three-step choice of law analysis. This requires that: (1) the court determine whether the applicable laws of potentially concerned jurisdictions materially differ; (2) if they do, the court must examine each jurisdiction's interest in having its own law applied to the dispute; and (3) if other states have such an interest, a "true conflict" exists, and the court must perform a comparative impairment analysis to determine which jurisdiction's interest would be more significantly impaired if its laws were not applied. *Wash. Mutual Bank v. Super. Ct.*, 24 Cal. 4th 906, 919-20 (Cal. 2001). The court then applies the law of the jurisdiction that would be more impaired. *Id.* When these rules come into play in a class certification motion, "a separate conflict of laws inquiry must be made with respect to each issue in the case." *Id.* at 920.

The choice of law analysis confirms that California law should not be applied to a nationwide class of indirect purchasers. *In re Grand Theft Auto Video Game Consumer Litig. (In Re GTA),* 251 F.R.D. 139, 147 (S.D.N.Y. 2008), is squarely on-point. There, the court conditionally certified a nationwide settlement class under the laws of the state where the defendant, a videogame publisher, was headquartered—New York. Prior to final certification, the court re-examined whether plaintiffs had satisfied Rule 23(b)(3)'s predominance requirement, and whether nationwide certification was proper under California's choice of law principles. As in this case, the videogame at issue (the hit game *Grand Theft Auto*) was sold throughout the 50 states. The court held that a nationwide class could not be certified under New York law because—although the conduct at issue "may have been conceived at the defendants' principal places of business in New York"—the issue critical to the interest analysis was where the plaintiffs purchased the product. *Id.* at 149-50. The court held that the state of purchase had the most significant contacts with the sale / purchase of the videogame, and that its interests would be most impaired if its laws were not applied. "Therefore, California conflicts jurisprudence … requires the application of the law of the state of purchase to Settlement Class

members' claims." *Id.* at 150.[83]

*In re HP Inkjet Printer Litigation*, No. 05-3580, 2008 WL 2949265 (N.D. Cal. July 25, 2008) reaches the same conclusion.  Applying California's choice of law principles, the Court found that "each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporation and in delineating the scope of recovery for its citizens under is own laws." *Id.* at *6.  Consequently, despite the fact that defendant's worldwide headquarters were located in California, the Court declined to apply California law to non-resident class members' claims. *Id.* at *6-7. *In re GTA* and *In re HP Inkjet* leave no doubt—the place of purchase is determinative in a California choice of law analysis.[84]

## F.  Certification Of State Subclasses Where There Is No State Claim And No Plaintiff With Standing Would Be Improper

In the alternative to a nationwide class, plaintiffs ask the Court to certify 20 state subclasses under the antitrust statutes of 19 states and the District of Columbia.[85]  As a matter of law, a party cannot obtain certification for causes of action not pled in the operative complaint.

---

[83] *See also Vulcan Golf v. Google Inc.*, 254 FRD 521, 531-32 (N.D. Ill. 2008) (finding significant variations in state unjust enrichment laws; rejecting claim that California's unjust enrichment law should apply to nationwide class.); *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, 2008 WL 4906433, at *2-3 (C.D. Cal. Nov. 13, 2008) ("[T]here are material conflicts between the California law of unjust enrichment ... and the laws of the other states," and thus "declines to apply California law to nationwide unjust enrichment ... class pursuant to Rule 23(b)(3)."); *Thompson v. Jiffy Lube Intern., Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008) ("[T]here are differences nationwide in the very definition of unjust enrichment and its availability as a remedy.... Because of such variations federal courts have generally refused to certify a nationwide class based upon a theory of unjust enrichment.").

[84] *See also In re Charles Schwab Corp. Sec. Litig.*, No. 08-01510, 2009 WL 2591389, at *7 (N.D. Cal. Aug. 21, 2009) (declining to certify nationwide class under California UCL, even though "the challenged conduct occurred...at Schwab's California headquarters," because "[s]tate 'Little FTC Acts' are far from uniform.  States have an interest in deciding the contours of their own unfair-competition laws and whether they will be used to vindicate claims like this one."); *Thompson*, 250 F.R.D. at 627 (declining to certify nationwide class for consumer protection and unjust enrichment claims, reasoning: "[T]he simple expedient of selecting defendant's home state law for the apparent purpose of facilitating a nationwide class action strongly resembles the 'bootstrapping' criticized by the U.S. Supreme Court in *Shutts*.").

[85] Plaintiffs' request for 20 state subclasses is limited to state antitrust claims.  Plaintiffs do not move for any state subclasses based on the consumer protection or unjust enrichment laws of any states. Pl. Motion at 31-32.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

44

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1  *See Wren v. RGIS Inventory Specialists*, 256 F.R.D. 180, 209 (N.D. Cal. 2009) (declining to

2  certify subclasses under various state laws on grounds that, while plaintiffs' complaint asserted

3  claims under California law, plaintiffs had failed to assert similar claims under the various state

4  laws for which plaintiffs sought certification of subclasses).

5      If plaintiffs wish to assert claims not presently pled, they must first seek leave to amend

6  their Complaint via a Rule 15 motion; a "bare request" in briefing for class certification is

7  insufficient to amend the operative complaint. *See* Fed. R. Civ. P. 15(a); *see also U.S. Care, Inc.*

8  *v. Pioneer Life Ins. Co.*, 244 F. Supp. 2d 1057, 1065 (C.D. Cal. 2002) (holding a "bare request"

9  to amend "does not constitute a motion within the contemplation of Rule 15(a)."). "To hold

10  otherwise would mean that a party could unilaterally amend a complaint at will, even without

11  filing an amendment, and simply by raising a point in a brief." *Morgan Distrib. Co. v.*

12  *Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989).

13      Here, plaintiffs have neither moved to amend the Complaint nor appealed the dismissal of

14  the state antitrust claims under which they now attempt to certify sub-classes. Instead, plaintiffs

15  attempt to end-run the Court's Order on EA's Motion to Dismiss by improperly seeking

16  certification of 18 state law claims that either (a) were never asserted in the Complaint, or (b) the

17  Court dismissed for lack of standing.[86] As this Court correctly ruled, plaintiffs lack standing to

18  pursue claims under the antitrust laws of those states in which no named plaintiff resides.

19  Submitting declarations from potential class members, who are not named plaintiffs in a properly

20  amended complaint, does not cure this defect.[87]

---

[86] Mot. to Dismiss Order at 14, June 5, 2009 (dismissing all state law claims except California
and D.C.). The Complaint's fifth cause of action does not allege claims under the state
antitrust laws of either Hawaii or Utah, but plaintiffs' motion for class certification requests
certification of a subclass under both states' antitrust laws. *Compare* Compl. ¶¶ 50-69 *with*
Pl. Motion at 31.

[87] *See Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[A] claim cannot be asserted on
behalf of a class unless at least one *named* plaintiff has suffered the injury that gives rise to
that claim.") (emphasis added); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107
(N.D. Cal. 2007) (same); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d
1011, 1026-27 (N.D. Cal. 2007) (same).

In seeking to certify claims not alleged in the operative Complaint, plaintiffs are attempting to
deprive EA of its right to move to dismiss those claims. This cannot be countenanced. By

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

45                    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    **1.    Plaintiffs' Proposed 20 State Sub-Classes Are Unmanageable**

2    The request for certification of 20 state sub-classes fails for yet another reason:  the

3    variances in the state antitrust laws would render this litigation unmanageable.[88]  If class claims

4    will require adjudication under the laws of multiple states, the court must determine whether

5    such differences can be managed.   The proponent of class certification bears the burden of

6    demonstrating how such differences can be managed at trial.  *Utility Consumers' Action Network*

7    *v. Sprint Solutions*, 259 F.R.D. 484, 486 (S.D. Cal. 2009).   This requires the class action

8    proponent to "credibly demonstrate, through a thorough analysis of the applicable state laws, that

9    state law variations will not swamp common issues and defeat predominance."  *Washington*

10   *Mutual Bank,* 24 Cal. 4th at 926.  Plaintiffs have not—and cannot—meet their burden because

11   "when more than a few state laws differ, [as they do here, the] court would be faced with [the]

12   impossible task of instructing jury on relevant law."  *Zinser*, 253 F.3d at 1189; *Rivera v. Bio*

13   *Engineered Supplements & Nutrition, Inc.*, No. 07-1306, 2008 WL 4906433, at *2-3 (C.D. Cal.

14   2008) (same); *Gartin v. S&M Nutec, LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) ("if class action

15   would involve the application of multiple states' laws—even if only on one claim—it is likely to

16   be too unmanageable under Rule 23(b)(3)(d)").

17   Plaintiffs offer an appendix listing the language of the 20 states' antitrust laws but

18   provide absolutely no further analysis of the differences or similarities between the statutes.

19   Rather, plaintiffs simply assert that the 20 states' laws "follow" federal law, which they claim

---

20   way of just one example, plaintiffs' motion for class certification seeks certification of a
21   subclass under Hawaii's antitrust law, a claim neither asserted in the original Complaint nor
     added by an amendment.  If plaintiffs had followed proper procedure, EA would have opposed
22   or moved to dismiss on grounds that plaintiffs failed to comply with the Hawaii statute's
     notice provisions, which require that plaintiffs asserting state antitrust claims first serve a copy
23   of the complaint on the state attorney general, and may only proceed with those claims if the
     attorney general declines to proceed.  Haw. Rev. Stat. § 480.13-3(a)(1).  *See also In re Flash*
24   *Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1158, (N.D. Cal. 2009) (dismissing Hawaii
     antitrust claim without leave to amend for failure to comply with statutory notice
25   requirements).  Many or all of the purported state law antitrust claims for the state subclasses
     would fail as a matter of law for a host of additional reasons.

26   [88] "Implicit in the satisfaction of the predominance test [under Rule 23(b)(3)] is the notion that
     the adjudication of common issues will help achieve judicial economy." *Zinser*, 253 F.3d at
27   1189.  If "variances in state laws overwhelm common issues of fact," then it renders the case
     unmanageable and predominance is destroyed.  *Id.*

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

46

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

"minimiz[es] any difficulties in manageability." Pls.' Mot. at 31, Appendix A. Plaintiffs' mere assertion that 20 state subclasses *should* be manageable completely fails to meet their burden. *See Zinser*, 253 F.3d at 1189 (mere "assurances of counsel that any problems with predominance can be overcome" are insufficient to demonstrate manageability); *In re Hydrogen Peroxide*, 552 F.3d at 318 (same). Here again, plaintiffs do not even attempt to actually get in the game, let alone make the throw. Plaintiffs offer no analysis, much less the "extensive analysis" required, of how to manage a single trial applying the vastly different laws of 20 jurisdictions. And as Appendix B to this Opposition shows, there are in fact significant variances among the 20 state antitrust laws, including variations in jurisdictional reach, notice requirements, and the availability of treble damages. These variations would be unmanageable, swamp common issues, and defeat predominance.[89]

## G.    A Nationwide Damages Class Is Not Superior

Certification of a Rule 23(b)(3) damages class is only proper where a class action would be superior to other available methods of adjudication. *See* Fed.R.Civ.P. 23(b)(3). The first factor listed by Rule 23(b)(3) as pertinent to the superiority issue is "the interests of members of the class in individually controlling the prosecution or defense of separate actions." *Id.* Where, as here (*see supra* Section III.B), "there is a wide range of choice of the strategy and tactics of the litigation," a class action is not superior. *Hobbs v. Northeast Airlines, Inc.*, 50 F.R.D. 76, 79 (E.D. Penn 1970). Further, a class action is not superior—indeed, fundamentally inappropriate—where "class certification magnifies and strengthens the number of unmeritorious claims." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996). In such a case, "class certification creates insurmountable pressure on defendants to settle, whereas individual trials would not. The risk of facing an all-or-nothing verdict presents too high a risk, even when

---

[89] *See, e.g., Castano v. Am. Tobacco Co.,* 84 F.3d 734, 743 (5th Cir. 1996) ("The surveys provided by the plaintiffs failed to discuss, in any meaningful way, how the court could deal with variations in state law."); *Walsh v. Ford Motor Co.,* 130 F.R.D. 260, 273 (D.D.C. 1990) (finding "that the plaintiffs have not met their burden of illustrating, through extensive analysis, that the relevant states apply common standards of law which can be employed in trying this case").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1    probability of adverse judgment is low." *Id.*  Finally, even where the potential individual

2    damage awards are small, a class action is not always superior.  Courts have held that the

3    "expense of litigation does not necessarily turn this case into a negative value suit, in part

4    because the prevailing party may recover attorneys' fees" under the Cartwright Act.  *Id.*; citing

5    *Boggs v. Alto Trailer Sales*, 511 F.2d 114, 118 (5th Cir. 1975) (availability of attorneys' fees is a

6    common basis for finding non-superiority.).  Here, the named plaintiffs (and their counsel) claim

7    to take issue with the series of exclusive license agreements at issue.  They purport, however, to

8    represent a class that invariably will have widely divergent opinions as to value and effect of the

9    exclusive licenses.  If plaintiffs' believe these agreements are anticompetitive, and want to

10   litigate their own individual grievances of an alleged decrease in quality and choice, they can sue

11   in their individual capacity seeking treble damages and attorneys fees under the Cartwright Act.

12   They should not, however, be allowed to cobble together a class of plaintiffs who do not share

13   their views (or who would pursue different litigation strategies) merely to aggregate potential

14   damages and exert undue settlement pressure on EA.

15
16   **H.     A Rule 23(b)(2) Injunction Class Cannot Be Certified Where Plaintiffs'
            Primarily Seek Damages**

17          Plaintiffs' Rule 23(b)(2) class fails for two independent reasons.  *First*, cases primarily

18   seeking money damages cannot be certified under Rule 23(b)(2).  *See* Fed.R.Civ.P. 23 Advisory

19   Comm. Notes ("The subdivision does not extend to cases in which the appropriate final relief

20   relates exclusively or predominantly to money damages.").  A class seeking monetary damages

21   may only be certified pursuant to Rule 23(b)(2) "where such relief is merely incidental to the

22   primary claim for injunctive relief." *Util. Consumers' Action Network*, 259 F.R.D. at 488.

23          Incidental damages are damages that flow directly from liability to the
             class as a whole on the claims forming the basis of the injunctive or
24           declaratory relief.  In this case, the primary relief sought is not
             declaratory or injunctive relief.... The primary intent of the litigation
25           is to reclaim damages caused by the Defendants' actions. The
             equitable relief requested is to prevent further actions by the
26           Defendants that would create further similar monetary damages.
             Therefore, it appears that the declaratory and injunctive relief is
27           secondary to the damages requested, and thus, nationwide class
             certification under Fed.R.Civ.P. 23(b)(2) would be inappropriate.
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

48                     DEFENDANT'S OPPOSITION TO PLAINTIFFS'
                       MOTION FOR CLASS CERTIFICATION
                       CASE NO. C-08-02820 VRW

1   *Id.*[90]   Here, there can be no question that this case is primarily about damages.   First, plaintiffs

2   have submitted an expert declaration claiming that damages could exceed one billion dollars.[91]

3   Second, plaintiffs' expert concedes that damages will not flow automatically from a finding of

4   liability; rather, damages (if any) will vary from plaintiff-to-plaintiff.   MacKie-Mason Dep. 78:5-

5   6, 81:9-19, 88:10-13 & 125:17-25.   Third, in their 40-page brief, plaintiffs devote less than a

6   page to the issue of injunctive relief, and fail even to identify the nature of the relief requested.

7   Pls.' Mot. at 22-3.   Fourth, in deposition, Mr. Pecover testified that what he expects to get if

8   plaintiffs prevail is "[b]asically the overcharge"—i.e., damages.   Pecover Dep. 20:17-19.

9   Finally, plaintiffs have not sued the football leagues, whose IP licenses are at issue.   Because the

10   leagues ultimately determine the number and nature of their license agreements, any injunctive

11   relief plaintiffs seek regarding these license agreements would likely have little practical effect

12   (e.g., no injunction against EA could force the NFL to license its intellectual property to multiple

13   parties).   Clearly, plaintiffs' amorphous request for an injunction is merely an afterthought,

14   precluding certification of an injunctive class.

15        *Second*, members of a putative injunctive class must be "cohesive"—that is, similarly

16   situated with respect to the core issues in dispute.   *See, e.g., Allison v. Citgo Petroleum*, 151 F.3d

17   402, 412-13 (5th Cir. 1998) ("[T]he (b)(2) class is, by its very nature, assumed to be a

18   homogenous and cohesive group … [whose] members suffer from a common injury properly

19   addressed by class-wide relief.").   Cohesiveness is essential in a Rule 23(b)(2) class because,

20   unlike a Rule 23(b)(2) class, "unnamed members with valid individual claims are bound by the

21   action without the opportunity to withdraw."   *Romberio v. Unumprovident Corp.*, No.07-6404,

22   2009 WL 87510, at *8 (6th Cir. Jan. 12, 2009) (holding "the well-recognized rule that Rule

23   23(b)(2) classes must be cohesive" precluded Rule 23(b)(2) class).   "The defining characteristic

24   of a [Rule 23(b)(2)] class is the homogeneity of the interests of the members of the class."   *Id.*

25

26   [90]   *See also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 507 (N.D. Cal. 2008) (monetary relief must be "'merely incidental' to the primary claim for the injunction").

27   [91]   Decl. of MacKie-Mason in Support of Plaintiffs' Request for Pricing and Market Definition Documents  for the Period Aug. 1, 2001 to Jan. 1, 2004, ¶ 16.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

49

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C-08-02820 VRW

1  Here, there are intra-class conflicts that preclude any argument that the proposed class is

2  sufficiently cohesive to be certified under Rule 23(b)(2). *See supra* Section III.B, D.

3  **IV.    CONCLUSION**

4       For the reasons stated above, EA respectfully submits that plaintiffs' motion for class

5  certification should be denied.

6  Dated: February 19, 2010                          LATHAM & WATKINS LLP
                                                     Daniel M. Wall
7                                                    Timothy L. O'Mara

8
                                                 By _____/s/_____
9                                                    Daniel M. Wall
                                                     Attorneys for Defendant
10                                                   Electronic Arts Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

SF\740881.1

28