1
2
3
4
5
6
7                   IN THE UNITED STATES DISTRICT COURT
8              FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   GEOFFREY PECOVER and JEFFREY          No    C 08-2820 VRW
     LAWRENCE, on Behalf of Themselves
11   and All Others Similarly             ORDER
     Situated,
12
          Plaintiffs,
13
          v
14
     ELECTRONIC ARTS INC, a Delaware
15   Corporation
16        Defendant.
17   ─────────────────────────────────/
18        Plaintiffs in the above-captioned action move to certify
19   a class of video game purchasers pursuant to FRCP 23(b)(2) and
20   23(b)(3); defendant opposes.  As detailed below, after plaintiffs
21   filed their motion, the parties exchanged a series of derivative
22   motions, which include a motion to strike an expert opinion and
23   several motions to file documents under seal.  See, for example,
24   Docs #80, 84, 117.  Having considered the parties' submissions and
25   for the reasons that follow, the court DECLINES TO CERTIFY
26   plaintiffs' purported class under FRCP 23(b)(2), CERTIFIES a FRCP
27   23(b)(3) damages class and GRANTS plaintiffs' request for
28   appointment of class counsel pursuant to FRCP 23(g).

**I**

On June 5, 2008, plaintiffs, on behalf of a purported class of indirect purchasers of video games, filed suit against Electronic Arts, Inc ("EA") for allegedly foreclosing competition in a market for football-based interactive video games. Doc #1. Plaintiffs allege six causes of action: (1) violation to section 2 of the Sherman Act, 15 USC § 2; (2) violation of California's Cartwright Act, Cal Bus & Prof Code § 16700 et seq; (3) violation of California's Unfair Competition Act, Cal Bus & Prof Code § 17200 et seq; (4) unjust enrichment; and, in the event that the court does not apply California law on a nationwide basis, (5) violation of various other state antitrust and restraint of trade laws; and (6) violation of various state consumer protection and unfair competition laws. Shortly after plaintiffs filed the complaint, EA filed a motion to dismiss under FRCP 12(b)(6). Doc #17. The court denied the bulk of EA's motion but dismissed in part plaintiffs' fifth and sixth claims for the violation of the antitrust and consumer protection laws of various states. With respect to these state law causes of action, only those advanced under California law and the District of Columbia Consumer Protection Procedures Act remain. Doc #40 at 14.

Plaintiffs now seek to certify a class pursuant to FRCP 23(b)(2) and 23(b)(3). Doc #160 (filed under seal). In addition to plaintiffs' motion for class certification, the court has before it several administrative motions to seal documents, Docs #80, 84, 117, 134, 141, 156 and 175; a motion to exclude the opinion of defendant's expert Jill Hamburger, Doc #130; a motion for an adverse inference regarding choice of law, Doc #132; and a

United States District Court
For the Northern District of California

conditional motion for leave to amend the complaint, Doc #136.   **EA**
opposes each of plaintiffs' motions.   See Docs #152, 148, 150.

II

In opposing plaintiffs' motion for class certification,
defendant submitted, under seal, the report of purported expert
Jill Hamburger.   See Hamburger Decl Exh 1 ("Hamburger Report").
Plaintiffs move to exclude this report as inadmissible opinion
evidence.   Doc #130.   Before the court can rule on plaintiffs'
motion for class certification, it must first determine the
admissibility of the opinions expressed in the Hamburger Report.

The admissibility of opinion testimony is governed by
Article VII of the Federal Rules of Evidence ("FRE").   FRE 702
provides that opinions relating to "scientific, technical, or other
specialized knowledge" may be admitted if they will "assist the
trier of fact to understand the evidence or to determine a fact in
issue."   Id.   The testimony may only be admitted if "(1) [it] is
based on sufficient facts or data, (2) [it] is the product of
reliable principles and methods, and (3) the witness has applied
the principles and methods reliably to the facts of this case."
Id.

The court has a duty to ensure that expert testimony is
both relevant and reliable.   <u>Kumho Tire Co v Carmichael</u>, 526 US
137, 147 (1999) (citing <u>Daubert v Merrell Dow Pharm</u>, 509 US 579,
589 (1993)).   To this end, the trial judge must "determine whether
the testimony has a 'reliable basis in the knowledge and experience
of [the relevant] discipline,'" id at 149 (citing <u>Daubert</u>, 509 US
at 592) (brackets in original).

1    There is considerable inconsistency in the level of
2  review conducted by courts evaluating expert testimony in the class
3  certification context.  Compare, for example, American Honda Motor
4  Co v Allen, 600 F3d 813 (7th Cir 2010) ("[W]here an expert's report
5  or testimony is critical to class certification [and is challenged]
6  * * * the district court must perform a full Daubert analysis
7  before certifying the class if the situation warrants.") with Ellis
8  v Costco Wholesale Corp, 240 FRD 627, 635 (ND Cal 2007) (Patel, J)
9  ("At this early stage, robust gatekeeping of expert evidence is not
10  required; rather, the court should ask only if expert evidence is
11  'useful in evaluating whether class certification requirements have
12  been met.'") (citation omitted).

13    The required level of scrutiny of experts' opinions for
14  purposes of determining whether to certify a class has not been
15  conclusively determined by the Ninth Circuit.  Compare Dukes v Wal-
16  Mart Stores, Inc, 603 F3d 571, 639 (9th Cir 2010) (en banc),
17  certiorari granted, in part, by --- S Ct ----, 79 USLW 3128 (Dec
18  06, 2010), (Ikuta, J, dissenting) ("Like any other evidence, expert
19  evidence introduced to 'establish a component of a Rule 23
20  requirement' must be reliable; it is not enough that the expert
21  testimony is 'not fatally flawed.'") (citing In re Initial Pub
22  Offerings Sec Litig, 471 F3d 24, 42 (2d Cir 2006)), with id at 602
23  n22 (Hawkins, J, majority opinion) ("We are not convinced by the
24  dissent's argument that Daubert has exactly the same application at
25  the class certification stage as it does to expert testimony
26  relevant at trial. * * * However, * * * we need not resolve that
27  issue here.").

28  //

4

United States District Court
For the Northern District of California

1    FRE 1101 states that the Federal Rules of Evidence apply
2    "generally to all civil actions and proceedings."  FRE 1101(b).
3    There seems to be nothing in the Federal Rules of Evidence or in
4    the Federal Rules of Civil Procedure to suggest that class action
5    certification proceedings present an exception to FRE 1101 or that
6    the Federal Rules of Evidence carry different meaning in the class
7    action certification context than elsewhere.  See Joseph M
8    McLaughlin, <u>McLaughlin on Class Actions</u>, § 3:14 (6th ed 2010).
9    Furthermore, undertaking a full-blown Daubert analysis at the class
10   certification stage makes a great deal of practical sense.  It is
11   well established that courts, in evaluating whether class
12   certification is appropriate, cannot engage in a so-called "battle
13   of the experts."  Thus, while courts cannot decide which parties'
14   evidence is ultimately more persuasive as to the merits of the
15   case, they must nevertheless make factual determinations regarding
16   evidence as it relates to the requirements of FRCP 23.  There would
17   be scant, if any benefit to the FRCP 23 inquiry if courts cannot
18   ensure that competing testimony is relevant, admissible and in fact
19   proffered by an expert.  While the court agrees that the
20   persuasiveness of competing expert opinions as to liability should
21   be left to the trier of fact, it cannot conclude that accepting
22   <u>anyone's</u> testimony to establish commonality, typicality or
23   predominance is the proper way to ensure that FRCP 23's
24   requirements have been met.
25         It thus appears that, under the dictum provided by the
26   <u>Dukes</u>' majority, a court could blindly accept without comment a
27   party's proffered expert on a subject for purposes of undertaking
28   its "rigorous" FRCP 23 analysis, only to jettison that expert's

evidence as unreliable on the eve of trial. Given that class actions consume vast judicial resources and that many defendants face substantial settlement pressures as a result of class certification, however, it hardly seems appropriate to allow flimsy expert opinions to buttress plaintiffs' FRCP 23 arguments. Likewise, defendants should not be able to resist class certification by using lay witnesses (or, as discussed further below, an expert in a field testifying as to matters outside of her area of expertise) to disprove plaintiffs' economic theory. In short, because an adequate Daubert analysis of every challenged expert opinion seems prudent in fulfilling the court's obligation to ensure actual conformance with FRCP 23, the court applies FRE 702 as interpreted by the Supreme Court in Daubert and Kumho Tire.

As a threshold matter, a proposed witness must qualify as an expert "by knowledge, skill, experience, training, or education." FRE 702. Hamburger is tendered by defendant as an expert in the video game industry. Doc #152 at 9; see also Doc #131-1 at 27:19-20. In support of this, defendant points to Hamburger's many years of experience in the video game industry both as a senior executive at Best Buy and as a private consultant. Id at 8-11; see also Hamburger Report at 1, 49-50.

Despite the fact that Hamburger is a "well-qualified consultant in the video game industry," Doc #130 at 9 n3, plaintiffs challenge Hamburger's qualifications because "she has no relevant academic qualifications or expertise in economics, accounting, statistics or budgeting." Id at 1. EA contends that Hamburger is not offering expert opinion on any of those subjects. See Doc #130 at 5 ("[S]o what?").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1        Due to Hamburger's experience in video game retail, she
2   is certainly no stranger to the video game industry.  During her
3   years at Best Buy, the international electronics retailer,
4   Hamburger oversaw the selection of video games for in-store sale,
5   Doc #130 at 9, and "interacted with consumers, publishers, and
6   other retailers on a daily basis," Hamburger Report at 1.  In 2006,
7   she was "named one of the Top 25 Most Influential People in the
8   Video Gaming Industry by the Wall Street Journal."  Id.

9        The multi-billion dollar video game industry is a highly
10  specialized business involving a broad area of expertise,
11  encompassing disciplines ranging from psychological analysis of
12  consumer behavior to software engineering.  See, for example, Doc
13  #109 at 14-32.  Hamburger's expertise, acquired chiefly through
14  years of experience at one video game retailer, does not encompass
15  the entire video game industry.  As such, the court hereby
16  DETERMINES that Hamburger is qualified by her many years of
17  experience to testify on video game retail and the video game
18  industry from a retailer's perspective.

19       Once a court finds that the proposed witness qualifies as
20  an expert, it "must determine whether the testimony has 'a reliable
21  basis in the knowledge and experience of [the relevant]
22  discipline.'"  Kumho Tire, 526 US at 149 (quoting Daubert, 509 US
23  at 592) (brackets in original).  This progression establishes a
24  standard of evidentiary reliability, Daubert, 509 US at 590,
25  intended to ensure that the analysis "undergirding the expert's
26  testimony falls within the range of accepted standards governing
27  how [experts in the relevant field] conduct their research and
28  reach their conclusions."  Daubert v Merrell Dow Pharm, 43 F3d

1311, 1317 (9th Cir 1995) (on remand) ("Daubert II").  The court's
task "is to analyze not what the experts say, but what basis they
have for saying it."  Id at 1316.  Accordingly, the court focuses
on the "reliability of the methodology."  Id at 1319 n11.

While the methodologies on which expert testimony may be
based are not limited to what is generally accepted, id, "nothing
in either Daubert or the Federal Rules of Evidence requires a
district court to admit opinion evidence that is connected to
existing data only by the ipse dixit of the expert."  General
Electric v Joiner, 522 US 136, 146 (1997).  The party proffering
the evidence "must explain the expert's methodology and demonstrate
in some objectively verifiable way that the expert has both chosen
a reliable * * * method and followed it faithfully."  Daubert II,
43 F3d at 1319 n11.

While there is no definitive checklist or test, Daubert,
509 US at 593, courts have identified several non-exclusive and
non-dispositive factors as potentially relevant to the reliability
inquiry, including: (1) "whether a [method] * * * can be (and has
been) tested," (2) "whether the [method] has been subjected to peer
review and publication," (3) "the known or potential rate of
error," (4) "the existence and maintenance of standards controlling
the [method's] operation," (5) "a * * * degree of acceptance" of
the method within "a relevant * * * community," id at 593-94, (6)
whether the expert is "proposing to testify about matters growing
naturally and directly out of research they have conducted
independent of the litigation," Daubert II, 43 F3d at 1317, (7)
whether the expert has unjustifiably extrapolated from an accepted
premise to an unfounded conclusion, see Joiner, 522 US at 146, (8)

United States District Court
For the Northern District of California

whether the expert has adequately accounted for obvious alternative explanations, see generally Claar v Burlington N RR, 29 F3d 499 (9th Cir 1994), (9) whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," Kumho Tire, 526 US at 152, and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give, see id at 151.  Because Hamburger offers opinions on a wide variety of subjects, the admissibility of each is discussed separately below.

A

Hamburger offers the opinion that the video game industry "is characterized by 'industry standard retail launch pricing,' meaning that all premium games are launched at standardized retail price points."  Hamburger Report at 4.  Hamburger further states that "industry standard video game price across all publishers for newly released premium games on the PS3 and Microsoft Xbox 360 platforms is $59.99 retail" and on "the Nintendo Wii platform, all newly released games launch at $49.99 retail."  Id.  Plaintiffs' primary objection to this opinion is based on the fact that Hamburger is not able to classify a game as a "premium" game or a "value" game, see Hamburger Report at 38, without reference to whether publishers present the game as premium or value.  See Doc #130 at 16-18.  Plaintiffs contend that Hamburger therefore has no reliable methodology for reaching her conclusions regarding industry standard retail pricing.

//

9

But Hamburger does not claim to have reached this conclusion by virtue of having observed games, independently classified them as premium or value games and then observed the prices of these classes of games. Rather, she defers to her experience that publishers present their games to retailers as being either premium or value games (as a description of their quality) and that they price these games using standard industry prices based on this classification. See, for example, Doc #131-1 at 51:1-52:13, 76:3-8. While Hamburger's approach may at first glance appear tautological, she bases this opinion directly on her observations of the behavior of publishers of video games during her years in the video game industry. This approach is at least as reliable — if not substantially more reliable — than an evaluation of video game content and subjective evaluation of them as a "premium" or "value" game. The court hereby finds this aspect of Hamburger's opinion to have a reliable basis in the expert's knowledge and experience of the relevant field.

B

Hamburger also offers the opinion that the video game industry "is characterized by post-launch discounting based on sell-through performance," meaning that "[a]t some point in a game's shelf life, publishers will begin to discount the wholesale price to stimulate retail sales." Hamburger Report at 8. Thus, for titles like Madden NFL, "price discounting at the close of a sports season re-stimulates demand and clears out inventory in preparation for the launch of the game's next iteration." Id at 9. Because Hamburger has direct knowledge of the decision-making

strategies of retailers by virtue of having served in that capacity for many years, this opinion has a reliable basis in her knowledge and experience of the relevant field.

C

Hamburger further opines that "videogame consumers can be divided into hard-core gamers and more casual gamers"; "[p]rice is not the primary motivator for [hardcore] gamers," but more casual gamers "are price-sensitive and generally consider a mix of titles while shopping."[1] Hamburger Report at 10, 11. This is not an opinion that can be drawn from direct observation, however, and Hamburger relies for this opinion primarily on consumer segmentation studies and price-sensitivity studies. See, for example, Doc #131-1 at 141:25-142:5, 145:13-21, 146:8-11. Hamburger is not qualified as an expert in economics or statistics and does not otherwise explain her qualifications to interpret the methodology employed in such studies; she thus lacks the qualification necessary to evaluate the reliability of these studies. Because Hamburger lacks the expertise necessary to interpret and evaluate these studies, the court finds this opinion to be unreliable and accordingly inadmissible. See <u>Daubert</u> at 589.

Notwithstanding that an economist might be able to identify differing preferences for video games among consumers, it is not clear to the court that this is a subject that requires

---

[1] Despite Hamburger's assertion, EA's economic expert states (without any apparent factual basis) that this casual-hardcore dichotomy is "oversimplified." See Doc #109 at 63 ("In very broad, oversimplified terms, video game consumers can be divided into early adopters and more casual gamers.")

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

expert testimony.  Differences among consumers in the strength of their preferences would seem to be a matter largely of common sense.  Hamburger's inability to pass a <u>Daubert</u> test for this part of her opinion would seem to be of little consequence for present purposes.

### D

Hamburger also offers the opinion that "retailers are content- and genre-agnostic.  They care about sell-through, * * * not about specific titles or genres of videogames."  Hamburger Report at 12.  Because of her extensive experience at a national retailer of video games and as a consultant of video game retailers, Hamburger has considerable experience observing the priorities of retailers; the court accordingly finds this opinion to be reliable.

### E

Hamburger next offers the opinion that Take-Two's 2004 "$19.99 pricing was a one-time promotional pricing strategy and Take-Two intended to raise the price on its sports titles back to industry standard prices in subsequent years."  Id at 15. Hamburger asserts four bases for this opinion: (1) the declaration of Paul Eibeler, the former CEO of Take-Two Interactive, Doc #106 (2) a personal conversation she had with Eibeler, (3) a public announcement released by Take-Two in 2004 and (4) the opinion that this strategy "was not sustainable in the long run."  Id.  The opinion that the 2004 pricing was not a sustainable strategy for a publisher of video games would presumably require a comparison of

the publisher's revenue from video game sales and the costs of producing video games, which falls outside of Hamburger's expertise, which is limited to the retail sale —— not publishing —— of video games.  Accordingly, the court determines that this does not provide a reliable basis for Hamburger's conclusion.  The remaining three bases for this conclusion do not concern "specialized knowledge," FRE 702, because they do not "address an issue beyond the common knowledge of the average layman."  <u>United States v Vallejo</u>, 237 F3d 1008, 1019 (9th Cir 2001), amended by 246 F3d 1150 (9th Cir 2001).  The court accordingly finds that this opinion does not constitute reliable expert testimony concerning specialized knowledge.

F

Hamburger next offers the opinion that "[t]he factors that drive sell through performance * * * include competition from other hit games[,] * * * the quality of game, and industry / consumer 'buzz'" and that "[c]ompetition from other hit titles does not impact launch pricing, but * * * does impact sell through and post-launch discounting."  Hamburger Report at 14, 16.  Hamburger's experience in video game retail allowed her directly to observe trends in video game sales.  In order to reach her conclusion regarding the "factors that drive" these trends, however, Hamburger relies upon statistical analyses of market data, the interpretation and evaluation of which are outside of her expertise.  This opinion is accordingly unreliable.

//

//

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

**G**

Hamburger also offers the opinion that video games compete with each other across genres and that "[t]he most intense competition for any game at any given time comes from whatever other titles are hot in the same release period, regardless of genre or apparent 'closeness' in content." Id at 16.  Hamburger's report does not specify whether this opinion refers to competition for retailer shelf space or to competition for consumer attention. Id.  Insofar as this opinion is intended to refer to competition for retailer shelf space, it is within the direct observational capacity of Hamburger in her experience as a retailer of video games.  To such extent that this opinion is intended to refer to competition for consumer attention, however, it requires statistical analysis of consumer behavior that is outside of Hamburger's expertise and constitutes unreliable testimony. Accordingly, the court finds this opinion admissible for the purpose of showing that video games compete across genres for shelf space, but inadmissible for the purpose of proving that video games compete across genres for consumer attention.


**H**

Finally, Hamburger offers the opinion that "there is no evidence that an exclusive licensing structure results in lower quality games" and that "major league sports games subject to exclusive licenses —— for EA and Take-Two —— have achieved better [critics'] scores overall than games with non-exclusive licenses." Hamburger Report at 42.  Hamburger cites two bases in support of this opinion.  The first is market data purporting to show a

correlation between exclusive licenses and critical ratings. See,
for example, id at 43. Because the evaluation and interpretation
of this numerical data is outside of Hamburger's expertise, there
is no reliable basis for this opinion. The second is a series of
anecdotal quotations praising games with exclusive licenses. See
id at 44-45. To the extent that these quotations are merely
illustrative, they provide no independent basis for Hamburger's
opinion. Insofar as Hamburger's opinion relies on these quotations
for support, Hamburger provides no methodology by which she
determined these quotations to be representative of all or even
most critics' opinions, and the court thereby finds Hamburger's
opinion to be connected to existing data only by the <u>ipse dixit</u> of
the expert. The court therefore finds this opinion to be
unreliable.

Having, thus, GRANTED IN PART and DENIED IN PART
plaintiffs' motion to exclude Hamburger's testimony, Doc #130, the
court turns to the issue of class certification.

III

Plaintiffs seeking to represent a class bear the burden
of showing each of the four requirements of FRCP 23(a) and at least
one requirement of FRCP 23(b) are met. <u>Zinser v Accufix Research
Inst, Inc</u>, 253 F3d 1180, 1186, amended by 273 F3d 1266 (9th Cir
2001). Under FRCP 23(a), a court may certify a class only if: (1)
the class is so numerous that joinder of all members is
impracticable; (2) there are questions of law or fact common to the
class; (3) the claims or defenses of the representative parties are
typical of the claims or defenses of the class; and (4) the

representative parties will fairly and adequately protect the

interests of the class.  FRCP 23(b) further provides that a class

may be certified only if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

The Ninth Circuit has recently provided guidance for district

courts undertaking FRCP 23 analyses:

> In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met[].  * * *  Although certification inquiries such as commonality, typicality, and predominance might properly call for some substantive inquiry, the court may not go so far * * * as to judge the validity of these claims.  Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies [FRCP 23].

United Steel, Paper & Forestry, Rubber, Mfg Energy, Allied Indus &

Service Workers Intern Union, AFL-CIO, CLC v ConocoPhillips Co, 593

F3d 802, 808-09 (9th Cir 2010) (quotation marks, capitalization

16

**United States District Court**
For the Northern District of California

alterations and citations omitted) ("<u>United Steel</u>"); see generally <u>Dukes</u>, 603 F3d at 586-95.

A

"Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed."  <u>Schwartz v Upper Deck Co</u>, 183 FRD 672, 679-80 (SD Cal 1999) (quoting <u>Elliott v ITT Corp</u>, 150 FRD 569, 573-74 (ND Ill 1992)).  "A class definition should be 'precise, objective and presently ascertainable.'"  <u>Rodriguez v Gates</u>, 2002 WL 1162675 at *8 (CD Cal 2002) (quoting <u>O'Connor v Boeing North American, Inc</u>, 184 FRD 311, 319 (CD Cal 1998)); see also Manual for Complex Litigation, Fourth, §21.222 at 270-71 (2004).  The class definition must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member.  See, for example, <u>Davoll v Webb</u>, 160 FRD 142, 144 (D Colo 1995).  Before engaging in a FRCP 23 analysis, the court therefore must determine whether plaintiffs' purported class is ascertainable.

Plaintiffs contend a class should be certified pursuant to FRCP 23(b)(2) or 23(b)(3), defined as follows:

> All persons in the United States who purchased Electronic Arts' Madden NFL, NCAA or Arena Football League brand interactive football software, excluding software for mobile devices, ("Relevant Software") with a release date of January 1, 2005 to the present.  Doc #75 at 9.[2]

---

[2] Excluded from plaintiffs' proposed class are persons purchasing directly from Electronic Arts, persons purchasing used copies of the Relevant Software and EA's employees, officers, directors, legal representatives and wholly or partly owned subsidiaries or affiliated

1  Doc #75 at 39.

2       Plaintiffs' proposed class definition appears to be

3  precise, objective and ascertainable.  Potential class members and

4  the court should have little difficulty identifying class

5  membership; any potential class member should know whether or not

6  he or she purchased an NFL, NCAA or AFL football game in the

7  relevant time period.  Defendant does not seem to dispute this

8  conclusion.  See Doc #103.  The court therefore finds the proposed

9  class definition to be ascertainable.

10

11                                  B

12       EA, in discussing purported intra-class conflicts and

13  antagonistic attributes, seems to challenge only the typicality and

14  adequacy requirements of FRCP 23(a).  See Opp.  These requirements,

15  like each of the four separate factors of FRCP 23(a), tend to

16  merge.  See, for example, Amchem Prods, Inc v Windsor, 521 US 591,

17  626 n20 (1997); General Tel Co of Southwest v Falcon, 457 US 147,

18  157 n13 (1982); Staton v Boeing Co, 327 F3d 939, 957 (9th Cir

19  2003).  The court addresses each requirement in turn; because EA

20  does not specify to which 23(a) factor its arguments concerning

21  potential class conflicts or antagonistic attributes are addressed,

22  the court considers each below as part of the adequacy requirement

23  of FRCP 23(a).

24

25                                  1

26       FRCP 23(a) permits certification of a class only if "the

27  _____

28  companies.

United States District Court
For the Northern District of California

representative parties will fairly and adequately protect the interests of the class." FRCP 23(a)(4). This requirement consists of two inquiries: "(1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." Dukes, 603 F3d at 6212 (citing Hanlon, 150 F3d at 1020 and Molski v Gleich, 318 F3d 937, 955 (9th Cir 2003)). Whether the named plaintiffs satisfy the adequacy requirement depends, in part, on "an absence of antagonism [and] a sharing of interests between the representatives and absentees." Walters v Reno, 145 F3d 1032, 1046 (9th Cir 1998) (quoting Crawford v Honig, 37 F3d 485, 487 (9th Cir 1994)). The requirement thus "serves to uncover conflicts of interest," Amchem, 521 US at 625; plaintiffs with "interests that are antagonistic to the proposed class members" are inadequate class representatives. Dunnigan v Metropolitan Life Ins Co, 214 FRD 125, 138 (SDNY 2003). A class cannot be certified if class "members benefit from the same acts alleged [by the named plaintiffs] to be harmful to other members of the class." Pickett v Iowa Beef Processors, 209 F3d 1276, 1280-81 (11th Cir 2000); Bieneman v City of Chicago, 864 F2d 463 (7th Cir 1988). The Ninth Circuit, however, "does not favor denial of class certification on the basis of speculative conflicts." Cummings v Connell, 316 F3d 886, 896 (9th Cir 2003); see also Soc Servs Union, Local 535 v County of Santa Clara, 609 F2d 944, 948 (9th Cir 1979) ("Mere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial class certification."); Blackie v Barrack, 524 F2d 891, 909 (9th Cir 1975) ("potential conflicts" are insufficient to refuse class certification).

19

1    EA does not challenge the qualifications of plaintiffs'

2 counsel; rather, as discussed below, EA contends that the named

3 plaintiffs and the purported class possess two sets of "conflicting

4 interests": class members are comprised both of quality-driven and

5 cost-driven purchasers as well as "early" and "late" purchasers.

6 The court addresses each purported conflict in turn.

7

8                                    a

9    The proposed class's first conflict, in EA's view, is

10 that some gamers (like named plaintiffs) "do[] not care about

11 innovation" and believe that EA football games are overpriced,

12 while others have "no stake in videogame pricing" and would instead

13 favor exclusive licensing agreements that would enhance game

14 quality.  That is, some gamers are motivated by quality, while

15 others are motivated by price.  The quality-driven gamers, who

16 presumably want increased research and development encouraged by

17 exclusive licenses, therefore would likely support EA; price-driven

18 gamers, who believe the games are overpriced already, would

19 presumably favor plaintiffs.  Opp at 36.  The purported class, the

20 argument goes, made up of both cost-driven and quality-driven

21 gamers, does not share the same preference for exclusive licensing

22 schemes, and thus has hopelessly misaligned interests in this case.

23 EA concludes that, based on these diverging views, "it is not

24 economically rational to assume that all members of the class would

25 have the same preference for exclusive or non-exclusive licensing

26 schemes."  Id (emphasis in original).

27    EA's argument is an interesting one.  One could imagine

28 certain class members favoring a series of exclusive licenses for

the increased research and development ("R&D") expenditures that might flow from such agreements.  But such disagreement exists in most every class action, where but a fraction of possible plaintiffs bring suit and all others, who might not know about the alleged wrongdoing, might not care or might not be interested in litigating their respective claims, do not.  The mere fact that some purported class members might not have brought the lawsuit in the first place is not a reasonable basis on which to conclude that the class has antagonistic properties.  After all, a class may exhibit differences while not possessing conflict.  See, for example, Turner v Murphy Oil USA, Inc, 234 FRD 597 (ED La 2006); Arthur v Starrett City Assocs, 98 FRD 500, 506 (EDNY 1983).  More importantly, EA has proffered no evidence indicating that potential class members oppose this suit, nor has it highlighted for the court in its opposition any economic analysis (in the almost 7,000 pages of documents that have been submitted by the parties relating to this motion) addressing the interplay between exclusive licenses and R&D expenditures.[3]  See Opp at 36.

While a motion for class certification may fail where some putative class members "undoubtedly" benefit from the alleged conduct and thus would likely have opposed the class action, see, for example, Bieneman, 864 F2d at 465, EA has not pointed to any tangible evidence in the record that indicates any class members would oppose the instant action.  Because the Ninth Circuit "does not favor denial of class certification on the basis of speculative conflicts," Cummings, 316 F3d 886, 896 (9th Cir 2003), and EA

---

[3]In addition, Hamburger's opinion concerning EA's first conflict argument has been rejected by the court, above.

United States District Court
For the Northern District of California

offers but hypothetical scenarios indicating that intra-class conflicts might exist, the court rejects EA's first conflict argument.

b

EA's second conflict argument involves class litigation strategy.  With respect to this argument, EA envisions two distinct consumers as part of the purported class: those who buy <u>Madden NFL</u> early, near launch, and those who buy <u>Madden NFL</u> in November or later during the discounting season.  Because, EA argues, all premium video games launch at the same industry-standard release price, the "early buyers" would, in EA's view, "have to take on the very difficult argument that, but for the exclusive license, the price they paid would have been lower."  EA's argument continues that all others, who purchased the game at various discounted prices as the season and year progressed, do "not care about that issue and would not risk credibility arguing about what might have happened at or near launch."  Opp at 36-37.  Thus, EA argues, the two groups of purchasers "may not have <u>opposing</u> interests, but they do have <u>conflicting interests in the conduct of the litigation</u>."  Id (emphasis in original; citing <u>Amchem</u>).

But even if EA's conceptual framework were true, plaintiffs' expert sets forth a methodology which posits that the early purchasers (who include the named plaintiffs) and all late purchasers would still suffer the same type of alleged injury.  EA's sub-group distinctions, in relation to this second conflict, merely assert that "early" purchasers suffered a different type of injury than "late" purchasers.  Different amounts of damage

22

United States District Court
For the Northern District of California

1 sustained by individual plaintiffs, however, are not enough to

2 defeat class certification.  See, for example, In re TFT-LCD (Flat

3 Panel) Antitrust Litig, 2010 WL 1286478 at *8 (ND Cal 2010)

4 (Illston, J) (quoting In re Flat Glass Antitrust Litig, 191 FRD

5 472, 480 (WD Pa 1999)).  In short, the interests and potential

6 remedies of early and late purchasers do not "tug" at each other;

7 thus, success by one "sub-group" would not necessarily lead to the

8 detriment of the other.  While this might not be true if named

9 plaintiffs were late rather than early purchasers and would thus

10 not necessarily have to take up the industry-standard pricing issue

11 in order to prevail, that is simply not the case here.

12

13                                    2

14        FRCP 23 also requires that "the claims or defenses of the

15 representative parties are typical of the claims or defenses of the

16 class."  FRCP 23(a)(3).  "[R]epresentative claims are 'typical' if

17 they are reasonably coextensive with those of absent class members;

18 they need not be substantially identical."  Dukes, 603 F3d at 6210,

19 quoting Hanlon, 150 F3d at 120; Staton, 327 F3d at 957; see also La

20 Fata v Raytheon Co, 207 FRD 35, 42 (ED Pa 2002) ("Typicality is not

21 identicality."); In re Catfish Antitrust Litig, 826 F Supp 1019,

22 1036 (ND Miss 1993) ("There is nothing in Rule 23(a)(3) that

23 requires named plaintiffs to be clones of each other or clones of

24 other class members.").

25        In antitrust cases, typicality usually "will be

26 established by plaintiffs and all class members alleging the same

27 antitrust violations by defendants."  In re Playmobil Antitrust

28 Litig, 35 F Supp 2d 231, 241 (EDNY 1998).  "The typicality

requirement does not mandate that the products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of absent class members." In re TFT-LCD, 2010 WL 1286478 at *8 (quoting In re Vitamins Antitrust Litig, 209 FRD 251, 261 (DDC 2002)). "Instead, '[t]he overarching scheme is the linchpin of plaintiffs' * * * complaint, regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong.'" Id (quoting In re Flat Glass, 191 FRD at 480).

EA argues that named plaintiffs are not typical of consumers who may have been injured by the alleged series of anticompetitive exclusive licenses. Opp at 39. While the named plaintiffs purchased Madden NFL, they did not purchase either of the other EA football games included in the class definition. Moreover, they do not even follow the Arena League or college football. Id at 39 (citing Pecover Dep 53:5-14; 74:19-23 & 75:17-19; Owens Dep 64:16-22 & 126:19-127:1). Given named plaintiffs' lack of interest and experience with two of the three games at issue, EA questions whether plaintiffs can be typical of those injured by an alleged "series" of exclusive licenses between EA and the NFL, NCAA and AFL. Opp at 40.

Plaintiffs contend that their claims are indeed typical of the class, since both have purchased interactive football video game software from EA. Reply at 4-5. In making their argument, plaintiffs point out that at least one judge in this district has

United States District Court

For the Northern District of California

24

**United States District Court**
For the Northern District of California

1  held that "claims of named plaintiffs are typical if they relate to

2  a common scheme, even if the mix of products purchased is

3  different."  Reply at 5, citing In re Citric Acid Antitrust Litig,

4  US Dist LEXIS 16409 (ND Cal 1996) (Smith, J) ("Citric Acid")).  In

5  Citric Acid, purchasers sought class certification in a price-

6  fixing action; defendants opposed, in part arguing that the named

7  plaintiffs could not adequately represent the interests of the

8  class members who purchased different kinds of citric acid.  US

9  Dist LEXIS 16409 at *16.  The court, in certifying the class,

10  observed "[t]he inquiry here * * * is not how many kinds of citric

11  acid plaintiffs purchased, but rather whether each representative

12  has sufficient incentive to present evidence that will establish

13  the existence of the alleged conspiracy and its effect on the

14  prices of all of the products purchased by class members."  Id,

15  citing In re Indus Diamonds Antitrust Litig, 167 FRD 374 (SDNY

16  1996).  Other district courts evaluating typicality in the price-

17  fixing context have agreed.  See, for example, In re Polypropylene

18  Carpet Antitrust Litig, 178 FRD 603, 613 (ND Ga 1997) (finding that

19  although the unnamed class members may have purchased different

20  carpet products at different prices and under different conditions,

21  the nature of all the claims remained the same); Arden

22  Architectural Specialties, Inc v Washington Mills Electro Minerals

23  Corp, 2002 WL 31421915 (WDNY 2002) (rejecting defendants'

24  contention that typicality was lacking merely because defendants

25  sold several different types of the product at issue to different

26  customers for different prices).  While these cases primarily

27  address price-fixing, their underlying reasoning —— that named

28  plaintiffs cannot prove their own claims without proving those of

the class —— applies equally here: both named plaintiffs and the
purported class, to succeed on the merits, must show that the
exclusive licenses at issue had an anticompetitive effect on the
market and that they suffered damages.

While as discussed below EA argues that some purported
class members —— "early purchasers" ——  may have to prove even more
than this, named plaintiffs are in fact such early purchasers.
While under EA's theory a late purchaser would not necessarily go
out of his way to prove that he suffered antitrust injury by virtue
of an industry-standard purchase, plaintiffs, as early purchasers,
must prove "late" purchasers' case to succeed.  In other words,
named plaintiffs must prove that absent the exclusive licenses the
price of EA's football video games would have been lower.  Even
under EA's theory, this anticompetitive effect is all that EA's so-
called "late" purchasers need to prove.  Because named plaintiffs
therefore have sufficient incentive to present evidence that all
class members must prove, the court finds that the named plaintiffs
are sufficiently typical of the class.


3

EA concedes that plaintiffs have satisfied the numerosity
and commonality requirements of FRCP 23(a).  See Opp (declining to
address either requirement).  Nevertheless, because plaintiffs must
establish that they satisfy all the FRCP 23(a) requirements, the
court briefly evaluates each, below.

Under FRCP 23(a)(1), the class must be "so numerous that
joinder of all members is impracticable."  "A finding of numerosity
may be supported by common sense assumptions, and it is especially

**United States District Court**
For the Northern District of California

appropriate in antitrust actions brought under Rule 23(b)(3).”  <u>In re Playmobil</u>, 35 F Supp 2d at 239 (citation omitted).  Plaintiffs contend that joinder would be impracticable because class members are “dispersed geographically across the country” and because their proposed class “likely contains millions of members.”  Doc #160 at 19.  The court agrees and finds that FRCP 23(a)’s numerosity requirement satisfied.

The court further concludes that FRCP 23(a)’s commonality requirement is met.  This requirement is “a low hurdle easily surmounted.”  <u>Scholes v Stone, McGuire & Benjamin</u>, 143 FRD 181, 185 (ND Ill 1992).  To satisfy FRCP 23(a)(2), “[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.”  <u>Hanlon v Chrysler Corp</u>, 150 F3d 1011, 1019 (9th Cir 1988).  The court finds common issues of law and fact to include: whether EA has restrained trade and monopolized the market for interactive football software, the definition of relevant product and geographic markets, whether EA’s conduct violated the Sherman or Cartwright Acts and whether injunctive relief is appropriate.

C

As stated above, in addition to meeting the requirements of FRCP 23(a), plaintiffs seeking to certify a class must demonstrate that at least one of the requirements of FRCP 23(b) has been met.  <u>Zinser</u>, 253 F3d at 1186.

//

//

1

**1**

2    Plaintiffs argue that the court should certify a
3  nationwide injunctive-relief class pursuant to FRCP 23(b)(2)
4  because EA, by entering into a series of exclusive licensing
5  agreements, "acted uniformly 'on grounds generally applicable to
6  all class members.'"  Docs #75; 160 (under seal).

7        "To decide whether certification under Rule 23(b)(2) is
8  appropriate, * * * a district court must squarely face and resolve
9  the question of whether the monetary damages sought by the
10  plaintiff class predominate over the injunctive and declaratory
11  relief."  Dukes, 603 F3d at 620.  "To be certified under Rule
12  23(b)(2), * * * a class must seek only monetary damages that are
13  not 'superior [in] strength, influence, or authority' to injunctive
14  and declaratory relief."  Id at 616.  If the monetary damages
15  sought by the plaintiff class predominate over injunctive and
16  declaratory relief, "then the court may either deny certification
17  under Rule 23(b)(2) or bifurcate the proceedings by certifying a
18  Rule 23(b)(2) class for equitable relief and a separate Rule
19  23(b)(3) class for damages."  Id at 620 (citation omitted).  "To
20  determine whether monetary relief predominates, a district court
21  should consider, on a case-by-case basis, the objective 'effect of
22  the relief sought' on the litigation."  Id at 617 (citation
23  omitted).  "Factors such as whether the monetary relief sought
24  determines the key procedures that will be used, whether it
25  introduces new and significant legal and factual issues, whether it
26  requires individualized hearings, and whether its size and nature
27  ⸺ as measured by recovery per class member ⸺ raise particular due
28  process and manageability concerns would all be relevant, though no

**United States District Court**
For the Northern District of California

1   single factor would be determinative."   Id at 617.

2         "A comparison between the amount of monetary damages

3   available for each plaintiff and the importance of injunctive and

4   declaratory relief for each is far more relevant to establishing

5   predominance than the total size of the potential monetary award

6   for the class as a whole."   Id at 618.   Furthermore, "[t]he fact

7   that some class members may have suffered no injury or different

8   injuries from the challenged practice does not prevent the class

9   from meeting the requirements of Rule 23(b)(2)."   Rodriguez v

10   Hayes, 591 F3d 1105, 1125 (9th Cir 2010) (citing Walters, 145 F3d

11   at 1047).   "Rule 23(b)(2)'s requirement that a defendant have acted

12   consistently towards the class is plainly more permissive than

13   23(b)(3)'s requirement that questions common to the class

14   predominate over individual issues."   McManus v Fleetwood

15   Enterprises, Inc, 320 F3d 545, 552 (5th Cir 2003).

16         Despite plaintiffs' assertion that "[r]elief to the class

17   from injunctive relief could well exceed the amount of damages in

18   the case," Doc #137 (under seal), plaintiffs spend barely one page

19   in their opening motion addressing 23(b)(2) certification (and in

20   doing so address very limited authority).   This highlights a

21   potentially troubling conflict.   Counsel's interests in such cases

22   —— which are advanced in the 23(b)(3) context in a way they

23   typically are not under 23(b)(2) —— seem to be vigorously pursued,

24   while those of their clients —— which, according to the Rules of

25   Civil Procedure, must stand more to gain via injunctive 23(b)(2)

26   relief than under 23(b)(3) —— are pursued only in passing.   See

27   Docs #75; #160 (under seal) at 31-32.   This phenomenon is a cause

28   for concern: if plaintiffs' interests in injunctive relief are as

United States District Court
For the Northern District of California

29

**United States District Court**
For the Northern District of California

strong as plaintiffs would have the court believe, surely the complexity of 23(b)(3) issues alone could not possibly overshadow those interests to quite this extent.

That observation aside, the burden of establishing the appropriateness of class certification rests with plaintiffs. Zinser, 253 F3d 1180 at 1186. In their opening memorandum, plaintiffs fail to address the Ninth Circuit's instruction that "[c]lass certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." Id at 1195; see Mot at 22-23. In reply, plaintiffs suggest their claims for injunctive relief "are an indispensable part of this case" that "could well exceed the amount of damages in this case." Reply at 6. But these arguments, even when read together, do not allege that the primary relief sought is injunctive. "The mere fact that Plaintiffs ask for injunctive relief does not automatically satisfy Rule 23(b)(2)." Lang v Kansas City Power & Light Co, 199 FRD 640, 648 (WD Mo 2001).

EA contends that plaintiffs' proposed Rule 23(b)(2) class fails because plaintiffs primarily seek economic damages and plaintiffs' proposed injunctive class is not sufficiently cohesive due to the proposed intra-class conflicts addressed above. Doc #103 at 48-50. EA argues that "there can be no question that this case is primarily about damages" because plaintiffs claim that "damages could exceed one billion dollars." Doc #103 at 57. As an initial matter, courts focus on the relative importance of monetary damages versus injunctive and declaratory relief to each class member, rather than on the potentially large overall damages award. Even claims that "may amount to billions of dollars" do not

United States District Court
For the Northern District of California

preclude class certification under FRCP 23(b)(2).  <u>Dukes</u>, 603 F3d at 617.  Thus, the fact that the damages sought are large would not necessarily affect FRCP 23(b)(2) certification if plaintiffs were to claim that injunctive relief predominates.  Plaintiffs' response to EA's contention, however, does not make this allegation.  Instead, plaintiffs suggest "the impact on the choice and quality of games available to class members is something that can be best addressed through injunctive relief."  Id.  Plaintiffs, however, fail to develop this theory, support it with citations from the record, discuss why such relief is more important than damages or to explain how the court might frame an injunction that would address "the choice and quality" of video games should they prevail.  Plaintiffs further contend that injunctive relief "<u>could well</u> exceed the amount of damages in the case."  Doc #137 at 13 (emphasis added).  But then again, it could not.  This claim, too, fails to make the argument that injunctive relief is truly what is important to the class.

Furthermore, the court is unsure, given plaintiffs' limited submissions, what, if any, benefit certifying an injunctive class would serve.  Because plaintiffs fail to allege that injunctive relief predominates, the court cannot evaluate fully the objective "effect of the relief sought" on the litigation.  Left with a void where plaintiffs' predominance arguments should be and given the record before the court, which overwhelmingly focuses on FRCP 23(b)(3) certification and damages, the court must conclude that monetary damages sought by the plaintiff class predominate over the desired injunctive and declaratory relief.  No matter the aims of plaintiffs' lawsuit, which the court, at the class

United States District Court
For the Northern District of California

certification stage ―― even when well briefed ―― is in a difficult position to gauge, it is not the court's role to make plaintiffs' case on their behalf; the duty in establishing the appropriateness of class certification rests with plaintiffs.  Accordingly, the court finds that plaintiffs' argument regarding their interest in injunctive relief is rebutted by their lack of attention to the issue.  Plaintiffs fail to carry their burden of establishing that the injunctive relief they seek is more important than FRCP 23(b)(3) damages which they also claim.  Plaintiffs utterly fail to claim that injunctive relief predominates.

    For these reasons, the court must conclude that final relief in this matter relates predominantly to damages.  Accordingly, the court DECLINES TO CERTIFY plaintiffs' proposed class under FRCP 23(b)(2).

2

    As outlined above, to certify a class under FRCP 23(b)(3), a court must find that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  See, for example, Amchem, 521 US at 615.  To determine whether the requirements of Rule 23(b)(3) are met the court must consider the following factors:  (i) the class members' interests in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or against class members; (iii) the desirability or undesirability of concentrating

the litigation of the claims in the particular forum; and (iv) the likely difficulties in managing a class action. FRCP 23(b)(3). Having considered these factors and for the reasons that follow, the court concludes that plaintiffs sufficiently demonstrate that the proposed class satisfies the requirements of 23(b)(3).

a

The predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Ortiz v Fibreboard Corp, 527 US 815, 858-59 (1999) (citing Amchem, 521 US at 622-23). "That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy." Amchem, 521 US at 623. "Although [a] certification inquir[y into] predominance might properly call for some substantive inquiry, the court may not go so far * * * as to judge the validity of these claims." United Steel, 593 F3d at 808-09. "Analyzing the predominance requirement necessitates looking at both the substantive issues of the underlying claim and the proof relevant to each issue." Williams v Veolia Transportation Services, Inc, 2010 WL 1936270 (9th Cir 2010) (unpublished slip copy) (citing In re Wells Fargo Home Mortgage Overtime Pay Litig, 571 F3d 953, 959 (9th Cir 2009)). To predominate, common questions need not be dispositive of the litigation; rather, the court must identify issues involved and determine which "are subject to generalized proof * * * applicable to the class as a whole" and which must be the subject of proof on behalf of individualized class members. In re Tableware Antitrust Litig, 241 FRD 644, 651 (ND Cal 2007). "Because no precise test

United States District Court
For the Northern District of California

can determine whether common issues predominate, the court must pragmatically assess the entire action and the issues involved." <u>Romero v Producers Dairy Foods, Inc</u>, 235 FRD 474, 489 (ED Cal 2006). "Courts in antitrust cases, as in other cases, typically evince a greater willingness to certify classes involving individualized damages, as opposed to individualized liability issues." <u>In re Tableware</u>, 241 FRD at 651 (citing <u>Alexander v QTS Corp</u>, 1999 WL 573358 (ND Ill 1999)).

i

Plaintiffs argue that the application of California law to a nationwide class is a predominating issue of law and fact. Doc #160 at 24. Thus, in order to address whether plaintiffs have satisfied FRCP 23(b)(3), the court must conduct a choice-of-law analysis to determine whether the entire class has valid claims under California law. <u>Estrella v Freedom Fin Network</u>, 2010 WL 2231790, *4 (ND Cal 2010) (Illston, J) (slip copy). Because a federal court sitting in diversity must apply the choice-of-law rules of the forum state, <u>Klaxon Co v Stentor Elec Mfg Co</u>, 313 US 487, 496 (1941), the court follows California's choice-of-law rules in deciding whether to apply California law to the plaintiffs' claims. In addition to this choice-of-law inquiry, the court must also ensure that the application of California law to plaintiffs' claims will not violate due process. <u>Phillips Petroleum Co v Shutts</u>, 472 US 797, 818 (1985). If this due process test is satisfied, the presumption under California choice-of-law rules is that California law applies; the burden of proving otherwise rests with the party seeking to invoke foreign law. <u>Washington Mutual</u>

**United States District Court**
For the Northern District of California

Bank v Superior Court, 15 P3d 1071, 1080 (Cal 2001).  The court first addresses the due process issue before considering whether EA, which seeks application of foreign law to plaintiffs' claims, has met its burden under California law.

(I)

There are constitutional limits to the certification of nationwide classes under the laws of a single state.  Before certifying a nationwide class, the court must determine whether the state has a "'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that choice of * * * [substantive state] law is not arbitrary or unfair."  Shutts, 472 US at 821-22 (quoting Allstate Ins Co v Hague, 449 US 302, 312-13 (1981)).  In resolving whether application of state law would be unfair, the court can look to the expectations of the parties.  Id at 822 (finding that parties could not expect that Kansas law would control where 97% of plaintiffs did not reside in Kansas and 99% of gas leases at issue were located outside Kansas).  The focus of the Shutts analysis is on both the plaintiffs' and defendant's contacts with the forum state. In re Seagate Tech Sec Litig, 115 FRD 264, 270, 272 (ND Cal 1987) (Ingram, J).

Here, plaintiffs argue that EA has significant contacts with California because EA: (1) uses end-user licensing agreements ("EULAs") and online terms of service that contain California choice-of-law provisions, (2) has headquarters located in California, (3) negotiated anticompetitive licenses in California,

35

**United States District Court**
For the Northern District of California

(4) negotiated retail contracts to sell the video games in California, (5) made anticompetitive pricing decisions in California and (6) included its California address on each video game package.  Doc #75 at 26-28.

EA relies on In re Graphics Processing Units Antitrust Litig ("GPU") to argue that the location of the injury is in fact the controlling factor.  527 F Supp 2d 1011, 1028 (ND Cal 2007) (Alsup, J).  Because most of the video games at issue were sold outside California, EA argues that California does not have significant contacts to the claims asserted by plaintiffs.  Doc #103 at 41.  In doing so, EA suggests that antitrust and consumer protection laws are primarily meant to compensate local consumers, not police corporate conduct, and thus the state where the sale occurred has the greatest interest.  Id (quoting GPU, 527 F Supp 2d at 1028 (citing In re Relafen Antitrust Litig, 221 FRD 260, 276-77 (D Mass 2004))).

Courts, however, have moved away from the view that the location of the event is controlling.  See Hague, 449 US at 308 n11 (noting the move away from a "choice-of-law methodology focused on the jurisdiction where a particular event occurred" to one based on "interest analysis").  Moreover, "the relative interests of other states generally is not a matter of constitutional concern."  In re Activision Sec Litig, 1985 WL 5827, *4 (ND Cal 1985) (Patel, J) (emphasis in original) (citing Hague, 449 US at 309 n8).  Thus California could have a smaller actual interest in the claims than that of other states yet still have significant contacts to satisfy due process.

Courts therefore consider several different factors in

**United States District Court**
For the Northern District of California

addition to the location of the sale in determining whether due process is satisfied.  In <u>GPU</u>, Judge Alsup noted that the defendants had not alleged that the secret meetings underlying the antitrust claim had taken place in California, 527 F Supp 2d at 1028, implying that the location of the wrongful conduct has significant weight.  Other courts have adopted a similar view.  For example, in <u>Keilholtz v Lennox Hearth Products Inc</u>, --- FRD ----, 2010 WL 668067, *7 (ND Cal 2010) (Wilken, J), the court certified a nationwide class with product liability claims under California law against a fireplace manufacturer.  In doing so, the court found contacts sufficient for nationwide class certification despite the fact that most of the defendant's fireplaces were sold outside California.  Because 79% of fireplaces were either exclusively or partly manufactured, assembled and packaged inside California, the court found that "[p]laintiffs have shown that a significant portion of [d]efendant's alleged harmful conduct emanated from California"; thus, California had a sufficient state interest.  Id.

The location of the defendant's headquarters is relevant as well.  <u>In re Charles Schwab Corp Sec Litig</u>, 264 FRD 531, 538 (ND Cal 2009) (Alsup, J) (finding <u>Shutts</u> to be satisfied when the defendant was headquartered in California and the challenged conduct occurred there as well); see also <u>Kelley v Microsoft Corp</u>, 251 FRD 544, 550 (WD Wash 2008) (finding significant contacts for application of Washington law because defendant had its headquarters in Washington and allegedly devised its unfair marketing scheme in the state).

For purposes of satisfying <u>Shutts</u>, this case is more analogous to <u>Keilholtz</u> and <u>Charles Schwab</u> than to <u>GPU</u>.  EA has its

headquarters in California and, as pointed out by plaintiffs, see doc #75 at 27, the exclusive licensing agreements originated, at least in part, in California.  Moreover, EA does not dispute that its retail contracts contain California choice-of-law provisions.  See <u>Kelley</u>, 251 FRD at 550 (state choice-of-law provision in contracts with retailers supported finding of significant contacts with forum state in case brought by indirect purchasers alleging deceptive marketing of software).  The retail contracts indicate that EA was prepared to litigate in California; likewise, the inclusion of EA's California corporate address on the video game packaging ensured that consumers were aware that they were dealing with a California company.  In these circumstances, EA cannot claim that application of California law to the nationwide sales of its video games was unexpected, and thus "arbitrary or unfair." <u>Shutts</u>, 427 US at 822.  California has sufficient interest in the conduct of its citizens and in "harmful conduct emanat[ing] from California," <u>Keilholtz</u>, 2010 WL 668067 at *7, to satisfy due process concerns.

(II)

        Having determined that due process is satisfied, the court now turns to California's choice-of-law analysis, frequently referred to as the governmental interest test.  See, for example, <u>Kearney v Salomon Smith Barney</u>, 137 P3d 914, 922 (Cal 2006).  This test consists of three steps: (1) the court first determines whether the relevant law is the same or different across the affected jurisdictions; (2) if there is a difference in the law, the court looks to each jurisdiction's interest in the application

of its own law to the particular circumstances to determine whether a true conflict exists; and (3) if a true conflict exists, the court weighs the strengths of the interests to determine which state's interest would be more impaired by not having its law applied. Id at 107-08. Because the presumption is that California law applies to the plaintiffs' claims once due process is satisfied, <u>Washington Mutual Bank</u>, 15 P3d at 1080, as it is here, EA bears the burden of demonstrating that the governmental interest test requires the application of foreign law.

Plaintiffs concede that there are differences in state consumer protection laws.[4] Doc #75 at 29. EA argues that these state law differences create a true conflict because each state has an interest in remedying harm caused by out-of-state corporations to its consumers. In making this argument, EA provides several appendices listing (1) the differences in indirect-purchaser standing under state antitrust laws, (2) the differences in antitrust law in states that allow indirect-purchaser standing and (3) the differences among state consumer protection and unfair trade practices laws. Doc #103. EA, however, does not effectively use these tables to demonstrate that a true conflict exists if California law is applied to out-of-state claims.

EA relies on <u>In re Grand Theft Auto Video Game Consumer Litig</u> ("<u>GTA</u>"), 251 FRD 139, 147 (SDNY 2008), to argue that there is

---

[4] Plaintiffs request certification of a nationwide damages class under California law. Doc #75 at 23-34. Because plaintiffs provide no further specification, the court assumes that plaintiffs are seeking certification under all remaining California claims: (1) violation of the Cartwright Act, Cal Bus & Prof Code § 16700 et seq; (2) violation of California's Unfair Competition Act, Cal Bus & Prof Code § 17200 et seq; and (3) unjust enrichment. See doc #40 (order granting in part and denying in part EA's motion to dismiss).

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   a "true conflict" between the laws.  Doc #103 at 43.  In <u>GTA</u>, the

2   court had conditionally certified a class alleging consumer fraud

3   for the manufacturer's allowance of a sexually explicit

4   modification to the original game.  In choosing to decertify the

5   class, the court in <u>GTA</u> found that New York's governmental interest

6   analysis, which it found substantially similar to California's

7   three-part test, favored applying the law of the state wherein each

8   copy of the video game was purchased, because "[s]tates have a

9   strong interest in protecting consumers with respect to sales

10  within their borders, but they have a relatively weak interest, if

11  any, in applying their policies to consumers or sales in

12  neighboring states."  251 FRD at 149 (quoting <u>Relafen</u>, 221 FRD at

13  278).

14          California courts disagree.  They have recognized

15  California's interest in entertaining claims by nonresident

16  plaintiffs against resident defendants.  See <u>Hurtado v Superior</u>

17  <u>Court</u>, 522 P2d 666, 670 (Cal 1974).  California, for purposes of

18  its UCL, "has a clear and substantial interest in preventing

19  fraudulent practices in this state and a legitimate and compelling

20  interest in preserving a business climate free of * * * deceptive

21  practice."  <u>Estrella</u>, 2010 WL 2231790, *6 (quoting <u>Norwest Mortg,</u>

22  <u>Inc v Superior Court</u>, 72 Cal App 4th 214, 225 (Cal Ct App 1999)).

23  For this reason, the state "has a legitimate interest in extending

24  state-created remedies to out-of-state parties harmed by wrongful

25  conduct occurring in California."  Id; see also <u>Clothesrigger, Inc</u>

26  <u>v GTE Corp</u>, 191 Cal App 3d 605, 615 (Cal Ct App 1987) (recognizing

27  California's "fraud deterrence and consumer protection interests in

28  applying its law to the claims of nonresident plaintiffs").

40

**United States District Court**
For the Northern District of California

1        California's interest in allowing nonresident claims

2   under its consumer protection laws does not appear to be in

3   conflict with those of foreign states.  Cf <u>Charles Schwab</u>, 264 FRD

4   at 538 (see discussion below).  The California Supreme Court has

5   held that, in cases involving resident defendants, foreign states

6   do not have a legitimate interest in limiting the amount of

7   recovery for nonresident plaintiffs under California law.  <u>Hurtado</u>,

8   522 P2d at 674.  While this court recognizes that nationwide

9   liability may result in companies passing along increased costs to

10  consumers in all states, and that states may very well have this

11  purpose in mind when limiting recovery amounts, <u>Hurtado</u> held that

12  the purpose behind liability limits is to protect resident

13  defendants, not limit damage awards to resident plaintiffs.  522

14  P2d at 670.  To the extent that California's consumer protection

15  laws are more generous than those of foreign states, foreign states

16  have no legitimate interest in denying higher recoveries to their

17  residents, and thus there can be no true conflict under California

18  law.[5]  See <u>Washington Mutual Bank</u>, 15 P3d at 1081.

19        EA's references to other Northern District cases are not

20  on point.  EA relies on <u>In re HP Inkjet Printer Litig</u> ("HP"), 2008

21  WL 2949265, *6 (ND Cal 2008) (Fogel, J), and <u>Charles Schwab</u> in

22  support of its argument that foreign law should apply to out-of-

23

24        [5] A true conflict might exist if California's recovery laws were
less generous than those of other states, but EA does not specifically
25  argue this.  EA only lists in an appendix that California's UCL
permits equitable remedies, doc #103, leaving it up to the court to
26  infer that other states permit compensatory or punitive damages.  Even
so, a violation of California's UCL includes as a predicate a
27  violation of the Consumer Legal Remedies Act, Cal Civ Code § 1750 et
seq, which provides for the remedies available under other states'
28  UCLs.  <u>Keilholtz</u>, 2010 WL 668067 at *9 (citing <u>Mazza v American Honda
Motor Co</u>, 254 FRD 610, 622 (CD Cal 2008)).

**United States District Court**
For the Northern District of California

state residents.  Doc #103 at 44.  Those cases are not persuasive.
In <u>HP</u>, however, the plaintiffs did not "discuss any of the
potential jurisdictional and due process limitations upon the
application of California law to the claims of non-resident class
members" nor did they "address the potential choice of law problems
that would arise should the Court certify a nationwide class."
2008 WL 2949265, *6.  Faced with a complete absence of any opposing
argument on the choice-of-law issues, the court held only that "the
proposed nationwide class would be unmanageable," id at *7,
offering no conclusion on the applicability of California law to
out-of-state claims.  Given the one-sided record presented in <u>HP</u>,
this court cannot find the case persuasive.

        In <u>Charles Schwab</u> the plaintiffs sought certification of
a nationwide class under California law based on unfair competition
claims.  The court noted that it was "yet unclear that every state
would allow their 'Little FTC Acts' to be used as a vehicle to
redress violations of the federal Investment Company Act."  264 FRD
at 539.  While the court declined to apply California law to the
claims of nonresident class members, reasoning that "[s]tates have
an interest in deciding the contours of their own unfair-
competition laws," id, it did not explain if or why there was a
true conflict or analyze which state's interests would be more
impaired.  In the absence of further elaboration on this line of
reasoning, this court cannot find <u>Charles Schwab</u> persuasive.

        EA has thus failed to carry its burden of showing a true
conflict by demonstrating that foreign state interests are in
conflict with California's.  The court finds EA's mere listing of
so-called "material differences" in appendices, without providing

accompanying analysis, to be almost entirely unhelpful.

While the court "may properly find California law applicable without proceeding to the third step in the analysis if the foreign law proponent fails to identify any actual conflict or to establish the other state's interest in having its own law applied," Washington Mutual Bank, 15 P3d at 1081, even if there were a conflict, California law would prevail based on the third prong of the governmental interest test. See Bernhard v Harrah's Club, 546 P2d 719, 723 (Cal 1976) (noting that the third prong is a "comparative impairment" test as opposed to a relative interest test). Applying the laws of foreign states will not vindicate California's legitimate interests in deterring harmful conduct within its borders, whereas applying California law to nonresident plaintiffs will vindicate foreign states' interests in compensating their residents. Thus, it seems clear that if California's law were not applied its interests would be more impaired.

(III)

Plaintiffs also argue that EA's inclusion of choice-of-law provisions in its EULAs and online terms of service, as a separate basis, requires the application of California law to a nationwide class. Doc #75 at 24. In support of this argument, plaintiffs move for an adverse inference regarding the choice of law. Doc #133. Plaintiffs' motion boils down to an assertion that EA failed to preserve evidence relevant to a choice-of-law determination based on its contracts. Id at 2-8. Having concluded that California law may apply nationwide, however, the court need not need address this argument. Plaintiffs' motion for an adverse

United States District Court
For the Northern District of California

inference, id, therefore is DENIED as moot.

Plaintiffs argue, in the alternative, for certification of twenty state subclasses of indirect purchasers.  Doc #75 at 31.  To this end, plaintiffs filed a motion for leave to file an amended complaint in order to provide the names of plaintiffs in each subclass.  Doc #136.  Because the court finds that California law applies to the nationwide class, the court need not address plaintiffs' subclass argument.  Thus, plaintiffs' motion to file an amended complaint, id, is also DENIED as moot.

ii

EA reenlists its arguments against typicality and adequacy, described at length above, to argue that EA's alleged conduct did not have a "common impact" on the proposed class.  In addition, EA argues that plaintiffs' opening motion fails to address the effects of EA's alleged conduct on direct purchasers.  EA contends that plaintiffs cannot "just assert harm to direct purchasers; they must put on evidence demonstrating 'the existence of facts necessary for the theory to succeed.'"  Opp at 3 (quoting In re New Motor Vehicles Canadian Exp Antitrust Litig, 522 F3d 6, 26 (1st Cir 2008)).  In other words, plaintiffs have to be able to show some conception of damages —— for example, that direct purchasers paid higher prices and then passed those prices along to indirect purchasers.  The court notes that, while plaintiffs' motion does not thoroughly set forth their pass-through argument, plaintiffs do provide extensive declarations from their expert describing his methods, which include both direct and indirect calculations of overcharges paid by class members.  See MacKie-

Mason Decl & Reply Decl; Reply.

In support of plaintiffs' class-wide approach, their expert, Jeffrey K MacKie-Mason, offers three types of injury that class members allegedly suffered in common:

>    (1)  EA, as a result of its anticompetitive conduct, charged higher than competitive wholesale prices, and it will be possible to show using common methods that at least some amount (usually about 100%) of this overcharge was passed through to class members, so they suffer antitrust injury in the form of higher prices;
>
>    (2)  [A]s a result of EA's alleged monopolization, consumers were denied choice between different NCAA-, NFL-, and NFLPA-licensed games, and loss of choice is an injury to all consumers regardless of which particular game they would have chosen but-for EA's anticompetitive conduct; and
>
>    (3)  [D]ue to its anticompetitive conduct, EA faced less incentive to innovate and class members purchased a lower-quality product than they would have in the but-for world.

MM Decl at 25-26.  Because the court finds that MacKie-Mason's first proposed common injury, anticompetitive prices, alone suffices to show common impact, it does not evaluate plaintiffs' choice and quality arguments below.

MacKie-Mason offers three methodologies by which anticompetitive prices may be demonstrated and damages to the class may be calculated.  The first uses the prices of the football games at issue in the period prior to the challenged conduct as the basis for prices in the but-for world; the second compares the contemporaneous prices of similar products; and the last uses a two-step process of calculating the effect of the challenged conduct on wholesale prices and then calculating the amount of this overcharge passed through to consumers.  See MM Reply Decl ¶¶154-82.  EA, which supplies two experts of its own — Hamburger and Janusz A Ordover — challenges MacKie-Mason's report on several

45

United States District Court
For the Northern District of California

grounds.  See Opp.  The main thrust of EA's opposition remains, however, that plaintiffs cannot demonstrate antitrust injury because —— given the industry-standard release pricing of football games —— even in the face of competition, prices would have been the same, with or without exclusive licensing.  Id at 28-29.

The court finds that plaintiffs have demonstrated that a common nucleus of anticompetitive conduct is at the core of all class members' claims.  See <u>Amchem</u>, 521 US at 625.  The overarching substantive issue presented is common to all purported members of plaintiffs' proposed class: whether EA's series of exclusive licensing agreements with the NFL, NCAA and AFL choked off competition in a way that is not legally sanctioned and whether, as a result of EA's conduct, plaintiffs suffered injury.

Under plaintiffs' overarching antitrust theory, evidence common to the class predominates.  When faced with pricing competition, plaintiffs' theory goes, EA was forced to compete on price.  See Reply at 9-19 and supporting materials.  Plaintiffs contend that EA's execution of the three exclusive licenses at issue fundamentally changed industry dynamics and subsequently resulted in class-wide damages in the form of higher wholesale prices passed through to indirect purchasers.  Under this theory, it is of no consequence that "early" purchasers paid the industry-standard price for their video games —— EA could not have charged the prevailing industry-standard price if competitors remained.  This theory has a basis in both the theoretical and real-world evidence.  See, for example, NBA/NHL licensing discussion, id at 13; MM Decl & Reply Decl.  The court therefore finds that common issues will predominate over individual issues in this action.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    While FRCP 23(b)(3) "requires a district court to

2    formulate some prediction as to how specific issues will play out

3    in order to determine whether common or individual issues

4    predominate in a given case," <u>Dukes</u>, 603 F3d at 593, this court

5    cannot conduct "a full inquiry into the merits of a putative

6    class's legal claims," <u>United Steel</u>, 593 F3d at 809.   In other

7    words, despite EA's suggestions to the contrary, the question of

8    plaintiffs' ultimate success on the merits does not answer the

9    court's certification inquiry; rather, the court must decide

10   whether plaintiffs' theory is one in which common issues of law or

11   fact predominate over individual questions.   Id at 808.

12   For the purposes of class certification, MacKie-Mason has

13   put forth a methodology that "there is a way to prove a class-wide

14   measure of [impact] through generalized proof."   <u>In re TFT-LCD</u>,

15   2010 WL 1286478 at *22 (quoting <u>In re Ethylene Propylene Diene</u>

16   <u>Monomer (EPDM) Antitrust Litig</u>, 256 FRD 82, 100 (D Conn 2009)).

17   Specifically, MacKie-Mason concludes that "an

18   across-the-board increase in the wholesale price paid by all direct

19   purchasers for interactive football software, sustained over an

20   extended period of time, was passed through to end consumers in the

21   form of increased retail prices of said software."   MM Decl ¶89.

22   While EA argues that the economic realities of the interactive

23   football market, which include industry-standard release pricing of

24   "premium" games such as those at issue, mandate otherwise, the

25   court concludes that MacKie-Mason's opinion establishes that —— for

26   the purposes of class certification —— means exist for proving

27   impact on a class-wide basis.   Even though, as a factual matter,

28   "early" purchasers may have sustained different quanta of damages

**United States District Court**
For the Northern District of California

from their discount-purchasing counterparts, MacKie-Mason sets
forth a method for calculating that all end-consumers may have
suffered a common impact.

Ordover, EA's expert, criticizes MacKie-Mason's report on
several grounds, including that MacKie-Mason incorrectly assumes
that, in the but-for world, none of the football leagues would have
offered exclusive licenses and that there would have been multiple
NCAA football and AFL games.  Doc #109 at 32-43.  Because of these
"invalid" assumptions, Ordover concludes that MacKie-Mason's
analysis of common harm is irrelevant.  Without definitively ruling
on the matter, the court finds Ordover's arguments unconvincing.
While the court finds that Ordover does highlight weaknesses in
MacKie-Mason's theory, he does not contest directly MacKie-Mason's
conclusions that, if plaintiffs' theory proves correct, direct
purchasers paid essentially the same inflated wholesale prices and
subsequent pass-through costs to indirect purchasers can be
measured on a class-wide basis.  In short, because plaintiffs are
not required to "prove the merits of their case-in-chief at the
class certification stage * * * [i]t is unnecessary to delve
further into the merits by going point-by-point through each
expert's theory to decide who has designed the 'better'
[methodology]."  In re TFT-LCD Antitrust Litig, 267 FRD at 604
(citing In re Ethylene Propylene Diene Monomer (EPDM) Antitrust
Litig, 256 FRD 82, 100 (D Conn 2009); see also, In re Domestic Air
Transp Antitrust Litig, 137 FRD 677, 693 (ND Ga 1991) ("It is not
necessary that plaintiffs show that their expert's methods will
work with certainty at [the class certification stage;] rather,
plaintiffs' burden is to present the court with a likely method for

determining class damages.").

At this stage of litigation, MacKie-Mason's opinion, even if "narrow," see Doc #109 at 43, sets up a conceivable but-for world; put simply, Ordover's competing viewpoint does not alter this conclusion.  Having evaluated the evidence presented thoroughly and for the above reasons, the court finds that common issues predominate.

**b**

Having found that common issues predominate, the court considers whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." FRCP 23(b)(3).  EA contends that a nationwide damages class is not superior to other available methods of adjudication because the proposed class has widely divergent opinions as to the value and effect of the exclusive licenses and possesses unmeritorious claims, which when combined place a great deal of pressure on defendant to settle.  Opp at 47-48.  The court disagrees, as the modest amount at stake for each purchaser renders individual prosecution impractical.  Thus, class treatment likely represents plaintiffs' only chance for adjudication.  See, for example, Amchem, 521 US at 616 (quotation omitted).

**3**

For these reasons, the court finds that the four requirements of FRCP 23(a) are met and that: (i) common questions of law and fact predominate over individual questions and (ii) class treatment of this matter is superior to any other available

United States District Court
For the Northern District of California

49

1   means of adjudication.   The court therefore CERTIFIES the proposed

2   class pursuant to FRCP 23(b)(3).

3

4                                    IV

5        Plaintiffs also seek appointment of their current counsel

6   as class counsel.  Doc #160 at 38.  Having considered counsel's

7   work in identifying potential claims, counsel's experience in

8   handling class actions, other complex litigation, and the types of

9   claims asserted in this action, counsel's knowledge of the

10  applicable law as evidenced by their memoranda and declarations

11  submitted in this action and the resources that counsel will commit

12  to representing the class, the court HEREBY APPOINTS The Paynter

13  Law Firm PLLC and Hagens Berman Sobol Shapiro LLP class counsel.

14

15                                    V

16       Along with their submissions concerning plaintiffs'

17  motion for class certification, the parties filed several motions

18  to seal.  Docs #80, 84, 117, 134 and 141.

19        As a general rule, documents filed with the court must

20  be open to public inspection; courts have a "strong presumption in

21  favor of access."  Kamakana v City and Cty of Honolulu, 447 F3d

22  1172, 1178 (9th Cir 2006) (citation omitted).  A presumption in

23  favor of access can only be overcome "on the basis of articulated

24  facts known to the court."  Valley Broadcasting Co v United States

25  Dist Court, 798 F2d 1289, 1294 (9th Cir 1986).  To determine

26  whether a document may be sealed, the court may consider the

27  "likelihood of an improper use, including publication of

28  scandalous, libelous, pornographic, or trade secret materials * * *

and residual privacy rights."  Id (citation omitted); see also <u>EEOC</u> <u>v Erection Co, Inc</u>, 900 F2d 168, 169 (9th Cir 1990) (holding that the <u>Valley Broadcasting</u> factors apply equally to civil and criminal proceedings).

        In accordance with Civil Local Rule 79-5, the court will entertain requests to seal that are narrowly tailored to seal only the particular information that is genuinely privileged or protectible as a trade secret or otherwise has a compelling need for confidentiality.  Civil LR 79-5(a).  Documents may not be filed under seal pursuant to blanket protective orders covering multiple documents.  Id.  Parties seeking to maintain secrecy of documents attached to non-dispositve motions must make a "good cause" showing under Rule 26(c).  <u>Kamakana</u>, 447 F3d at 1179 ("[T]he public has less of a need for access to court records attached only to non-dispositive motions because those documents are often unrelated, or only tangentially related, to the underlying cause of action.").

        Plaintiffs argue that the court should evaluate the motions to seal under the "compelling interest" standard, which plaintiffs argue is the appropriate legal standard when seeking to conceal documents attached to dispositive motions.  Doc #90 at 2-3.  Defendant argues that a motion for class certification is a non-dispositive motion and therefore asks the court to apply the "good cause" standard associated with motions to seal non-dispositive motions and materials.  Doc #84 at 3-4.

        With this order, the court grants plaintiffs' motion for class certification; plaintiffs' motion is non-dispositive.  Accordingly, the court evaluates the parties' respective motions to seal under the good cause standard.  <u>Kamakana</u>, 447 F3d at 1179.  At

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  this time disclosure of trade secret information identified in

2  Appendix A may arguably result in competitive harm to the

3  defendant.  Accordingly, as set forth in Appendix A, the parties'

4  motions to seal are GRANTED IN PART and DENIED IN PART.

5        Additionally, the court reserves judgment regarding

6  several documents.  The parties shall RESUBMIT the following

7  documents with purposed redactions highlighted in yellow:  (1)

8  Berman Declaration exhibits 109 and 122; (2) Schatz Declaration

9  exhibit 22; (3) Pecover Deposition; and (4) Owens Deposition.

10  Defendant shall additionally RESUBMIT an intelligible version of

11  Schatz Declaration exhibit 47.  These resubmissions shall be

12  accompanied by proposed orders sealing the document(s) at issue.

13        Within ninety (90) days of this order, the parties shall

14  RESUBMIT via ECF redacted copies of all materials set forth in

15  Appendix A for public filing.  (Chambers copies are not necessary.)

16  Before resubmitting these redacted versions, the parties shall meet

17  and confer in order to ensure that no materials herein designated

18  as confidential are publically disseminated.

19

20                            VI

21        For the foregoing reasons, the court finds that the

22  requirements of FRCP 23(a) and 23(b)(3) are met.  The court

23  therefore CERTIFIES the following class pursuant to FRCP 23(b)(3):

24      All persons in the United States who purchased Electronic
         Arts' Madden NFL, NCAA or Arena Football League brand

25      interactive football software, excluding software for mobile
         devices, ("Relevant Software") with a release date of January

26      1, 2005 to the present.

27  Additionally, the court APPOINTS The Paynter Law Firm PLLC and

28  Hagens Berman Sobol Shapiro LLP class counsel and DENIES AS MOOT

1    plaintiffs' motions for an adverse inference, Doc #133 and for

2    leave to amend, Doc #136.

3            Within thirty (30) days of this order the parties shall

4    meet and confer on the notice to be issued to the class.  In

5    addition, the parties must file with the court a draft notice that

6    complies with FRCP 23(c)(2)(B) within sixty (60) days of this

7    order.

8

9            IT IS SO ORDERED.

10

11                                   VAUGHN R WALKER
                                     United States District Chief Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

**APPENDIX A**

   The court **GRANTS IN PART** and **DENIES IN PART** plaintiffs'
and defendant's first motions to file under seal.  Doc ##80 & 84.

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| Berman Declaration | 2 | X | | |
| | 3 | X | | |
| | 4 | X | | |
| | 5 | X | | |

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
|  | 6 | X |  |  |
|  | 7 |  | X |  |
|  | 8 |  | X |  |
|  | 10 | X |  |  |
|  | 11 | X |  |  |
|  | 12 | X |  |  |
|  | 13 | X |  |  |
|  | 14 | X |  |  |
|  | 15 | X |  |  |
|  | 18 |  | X |  |
|  | 19 | X |  |  |
|  | 20 | X |  |  |
|  | 21 | X |  |  |
|  | 22 | X |  |  |
|  | 23 | X |  |  |
|  | 24 |  | X |  |
|  | 25 | X |  |  |
|  | 26 |  | X |  |
|  | 27 | X |  |  |
|  | 28 | X |  |  |
|  | 29 | X |  |  |
|  | 30 | X |  |  |
|  | 31 | X |  |  |
|  | 32 |  | X |  |
|  | 33 | X |  |  |
|  | 34 |  | X |  |
|  | 35 | X |  |  |
|  | 36 |  | X |  |
|  | 37 | X |  |  |

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 38 | X | | |
| | 39 | X | | |
| | 40 | X | | |
| | 41 | X | | |
| | 42 | X | | |
| | 43 | X | | |
| | 44 | X | | |
| | 45 | X | | |
| | 46 | | X | |
| | 47 | X | | |
| | 48 | X | | |
| | 49 | X | | |
| | 50 | X | | |
| | 51 | X | | |
| | 52 | X | | |
| | 53 | X | | |
| | 54 | | X | |
| | 55 | X | | |
| | 56 | X | | |
| | 57 | X | | |
| | 58 | X | | |
| | 59 | X | | |
| | 60 | X | | |
| | 61 | X | | |
| | 62 | X | | |
| | 63 | | X | |
| | 65 | X | | |
| | 66 | X | | |
| | 67 | X | | |

United States District Court
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|----------|------------------|------------------------|--------|---------|
|          | 68               | X                      |        |         |
|          | 69               | X                      |        |         |
|          | 70               | X                      |        |         |
|          | 71               | X                      |        |         |
|          | 72               | X                      |        |         |
|          | 73               | X                      |        |         |
|          | 74               | X                      |        |         |
|          | 75               | X                      |        |         |
|          | 76               | X                      |        |         |
|          | 77               | X                      |        |         |
|          | 78               | X                      |        |         |
|          | 79               | X                      |        |         |
|          | 80               | X                      |        |         |
|          | 81               | X                      |        |         |
|          | 82               | X                      |        |         |
|          | 83               | X                      |        |         |
|          | 84               | X                      |        |         |
|          | 85               | X                      |        |         |
|          | 86               | X                      |        |         |
|          | 87               | X                      |        |         |
|          | 88               | X                      |        |         |
|          | 89               | X                      |        |         |
|          | 90               | X                      |        |         |
|          | 91               | X                      |        |         |
|          | 92               | X                      |        |         |
|          | 93               | X                      |        |         |
|          | 94               | X                      |        |         |
|          | 95               | X                      |        |         |
|          | 96               | X                      |        |         |

**United States District Court**
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 97 | X | | |
| | 98 | X | | |
| | 99 | X | | |
| | 100 | X | | |
| | 101 | X | | |
| | 102 | X | | |
| | 103 | X | | |
| | 104 | X | | |
| | 105 | X | | |
| | 106 | X | | |
| | 107 | X | | |
| | 108 | X | | |
| | 109 | | | Defendant must RESUBMIT version with yellow highlighted proposed redactions. |
| | 110 | | X | |
| | 111 | | X | |
| | 112 | | X | |
| | 113 | | X | |
| | 114 | | X | |
| | 122 | | | Defendant must RESUBMIT version with yellow highlighted proposed redactions. |
| | 123 | | X | |
| | 124 | X | | |
| | 130 | | X | |
| | 131 | | X | |
| | 132 | | X | |
| | 133 | | X | |

United States District Court
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 134 | | X | |
| | 135 | | X | |
| | 136 | | X | |
| | 137 | | X | |
| | 138 | | X | |
| | 139 | | X | |
| | 140 | | X | |
| | 141 | | X | |
| | 142 | | X | |
| | 143 | | X | |
| | 144 | | X | |
| | 145 | | X | |
| | 146 | | X | |
| | 147 | | X | |
| | 148 | | X | |
| | 149 | | X | |
| | 150 | | X | |
| | 151 | | X | |
| | 152 | | X | |
| | 153 | | X | |
| | 154 | | X | |
| | 155 | | X | |
| | 156 | | X | |
| | 157 | | X | |
| | 158 | | X | |
| | 159 | | X | |
| | 160 | | X | |
| | 161 | | X | |
| | 162 | | X | |

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 163 | | X | |
| | 164 | | X | |
| | 165 | | X | |
| | 166 | | X | |
| | 167 | | X | |
| | 168 | | X | |
| | 210 | X | | |
| | 211 | X | | |
| | 212 | X | | |
| | 213 | X | | |
| | 214 | X | | |
| | 215 | X | | |
| | 216 | X | | |
| | 218 | X | | |
| MackKie-Mason Declaration | | PARTIALLY | | See court's ruling on plaintiffs' third motion to file under seal.  Doc #141. |

Having considered the matter, the court GRANTS IN PART and DENIES IN PART defendant's second motion to file under seal as follows.  Doc #117.

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| Shatz Declaration | 1 | X | | |
| | 2 | X | | |
| | 4 | X | | |
| | 5 | X | | |
| | 7 | X | | |
| | 8 | X | | |

60

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 9 | X | | |
| | 11 | X | | |
| | 14 | X | | |
| | 15 | X | | |
| | 17 | X | | |
| | 18 | X | | |
| | 22 | | | Defendant must RESUBMIT version with yellow highlighted proposed redactions. |
| | 25 | X | | |
| | 26 | X | | |
| | 29 | X | | |
| | 30 | X | | |
| | 32 | X | | |
| | 34 | X | | |
| | 36 | X | | |
| | 39 | X | | |
| | 40 | X | | |
| | 41 | X | | |
| | 43 | X | | |
| | 44 | X | | |
| | 45 | X | | |
| | 47 | X | | |
| | 48 | X | | |
| | 49 | X | | |
| | 50 | X | | |
| | 51 | X | | |
| | 67 | X | | |
| | 68 | X | | |

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 69 | X | | |
| | 70 | X | | |
| | 72 | X | | |
| | 73 | X | | |
| | 74 | X | | |
| | 75 | X | | |
| | 76 | X | | |
| | 77 | X | | |
| | 79 | X | | |
| | 81 | X | | |
| | 82 | X | | |
| | 83 | X | | |
| | 84 | X | | |
| | 85 | X | | |
| | 86 | X | | |
| | 87 | X | | |
| | 88 | X | | |
| | 89 | X | | |
| | 90 | X | | |
| Ordover Declaration | | X | | |
| Hamburger Declaration | | Partially | | See court's ruling on plaintiffs' second motion to file under seal. Doc #134. |
| Linzner Declaration | | X | | |
| Gertzog Declaration | | X | | |
| Drucker Declaration | | X | | |

United States District Court
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| Miele Deposition | | PARTIALLY | | The court grants the motion to seal as to pages 12, 13, 19, 20, 21, 29 and 45 only. |
| O'Mara Declaration | 1 | X | | |
| | 2 | X | | |
| | 3 | X | | |
| | 4 | X | | |
| | 5 | X | | |
| | 6 | X | | |
| | 7 | X | | |
| | 8 | X | | |
| | 9 | X | | |
| | 10 | X | | |
| | 11 | X | | |
| | 12 | X | | |
| | 13 | X | | |
| | 14 | X | | |
| | 15 | X | | |
| | 16 | X | | |
| | 17 | X | | |
| | 52 | X | | |
| Pecover Deposition | | | | Defendant must RESUBMIT version with yellow highlighted proposed redactions. |
| Owens Deposition | | | | Defendant must RESUBMIT version with yellow highlighted proposed redactions. |

Having considered the matter, the court GRANTS IN PART and DENIES IN PART plaintiffs' second motion to file under seal as follows.  Doc #134.

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| Scarlett Declaration | 18 | | X | |
| Paynter Declaration (Hamburger Declaration references) | 1(3) | PARTIALLY | | The court grants the motion to seal as to the last sentence of the last bullet only. |
| | 1(6) | X | | |
| | 1(8) | X | | |
| | 1(9) | X | | |
| | 1(10) | PARTIALLY | | The court grants the motion to seal as to Figure 5 and footnote 11 only. |
| | 1(12) | PARTIALLY | | The court grants the motion to seal as to Figure 6 and footnote 14 only. |
| | 1(13) | PARTIALLY | | The court grants the motion to seal as to footnotes 16-19 only. |
| | 1(14) | PARTIALLY | | The court grants the motion to seal as to footnotes 20 and 22 only. |
| | 1(18) | X | | |
| | 1(19) | X | | |
| | 1(20) | X | | |
| | 1(21) | X | | |
| | 1(23) | X | | |

United States District Court
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 1(24) | PARTIALLY | | The court grants the motion to seal as to Figure 14 and footnote 38 only. |
| | 1(25) | X | | |
| | 1(26) | X | | |
| | 1(30) | PARTIALLY | | The court grants the motion to seal as to Figure 20 and footnote 46 only. |
| | 1(31) | X | | |
| | 1(32) | PARTIALLY | | The court grants the motion to seal as to figure 22 and footnote 48 only. |
| | 1(34) | X | | |
| | 1(40) | PARTIALLY | | The court grants the motion to seal as to the last paragraph and footnotes 52-56 only. |
| | 4 | X | | |
| | 5 | X | | |
| | 6 | X | | |
| | 7 | | X | |
| | 11 | | X | |
| | 12 | | X | |
| | 13 | | X | |
| | 14 | | X | |
| | 15 | | X | |
| | 16 | | X | |
| | 17 | | X | |
| | 18 | | X | |
| | 19 | | X | |
| | 20 | | X | |

**United States District Court**
For the Northern District of California

| | 21 | X | | |
|---|---|---|---|---|
| | 22 | X | | |
| | 23 | | X | |
| | 24 | X | | |
| | 25 | X | | |
| | 26 | | X | |
| | 27 | | X | |
| | 29 | X | | |

Having considered the matter, the court GRANTS IN PART and DENIES IN PART plaintiffs' third motion to file under seal as follows.  Doc #141.

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| Berman Declaration | 231 | X | | |
| | 232 | | X | |
| | 233 | | X | |
| | 234 | X | | |
| | 235 | | X | |
| | 236 | X | | |
| | 237 | | X | |
| | 238 | X | | |
| | 239 | | X | |
| | 240 | X | | |
| | 241 | | X | |
| | 242 | X | | |
| | 243 | | X | |
| | 247 | | X | |
| | 248 | | X | |

66

United States District Court
For the Northern District of California

| DOCUMENT | EXHIBIT# (page#) | MOTION TO SEAL GRANTED | DENIED | COMMENT |
|---|---|---|---|---|
| | 249 | | X | |
| | 250 | | X | |
| | 251 | X | | |
| MacKie-Mason Declaration | (17) | X | | |
| | (22) | X | | |
| | (23) | X | | |
| | (24) | X | | |
| | (25) | X | | |
| | (43) | X | | |
| | (47) | X | | |