Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile:  (866) 734-0622
stuart@smplegal.com

Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GEOFFREY PECOVER and ANDREW OWENS, on behalf of themselves and a class of person similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ELECTRONIC ARTS INC., a Delaware Corporation, <br><br> Defendant. | No. 08-cv-02820 CW <br><br> PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, EXPENSES AND PARTICIPATION AWARDS <br><br> Date: February 7, 2013 <br> Time: 2:00 p.m. <br> Dept: Courtroom 2, 4th Floor <br> Judge: Hon. Claudia Wilken <br><br> ACTION FILED: June 5, 2008 |

# TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................................1

II.  THE WORK UNDERTAKEN BY CLASS COUNSEL .........................................1

    A.  Plaintiffs File Their Complaint and Defeat a Motion to Dismiss..................1

    B.  Plaintiffs' Aggressive Pursuit of Discovery ..................................................2

        1.  Plaintiffs Deposed Ten Current or Former Employees of Electronic Arts, and Reviewed and Catalogued Two Million Pages of Defendant's Documents .....3

        2.  Electronic Arts Served Hundreds of Discovery Requests on Plaintiffs and Deposed Both Named Plaintiffs ........................................................3

        3.  Over the Four Years of Litigation, the Parties Clashed Dozens of Times in Discovery Disputes ..........................................................3

        4.  Given the Importance of Third-Parties, Plaintiffs Crisscrossed the Country Pursuing Documents and Testimony from Key Players ..................................4

    C.  After an Epic Battle at Class Certification, Judge Walker Certified a Nationwide Class of Indirect Purchasers ..........................................................5

    D.  Electronic Arts Unsuccessfully Petitioned the Ninth Circuit for Interlocutory Appeal Arguing the Unprecedented Nature of the Nationwide Class ..........................7

    E.  Plaintiffs Disseminate Notice of Class Certification to Millions of Class Members ....7

    F.  Plaintiffs Intervened in Copycat Action Pending in Tennessee ....................8

    G.  The Parties Exchange Eight Expert Reports Regarding Impact and Damages ............8

    H.  After Four Years of Litigation, the Parties Settle the Claims.........................9

III.  ARGUMENT ......................................................................................................10

    A.  Plaintiffs Have Requested a Reasonable Amount of Attorneys' Fees and Expenses .10

        1.  Plaintiffs' Fee Request Is Reasonable under the "Common Fund" Percentage of Recovery Analysis ..................................................11

        2.  Plaintiffs' Fee Request Is Reasonable Under the Lodestar Cross-Check Method..............................................................................14

            a.  The Number of Hours that Plaintiffs' Counsel Devoted to This Litigation Is Reasonable ..................................................15

            b.  Plaintiffs' Counsel's Hourly Rates Are Reasonable ..........................16

            c.  Plaintiffs' Requested Fee Is Reasonable Considering the Time and Labor Required, Novelty and Complexity of the Litigation, Counsel's Skill and Experience and the Results Obtained.................17

(1) Plaintiffs' Counsel Invested a Significant Amount of Time and Resources into This Case ................................. 18

(2) The Litigation Featured Novel Legal and Factual Issues ........ 19

(3) Plaintiffs' Counsel Are Highly Skilled and Experienced ........ 19

d. Class Counsel Obtained an Outstanding Settlement Result for Class Members Nationwide .......................................................... 21

e. Plaintiffs' Fee Request Is Reasonable in Light of the Contingent Nature of the Fee and Class Counsel's Ongoing Work ..................... 21

B. Negotiated Attorneys' Fee Agreements Are Favored in Class Action Settlements .... 22

C. Plaintiffs' Expenses Are Reasonable and Were Necessarily Incurred ................... 23

D. Plaintiffs Request Participation Awards in the Amount of $5,000 ........................ 24

IV. CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Am. Needle, Inc. v National Football League,*
538 F.3d 736 (7th Cir 2008) ................................................................................................ 2

*Arenson v. Bd. of Trade,*
372 F. Supp. 1349 (N.D. Ill. 1974) ..................................................................................... 18

*Autodesk, Inc. v. Flores,*
No. 10-CV-01917, 2011 U.S. Dist. Lexis 53277 (N.D. Cal. May 18, 2011) ........................ 16

*Behrens v. Wometco Enters. Inc.,*
118 F.R.D. 534 (S.D. Fla. 1988) ......................................................................................... 18

*Bellows v. NCO Fin. Sys., Inc.,*
No. 07-CV-1413, 2009 U.S. Dist. LEXIS 297 (S.D. Cal. Jan. 5, 2009) .............................. 16

*Blum v. Stenson,*
465 U.S. 886 (1984) ........................................................................................................... 18

*Californians for Disability Rights v. Cal. Dep't of Transp.,*
No. C 06-05125, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. Dec. 13, 2010) ...................... 17

*City of Roseville Emps. Ret. Sys. v. Orloff Fam. Tr. UAD 12/31/01,*
No. 11-35455, 2012 U.S. App. LEXIS 11512 (9th Cir. June 7, 2012) ................................ 10

*Cohorst v. BRE Props. Inc.,*
No. 3:10-CV-2666, 2011 U.S. Dist. LEXIS 151719 (S.D. Cal. Nov. 14, 2011) .................... 25

*Crommie v. Pub. Utils. Comm'n,*
840 F. Supp. 719 (N.D. Cal. 1994) ..................................................................................... 19

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) .............................................................................................. 13

*Glass v. UBS Fin. Servs.,*
331 Fed. Appx. 452 (9th Cir. 2009) .................................................................................... 11

*Harris v. Marhoefer,*
24 F.3d 16 (9th Cir. 1994) .................................................................................................. 23

*Hartless v. Clorox Co.,*
273 F.R.D. 630 (S.D. Cal. 2011) ................................................................................... 16, 17

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ....................................................................................... 10, 11, 15, 22

*Hurtado v. Superior Court,*
   522 P.2d 666 (Cal. 1974) ...................................................................................... 13

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977) ............................................................................................... 2

*In re Apollo Group Inc. Secs. Litig.,*
   No. CV 04-2147, 2012 U.S. Dist. LEXIS 55622 (D. Ariz. Apr. 20, 2012) ........... 10

*In re Apple Inc. Secs. Litig.,*
   No. 5:06-CV-05208, 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May 17, 2011) ........ 17

*In re Cenco, Inc. Sec. Litig.,*
   519 F. Supp. 322 (N.D. Ill. 1981) ......................................................................... 18

*In re Charles Schwab Corp. Secs. Litig.,*
   No. 08-01510-WHA (N.D. Cal. Apr. 19, 2011), ECF No. 1101 ...................... 17, 20

*In re Combustion, Inc.,*
   968 F. Supp. 1116 (W.D. La. 1997) ...................................................................... 18

*In re Cont'l Ill. Secs. Litig.,*
   962 F.2d 566 (7th Cir. 1992) ........................................................................... 22, 23

*In re Equity Funding Corp. of Am. Secs. Litig.,*
   438 F. Supp. 1303 (C.D. Cal. 1977) ..................................................................... 21

*In re Heritage Bond Litig. v. U.S. Trust Co. of Tex., N.A.,*
   No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627 (C.D. Cal. June 10, 2005) ......... 19

*In re Ins. Brokerage Antitrust Litig.,*
   579 F.3d 241 (3d Cir. 2009) ........................................................................... 21, 25

*In re M.D.C. Holdings Sec. Litig.,*
   No. 89-0090, 1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990) ............... 22

*In re Mego Fin. Corp. Sec. Litig.,*
   213 F.3d 454 (9th Cir. 2000) ................................................................................ 25

*In re NASDAQ Market-Makers Antitrust Litig.,*
   187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................... 18, 19

*In re Nuvelo, Inc. Secs. Litig.,*
   No. C 07-04056, 2011 U.S. Dist. LEXIS 72260 (N.D. Cal. July 6, 2011) ....... 11, 12

*In re Rite Aid Corp. Secs. Litig.,*
   396 F.3d 294 (3d Cir. 2005) .................................................................................. 20

*In re RJR Nabisco Sec. Litig.,*
   MDL No. 818, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) ............. 18

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) ................................................................................ 18

*In re Wachovia Corp. "Pick-A-Payment" Mortg. Mktg. & Sales Practices Litig.*
   ("*Wachovia*"), No. 5:09- md-02105, 2011 U.S. Dist. LEXIS 55351 (N.D. Cal. May 17,
   2011) .......................................................................................................................... 10, 11, 14

*Johnson v. Ga. Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) ...................................................................................... 22

*Kerr v. Screen Extras Guild, Inc.*,
   526 F.2d 67 (9th Cir. 1975) .................................................................................. 18, 19

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
   222 F.3d 1142 (9th Cir. 2000) .................................................................................... 22

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
   671 F. Supp. 819 (D. Mass. 1987) .............................................................................. 22

*Malchman v. Davis*,
   761 F.2d 893 (2d Cir. 1985) ...................................................................................... 22

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................................................................... 17

*Mathis v. Spears*,
   857 F.2d 749 (9th Cir. 1988) ...................................................................................... 16

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ...................................................................................... 13

*Money Deposit Co. v. Gilliam*,
   No. SACV-09-287, 2010 U.S. Dist. LEXIS 65767 (C.D. Cal. May 24, 2010) ........ 17

*Moreno v. City of Sacramento*,
   534 F.3d 1106 (9th Cir. 2008) .................................................................................... 16

*Morris v. Lifescan, Inc.*,
   54 Fed. Appx. 663 (9th Cir. 2003) ............................................................................ 11

*Pecover v. Elecs. Arts Inc.*,
   633 F. Supp. 2d 976 (N.D. Cal. 2009) ................................................................... 2, 8

*Pecover v. Elecs. Arts Inc.*,
   Case No. 08-2820 CW, 2010 U.S. Dist. LEXIS 140632 (N.D. Cal. Dec. 21, 2010) .............. 7

*People Who Care v. Rockford Bd. of Educ.*,
   90 F.3d 1307 (7th Cir. 1996) ...................................................................................... 16

*Phillips Petroleum Co. v. Shutts*,
 472 U.S. 797 (1985) ............................................................................................... 13

*Rabin v. Concord Assets Group*,
 No. 89 Civ 6130, 1991 U.S. Dist. LEXIS 18273 (S.D.N.Y. Dec. 19, 1991) ........................ 18

*Rodriguez v. West Publ'g Corp.*,
 563 F.3d 948 (9th Cir. 2009) .................................................................................... 24

*Singer v. Beckton Dickinson & Co.*,
 No. 08- CV-821, 2010 U.S. Dist. LEXIS 53416 (S.D. Cal. June 1, 2010) ........................... 11

*Staton v. Boeing Co.*,
 327 F.3d 938 (9th Cir. 2003) .................................................................................... 23

*Steiner v. Am. Broad. Co. Inc.*,
 248 Fed. Appx. 780 (9th Cir. 2007) ........................................................................... 12

*Stonebrae, L.P. v. Toll Bros., Inc.*,
 No. C-08-0221, 2011 U.S. Dist. LEXIS 39832 (N.D. Cal. Apr. 7, 2011) ............................ 11

*Stuart v. RadioShack Corp.*,
 No. C-07-4499, 2010 U.S. Dist. LEXIS 92067 (N.D. Cal. Aug. 9, 2010) ........................... 17

*Sw. Ctr. for Biological Diversity v. Bartel*,
 No. 98-CV-2234, 2007 U.S. Dist. LEXIS 64232 (S.D. Cal. Aug. 30, 2007) ....................... 16

*Thieriot v. Celtic Ins. Co.*,
 No. C 10-04462, 2011 U.S. Dist. LEXIS 44852 (N.D. Cal. Apr. 21, 2011) ......................... 11

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
 896 F.2d 403 (9th Cir. 1990) .................................................................................... 16

*Van Vraken v. Atl. Richfield Co.*,
 901 F. Supp. 294 (N.D. Cal. 1995) ........................................................................ 18, 24

*Vizcaino v. Microsoft Corp.*,
 290 F.3d 1043 (9th Cir. 2002) ........................................................................ 11, 12, 17

*Wal-Mart Stores, Inc. v. Dukes*,
 __, U.S. ___, 131 S. Ct. 2541 (2011) ......................................................................... 13

*Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*,
 51 F. Supp. 2d 302 (S.D.N.Y. 1999) .......................................................................... 17

*Yurman Designs, Inc. v. PAJ, Inc.*,
 125 F. Supp. 2d 54 (S.D.N.Y. 2001) .......................................................................... 17

## FEDERAL RULES

Federal Rules of Civil Procedure
    23 ............................................................................................................. 10, 13
    30(b)(6) ............................................................................................................. 5

Federal Rules of Evidence
    702 ..................................................................................................................... 6

## OTHER AUTHORITIES

William Shakespeare, *A Midsummer Night's Dream* ........................................... 3, 4, 7

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on February 7, 2013 at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Claudia Wilken, United States District Judge of the Northern District of California, located in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612, plaintiffs and class counsel will, and hereby do, move for an award of attorneys' fees, expenses and participation awards to the named plaintiffs. This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities, the declarations in support of the motion, argument by counsel at the hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be presented at the hearing of this motion, and all papers and records on file in this matter.

## STATEMENT OF ISSUES

Whether this Court should approve (1) an award of attorneys' fees in the amount of $7,290,000 to plaintiffs' counsel which equals 27 percent of the $27 million settlement; (2) reimbursement of $2,000,000 in expenses incurred by counsel on behalf of the class, and payment of $927,012.03 in notice and claims administration fees; and (3) participation awards of $5,000 for each of the two named plaintiffs, Messrs. Pecover and Owens.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The cash settlement fund of $27 million in this case makes monetary relief available to thousands of class members, and represents an extraordinary result for the class. The refunds come with no strings – class members need only submit a claim to the claims administrator. No money will revert to the defendant; and no amounts are reserved for *cy pres* – only a small donation will be given at the end of the case if class members have not exhausted the funds or leave checks uncashed for longer than six months.[1] Class members will receive up to 100 percent of the estimated per unit overcharge through this settlement, adjusted downwards only if the settlement is fully claimed by class members.

Class counsel requests an award of $7,290,000 in attorneys' fees – only two percentage points above the Ninth Circuit's benchmark of 25 percent, and below the 30 percent contemplated in the settlement agreement. Class counsel also requests reimbursement of $2,000,000 in expenses (even though counsel incurred $2,033,418.64 in expenses) and participation awards of $5,000 to each of the two named representatives, Geoffrey Pecover and Andrew Owens. This request for expenses is in addition to the estimated $927,012.03 in costs estimated by the notice and claims administrator. This request is reasonable given class counsel's dedication to this case, their zealous advocacy on behalf of the class, the risks faced in litigating this case, and the vigorous opposition posed by an experienced corporate defendant represented by sophisticated defense counsel.

## II.    THE WORK UNDERTAKEN BY CLASS COUNSEL

### A.    Plaintiffs File Their Complaint and Defeat a Motion to Dismiss

In June 2008, plaintiffs filed their first complaint, alleging violations of the Sherman Act and various state antitrust and consumer protection laws. The allegations in the complaint were the same as those settled today – that Electronic Arts' entrance into exclusive agreements with football

---

[1]    Stipulation and Agreement of Class Action Settlement and Release ("Settlement Ag.") at 15, Sept. 20, 2012, ECF No. 381-1.

leagues and players' unions in 2004 had excluded competition from the football videogame market, and had resulted in higher prices to consumers.[2]

Defendant moved to dismiss raising a number of unique issues, including whether the *Illinois Brick*[3] doctrine barred any claims for injunctive relief under the Sherman Act for indirect purchasers; whether plaintiffs had alleged a recognizable market; whether the Seventh Circuit's opinion in *American Needle*[4] (which approved the NFL's licensing of intellectual property under section 2 of the Sherman Act) allowed Electronic Arts' actions here; and whether plaintiffs had properly alleged a "conspiracy" in violation of California's Cartwright Act.[5] In June 2009, Judge Walker issued a lengthy order denying the motion to dismiss – an order which has been cited repeatedly in the ensuing four years. The Court upheld the allegations and general theory of the case, dismissing only state law claims where a named plaintiff did not reside.[6]

## B.    Plaintiffs' Aggressive Pursuit of Discovery

After the denial of the motions to dismiss, plaintiffs pursued an aggressive case management schedule, and filed their motion for class certification within six months.[7] While preparing for class certification and throughout the discovery period, plaintiffs pursued discovery not only from defendant Electronic Arts, but also from third parties across the country.[8] The following is a brief summary of the discovery plaintiffs sought from defendants, the discovery sought by Electronic Arts from plaintiffs, and discovery plaintiffs pursued from third parties.

---

[2]    Class Action Complaint, June 5, 2008, ECF No. 1.

[3]    *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

[4]    *Am. Needle, Inc. v National Football League*, 538 F.3d 736 (7th Cir 2008), *rev'd*, _U.S._, 130 S.Ct. 1036 (2009).

[5]    *See generally* Defendant Electronic Arts Inc.'s Motion to Dismiss Class Action Complaint, Aug. 25, 2008, ECF No. 17.

[6]    *Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976 (N.D. Cal. 2009). *See also* Declaration of Shana E. Scarlett in Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees, Expenses and Participation Awards ("Scarlett Decl."), ¶ 3, filed concurrently herewith.

[7]    *See* Notice of Motion and Motion for Class Certification, Nov. 9, 2009, ECF No. 75.

[8]    Scarlett Decl., ¶ 4.

### 1. Plaintiffs Deposed Ten Current or Former Employees of Electronic Arts, and Reviewed and Catalogued Two Million Pages of Defendant's Documents

Over the course of this litigation, plaintiffs served 29 interrogatories on Electronic Arts and 30 document requests. Critical to the case, however, were the two million pages of documents produced by Electronic Arts – painstakingly reviewed and catalogued by the plaintiffs. Plaintiffs used these documents extensively at class certification and in the many depositions taken before the close of discovery. And plaintiffs used these documents to great effect – deposing ten current or former Electronic Arts employees – including the senior director of customer support (Boyd Beasley), the executive vice president of global publishing (Nancy Smith), the vice president of business planning (Laura Miele), the senior vice president of worldwide business affairs (Joel Linzner), the vice president of marketing for EA Sports (Todd Sitrin), and a group general manager of EA Sports (Steven Chiang).[9]

### 2. Electronic Arts Served Hundreds of Discovery Requests on Plaintiffs and Deposed Both Named Plaintiffs

Electronic Arts also vigorously pursued discovery from plaintiffs. By the close of discovery, defendant served 23 interrogatories, 28 document requests and *1,295 requests for admission* on the named plaintiffs. Electronic Arts also deposed both named plaintiffs, Geoffrey Pecover and Andrew Owens.[10]

### 3. Over the Four Years of Litigation, the Parties Clashed Dozens of Times in Discovery Disputes

The course of discovery, in this case, did not run smooth.[11] The parties filed a number of discovery motions against each other, all resolved by the discovery magistrates in this case. Early in the case, plaintiffs filed a motion to compel documents from the pre-class time period relevant to class certification which ended with Electronic Arts voluntarily producing a number of business

---

[9] *Id.*, ¶ 5.

[10] *Id.*, ¶ 6.

[11] *See* William Shakespeare, *A Midsummer Night's Dream*, act 1, sc. 1 ("Ay me! for aught that I could ever read, Could ever hear by tale or history, The course of true love never did run smooth. . . .").

reports from the early time period.[12] Plaintiffs also filed motions to compel further responses from Electronic Arts to certain interrogatories,[13] compelling production of documents withheld on the grounds of attorney-work product,[14] and compelling deposition transcripts from related FTC investigations.[15] Electronic Arts moved to compel further responses to certain of its 1,295 requests for admission.[16] Each of these motions required extensive discovery conferences between the parties, as well as briefing before the magistrate judges assigned to this case.[17]

### 4. Given the Importance of Third-Parties, Plaintiffs Crisscrossed the Country Pursuing Documents and Testimony from Key Players

Given the number of licenses involved, third parties played a critical role in unraveling Electronic Arts' web of exclusive licenses. Plaintiffs sought deposition and document discovery from fifteen separate third parties with knowledge of the allegations in the complaint (including witnesses from the NFL, NFLPA, CLC, NCAA, ESPN, and videogame competitor Take-Two Interactive Software, Inc. ("Take-Two")). In total, third parties produced over 200,000 documents to plaintiffs. This discovery did not come easily, however, as plaintiffs fought discovery battles across the country to force the production of documents and witnesses.[18] For example, Mr. Drucker of the CLC filed an emergency motion to quash his individual deposition subpoena in Georgia,

---

[12] *See* Letter of Stuart Paynter to the Court re Plaintiffs' Motion to Compel Discovery, Mar. 16, 2009, ECF No. 36.

[13] Plaintiffs' Notice of Motion and Motion to Compel Responses to Plaintiffs' Third Set of Special Interrogatories, Oct. 26, 2011, ECF No. 261.

[14] Plaintiffs' Notice of Motion and Motion to Compel Production of Document Being Withheld on the Grounds of Attorney-Work Product, Oct. 26, 2011, ECF No. 265.

[15] Letter of Stuart M. Paynter to Judge Bernard Zimmerman re Request for a Telephone Conference to Resolve a Discovery Dispute Regarding FTC Deposition Transcripts, Feb. 23, 2012, ECF No. 314; Notice of Motion and Motion to Compel Production of FTC Transcripts; Memorandum of Points and Authorities in Support Thereof, Mar. 15, 2012, ECF No. 347.

[16] Defendant Electronic Arts Inc.'s Notice of Motion and Motion to Compel Proper Responses to Requests For Admission; Memorandum of Points and Authorities in Support Thereof, Feb. 28, 2012, ECF No. 323.

[17] Scarlett Decl., ¶ 7.

[18] *Id.*, ¶ 8. *See also* William Shakespeare, *A Midsummer Night's Dream*, act 2, sc. 1 ("Thorough flood, thorough fire, I do wander everywhere.").

arguing that he had already been deposed once as Rule 30(b)(6) deponent in this case.[19] The motion was eventually transferred to the Northern District of California, where Magistrate Judge Cousins denied the motion ruling that Mr. Drucker could be deposed in his individual capacity.[20]

Similarly, the NCAA withheld from production a certain critical document on the grounds of attorney-client privilege and attorney work product. Plaintiffs filed a motion to compel in the Southern District of Indiana.[21] Although the motion was negotiated to a resolution, plaintiffs' willingness to pursue the necessary information for their case played a critical role in gaining access to key information.[22]

Plaintiffs also aggressively pursued discovery from hostile third parties such as the NFL. Given the NFL's large financial stake in the challenged licenses, the NFL provided only the bare minimum of cooperation in discovery. After the deposition of NFL employees, it was clear that Roger Goodell, the Commissioner of the NFL was a key figure in the negotiations of the exclusive agreement and its renewals. Plaintiffs sought, over heavy opposition from the NFL, the deposition of Mr. Goodell which Judge Barbara Jones in the Southern District of Northern York allowed, after a contested hearing.[23]

## C.    After an Epic Battle at Class Certification, Judge Walker Certified a Nationwide Class of Indirect Purchasers

Plaintiffs' motion for class certification was brought at the earliest practicable opportunity – six months after Judge Walker denied defendant's motion to dismiss – in November 2009. Much like the discovery disputes between the parties, the class certification battle was voluminous, contentious and ground-breaking. Plaintiffs' opening motion numbered 39 pages, included an

---

[19]    *See* Michael S. Drucker's Emergency Motion for a Protective Order and to Quash Subpoena, *Drucker v. Pecover, et al.*, No. 1:12-MI-003 RWS (N.D. Ga. Jan. 12, 2012).

[20]    *See* Order Denying Motion for Protective Order, *Pecover, et al. v. Drucker,* No. 4:12-mc-80064-CW (NC) (N.D. Cal. Mar. 20, 2012); Scarlett Decl., ¶ 9.

[21]    *See* Notice of Motion and Motion to Compel Document Being Withheld on the Grounds of Attorney-Client Privilege and Attorney Work Product, *Pecover, et al. v. National Collegiate Athletic Association*, No. 1:12-mc-0021 JMS-DKL (S.D. In. Feb. 28, 2012).

[22]    Scarlett Decl., ¶ 10.

[23]    *See* Notice of Motion to Quash and/or for a Protective Order, *In re Subpoena Ad Testificandum Directed to Non-Party Roger S. Goodell*, No. 12 Misc. 0087 (BSJ) (S.D.N.Y. Mar. 20, 2012); Scarlett Decl., ¶ 11.

appendix of law for 20 states, was accompanied by 2,703 pages of documents, and 70 pages of testimony and exhibits submitted by an expert economist, Professor Jeffrey MacKie-Mason.[24] In response, Electronic Arts filed a full scale assault – a 50-page opposition, testimony from economist Dr. Janusz Ordover, a report from a purported industry "expert," Jill Hamburger, and approximately 955 pages in exhibits.[25] Beyond merely contesting issues of common proof, however, Electronic Arts also challenged the merits of the case, filing declarations from its senior vice president of worldwide business affairs, Joel Linzner, Paul Eibeler of competitor Take-Two, Michael Drucker of the CLC, and Gary Gertzog of the NFL.[26]

Plaintiffs' reply included an additional declaration from their economist, Prof. MacKie-Mason, and a further 30 pages of legal briefing, and 201 pages of exhibits. In addition, plaintiffs filed a number of motions relating to the issues in defendant's opposition to class certification – including a motion to exclude the testimony of Electronic Arts' industry "expert," Jill Hamburger under Federal Rule of Evidence 702 (a *Daubert* motion),[27] a motion for an adverse inference on the application of California law given spoliation of evidence,[28] and a motion to amend the complaint to add additional representatives should the Court decline to apply California law nationwide.[29]

---

[24]    *See* Notice of Motion and Motion for Class Certification, Nov. 9, 2009, ECF No. 75; Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Motion for Class Certification, Nov. 9, 2009, ECF No. 78.

[25]    *See* Defendant Electronic Arts Inc.'s Opposition to Plaintiffs' Motion for Class Certification, Feb. 19, 2010, ECF No. 103; Declaration of Janusz A. Ordover in Support of Defendant Electronic Arts Inc.'s Opposition to Plaintiffs' Motion for Class Certification, Feb. 19, 2010, ECF No. 109.

[26]    Declaration of Joel Linzner in Support of Defendant Electronic Arts Inc.'s Opposition to Plaintiffs' Motion for Class Certification, Feb. 19, 2010, ECF No. 104; Declaration of Michael S. Drucker in Support of Defendant Electronic Arts Inc.'s Opposition to Plaintiffs' Motion for Class Certification, Feb. 19, 2010, ECF No. 105; Declaration of Paul Eibeler in Support of Defendant Electronic Arts Inc.'s Opposition to Plaintiffs' Motion for Class Certification, Feb. 19, 2010, ECF No. 106; Declaration of Gary M. Gertzog in Support of Defendant's Opposition to Class Certification, Feb. 19, 2010, ECF No. 107; Declaration of Jill Hamburger in Support of Defendant Electronic Arts Inc.'s Opposition to Plaintiffs' Motion for Class Certification, Feb. 19, 2010, ECF No. 108. *See also* Scarlett Decl., ¶ 12.

[27]    *See* Notice of Motion and Motion to Exclude the "Expert" Opinion of Jill Hamburger and Strike Section II.B of Defendant's Response to Plaintiffs' Motion For Class Certification, Apr. 1, 2010, ECF No. 130.

[28]    *See* Notice of Motion and Motion for An Adverse Inference Regarding Choice of Law, Apr. 1, 2010, ECF No. 132.

[29]    *See* Notice of Motion and Motion for Leave to Amend Complaint, Apr. 1, 2010, ECF No. 136; Scarlett Decl., ¶ 13.

In December 2010, Judge Walker certified a nationwide class.[30] In the order, Judge Walker noted the breadth of the record before him – nearly 7,000 pages.[31] Judge Walker also extensively discussed the testimony of the competing economists before deciding that on the record in front of him, defendant's economist's arguments were "unconvincing."[32] Judge Walker granted, in part, plaintiffs' *Daubert* motion against Ms. Hamburger's testimony.[33]

**D.** **Electronic Arts Unsuccessfully Petitioned the Ninth Circuit for Interlocutory Appeal Arguing the Unprecedented Nature of the Nationwide Class**

Within a matter of days, Electronic Arts filed its petition for permission to appeal the class certification order.[34] In its petition, Electronic Arts agreed that Judge Walker's order was ground-breaking, arguing that it was "the first – and only – decision to certify a nationwide indirect purchaser class under one state's antitrust laws."[35] Plaintiffs opposed the petition, and the Ninth Circuit, agreeing with plaintiffs, denied the petition for appeal on March 17, 2011.[36]

**E.** **Plaintiffs Disseminate Notice of Class Certification to Millions of Class Members**

The denial of the Electronic Arts' petition to appeal launched the parties into the next phase of the case where plaintiffs provided notice to millions of class members. As detailed in declarations from the notice administrator, plaintiffs sent notice to approximately 12.9 million e-mail addresses, 140,134 postal addresses, published press releases in the PR Newswire and Businesswire, published summary notice in the National edition of the USA Today, and conducted

---

[30] *Pecover v. Elecs. Arts Inc.*, No. 08-2820 CW, 2010 U.S. Dist. LEXIS 140632 (N.D. Cal. Dec. 21, 2010).

[31] *Id.*, at *29.

[32] *Id.*, at *67.

[33] *Id.*, at *16, *18-*20; Scarlett Decl., ¶ 14.

[34] *See Electronic Arts Inc. v. Pecover et al.*, Petition for Permission to Appeal the District Court's Order Granting Class Certification, No. 11-80001 (9th Cir. Jan. 4, 2011) ("Appeal"). *See also* William Shakespeare, *A Midsummer Night's Dream*, act 1, sc. 1 ("So quick bright things come to confusion.").

[35] *See* Appeal at 2.

[36] Scarlett Decl., ¶ 15.

a robust online campaign of sponsored links, targeted content advertising, banner advertising, Facebook advertising and a dedicated website (www.easportslitigation.com).[37]

**F.      Plaintiffs Intervened in Copycat Action Pending in Tennessee**

While the class certification and discovery battles were raging between plaintiffs, Electronic Arts and other third parties, plaintiffs also were forced to intervene in a Tennessee action, originally filed in state court, but removed by Electronic Arts to the federal district court. In an attempt to stay in state court, the plaintiff in that case, Tommy Hubbard, asserted that damages were under $5 million for the state of Tennessee. A class member (Mr. Cribb) who had been in contact with class counsel, and who resided in the state of Tennessee moved to intervene and requested the transfer of the action to the Northern District of California so that it could be heard by this Court in conjunction with the *Pecover* action.[38] The District Court for the Eastern District of Tennessee granted the motion to intervene, but denied the motion to transfer the action to California, ordering that it would be more efficient if both cases proceeded at the same time.[39] In the meantime, class counsel ensured that Mr. Hubbard's counsel received the class notice. When Mr. Hubbard failed to opt-out, Intervenor Cribb moved for reconsideration (pointing out that Hubbard was a class member of the certified *Pecover* class) and Hubbard stipulated to the dismissal of the Tennessee action.[40]

**G.      The Parties Exchange Eight Expert Reports Regarding Impact and Damages**

After dissemination of notice to the class and the close of fact discovery, the parties turned towards expert reports and the completion of expert discovery. Again, given the novel issues in the case, the parties exchanged multiple expert reports notable both for the breadth of topics covered and the volume of the submissions. In total, the parties exchanged eight expert reports. Plaintiffs

---

[37]      *See* Declaration of Daniel Burke re Dissemination of Notice to Class Members, July 8, 2011, ECF No. 256; Scarlett Decl., ¶ 16.

[38]      Proposed Intervenor Philip Cribb's Motion to Intervene, and Motion to Transfer or in the Alternative, Stay Action, *Hubbard v. Electronic Arts Inc.*, No. 2:09-cv-00233-JRG (E.D. Tenn. Oct. 27, 2010).

[39]      *See* Memorandum Opinion and Order at 9, *Hubbard v. Electronic Arts, Inc.*, No. 2:09-cv-00233-JRG (E.D. Ten. Aug. 5, 2011).

[40]      Scarlett Decl., ¶ 17.

submitted testimony from two expert economists (both opening and rebuttal reports) – Professor

MacKie-Mason, the Dean of the School of Information, University of Michigan, to testify

regarding the background of the industry and the impact on class members, and Dr. Jeffrey

Leitzinger, to quantify the damages suffered by class members due to the exclusive licenses. Dr.

Leitzinger calculated class members' damages in the following amounts, depending on the

generation of videogame console purchased by the class member:[41]

| Overcharge | 6th Gen | 7th Gen |
|---|---|---|
| **Average Percent Overcharge** | 16.5% | 3.6% |
| **Average Per-Unit Overcharge** | $6.79 | $1.95 |

Electronic Arts, not to be outdone, submitted five separate expert reports, including two

reports from Dr. Joseph Kalt (both an opening and a rebuttal report) regarding the lack of impact or

damages suffered by class members, and reports from three purported industry experts regarding

pricing and sales of videogames.[42]

Electronic Arts successfully argued to this Court that the appointment of a technical advisor

to assist the Court was necessary, given the "highly technical economic issues" presented by the

parties' experts.[43] In April 2012, this Court appointed Professor Tim Bresnahan from Stanford

University to serve as a neutral, independent advisor to the Court on the economics at issue in this

litigation, including arising from Electronic Arts' anticipated motion to decertify the class,

summary judgment and trial.[44]

**H.       After Four Years of Litigation, the Parties Settle the Claims**

The efforts to settle this case have involved extensive informal discussions between the

parties as well as two mediations. The first mediation occurred on July 15, 2011 before Mr.

---

[41]    Scarlett Decl., ¶¶ 18-19.

[42]    *Id.*, ¶ 20.

[43]    Joint Letter to the Court re Appointment of Neutral Expert, Mar. 12, 2012, ECF No. 335.

[44]    *See* Amended Order Concerning Duties and Instructions for Court-Appointed Technical Advisor
and Modifying the Case Schedule at 5, Mar. 26, 2012, ECF No. 359; Order Appointing Technical Advisor,
Apr. 6, 2012, ECF No. 365. *See also* Scarlett Decl., ¶ 21.

Antonio Piazza of the firm Gregorio, Haldeman, Piazza & Rotman. At the time, Electronic Arts'

motion to dismiss had been denied, the class had been certified, and the parties were in the midst of

discovery. The parties could not come to agreement, and no issues were resolved. Between the first

and second mediations, the parties continued to discuss settlement options, with little progress. On

May 4, 2012, however, within weeks of the close of expert discovery, the parties participated in

mediation before former U.S. District Court Judge Layn R. Phillips. The mediation, like the

settlement discussions before it, was conducted at arms' length; but this time the mediation resulted

in the $27 million settlement.[45]

## III.    ARGUMENT

### A.    Plaintiffs Have Requested a Reasonable Amount of Attorneys' Fees and Expenses

Rule 23 of the Federal Rules of Civil Procedure provides that "[i]n a certified class action,

the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or

by the parties' agreement."[46] "[A]wards of attorneys' fees serve the dual purpose of encouraging

persons to seek redress for damages caused to an entire class of persons and discouraging future

misconduct."[47] The U.S. Supreme Court has opined that consensual resolution of attorneys' fees, as

was achieved here, is the ideal.[48] In "common fund" cases, such as this, the district court has the

discretion to award attorneys' fees as either a percentage of the common fund, or by using the

lodestar method.[49] The district court's decision in awarding attorneys' fees and expenses to the

plaintiffs is reviewed for abuse of discretion.[50] Importantly, "the question on appeal is not whether

---

[45]    Scarlett Decl., ¶ 22.

[46]    Fed. R. Civ. P. 23(h).

[47]    *In re Apollo Group Inc. Secs. Litig.*, No. CV 04-2147, 2012 U.S. Dist. LEXIS 55622, at *19 (D. Ariz. Apr. 20, 2012). All internal citations and quotations omitted and all emphasis added, unless otherwise indicated.

[48]    *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

[49]    *Id.*, at *457; *see In re Wachovia Corp. "Pick-A-Payment" Mortg. Mktg. & Sales Practices Litig.* ("*Wachovia*"), No. 5:09- md-02105, 2011 U.S. Dist. LEXIS 55351, at *23-*24 (N.D. Cal. May 17, 2011).

[50]    *See City of Roseville Emps. Ret. Sys. v. Orloff Fam. Tr. UAD 12/31/01*, No. 11-35455, 2012 U.S. App. LEXIS 11512, at *4 (9th Cir. June 7, 2012).

the district court should have applied some other percentage, but whether in arriving at its percentage it considered all the circumstances of the case and reached a reasonable percentage."[51]

In the Ninth Circuit, the "benchmark" award in common fund cases is 25 percent of the recovery obtained, while awards of 30 percent or more of the common fund are not uncommon.[52] The court may also apply the lodestar method to determine a reasonable attorney's fee by multiplying the number of hours reasonably expended by a reasonable hourly rate.[53] The fee amount calculated under the lodestar method is ***presumptively reasonable***.[54] In common fund cases, the lodestar method may also be used as a cross-check of the percentage-of-fund method.[55]

Class counsel seek an award of $7,290,000 for attorneys' fees and expenses, an amount which defendant has agreed to pay. Plaintiffs' fee request represents 27 percent of the $27 million settlement fund and is within the range approved by the Ninth Circuit. Further, the reasonableness of plaintiffs' fee request of $7,290,000 is confirmed when cross-checked against their lodestar, allowing a multiplier of 1.15. Accordingly, under either the percentage of the common fund or lodestar approach, plaintiffs' requested fee award is reasonable.

### 1. Plaintiffs' Fee Request Is Reasonable under the "Common Fund" Percentage of Recovery Analysis

Plaintiffs seek an award of 27 percent of the settlement fund, only two percentage points above the Ninth Circuit's benchmark.[56] Courts routinely award attorneys' fees and expenses totaling 25 percent or more of the common fund provided under the settlement.[57]

---

[51] *Glass v. UBS Fin. Servs.*, 331 Fed. Appx. 452, 456 (9th Cir. 2009).

[52] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).

[53] *See Hensley*, 461 U.S. at 433.

[54] *See Stonebrae, L.P. v. Toll Bros., Inc.*, No. C-08-0221, 2011 U.S. Dist. LEXIS 39832, at *19 (N.D. Cal. Apr. 7, 2011).

[55] *See Wachovia*, 2011 U.S. Dist. LEXIS 55351, at *24.

[56] *See Vizcaino*, 290 F.3d at 1047.

[57] *See, e.g., Morris v. Lifescan, Inc.*, 54 Fed. Appx. 663, 664 (9th Cir. 2003) (affirming fee award of 33 percent of settlement fund); *Singer v. Beckton Dickinson & Co.*, No. 08- CV-821, 2010 U.S. Dist. LEXIS 53416, at *20-*24 (S.D. Cal. June 1, 2010) (fee award of 33.3 percent of settlement fund); *Wachovia*, 2011 U.S. Dist. LEXIS 55351, at *24 (fee award of one-third of settlement fund); *In re Nuvelo, Inc. Secs. Litig.*, No. C 07-04056, 2011 U.S. Dist. LEXIS 72260, at *10 (N.D. Cal. July 6, 2011) (fee award of 30 percent of settlement fund); *Thieriot v. Celtic Ins. Co.*, No. C 10-04462, 2011 U.S. Dist. LEXIS 44852, at *15 (N.D. Cal. Apr. 21, 2011) (fee award of 33 percent of settlement fund); *see also Glass*, 331 Fed. Appx. at 457

1 Plaintiffs' fee request is fully supported by the particular circumstances of this case. In

2 *Vizcaino*, the Ninth Circuit outlined a number of factors that courts may consider in setting an

3 appropriate fee, including whether counsel achieved exceptional results and the degree of risk

4 assumed by counsel.[58] The Ninth Circuit has clarified that these are not the only factors that the

5 district courts may consider in awarding fees and expenses; rather, "in selecting a reasonable

6 percentage fee award in a common fund case the district court must consider all relevant

7 circumstances."[59] Taking all the relevant circumstances into account, plaintiffs' requested fees in

8 the amount of 27 percent of the $27 million common fund is reasonable here.

9 *First*, there is no question that class counsel achieved an exceptional result on behalf of the

10 plaintiffs and the class. The settlement negotiated by class counsel provides valuable economic

11 relief to the millions of consumers who were harmed by Electronic Arts' exclusion of competition

12 from the football videogame market. Under the settlement, millions of class members will be able

13 to claim for the overcharge on both sixth and seventh generation games.

14 *Second*, the settlement provides for substantial injunctive relief. Under the terms of the

15 settlement, Electronic Arts has agreed not to renew its exclusive agreement with the CLC (the

16 licensing arm of the NCAA) or any member institution for a period of five years after its expiration

17 in 2014.[60] Electronic Arts has also agreed not to enter into an exclusive license with the Arena

18 Football League for a period of five years after the effective date.[61]

19

20

21

---

22 (noting that district court's calculation of 25 percent of total award rather than 25 percent of amount actually collected by the class was proper and in line with Ninth Circuit precedent).

23 [58] *See Vizcaino*, 290 F.3d at 1048-50; *see also Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *5.

24 [59] *Steiner v. Am. Broad. Co. Inc.*, 248 Fed. Appx. 780, 782 (9th Cir. 2007). In determining a

25 reasonable award under the common fund method, courts may also consider other factors, including: plaintiffs' counsel hourly rate, counsel's experience and skill, the complexity of the issues, and a comparison with counsel's lodestar. *Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *5. These factors, which

26 further support a fee award of 27 percent in this case, are examined below in section III.A.2, *supra*, which addresses the lodestar analysis.

27 [60] Settlement Ag. ¶ 15.

28 [61] *Id.*

*Third*, class counsel assumed a high degree of risk in bringing and pursuing this action to a successful conclusion. From the outset, a number of complexities and challenges confronted class counsel, including:

**Continued Certification of a Nationwide Class**: At class certification, plaintiffs argued that the application of California law to a nationwide class was appropriate under both the California Supreme Court's opinion in *Hurtado*,[62] and the Supreme Court's opinion in *Shutts*.[63] Electronic Arts argued that the subsequent opinion of the Ninth Circuit in *Mazza*,[64] undermined the certification of a nationwide class. Plaintiffs believed that the significant factual differences between the *Mazza* opinion and this case ensured the continued certification of the nationwide class, but were certainly cognizant of the recent developments in case law.[65]

**The Proposed Motion to Decertify Based on *Dukes***: Plaintiffs believe that Judge Walker engaged in a rigorous analysis of the 7,000 pages of evidence and testimony at the class certification stage. Electronic Arts continued to argue, however, that Judge Walker had applied the wrong standard and under the Supreme Court's decision in *Dukes*,[66] and the Ninth Circuit's ensuing opinion in *Ellis*, the class needed to be decertified.[67] Plaintiffs believed that not only was this motion untimely (given that the parties were on the verge of summary judgment), but also that defendant was just wrong. Judge Walker's order was thoughtful and thorough, and Electronic Art's subsequent Rule 23(f) petition to the Ninth Circuit was denied. Plaintiffs were confident they could withstand any decertification motion, but recognized that some small risk existed.[68]

**Contested Market Definition**: Given that this was an antitrust case to be analyzed under the rule of reason standard, the parties hotly contested the market definition. Electronic Arts

---

[62] *Hurtado v. Superior Court*, 522 P.2d 666 (Cal. 1974).

[63] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).

[64] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).

[65] Scarlett Decl., ¶ 23.

[66] *Wal-Mart Stores, Inc. v. Dukes*, ___, U.S. ___, 131 S. Ct. 2541 (2011).

[67] *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011), *cert. granted*, No. C-04-3341 EMC, 2012 U.S. Dist. LEXIS 137418 (N.D. Cal. Sept. 25, 2012).

[68] Scarlett Decl., ¶ 24.

strenuously argued that the relevant market was "hit videogames." Plaintiffs believed that the market was limited to football videogames. The parties exchanged substantial testimony from competing experts and were preparing for a heavily contested summary judgment motion. Although plaintiffs were confident they would prevail and convince a jury that they proposed the correct market definition, this issue did present some risk.[69]

***Daubert* Challenges to Plaintiffs' Experts at Summary Judgment:** The battle of the experts at class certification was enormous, and seemed destined to be dwarfed by the scope of the battle of the experts at summary judgment and in preparation for trial. Plaintiffs proposed a damages analysis which demonstrated clear injury to purchasers of both sixth and seventh generation consoles. Electronic Arts argued that prices for videogames would launch "almost invariably" at standardized prices and then fall over time. Plaintiffs believed that the exceptions to this standardized pricing overwhelmed the rule, but the parties were certain to face a hotly contested set of motions over pricing and damage to class member.[70]

**How the Licenses Came About**: Although plaintiffs believed it was legally irrelevant, Electronic Arts intended to present a story to the jury that all of the exclusive licenses were proposed and sought by the various third parties. Plaintiffs believed that this was belied by contemporaneous documents and common sense, but Electronic Arts largely controlled the third-party witnesses in the case. Although plaintiffs believed this factor was surmountable, it was another risk factor in considering whether to settle this case.[71]

In light of these factors, plaintiffs' benchmark fee request of 27 percent of the settlement fund is justified by the particular risks and circumstances of this case.

### 2. Plaintiffs' Fee Request Is Reasonable Under the Lodestar Cross-Check Method

Plaintiffs' fee request of $7,290,000 is also reasonable when cross-checked using the lodestar method.[72] Under the lodestar method, a presumptively reasonable fee award can be

---

[69] *Id.*, ¶ 25.

[70] *Id.*, ¶ 26.

[71] *Id.*, ¶ 27.

[72] *See Wachovia*, 2011 U.S. Dist. LEXIS 55351, at *7.

determined by multiplying the number of hours reasonably expended by plaintiffs' counsel by their reasonable hourly rate.[73]

### a. The Number of Hours that Plaintiffs' Counsel Devoted to This Litigation Is Reasonable

Under the lodestar method, courts first look at the number of hours spent by counsel on the case.[74] Here, in support of the lodestar determination, plaintiffs submit the declarations of class counsel attesting to their total hours, hourly rates, experience, and efforts to prosecute this action.[75]

As set forth in the supporting declarations, plaintiffs' counsel have collectively spent more than 13,878 hours of attorney and litigation support time on this action.[76] The number of hours that plaintiffs' counsel has devoted to pursuing this litigation is appropriate and reasonable, given: (1) the large number of discovery battles fought between the parties; (2) the extensive briefing at both the motion to dismiss and class certification stages; (3) the number and breadth of expert reports; (4) the depositions of dozens of witnesses; (5) the parties' preparation for summary judgment and *Daubert* motions; and (6) the extensive and contentious arm's-length negotiations regarding the settlement. In addition, class counsel has spent numerous hours working with the notice and claims administrator to answer the questions of class members, to launch the settlement website, to prepare the electronic claims form and address issues regarding notice.

Finally, class counsel's responsibilities will not end with final approval. Class counsel will assist class members with inquiries and work with the notice and claims administrator and defendant on any issues that may arise with respect to the settlement. Class counsel may also expend further time and effort to resolve any objections that are lodged, and litigate any appeals

---

[73] *See Hensley*, 461 U.S. at 433.

[74] *Id.*

[75] *See* Scarlett Decl., ¶¶ 32-37; Declaration of Stuart Paynter in Support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards ("Paynter Decl."), ¶¶ 1-15, filed concurrently herewith.

[76] Scarlett Decl., ¶ 33; Paynter Decl., ¶ 12; Declaration of Joseph N. Williams in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses and Service Awards ("Williams Decl."); Declaration of Christopher W. Cardwell in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses and Service Awards ("Cardwell Decl.") and; Declaration of James E. Cecchi in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses and Service Awards ("Cecchi Decl."), concurrently filed herewith.

1    that result therefrom. Past experience shows that this ongoing work will add significant time to the

2    work already undertaken in this case.

3         In sum, the hours that plaintiffs' counsel devoted to this action were reasonable and

4    necessary, particularly given the contentious nature of the settlement negotiations with defendant.

5    Indeed, their hard work and commitment ultimately paid off, resulting in a comprehensive

6    settlement agreement that provides substantial relief to class members.

7                    **b.      Plaintiffs' Counsel's Hourly Rates Are Reasonable**

8         The hourly rates of class counsel and other plaintiffs' counsel, as detailed in their

9    declarations, are also fair and reasonable. Under the lodestar method, counsel's reasonable hourly

10   rates are determined by the "prevailing market rates in the relevant community," which are the

11   rates a lawyer of comparable skill, experience and reputation could command in the relevant

12   community.[77] An attorney's actual billing rate is presumptively appropriate to use as the lodestar

13   market rate.[78] "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in

14   the community, and rate determinations in other cases, particularly those setting a rate for the

15   plaintiffs' attorney, are satisfactory evidence of the prevailing market rate."[79] Courts may also use

16   survey data in evaluating the reasonableness of attorneys' fees.[80]

17        Counsel's hourly rates in this action range from $800 to $300, with the high-end reserved

18   only for the most senior attorney working on the case, Steve Berman, the managing partner of

19   Hagens Berman Sobol Shapiro LLP ("Hagens Berman").[81] Hourly rates for paralegals are $250 or

20   lower. Class counsel are highly-respected members of the bar with extensive experience in

21   prosecuting high-stakes complex litigation, including consumer class actions. Class counsel also

22        [77]    *See Sw. Ctr. for Biological Diversity v. Bartel*, No. 98-CV-2234, 2007 U.S. Dist. LEXIS 64232, at
23   *14 (S.D. Cal. Aug. 30, 2007); *Bellows v. NCO Fin. Sys., Inc.*, No. 07-CV-1413, 2009 U.S. Dist. LEXIS
     297, at *17-*18 (S.D. Cal. Jan. 5, 2009); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 644 (S.D. Cal. 2011),
24   *aff'd*, 2012 U.S. App. LEXIS 10539 (9th Cir. May 24, 2012); *Moreno v. City of Sacramento*, 534 F.3d 1106,
     1111 (9th Cir. 2008).

25        [78]    *See People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996).

26        [79]    *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

27        [80]    *See Mathis v. Spears*, 857 F.2d 749, 755-56 (9th Cir. 1988); *Autodesk, Inc. v. Flores*, No. 10-CV-
     01917, 2011 U.S. Dist. Lexis 53277, at *5 (N.D. Cal. May 18, 2011).

28        [81]    Scarlett Decl., ¶ 33; Paynter Decl., ¶ 12.

submit the declarations of counsel from across the country that assisted in various discovery disputes and other motion practice.[82] The work undertaken by these various firms was at the direction of class counsel and reasonably necessary for the litigation of this action.

Class counsel's hourly rates are comparable to those approved in courts in this Circuit and by recent survey data.[83] PricewaterhouseCoopers ("PwC") recently published a comprehensive survey of the billing rates and salaries of associates and partners of law firms nationwide.[84] Class counsel's rates are comparable to the established law firm rates documented in PwC's survey, where partners in large firms charge up to $925 per hour.[85] Finally, class counsel's customary rates have been previously approved by courts across the country.[86]

### c. Plaintiffs' Requested Fee Is Reasonable Considering the Time and Labor Required, Novelty and Complexity of the Litigation, Counsel's Skill and Experience and the Results Obtained

Multiplying the hours spent by plaintiffs' counsel on the litigation by their respective hourly rates yields a lodestar calculation of $6,327,319.75. The requested $7,290,000 represents only a 1.15 multiplier on plaintiffs' lodestar. This falls well within the range of multipliers accepted by the Ninth Circuit and district courts throughout the country.[87]

---

[82] Williams Decl.; Cardwell Decl.; Cecchi Decl.

[83] *See Hartless*, 273 F.R.D. at 644 (citing comparable hourly rate of $750 and finding rate of $675 to be reasonable); *Money Deposit Co. v. Gilliam*, No. SACV-09-287, 2010 U.S. Dist. LEXIS 65767, at *9-*10 (C.D. Cal. May 24, 2010) (finding hourly rates ranging from $385 to $900 to be reasonable); *Stuart v. RadioShack Corp.*, No. C-07-4499, 2010 U.S. Dist. LEXIS 92067, at *16 (N.D. Cal. Aug. 9, 2010) (finding rates ranging between $600 and $1,000 reasonable); *In re Apple Inc. Secs. Litig.*, No. 5:06-CV-05208, 2011 U.S. Dist. LEXIS 52685, at *16 (N.D. Cal. May 17, 2011) (approving hourly rate of $836); *Californians for Disability Rights v. Cal. Dep't of Transp.*, No. C 06-05125, 2010 U.S. Dist. LEXIS 141030, at *39 (N.D. Cal. Dec. 13, 2010) (requested fees of $510 for associates and $800 for partners found to be reasonable).

[84] Scarlett Decl., Ex. 1. *See also Yurman Designs, Inc. v. PAJ, Inc.*, 125 F. Supp. 2d 54, 58 (S.D.N.Y. 2001) (relying on survey data to assess the reasonableness of attorneys' fees); *Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*, 51 F. Supp. 2d 302, 305 (S.D.N.Y. 1999) (same).

[85] Scarlett Decl., Ex. 1 at 101.

[86] *See* Final Judgment and Order of Dismissal with Prejudice, *Ruwe et al. v. Cellco P'ship d/b/a Verizon Wireless*, No. 07-03679 JSW (N.D. Cal. Nov. 16, 2012); Order Granting Motions for Final Approval of Class Settlement Agreements (Dkt. Nos. 837 and 841) and Granting in Part Motion for Attorney's Fees and Expenses (Dkt No. 844), *In re Charles Schwab Corp. Secs. Litig.*, No. 08-01510-WHA (N.D. Cal. Apr. 19, 2011), ECF No. 1101; Scarlett Decl., ¶¶ 28-31; Paynter Decl., ¶¶ 1-15.

[87] *See Vizcaino*, 290 F.3d at 1051 n.6 (surveying class actions settlements nationwide, and noting 54 percent of lodestar multipliers fell within the 1.5 to 3.0 range, and that 83 percent of multipliers fell within the 1.0 to 4.0 range); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (4.65

In deciding an appropriate fee under the lodestar method, district courts may consider a number of factors, including the time and labor required, novelty and complexity of the litigation, skill and experience of counsel, contingent nature of the case, and the results obtained.[88] All of these factors weigh heavily in favor of granting the $7,290,000 for fees requested here.

### (1) Plaintiffs' Counsel Invested a Significant Amount of Time and Resources into This Case

To date, plaintiffs' counsel have expended more than 13,878 hours, totaling more than $6,327,319.75 million in lodestar, and have incurred more than $2,033,418.64 in expenses in prosecuting this action for the benefit of the class.[89] Class counsel vigorously litigated this action and were challenged by aggressive, skilled and well-funded defense counsel every step of the way.

To effectively prosecute this very large and complex class action, class counsel had to commit a significant amount of time, personnel and expenses to this litigation on a contingency basis with absolutely no guarantee of being compensated in the end. Such efforts included, but were certainly not limited to: (1) investigating the factual and legal claims and filing this action; (2) successfully defeating a motion to dismiss; (3) filing a factually robust motion for class certification and reply in support of the same; (4) actively engaging in discovery, including the taking and defending of depositions, written discovery, reviewing documents from both the defendant and fifteen third parties; (5) retaining and working with two expert economists to develop a damages model and explain the impact of defendant's exclusive licenses on class

---

multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (3.97 multiplier: "In recent years multipliers of between 3 and 4.5 have become common."); *In re RJR Nabisco Sec. Litig.*, MDL No. 818, 1992 U.S. Dist. LEXIS 12702, at *15-*23, (S.D.N.Y. Aug. 24, 1992) (6.0 multiplier); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (2.5 multiplier); *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (3.0 multiplier); *Van Vraken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (3.6 multiplier); *Rabin v. Concord Assets Group*, No. 89 Civ 6130, 1991 U.S. Dist. LEXIS 18273, at *2, (S.D.N.Y. Dec. 19, 1991) (4.4 multiplier: "multipliers of between 3 and 4.5 have been common"); *Behrens v. Wometco Enters. Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988) ("[T]he range of lodestar multipliers in large and complicated class actions runs from a low of 2.26 to a high of 4.5."); *In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322, 327 (N.D. Ill. 1981) (4.0 multiplier); *Arenson v. Bd. of Trade*, 372 F. Supp. 1349, 1359 (N.D. Ill. 1974) (4.0 multiplier).

[88]    *Blum v. Stenson*, 465 U.S. 886, 898-900 (1984); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

[89]    Scarlett Decl., ¶¶ 33, 35; Paynter Decl., ¶¶ 12, 14; Williams Decl., ¶¶ 5-6 ; Cardwell Decl., ¶¶ 6-7; Cecchi Decl., ¶¶ 6-7.

members; (6) disseminating notice after class certification to millions of class members; (7) answering many inquiries from class members regarding the litigation, settlement, claim forms and other matters concerning their claims; (8) engaging in two hard-fought mediations before settling this matter; and (9) assisting the claims administrator with the settlement website, electronic claim form and notice issues. Despite the significant risks and uncertainty, class counsel obtained an outstanding result on behalf of class members.

### (2)    The Litigation Featured Novel Legal and Factual Issues

Plaintiffs faced a number of novel and complex legal and factual issues in this litigation, including developing evidence supporting market definition, arguing for the application of California law to a nationwide class, and the correct measure of impact and damages in the videogame industry given the purported standardized pricing. Had the parties failed to reach a settlement, plaintiffs would have continued to litigate these complicated issues and, in particular, would have faced a complex and time-consuming motion to decertify the class, a motion for summary judgment and cross-motions to exclude the testimony of each side's proposed experts, combined with the near certainty that no matter the outcome of the litigation, both sides intended to appeal the outcome.

### (3)    Plaintiffs' Counsel Are Highly Skilled and Experienced

The Court may also consider the experience, skill and reputation of plaintiffs' counsel.[90] Here, class counsel are well-respected leaders in the fields of consumer and class action litigation.

Courts in the Northern District of California have repeatedly appointed Hagens Berman as lead or co-lead counsel of large multidistrict litigation proceedings, including in the recent *In re Carrier IQ Privacy Litig.*, an MDL currently pending before Judge Chen;[91] the *In re Optical Disk Drives Prods. Antitrust Litig.*, currently pending before Judge Seeborg where Hagens Berman acts

---

[90]    *See Kerr*, 526 F.2d at 70; *In re Heritage Bond Litig. v. U.S. Trust Co. of Tex., N.A.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627, at *38 (C.D. Cal. June 10, 2005); *Crommie v. Pub. Utils. Comm'n*, 840 F. Supp. 719, 725 (N.D. Cal. 1994).

[91]    *In re Carrier IQ Privacy Litig.*, No. 12-md-2330 EMC (N.D. Cal.).

as sole lead counsel on behalf of the indirect purchaser class;[92] and in *Schwab*, where Hagens

Berman acted as lead counsel on behalf of a class of purchasers of securities.[93] Hagens Berman is a

fifty-five lawyer firm, with offices across the country. Since its founding in 1993, the firm has been

recognized in courts throughout the United States for its ability and experience in handling major

class litigation.[94]

The Paynter Law Firm, a boutique litigation firm based in Washington, D.C., likewise has

extensive experience in complex class action lawsuits. Prior to founding his own firm, Mr. Paynter

was a litigator at Sullivan & Cromwell LLP, where he represented Microsoft in a series of antitrust

actions filed by private plaintiffs around the country. In addition to extensive experience in the

prosecution and management of complex class actions, Mr. Paynter has expertise in antitrust issues

and, in particular, the intersection of antitrust law and technology. The Paynter Law Firm is

currently counsel in a number of complex class actions including *In re: NCAA Student-Athlete*

*Name & Likeness Licensing Litigation*, No. 4:09-cv-01967-CW (N.D. Cal.); *Rock v. NCAA*, No.

1:12-cv-1019 JMS-DKL (S.D. Ind.); and *Canada v. Meracord*, No. 3:12-cv-05657-BHS (W.D.

Wash.)

The reputation, experience and skill of class counsel were essential to the success in this

litigation.[95] From the outset, class counsel used their expertise and skill to obtain maximum

recovery for the class, given the particular factual and legal complexities of this litigation. Had the

parties not reached a settlement, they would have continued to debate before this Court, complex

legal questions. At no time has defendant Electronic Arts ever conceded liability, the

appropriateness of certification other than for settlement purposes, or the existence of damages.

Given the significant risks and uncertainty associated with this complex class action, it is a

---

[92]  Order at 4-5, *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 10-md-2143 RS (N.D. Cal. June 4, 2010), ECF No. 96 (in deciding lead counsel in an antitrust MDL, Judge Walker noted that each firm applying to be lead counsel brought "impressive skills and experience to the proposed task," but that when taking into account the proposed fee and analysis of the prospects for recovery, the "clear choice" was Hagens Berman).

[93]  *Schwab*, No. 08-01510-WHA (N.D. Cal.).

[94]  *See* Scarlett Decl., Ex. 2.

[95]  *See In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 304 (3d Cir. 2005).

testament to class counsel's skill, creativity and determination that they were able to negotiate an excellent settlement providing substantial economic relief.[96]

The quality of opposing counsel should also be considered.[97] Here, counsel for defendant – Latham & Watkins LLP – is a nationally recognized law firm in the defense of antitrust class actions. Class counsel vigorously litigated, and defense counsel vigorously defended against, the class wide claims asserted by plaintiffs. Indeed, virtually every point in this litigation and in the settlement negotiations process was relentlessly disputed by counsel for defendant.

### d. Class Counsel Obtained an Outstanding Settlement Result for Class Members Nationwide

In light of the looming risks and uncertain outcome of the litigation, the results obtained for the class are exceptional. Class counsel has negotiated and achieved a meaningful settlement that provides class members the opportunity to claim a refund for the impacted videogames. Although the claims period has not expired, to date over 33,000 class members have submitted claims. Only 56 class members have requested to be excluded to date (although the deadline for exclusions has not expired).[98] As demonstrated by the claims to date, this settlement provides economic relief to thousands of class members. Class counsel has achieved an excellent result for the class in light of all of the circumstances of the case.

### e. Plaintiffs' Fee Request Is Reasonable in Light of the Contingent Nature of the Fee and Class Counsel's Ongoing Work

Class counsel's fee request is reasonable in light of the future work and expenses that will be incurred by class counsel under the settlement, which is not included in the current lodestar. This includes all pre- and post-approval work such as overseeing claims administration, communications with class members, disputes over claims, appeals and any other issues that may arise under the settlement. This future work is substantial and could last for many months. This additional future work underscores the reasonable and fair nature of plaintiffs' fees request.

---

[96] *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 281 (3d Cir. 2009) (considering skill and efficiency of attorneys involved).

[97] *See, e.g., In re Equity Funding Corp. of Am. Secs. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977).

[98] Declaration of Tricia M. Solorzano on Behalf of Settlement Administrator Regarding Notice and Administration (" Solorzano Decl."), ¶¶ 9-11, filed concurrently herewith.

## B. Negotiated Attorneys' Fee Agreements Are Favored in Class Action Settlements

Federal courts at all levels encourage litigants to resolve fee issues by agreement whenever possible. "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."[99] In affirming the award of a negotiated fee, the Second Circuit has observed:

> [W]here . . . the amount of the fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. It is difficult to see how this could be left entirely to the court for determination after the settlement.[100]

The virtue of a fee negotiated by the parties at arm's-length is that it is, in effect, a market-set price. Defendants have an interest in minimizing the fee; plaintiffs have an interest in maximizing it; and the negotiations are informed by the parties' knowledge of the work done and result achieved, and their views on what the court might award if the matter were litigated. In *In re Cont'l Ill. Secs. Litig.*, Judge Posner endorsed a market-based approach to evaluating fee requests. "[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order."[101] Judge Posner explained that "[t]he object in awarding a

---

[99] *Hensley*, 461 U.S. at 437; s*ee also In re M.D.C. Holdings Sec. Litig.*, No. 89-0090, 1990 U.S. Dist. LEXIS 15488, at *12 (S.D. Cal. Aug. 30, 1990) ("[b]ecause this Court believes the parties should be encouraged to settle all their disputes as part of the settlement . . . including the amount of the fee . . . if the agreed-to fee falls within a range of reasonableness, it should be approved as part of the negotiated settlement"); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 829 (D. Mass. 1987) ("Whether a defendant is required by statute or agrees as part of the settlement of a class action to pay the plaintiffs' attorneys' fees, ideally the parties will settle the amount of the fee between themselves."); *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.").

[100] *Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985); s*ee also Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) (affirming award of fees and expenses, where defendant has agreed not to oppose request for fees and expenses up to negotiated ceiling, which was paid separately from class settlement benefits).

[101] *In re Cont'l Ill. Secs. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992)

reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arms' length negotiation, had one been feasible."[102]

Here, such a negotiation was feasible, and was conducted. In the settlement agreement, the defendant agreed not to oppose a request for attorneys' fees up to 30 percent of the settlement and costs not to exceed $2,000,000 (excluding the costs of administration of the settlement).[103] Plaintiffs' requests fall well within those boundaries, as they are only applying for fees of 27 percent of the settlement and costs in the amount of $2,000,000 (less than the $2,033,418.64 incurred by counsel). This request for expenses is in addition to the $927,012.03 which represents the costs of notice to the class and the anticipated costs of administrations.[104] In addition, an experienced mediator oversaw the negotiations and the final terms of the settlement agreement, further demonstrating the reasonableness of plaintiffs' request.

## C. Plaintiffs' Expenses Are Reasonable and Were Necessarily Incurred

In addition to the $7,290,000 sought by plaintiffs to be awarded to class counsel, plaintiffs seek an award of $2,000,000 in expenses necessarily incurred in connection with the prosecution of this action. In total, counsel have incurred $2,033,418.64 in expenses, although they are not seeking reimbursement for this total amount.[105] The Ninth Circuit allows recovery of pre-settlement litigation costs in the context of class action settlements.[106] All expenses that are typically billed by attorneys to paying clients in the marketplace are compensable.[107] With this motion, plaintiffs provide an accounting of the $2,033,418.64 in expenses incurred by plaintiffs' counsel.[108] This request for expenses is in addition to the $927,012.03 for notice and claims administration.[109] Several categories account for the bulk of these expenses: fees paid to experts,

---

[102] *Id.* at 572.

[103] Settlement Ag., ¶ 13.

[104] *See* Solorzano Decl., ¶¶ 13-14.

[105] Scarlett Decl., ¶ 35; Paynter Decl., ¶ 14.

[106] *See Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003).

[107] *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

[108] Scarlett Decl., ¶ 35; Paynter Decl., ¶ 14.

[109] Solorzano Decl., ¶¶ 13-14.

1  filing fees, travel expenses, costs of court and deposition transcripts, and computer research

2  expenses. All of these costs were necessarily and reasonably incurred to bring this case to a

3  successful conclusion, and they reflect market rates for the various categories of expenses incurred.

4  Further, plaintiffs' counsel advanced these necessary expenses without assurance that they would

5  even be recouped. Plaintiffs' request for fees is reasonable.

6  **D.      Plaintiffs Request Participation Awards in the Amount of $5,000**

7          Plaintiffs also request that the court approve the participation awards in the amount of

8  $5,000 for the two named plaintiffs, to be deducted from the settlement fund. Participation awards

9  for class representatives are routinely provided to encourage individuals to undertake the

10  responsibilities of representing the class and recognize the time and effort spent in the case.

11  "Incentive *awards* are fairly typical in class action cases."[110] In the Ninth Circuit, participation

12  awards "compensate class representatives for work done on behalf of the class, to make up for

13  financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their

14  willingness to act as a private attorney general."[111] Courts have discretion to approve participation

15  awards based on, *inter alia*, the amount of time and effort spent, the duration of the litigation, and

16  the personal benefit (or lack thereof) as a result of the litigation.[112]

17          Here, the two named representatives, Geoffrey Pecover and Andrew Owens, have spent a

18  significant amount of time assisting in the litigation of this case. Among other things, Mr. Pecover

19  has been involved since the inception of the case, assisting in gathering evidence to file the

20  pleadings in this case. Mr. Owens was added during the class certification process, and each

21  plaintiff responded to written discovery and produced documents relating to their claims in this

22  case; they were each deposed by defense counsel regarding their claims in this case; they assisted

23  in the preparation of the class certification motion and were proposed as the named representatives.

24

25

---

[110]  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (emphasis in original).

[111]  *Id.* at 958-59.

[112]  *See Van Vraken*, 901 F. Supp. at 299.

Both Messrs. Pecover and Owens actively participated in the settlement of this action, including reviewing and approving the settlement agreement.[113]

The service awards of $5,000 are modest compared with incentive awards in other cases.[114] Defendant Electronic Arts has agreed to pay these service awards to the class representatives under the terms of the settlement agreement.[115] The class representatives' efforts and time should not go unrecognized. Thus, plaintiffs and class counsel respectfully request that the Court approve the modest service awards for each of the two named representatives.

## IV. CONCLUSION

Class actions play an important role in the vindication of individual rights. Without class actions, overcharges such as the amounts at issue here ($6.79 on sixth generation games and $1.95 on seventh generation games) are wrongly charged by companies, but cannot be recouped by individuals who would spend far more than these small amounts in any attempted recovery. In this case, the named plaintiffs and class counsel have made millions of dollars in refunds available to the class. These refunds come with no strings – they are all cash, payable to the class members upon submission of a claims form. No amounts are reserved for *cy pres* and nothing will revert to defendant Electronic Arts. To date, over 33,000 class members have agreed and have submitted requests for refunds. Plaintiffs respectfully submit that this was an outstanding victory for the class. Accordingly, plaintiffs request an award of $7,290,000 in attorneys' fees, $2,000,000 in expenses, $927,012.03 to be paid to the notice and claims administrator, and a $5,000 participation service award each for plaintiffs Geoffrey Pecover and Andrew Owens.

DATED: November 26, 2012

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____/s/ Shana E. Scarlett_____
SHANA E. SCARLETT

---

[113] Scarlett Decl., ¶ 38.

[114] *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463 (9th Cir. 2000) (approving incentive award of $5,000); *Cohorst v. BRE Props. Inc.*, No. 3:10-CV-2666, 2011 U.S. Dist. LEXIS 151719, at *66 (S.D. Cal. Nov. 14, 2011) (approving $5,000 incentive awards to each of three appointed class representatives); *Ins. Brokerage*, 579 F.3d at 253 (approving incentive award of $10,000).

[115] *See* Settlement Ag., ¶ 12.

Jeff D. Friedman (173886)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2012, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Shana E. Scarlett

SHANA E. SCARLETT
