Karl Siganporia (CA Bar #284924)
38 Miller Avenue, #263
Mill Valley, CA 94941
310-210-1824

*Attorney for Objector, Brett Gibbs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GEOFFREY PECOVER and ANDREW OWENS, on behalf of themselves and a class of persons similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> ELECTRONIC ARTS INC., a Delaware corporation, <br><br> *Defendant*. | CASE NO. 08-cv-02820 CW <br><br> **OBJECTION TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR** <br><br> Judge: Hon. Claudia Wilken <br><br> Date: February 7, 2013 <br> Time: 2:00 p.m. <br> Dept: Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

I. THE OBJECTOR IS A MEMBER OF THE CLASS ......................................... 2

II. LEGAL STANDARD ............................................................................................. 3

III. RIPENESS FOR DETERMINATION ................................................................. 4

IV. DISCUSSION ........................................................................................................ 5

    a. Factual Background on Child's Play ............................................................ 5

    b. Factual Background on the Settlement Class .............................................. 7

    c. Child's Play Is Not an Appropriate *Cy Pres* Beneficiary of this Settlement Under Binding Ninth Circuit Precedent ................................................... 7

    d. The Parties Should Renegotiate the *Cy Pres* Distribution to Choose an Appropriate Charity and to Supply Terms that Are Not Vague Under *Dennis v. Kellogg* ......................................................................................... 9

V. CONCLUSION ..................................................................................................... 11

**TABLE OF AUTHORITIES**

**Cases**

*Dennis v. Kellogg Co.*, ___ F.3d ___, Nos. 11-55674, 11-55706 (9th Cir. Sept. 4, 2012)
    (Slip. Op.) (attached hereto as Exhibit E) ................................................................... passim

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000 (9th Cir. 2003) ......................................... 8

*Kochert v. Greater Lafayett Help Serv., Inc.*, 463 F.3d 710 (7th Cir. 2006) ..................................... 8

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ..................................................................... 10

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) ............................................................ passim

*Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615 (9th Cir. 1982) ..................................... 9

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ......................................................... 4

*Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ....................... 3, 4, 10

The Objector, Brett Gibbs, a member of the proposed settlement class, hereby objects to the proposed settlement on the limited grounds that the *cy pres* distribution contemplated by the settlement terms does not comply with binding Ninth Circuit precedent and is contrary to law. The Objector intends to appear at the final approval hearing through his counsel.

The Objector preliminarily states that he does not oppose settlement in general. For the most part, this settlement represents a significant victory for the class. The agreement by Electronic Arts Inc. ("EA") to relinquish and abstain from exclusive licensing agreements with the Collegiate Licensing Company and the Arena Football League for a period of five years provides substantial prospective relief for the class members. Furthermore, the direct distribution of the $27 million Settlement Fund will provide substantial retrospective relief to class members who choose to submit claims, on a par rarely seen in similar class action settlements. The Objector believes that, with only minimal modifications to the *cy pres* distribution (as suggested in Part IV.d), the settlement taken as a whole could be adjudged fair, reasonable, and adequate to the absent class members, and could merit final approval under Fed. R. Civ. P. 23(e).

However, even a beneficial settlement may run afoul of the law. The inclusion of a *cy pres* element in the settlement terms requires the Court to make an inquiry—separate and distinct from the Rule 23(e) settlement approval inquiry—into "whether the *distribution* of the approved class settlement complies with [the Ninth Circuit's] standards governing *cy pres* awards." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011) (emphasis in original). The Ninth Circuit has instructed that a *cy pres* distribution must:

(1) address the objectives of the underlying statutes;

(2) target the plaintiff class; and

(3) provide reasonable certainty that class members will be benefitted.

*Id.* Under the terms of this settlement, six months after the monetary distribution to class members who choose to submit claims has been completed, any money that remains in the common fund will be distributed by a *cy pres* payment to Child's Play, a 501(c)(3) charitable organization. (Dkt. No. 377-1, at 15.)

Although the Objector sincerely believes that Child's Play is a venerable charity, well-deserving of donations and praise for its good works, that is not the issue before the Court. The Defendant, Electronic Arts, Inc. ("EA"), stands accused of violating antitrust laws through anticompetitive actions which allowed it to monopolize the market for interactive football software. (*See generally* Dkt. No. 252.) These actions allegedly resulted in consumers being overcharged for EA's video games by many millions of dollars. (*See generally id.*) Through this settlement, EA would absolve its liability for these unfair and anticompetitive business practices. Therefore, if *cy pres* is to be used, it must be used in a manner which reflects the harms inflicted and benefits the class. This *cy pres* distribution, however, would not reflect the class claims and is not targeted to provide any benefit to the class.

While Child's Play is an admirable charity with an important mission, for the reasons stated herein the settling parties acted contrary to law by naming Child's Play as a *cy pres* beneficiary. Although it is certainly a worthy recipient, Child's Play cannot provide the "driving nexus between the plaintiff class and the *cy pres* beneficiaries" that binding Ninth Circuit precedent requires. *Nachshin*, 663 F.3d at 1038. Instead, this settlement would allow EA to use settlement funds—which ostensibly represent restitutionary disgorgement of EA's ill-gotten gains from overcharging consumers—to buy favorable press and goodwill through a sympathetic charitable donation. Current estimates show that the *cy pres* distribution will total at least $12.2 million, representing more than 45% of the $27 million settlement fund, and it is therefore extremely important that this money be distributed in a way that targets and benefits the class. The current *cy pres* distribution does not. For that reason, the proposed settlement cannot be approved as it stands.

## I. THE OBJECTOR IS A MEMBER OF THE CLASS

The Objector, Brett Gibbs, is a resident of the state of California who purchased new retail copies of several different yearly iterations of EA's *Madden NFL* brand interactive football software with release dates between January 1, 2005 and June 21, 2012. The putative settlement class is described as follows:

> [P]ersons in the United States who purchased EA's *Madden NFL*, *NCAA Football* or *Arena Football League* brand interactive football software, excluding software for mobile devices, with a release date of

>January 1, 2005 to June 21, 2012. . . . Excluded from the Settlement Class are (i) persons purchasing directly from EA; (ii) persons purchasing used copies of the relevant software, and (iii) EA's employees, officers, directors, legal representatives, and wholly or partly owned subsidiaries or affiliated companies. Also excluded from the Settlement Class are (i) those persons who timely and validly request exclusion from the Settlement Class pursuant to the Class Notice detailed in paragraphs 7 and 8 of this Order, and (ii) any class members who previously filed a timely request for exclusion on or prior to June 25, 2011, and were included on the class member exclusion list filed with the Court on July 25, 2011.

(Dkt. No. 385, at ¶ 3.) The Objector does not fall within any of the exclusions. The Objector is therefore a member of the class, with standing to object to the proposed settlement under Fed. R. Civ. P. 23(e) and under the Court's Preliminary Approval Order (*Id.* at ¶ 15). Although the settlement website purports to require disclosure of the Objector's address and telephone number, this information is withheld here for his privacy.[1]

## II.   LEGAL STANDARD

The *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the "next best" class of beneficiaries. *Nachshin*, 663 F.3d at 1036 (citing *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307–08 (9th Cir. 1990)). *Cy pres* is shorthand for the old equitable doctrine "*cy près comme possible*"—French for "as near as possible." *Dennis v. Kellogg Co.*, ___ F.3d ___, Nos. 11-55674, 11-55706 (9th Cir. Sept. 4, 2012) (Slip. Op. at 10537) (attached hereto as Exhibit E for the Court's convenience).

However, if "unbridled by a driving nexus between the plaintiff class and the *cy pres* beneficiaries," the *cy pres* doctrine "poses many nascent dangers to the fairness of the distribution process." *Nachshin*, 663 F.3d at 1038. "When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court." *Id.* at 1039. For this reason, the Ninth Circuit has set strict guiding standards to govern *cy pres* awards.

"Not just any worthy recipient can qualify as an appropriate *cy pres* beneficiary." *Dennis*, Ex. E, Slip Op. at 10538. A *cy pres* distribution must: (1) address the objectives of the underlying

---

[1] *See* Frequently Asked Questions, http://www.easportslitigation.com/Home/FAQ#7 (last visited Nov. 9, 2012). The Objector will disclose this information to the Court upon request if necessary.

1 statutes, (2) target the plaintiff class, and (3) provide reasonable certainty that class members will be benefitted. *Nachshin*, 663 F.3d at 1040; *Six Mexican Workers*, 904 F.2d at 1307. Crucially, these guiding standards are separate and distinct from those relating to final approval of the settlement—fairness, reasonableness, and adequacy, taken as a whole—and analysis of the *cy pres* distribution may not be conflated with the Rule 23(e) inquiry. *Nachshin*, 663 F.3d at 1040.

## III. RIPENESS FOR DETERMINATION

For the purposes of the Court's inquiry, it is of no matter that the *cy pres* distribution here is contingent upon excess money remaining in the settlement fund after the cash distribution to claimants is completed. While the Ninth Circuit has declined to review a *cy pres* distribution because the "issue becomes ripe only if the entire settlement fund is not distributed to class members," it did so where objectors challenged the use of *cy pres* generally and the amount of that distribution—not an explicitly chosen beneficiary. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). Where objectors challenged the settling parties' choice of beneficiary, the Ninth Circuit deemed the issue ripe for review when the deadline for submission of claim forms had passed and when plaintiffs' counsel could not show that excess cash would not remain in the settlement fund. *Dennis*, Ex. E, Slip Op. at 10537.

In this case, simple calculations based on current estimates show that significant excess money will remain in the settlement fund for *cy pres* distribution. As of November 26, 2012, the settlement administrator has received 164 mailed claim forms and 33,131 online claims. (Dkt. No. 395, at ¶¶ 9–10.) The deadline for submission of claim forms in the instant settlement is March 5, 2013. (Dkt. No. 385, at 4.) The settlement administrator estimates that a total of 250 mailed claims and 64,600 online claims will be received by the deadline for claim submissions, for an estimated grand total of 64,850 claimants. (Dkt. No. 395, at ¶¶ 9–10.)

Each claimant is eligible to receive a cash payment of $6.79 for each Sixth Generation Title purchased, up to a maximum of eight units ($54.32), as well as a cash payment of $1.95 for each Seventh Generation Title purchased, up to a maximum of eight units ($15.60). (Dkt. No. 377, at ¶ 14(a).) The absolute theoretical maximum payment an individual claimant may receive is therefore $69.92 (54.32 + 15.60). If each of the estimated 64,850 claimants were entitled to the absolute

theoretical maximum payment of $69.92, cash payments from the settlement fund to class members would total $4,534,312.00 (64,850 x 69.92). The theoretical maximum amount to be distributed to class members from the settlement fund is therefore currently estimated to be less than $4.6 million.

Class Counsel has petitioned for fees of $7,290,000; reimbursement of expenses of $2,000,000; payment of notice and claims administration fees of $927,012.03; and participation awards to the named plaintiffs of $10,000. (Dkt. No. 389, at viii.) If Class Counsel's requests are approved in their entirety, these payments will total $10,227,012.03.[2]

The total settlement fund is $27 million, an "all-in" number which includes all monetary benefits, participation awards, fees, costs, and expenses. (Dkt. No. 377, at ¶ 8.) Therefore, if Class Counsel's requests are approved in their entirety, there will be $16,772,987.97 remaining in the settlement fund for distribution to claimants.[3]

The evidence currently before the Court thus shows that there will be significant excess money in the settlement fund remaining after cash distribution to claimants has been completed, which will be disbursed in a *cy pres* distribution. If Class Counsel's requests are approved in their entirety, there will be over $16.7 million in the settlement fund which is eligible for distribution to claimants. Even if each of the estimated 64,850 claimants takes the absolute theoretical maximum payment of $69.92—which is highly unlikely—the cash distributed to class members will amount to less than $4.6 million. Child's Play is therefore currently estimated to receive a *cy pres* payment of at least $12.2 million.[4] This issue is therefore ripe for determination by the Court.

## IV. DISCUSSION

### a. Factual Background on Child's Play

Child's Play is a 501(c)(3) charitable entity founded in 2003.[5] Its founding mission is to improve the lives of children in hospitals around the world.[6] Child's Play works in two ways. First,

---

[2] (7,290,000 + 2,000,000 + 927,012.03 + 10,000) = 10,227,012.03.
[3] (27,000,000 − 10,227,012.03) = 16,772,987.97
[4] (16,772,987.97 − 4,534,312.00) = 12,238,675.97
[5] *About Child's Play*, ChildsPlayCharity.org, http://www.childsplaycharity.org/about (last visited Nov. 30, 2012) (attached hereto as Exhibit C).
[6] *Child's Play Press Kit*, ChildsPlayCharity.org, http://www.childsplaycharity.org/assets/downloads/childsplay_press_kit.pdf (last visited Nov. 30, 2012)

1  Child's Play sets up gift wish lists including video games, toys, books, and other items for their
2  network of over seventy partner hospitals; potential donors can view the wish lists of specific
3  hospitals and send requested gifts.[7] Second, Child's Play receives cash donations throughout the
4  year.[8]

5  Child's Play uses cash donations to purchase new video game consoles, peripherals, games,
6  and other items for hospitals and therapy facilities.[9] These items are given to the hospitals and
7  therapy facilities; children receiving care at these facilities are able to "check out" or borrow games
8  and have them placed in their rooms.[10] Other toys are given to individual children as presents.[11] As
9  of November 30, 2012, Child's Play has currently raised a total of $1.42 million for these purposes
10 during calendar year 2012.[12] Contributions are tax-deductible.[13] Child's Play is very highly regarded
11 within the game industry and the community of game consumers, having raised a cumulative total of
12 over $10 million as of 2010.[14]

13 The Defendant, EA, has a past history with Child's Play. Child's Play accepts corporate
14 donations.[15] In 2011, EA promoted the sale of downloadable content for its interactive software title
15 "Battlefield Heroes" by promising to donate $1 to Child's Play for every download sold.[16] Although
16 Child's Play denies giving EA permission to promote its products in this way, EA collected $4,594
17 through the sale of downloadable content and matched this amount itself, donating a total of $9,188
18 to Child's Play.[17]

---

(attached hereto as Exhibit A for the Court's convenience); *see also Front Page*, ChildsPlayCharity.org, http://www.childsplaycharity.org (last visited Nov. 30, 2012) (attached hereto as Exhibit B).
[7] *Child's Play Press Kit*, Ex. A.
[8] *Id.*
[9] *Id.*; *About Child's Play*, Ex. C.
[10] *Frequently Asked Questions*, ChildsPlayCharity.org, http://www.childsplaycharity.org/faq (last visited Nov. 30, 2012) (attached hereto as Exhibit D).
[11] *Id.*
[12] *Front Page*, Ex. B.
[13] *Frequently Asked Questions*, Ex. D.
[14] *Child's Play Press Kit*, Ex. A.
[15] *Id.*
[16] William Usher, *Penny Arcade Lets EA's Charity Slide But Not Retake Mass Effect 3*, Gaming Blend, http://www.cinemablend.com /games/Penny-Arcade-Lets-EA-Charity-Slide-Retake-Mass-Effect-3-41139.html (last visited Nov. 30, 2012) (attached hereto as Exhibit F).
[17] *Id.*

1     **b. Factual Background on the Settlement Class**

2 On behalf of a nationwide class of consumers, Plaintiffs alleged that EA monopolized an alleged market for interactive football software by entering into "exclusive" trademark licenses with the National Football League and its Players' Association, the Arena Football League, the Collegiate Licensing Company, and the National Collegiate Athletic Association. (Dkt. No. 377-1, at 2.) The alleged effect of EA's actions was that their only competitor, Take Two Interactive Software, Inc. ("Take Two") was forced out of the marketplace, and EA raised its prices accordingly by nearly seventy percent. (Dkt. No. 252, ¶¶ 16–17.) Class members were allegedly deprived of the benefits of a free and competitive marketplace for interactive football software, and were injured by payment of more money for interactive football software than they would have paid or would otherwise pay in the absence of EA's anticompetitive actions. (*Id.* at ¶¶ 35, 38, 42.)

As part of the instant settlement, class members would release any and all claims that were or could have been brought by the Named Plaintiffs, including but not limited to any allegations that customers were overcharged for interactive football video games because of EA's exclusive agreements with trademark licenses with the National Football League and its Players' Association, the Arena Football League, the Collegiate Licensing Company, the National Collegiate Athletic Association, and/or ESPN. (Dkt. No. 377-1, at 8.) All class members would be bound by this release, even if they never received actual notice of the lawsuit or of this settlement. (*Id.* at 18.) Thus, this settlement would represent the only relief class members would ever receive with regard to EA's alleged unlawful anticompetitive actions which unjustly resulted in them being collectively overcharged for interactive football software by millions of dollars.

    **c. Child's Play Is Not an Appropriate *Cy Pres* Beneficiary of this Settlement Under Binding Ninth Circuit Precedent**

The Objector sincerely believes that Child's Play is an admirable organization with an important purpose. However, even a worthy charity may not be an appropriate *cy pres* beneficiary in a particular instance. *Dennis*, Ex. E, Slip Op. at 10538. The Court must decide whether a *cy pres* distribution to Child's Play in this case would: (1) address the objectives of the underlying statutes, (2) target the plaintiff class, and (3) provide reasonable certainty that class members will be

7

1 benefitted. *Nachshin*, 663 F.3d at 1040. A proposed *cy pres* distribution must meet these standards

2 regardless of whether the award was fashioned by the settling parties or the Court. *Id.* For the

3 following reasons, the *cy pres* distribution contemplated here does not meet these standards.

4       First, the "principal purpose of the antitrust laws is to prevent overcharges to consumers."

5 *Kochert v. Greater Lafayett Help Serv., Inc.*, 463 F.3d 710, 715 (7th Cir. 2006); *see also Glen Holly*

6 *Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1014 (9th Cir. 2003). Here, the Defendant is alleged to

7 have engaged in anticompetitive behavior which caused consumers to pay many millions of dollars

8 in overcharges for interactive football software. The mission of Child's Play to improve the lives of

9 children in hospitals, while incredibly worthy, does not relate to the statutory purpose behind the

10 antitrust laws. A *cy pres* distribution to Child's Play therefore fails to address the objectives behind

11 the underlying statutes in this case. Just as the *Dennis v. Kellogg* litigation was not about "the

12 nutritional value of food," but rather about false advertising, this litigation is not about video games

13 or the positive effects they may have in people's lives—but rather about predatory and monopolistic

14 behavior which causes consumers to pay overcharges. *See Dennis*, Ex. E, Slip Op. at 10541.

15       Second, the Plaintiff class consists of all persons in the United States who purchased a new

16 retail copy of EA's *Madden NFL*, *NCAA Football* or *Arena Football League* brand interactive

17 football software, excluding software for mobile devices, with a release date of January 1, 2005 to

18 June 21, 2012. (Dkt. No. 385, at 3.) This nationwide settlement class undoubtedly includes millions

19 of consumers from all walks of life and a wide variety of ages. The admirable work Child's Play

20 does to improve the lives of children in hospitals does not adequately target this class. To the

21 contrary, the mission of Child's Play to benefit children, in particular, ensures that a majority of the

22 settlement class members would be excluded from directly benefitting from the *cy pres* distribution

23 here. On the face of the settlement's language, Child's Play may not serve a single person within the

24 plaintiff class of purchasers of interactive football software.

25       Thus, the *cy pres* distribution—which current estimates show will total at least $12.2

26 million—cannot be said to benefit the class. With all due respect to EA and Class Counsel, it appears

27 that the terms of the *cy pres* distribution in this case were chosen not with regard to the legal

28 requirements for that remedy, but instead with an eye towards generating positive press coverage. In

8

OBJECTION TO SETTLEMENT                                                                                CASE NO. 08-cv-02820 CW

the wake of the public announcement of this settlement agreement, the most prominently reported fact about the settlement in the game industry press was that EA would retain its "hated exclusive license" with the National Football League ("NFL"); this was denigrated as a significant loss for consumers.[18] The presence of Child's Play as a beneficiary, in contrast, was identified as the only significant redeeming factor of the settlement, prompting one reporter to declare that "maybe some good can come out of this."[19] In other words, the presence of Child's Play in this lawsuit functions as a *distraction* from the disappointing fact that EA's alleged monopoly in the market for NFL interactive football software will persist beyond this settlement.

This is not the first time that EA has used Child's Play to gain positive press and to promote itself.[20] In this case, however, EA would use settlement funds—which allegedly serve as restitution for the unlawful overcharging of consumers—to bolster its own reputation through a sympathetic donation to a charity for children's hospitals. Because Child's Play is unrelated to the alleged harm to the class, and because the money to be donated was allegedly taken unlawfully from the class members and must be distributed in a way meant to benefit them, this cynical ploy must be rejected.

### d. The Parties Should Renegotiate the *Cy Pres* Distribution to Choose an Appropriate Charity and to Supply Terms that Are Not Vague Under *Dennis v. Kellogg*

As in *Dennis v. Kellogg*, this settlement presents a situation where it appears that the *cy pres* distribution—which is likely to total at least $12.2 million—"will only be of serendipitous value to the class purportedly protected by the settlement." *Dennis*, Ex. E, Slip Op. at 10542. The Court lacks the power to "delete, modify, or substitute certain provisions" of a settlement, and so the settlement "must stand or fall as a whole." *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 628, 630 (9th Cir. 1982). The only solution, therefore, is renegotiation of this settlement, if possible.

---

[18] Owen Good, *Madden's Exclusive NFL License Survives in $27 Million "Monopoly" Lawsuit Settlement*, Kotaku.com, http://kotaku.com/5927919/maddens-exclusive-nfl-license-survives-in-27-million-monopoly-lawsuit-settlement (last visited Dec. 3, 2012) (attached hereto as Exhibit G).

[19] Owen Good, *The Big Winners in the Madden Lawsuit Are, Of Course, Lawyers*, Kotaku.com, http://kotaku.com/5927943/the-big-winners-in-the-madden-lawsuit-are-of-course-lawyers (last visited Dec. 3, 2012) (attached hereto as Exhibit H).

[20] William Usher, *Penny Arcade Lets EA's Charity Slide But Not Retake Mass Effect 3*, Ex. F.

For guidance in selecting an appropriate charity, the Ninth Circuit has written the following with regard to privacy claims against AOL, LLC:

> We are also not persuaded by the parties' claims that the size and geographic diversity of the plaintiff class make it "impossible" to select an adequate charity. It is clear that all members of the class share two things in common: (1) they use the internet, and (2) their claims against AOL arise from a purportedly unlawful advertising campaign that exploited users' outgoing e-mail messages. The parties should not have trouble selecting beneficiaries from any number of non-profit organizations that work to protect internet users from fraud, predation, and other forms of online malfeasance. If a suitable cy pres beneficiary cannot be located, the district court should consider escheating the funds to the United States Treasury.

*Nachshin*, 663 F.3d at 1040–41. By the same logic, it is clear that all members of this class share the following things in common: (1) they buy interactive football software, and (2) their claims against EA arise from purportedly unlawful anticompetitive actions which allowed EA to monopolize an industry and overcharge consumers. Because no charity currently exists which targets both of these distinguishing characteristics of the class, the parties could consider creating a charity specifically dedicated to the purpose of fostering competition within the interactive football software market, much like the defendant-created charity in *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012).

Otherwise, the parties may choose from any number of existing non-profit organizations that work to protect consumers from anticompetitive actions, monopolization, and overcharging, including the American Antitrust Institute ("AII"), the U.S. PIRG (the nationwide federation of state public interest research groups), or Consumers Union (the non-profit consumer advocacy organization which publishes *Consumer Reports*). Such a *cy pres* distribution should be further guided by a limiting restriction, restricting the use of any distributed funds to the purpose of combating anticompetitive or monopolistic behavior, or to the purpose of fostering competition in the interactive football software market. *See Dennis*, Ex. E, Slip Op. at 10531 (striking down a *cy pres* distribution which did not set forth "any limiting restriction on . . . recipients"); *Six Mexican Workers*, 904 F.2d at 1309 (striking down a *cy pres* distribution where the recipient was "not an organization with a substantial record of service nor [was] it limited in its choice of projects"). Failing this, the parties may consider escheating the excess funds to the United States Treasury—

which may be a very appropriate recipient in this case, given the significant role of the Justice Department in investigating and prosecuting antitrust violations.

Any renegotiation should supplemented by the inclusion of all information required for the Court to fairly judge the value of the settlement—information which remains vague in the instant proposal. In *Dennis*, the Ninth Circuit declared settlement terms "unacceptably vague and possibly misleading" where, among other things, the settlement failed to specify whether the defendant could or would use the *cy pres* distributions as tax deductions, and failed to disclose whether the defendant would use the *cy pres* distribution to offset its current obligations, if any, to the charitable recipients. *Dennis*, Ex. E, Slip Op. at 10542–43. The instant settlement is unacceptably vague for these same reasons. It is known that donations to Child's Play are tax-deductible,[21] and EA is known to have donated to Child's Play in the past.[22] Therefore, it is quite unclear whether the common fund of $27 million is accurately valued, or to what extent the settlement actually serves the purpose of restitutionary disgorgement and deterrence. *See Dennis*, Ex. E, Slip Op. at 10542–43. Thus, any renegotiated settlement's *cy pres* distribution should be bolstered by restrictions on accounting and disclosure of any existing, past, or contemplated charitable donations to the chosen *cy pres* recipient.

## V. CONCLUSION

The instant settlement fails to meet the Ninth Circuit's strict standards governing the use of *cy pres* distributions. While the charitable donee specified by the settlement agreement is an admirable organization, well-deserving of funds, it cannot provide the driving nexus with the Plaintiff class required by Ninth Circuit precedent. As such, the class would not benefit from this *cy pres* distribution. Given current estimates, which show that at least $12.2 million of the total $27 million settlement fund is likely to go towards the *cy pres* distribution, this result is unconscionable. Beyond the *cy pres* distribution's failure to meet Ninth Circuit precedent, the result here—where over 45% of the settlement fund will not benefit the class—reflects very poorly on the fairness and adequacy of the settlement under Rule 23(e). This settlement must therefore be renegotiated; failing that, the Court must reject it.

---

[21] *Frequently Asked Questions*, Ex. D.
[22] William Usher, *Penny Arcade Lets EA's Charity Slide But Not Retake Mass Effect 3*, Ex. F.

```
                                            Respectfully submitted,

DATED: December 10, 2012

                                            /s/ Karl Siganporia
                                            Karl Siganporia (CA Bar #284924)
                                            38 Miller Avenue, #263
                                            Mill Valley, CA 94941
                                            310-210-1824

                                            Attorney for Objector, Brett Gibbs
```

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 10, 2012, all individuals of record who are deemed to have consented to electronic service are being served a true and correct copy of the foregoing document using the Court's CM/ECF system.

                                                /s/ Karl Siganporia