Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile:  (866) 734-0622
stuart@smplegal.com

Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Class Counsel

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| GEOFFREY PECOVER and ANDREW OWENS, on behalf of themselves and a class of person similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ELECTRONIC ARTS INC., a Delaware Corporation,<br><br>Defendant. | No. 08-cv-02820 CW<br><br>NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT<br><br>Date:  February 7, 2013<br>Time: 2:00 p.m.<br>Dept:  Courtroom 2 - 4th Floor<br>Judge: Hon. Claudia Wilken<br><br>ACTION FILED: June 5, 2008 |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ........................................... 2

    A.    Summary of Plaintiffs' Claims ................................................................. 2

    B.    Procedural History .................................................................................... 3

    C.    Settlement Negotiations ............................................................................ 5

    D.    Overview of Settlement Terms ................................................................. 6

        1.    Financial Recovery ....................................................................... 6

        2.    Injunctive Relief ........................................................................... 7

        3.    Allocation ...................................................................................... 7

        4.    Dismissal and Releases ................................................................. 8

        5.    Participation Awards to Named Plaintiffs .................................... 8

        6.    Response by the Class ................................................................... 8

III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ................... 9

    A.    Standard of Review ................................................................................... 9

    B.    The Settlement Is the Non-Collusive Product of Extensive Arm's-Length
        Negotiations ............................................................................................ 11

    C.    For Purposes of Settlement Only, the Settlement Class Meets the
        Requirements of Rule 23 ........................................................................ 13

    D.    The Settlement Is Fair, Reasonable and Adequate ................................. 15

        1.    The Strength of Plaintiffs' Case and the Risk of Continued
            Litigation Supports Final Approval ............................................ 15

        2.    The Risk of Maintaining Class Action Status Through Trial ...... 17

        3.    The Relief Provided to the Class in the Settlement Is Substantial ................. 18

            a.    Twenty-Seven Million Dollars Provides Substantial
                Financial Relief to the Class ............................................. 18

            b.    The Injunctive Relief Will Allow Competitive Conditions
                to Return to the Alleged Interactive Football Video Game
                Market ................................................................................ 19

        4.    The Extent of Discovery and the State of the Proceedings ............................ 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5.   The Recommendations of Experienced Counsel Favor Approval of the Settlement ...................................................................................... 22

6.   The Reaction of the Class to the Proposed Settlement .................................... 23

E.   Notice to the Settlement Class Was Adequate and Satisfied Due Process ................. 23

IV.   CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Boyd v. Bechtel Corp.*,
  485 F. Supp. 610 (N.D. Cal. 1979) ....................................................................... 11

*Churchill Village L.L.C. v. Beckwith Place Ltd. P'ship*,
  361 F.3d 566 (9th Cir. 2004) ............................................................................... 15

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ........................................................................... 11, 23

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................... 18

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N.D. Cal. 1980) ..................................................................... 10, 11, 23

*Ferrington v. McAfee, Inc.*,
  2012 U.S. Dist. LEXIS 49160 (N.D. Cal. April 6, 2012)........................................ 12

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................................................. 15

*Harris v. Vector Mktg. Corp.*,
  2011 U.S. Dist. LEXIS 117927 (N.D. Cal. Oct. 12, 2011) ..................................... 12

*In re Bluetooth Headset Prods. Liability Litig.*,
  654 F.3d 935 (9th Cir. 2011) ............................................................. 11, 12, 13, 16

*In re Mfrs. Life Ins. Co. Premium Litig.*,
  1998 U.S. Dist. LEXIS 23217 (S.D. Cal. Dec. 21, 1998) ...................................... 23

*In re Warner Comm'cns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985) ...................................................................... 23

*Kirkorian v. Borelli*,
  695 F. Supp. 446 (N.D. Cal. 1988)....................................................................... 23

*Mazza v. American Honda Motor Co.*,
  666 F.3d 581, 590-94 (9th Cir. 2012)................................................................... 17

*Mba v. World Airways, Inc.*,
  369 Fed. Appx.194 (2d Cir. 2010) ....................................................................... 11

*Milstein v. Huck*,
  600 F. Supp. 254 (E.D.N.Y 1984)........................................................................ 23

*Molski v. Gleich,*
   318 F.3d 937 (9th Cir. 2003) ..................................................................10

*Nat'l Rural Telecomm. Coop. v. Direct TV, Inc.,*
   221 F.R.D. 523 (C.D. Cal. 2004)..................................................22, 23

*Pecover v. Electronic. Arts Inc.,*
   2010 U.S. Dist. LEXIS 140632 (N.D. Cal. Dec. 21, 2010).....................4

*Pecover v. Electronics Arts Inc.,*
   633 F. Supp. 2d 976 (N.D. Cal. 2009)....................................................20

*Rodriguez v. West Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009) ...........................................................23, 24

*Siber v. Mabon,*
   18 F.3d 1449 (9th Cir. 1994) ..................................................................24

*The Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco,*
   688 F.2d 615 (9th Cir. 1982) ......................................................9, 10, 11

*Torrisi v. Tuscon Elec. Power Co.,*
   8 F.3d 1370 (9th Cir. 1993) ....................................................................10

*United States v. McInnes,*
   556 F.2d 436 (9th Cir. 1977) ..................................................................16

*Util. Reform Project v. Bonneville Power Admin.,*
   869 F.2d 437 (9th Cir. 1989) ..................................................................10

*Van Bronkhorst v. Safeco Corp.,*
   529 F.2d 943 (9th Cir. 1976) ............................................................10, 16

*Wal-Mart Stores, Inc. v. Dukes,*
   _U.S._, 131 S.Ct. 2541 (2011) ...............................................................18

*Weinberger v. Kendrick,*
   698 F.2d 61 (2d Cir. 1982) .....................................................................11

**FEDERAL STATUTES**

Class Action Fairness Act, 28 U.S.C. §§ 1332(d) 1453, and 1711-1715 ....................25

Sherman Act, 15 U.S.C. § 2 .......................................................................3

**FEDERAL RULES**

Federal Rule of Civil Procedure 23 ...........................................................*passim*

1

## STATE STATUTES

2   Cal. Bus. & Prof. Code § 16720, *et seq.* ............................................................................ 3

3   Cal. Bus. & Prof. Code § 17200, *et seq.* ............................................................................ 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on February 7, 2013 at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Claudia Wilken, United States District Judge of the Northern District of California, located in Courtroom 2 - 4th Floor, 1301 Clay Street, Oakland, CA 94612, plaintiffs and class counsel will, and hereby do, move for the final approval of settlement.

This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities, the declarations in support of the motion, argument by counsel at the hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be presented at the hearing of this motion, and all papers and records on file in this matter.

**STATEMENT OF ISSUES**

1.    Whether, given the parties' agreement that the settlement class meets the requirements of Federal Rule of Civil Procedure 23 for purposes of settlement, the settlement class should be certified under Rule 23.

2.    Given plaintiffs' recovery of $27 million for the class of consumers who purchased Electronic Arts Inc.'s branded interactive football software, in the face of substantial risk, whether this Court should approve the settlement as fair, reasonable and adequate.

3.    Whether the robust notice campaign in this case, which included both direct and indirect notice to the class, was adequate under Federal Rule of Civil Procedure 23 and satisfies due process.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, class counsel submits this memorandum in support of plaintiffs' motion for final approval of the settlement of this litigation. The terms of the settlement are set forth in the Stipulation and Agreement of Class Action Settlement and Release pursuant to Fed. R. Civ. P. 23, filed on July 20, 2012 ("Settlement Agreement").[1] The settlement is the result of extensive, arm's length settlement negotiations, with two formal mediation sessions conducted by the Mr. Antonio Piazza of the firm Gregorio, Haldeman, Piazza & Rotman and Honorable Judge Layn R. Phillips. The settlement merits the approval of the Court.

For over four years, the parties have investigated, litigated and mediated their claims. Throughout these four years, the parties have repeatedly met to discuss the merits of their respective positions, with each side presenting evidence supporting or refuting the claims and defenses at issue in this case. From the outset, defendant adamantly denied any liability and challenged plaintiffs' ability to pursue class-wide relief. In response, class counsel made it clear that, while they were prepared to fairly assess the strengths and weaknesses of plaintiffs' case, they

---

[1]   ECF No. 375.

1   would continue to litigate absent a settlement that was fair and reasonable. In the end, the parties

2   agreed to a cash settlement of $27 million plus an injunction prohibiting Electronic Arts Inc.

3   ("Electronic Arts") from entering into an exclusive football license with the National Collegiate

4   Athletics Association ("NCAA") or its member institutions for a period of five years following the

5   2014 expiration of the current license. Class counsel believes the terms of the settlement are fair,

6   reasonable and in the best interests of the class.

7          Pursuant to the preliminary approval order, copies of the notice were directly e-mailed to

8   over 12 million class members.[2] Although the claims period is not over, 37,666 class members

9   have submitted claims.[3] In contrast, only fifty-six class members have requested exclusion from the

10  settlement and only nine class members have objected to the settlement.[4]

11         For all of the reasons discussed herein, it is respectfully submitted that the settlement is

12  eminently fair, reasonable, and adequate to the class and should be approved by the Court.

13                    **II.     FACTUAL AND PROCEDURAL BACKGROUND**

14  **A.     Summary of Plaintiffs' Claims**

15         Plaintiffs allege that starting in 2004, Electronic Arts faced significant competition from a

16  rival video game maker, Take-Two Interactive Software, Inc. ("Take-Two") for interactive football

17  software. Rather than compete on the quality of its games, plaintiffs allege that Electronic Arts

18  chose to enter into a series of exclusive agreements with licensors for the express purpose of

19  achieving a "licensing lockout." Plaintiffs further allege that this lockout allowed Electronic Arts to

20  effectively exclude competitors from the lucrative football video game market, permitting

21  Electronic Arts to maintain supra-competitive pricing on its league-branded interactive football

22

23

24

25         [2]   *See* Declaration of Tricia M. Solorzano on Behalf of Settlement Administrator Regarding
      Notice and Administration ("Solorzano Decl."),¶ 6, concurrently filed herewith.

26         [3]   *Id.*, ¶¶ 9-10.

27         [4]   All requests for exclusion are included in the chart attached as Exhibit A to the Declaration
      of Shana E. Scarlett in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement
28    ("Scarlett Decl."), filed concurrently herewith.

software.[5] As a result of the reduced competition, plaintiffs allege that Electronic Arts was able to charge, and plaintiffs were forced to pay, inflated prices for Electronic Arts' football video games.

Specifically, plaintiffs filed this action on June 2008, alleging that Electronic Arts' exclusive agreements with NFL Properties LLC ("NFL"), NFL Players Association ("NFLPA"), the Arena Football League ("AFL"), the NCAA, and the Collegiate Licensing Company ("CLC") unreasonably restrained trade and monopolized an alleged market for interactive football software, in violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*; California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and the federal Sherman Act, 15 U.S.C. § 2.[6] Through the course of discovery, plaintiffs also focused their claims on Electronic Arts' trademark license with ESPN, Inc.

The original complaint also contained claims for violations of various state antitrust and restraint of trade laws, as well as claims for violations of various state consumer protection and unfair competition laws – included in the event the Court did not apply California law to the nationwide class.[7] Plaintiffs' complaint sought injunctive relief, as well as restitution and/or damages to class members who purchased the league-branded interactive football software at prices allegedly inflated by Electronic Arts' ability to exclude competitors from the market.[8]

**B.      Procedural History**

From the start of the litigation, both parties vigorously litigated the claims in this case. The parties fully briefed Electronic Arts' motion to dismiss the claims,[9] and on June 5, 2009, Chief Judge Walker denied the motion as to the federal claims as well as the California and District of Columbia claims, but granted it as to the other state law claims.[10] Chief Judge Walker reasoned that although the named plaintiffs, who lived in California and the District of Columbia, had standing

---

[5]      First Amended Complaint, ¶¶ 9-18, 20-21, May 9, 2011, ECF No. 252.

[6]      *Id.*

[7]      Class Action Complaint, ¶¶ 49-92, June 5, 2008, ECF No. 1.

[8]      FAC at 8-9.

[9]      Defendant Electronic Arts Inc.'s Motion to Dismiss Class Action Complaint ("Motion to Dismiss"), Aug. 25, 2008, ECF No. 17.

[10]      Order, June 5, 2009, ECF No. 40.

1   under California's and the District of Columbia's state antitrust and consumer laws, they had

2   alleged no basis for standing to bring claims under the other state laws.

3       Approximately six months after the motion to dismiss was denied, plaintiffs filed their

4   motion to certify the class.[11] The parties filed extensive briefs and evidence relating to the motion

5   for class certification, including declarations from two economists, one industry expert, multiple

6   fact witnesses and thousands of pages of exhibits.[12] Chief Judge Walker certified a nationwide

7   class under Federal Rule of Civil Procedure 23(b)(3) consisting of "[a]ll persons in the United

8   States who purchased Electronic Arts' Madden NFL, NCAA or Arena Football League brand

9   interactive football software, excluding software for mobile devices . . . with a release date of

10   January 1, 2005 to the present."[13] In its petition to the Ninth Circuit for interlocutory appeal,

11   Electronic Arts noted that this decision was "the first—and only—decision to certify a nationwide

12   indirect purchaser class under one state's antitrust laws."[14] Plaintiffs' claims have been, from the

13   start of the class, only on behalf of indirect purchasers – the same class eventually settled between

14   the parties.[15]

15       The class certification records represented only a fraction of the extensive discovery

16   eventually conducted by the parties. In connection with their investigation into the allegations of

17   wrongdoing in the lawsuit, Electronic Arts produced, and Class counsel analyzed, approximately

18   1,987,345 pages of documents. Third parties produced an additional 227,325 pages of documents.

---

19      [11]   Notice of Motion and Motion for Class Certification ("Class Cert. Motion"), Nov. 9, 2009,

20   ECF No. 75 (Redacted Version, original filed under seal).

20      [12]   Declaration of Steve W. Berman in Support of Unopposed Motion for Preliminary

21   Approval of Class Action Settlement ("Berman Decl."), ¶ 2, ECF No. 377, July 20, 2012.

22      [13]   Order at 52, Dec. 21, 2010, ECF No. 198 ("Class Cert. Order").

23      [14]   Petition for Permission to Appeal the District Court's Order Granting Class Certification, at

23   2, Jan. 4, 2011, ECF No. 1-3, United States Court of Appeals for the Ninth Circuit.

24      [15]   *See Pecover v. Elec. Arts Inc.*, No C 08-2820, 2010 U.S. Dist. LEXIS 140632, at *2 (N.D.

25   Cal. Dec. 21, 2010) ("On June 5, 2008, plaintiffs, on behalf of a ***purported class of indirect***

25   ***purchasers of video games*** . . . ."); *id.*, at *24 n.2 ("***Excluded*** from plaintiffs' proposed class are

26   persons ***purchasing directly*** from Electronic Arts, persons purchasing used copies of the Relevant

26   Software and EA's employees, officers, directors, legal representatives and wholly or partly owned

26   subsidiaries or affiliated companies."); *id.*, at *64 ("Plaintiffs contend that EA's execution of the

27   three exclusive licenses at issue fundamentally changed industry dynamics and subsequently

27   resulted in class-wide damages in the form of higher wholesale prices ***passed through to indirect***

28   ***purchasers***."). (Emphasis added unless otherwise noted.)

Class counsel made additional inquiry as to pertinent facts, including through depositions and consultations with experts and consultants.[16] Indeed, the parties have conducted twenty-five depositions of fact and expert witnesses.[17]

Plaintiffs served twenty-nine interrogatories and thirty requests for production of documents upon Electronic Arts, reviewed and analyzed Electronic Arts' responses to those interrogatories and requests, responded to approximately 1,295 requests for admission, took twenty-two depositions, and altogether reviewed and analyzed over two million pages of documents produced in this lawsuit.[18] Moreover, plaintiffs were served with and responded to twenty-three interrogatories and twenty-eight requests for production of documents, and defended three depositions.[19] The parties also engaged experts and developed expert testimony and reports in support of their relative positions, producing four lengthy reports involving economic analyses of the parties' claims and defenses, including the relevant market definition, the effects of Electronic Arts' exclusive licenses on the price of video games in the alleged market, and the extent of damages the plaintiffs would seek to prove at trial.[20]

## C.    Settlement Negotiations

The efforts to settle this case have involved extensive informal discussions between the parties as well as two mediations. The first mediation occurred on July 15, 2011 before Mr. Antonio Piazza of the firm Gregorio, Haldeman, Piazza & Rotman.[21] At the time, Electronic Arts' motion to dismiss had been denied, the class had been certified, and the parties were in the midst of discovery. The parties could not come to agreement, and no issues were resolved.[22]

---

[16]    Berman Decl., ¶ 2.

[17]    *Id.*

[18]    *Id.*

[19]    *Id.*

[20]    *Id.* at ¶ 3.

[21]    *Id.* at ¶ 4.

[22]    *Id.*

1    Between the first and second mediations, the parties continued to discuss settlement

2 options, exchanging correspondence in early 2012 on the topic.[23]

3    Then, on May 4, 2012, the parties participated in mediation before former U.S. District

4 Court Judge Layn R. Phillips.[24] The mediation, like the settlement discussions before it, was

5 conducted at arms' length, but this time the mediation resulted in the settlement agreement

6 described below.[25] The length of the case and the settlement negotiations is reflective of the

7 zealous advocacy of both sides on behalf of their clients, and of plaintiffs' efforts to reach an

8 agreement that they believe to be fair, adequate, reasonable, and in the best interests of the class –

9 an agreement they believe they have come to with the proposed settlement described below.

10  **D.    Overview of Settlement Terms**

11      **1.    Financial Recovery**

12    As consideration for the settlement, defendant has agreed to pay $27 million into a

13 settlement fund.[26] This amount represents the total amount that Electronic Arts will pay, and

14 includes all payments to class members, any attorneys' fees and costs, costs of class administration,

15 and potential participation awards to the named plaintiffs.[27]

16    There is no reversion allowed under the Settlement Agreement unless the settlement does

17 not become final; the settlement funds, after costs and fees, will first be distributed to the class

18 members.[28] In the event that funds remain after distribution to class members, the Settlement

19 Agreement provides for these funds to be distributed by means of a *cy pres* payment to Child's

20 Play, a 501(c)(3) entity, in the amount that will exhaust the net settlement fund.[29]

21

22

23 _____

[23]  *Id.* at ¶ 5.

24  [24]  *Id.* at ¶ 6.

25  [25]  *Id.*

26  [26]  Settlement Agreement at 11-12, ¶ 8.

[27]  *Id.*

27  [28]  *Id.*

28  [29]  *Id.* at 15, ¶ 14(c).

## 2.     Injunctive Relief

The terms of the settlement provide substantial injunctive relief in the form of an agreement by Electronic Arts to refrain from renewing or otherwise entering into an exclusive trademark license with the AFL for five years from the final date of approval of the proposed settlement. Moreover, Electronic Arts agrees not to renew its current collegiate football trademark license with the CLC on an exclusive basis after that license expires in 2014, or seek any new exclusive trademark license regarding football video games with the NCAA, the CLC, or any NCAA-member institution covered by the current exclusive football license for a period of five years thereafter.[30]

## 3.     Allocation

Payments will be made to the settlement class members out of the net settlement fund  (the amount available after deducting payment of the costs of administering the settlement, including the costs of notice, attorneys' fees, costs of the litigation, and any payments allowed by the Court to the named plaintiffs).[31] Payments will differ depending on the type of video game title purchased. Settlement class members will (upon filing a valid and timely Claim Form) be entitled to a cash payment of up to $6.79 per sixth generation title purchased, up to a maximum of eight units ($54.32).[32] Settlement class members will be entitled (upon filing a valid and timely Claim Form) to a cash settlement payment of up to $1.95 per seventh generation title purchased, up to a maximum of eight units ($15.60).[33] If the timely and valid claims exceed the net settlement fund, the claims will be reduced *pro rata* so that all claims may be paid from the net settlement fund.[34]

---

[30]     Settlement Agreement at ¶ 15.

[31]     *Id.* at 14-15, ¶ 14.

[32]     *Id.* at 14-15, ¶ 14(a). Sixth generation title means a unit of the following video game titles sold new in the United States, for play on the video game platforms identified, between January 1, 2005 and June 21, 2012: any *Madden NFL*, *NCAA Football* or *Arena Football* video game released for play on the Xbox, PlayStation 2, PC, or GameCube platforms. *Id.*

[33]     Berman Decl., Ex. A, 14-15, ¶ 14(a). Seventh generation title means a unit of the following video game titles sold new in the United States, for play on the video game platforms identified, between January 1, 2005 and June 21, 2012: any *Madden NFL*, *NCAA Football* or *Arena Football* video game released for play on the Xbox 360, PlayStation 3, or Wii platforms. *Id.*

[34]     *Id.*

1    In the event the net settlement fund is not exhausted by timely and valid claims paid, the

2    parties will attempt in good faith to identify sixth generation purchasers who have provided

3    Electronic Arts with a physical address but have not submitted a claim, and send payments to such

4    individuals – without the necessity of a claims form – in an amount that equals the average claim

5    paid to sixth generation purchasers who did file a claim.[35]

6    **4.    Dismissal and Releases**

7    In exchange for the above consideration, members of the Settlement Class will release all

8    "Released Claims" relating to or arising from the allegations in this action, including any

9    allegations that customers were overcharged for interactive football video games because of

10    Electronic Arts' exclusive licensing agreements with the NFL, the NFLPA, the AFL, the CLC, the

11    NCAA, and/or ESPN.[36] In light of the ongoing relationship between Electronic Arts and class

12    members, Electronic Arts has expressly agreed not to insist on a general release of liability.

13    **5.    Participation Awards to Named Plaintiffs**

14    Plaintiffs requested, and defendant has agreed not to oppose, a participation award to each

15    of the named plaintiffs in the amount of $5,000. The two named plaintiffs have actively

16    participated in this action, including being in contact with class counsel during the litigation,

17    participating in responding to written discovery and producing documents, and sitting for

18    deposition. In addition, each of the named plaintiffs has reviewed and approved the terms of the

19    settlement and submits a declaration in support of final approval attesting to their support of the

20    settlement and their active involvement in this litigation.[37]

21    **6.    Response by the Class**

22    In October 2012, pursuant to this Court's preliminary approval order, direct notice was sent

23    to over 12 million class members through both e-mail and U.S. mail.[38] In addition, a robust online

---

[35]  *Id.* at 15, ¶ 14(b).

[36]  *Id.* at 8, ¶ 1(aa).

[37]  *See* Declaration of Geoffrey Pecover in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement, and Declaration of Andrew Owens in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement, filed concurrently herewith.

[38]  Solorzano Decl., ¶¶ 6-7.

campaign was undertaken, in addition to a website devoted entirely to the settlement of this action.[39] In mid-October 2012, summary notice was published in the USA Today.[40]

The deadline for objections and exclusions was December 10, 2012. As of the filing of this motion, fifty-six class members requested exclusion from the class. Plaintiffs have also received nine objections to the settlement (and two late objections, filed 14 days after the objection deadline which do nothing more than join in other, timely, objections).

Although the claims period does not end until March 5, 2013, a brief review of the claims rate to date and a projected value of the per unit claim demonstrates the success of this settlement. As of January 3, 2013, 37,666 class members had submitted claims to the settlement.[41] After the close of the claims period in March 2013, an additional round of distribution will take place for sixth generation purchasers. The proposed distribution in this case ensures that class members will received 100 percent of damages, under plaintiffs' economists' damages model. Dr. Jeffrey Leitzinger calculated class members' damages in the following amounts, depending on the generation of video game console purchased by the class member:[42]

| Overcharge | 6th Gen | 7th Gen |
|---|---|---|
| **Average Percent Overcharge** | 16.5% | 3.6% |
| **Average Per-Unit Overcharge** | $6.79 | $1.95 |

One hundred percent recovery is fair, reasonable and adequate, meriting final approval of this settlement.

### III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.    Standard of Review

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the

---

[39]  *See id.*, ¶¶ 4-5.

[40]  *Id.*, ¶ 3.

[41]  Solorzano Decl., ¶¶ 9-10.

[42]  Declaration of Shana E. Scarlett in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses and Participation Awards ("Scarlett Decl. in Support of Attorneys' Fees"), ¶¶ 18-19, ECF No. 390, Nov. 26, 2012.

1   preferred means of dispute resolution."[43] Class action suits readily lend themselves to compromise

2   because of the difficulties of proof, the uncertainties of the outcome and the typical length of the

3   litigation. It is beyond question that "there is an overriding public interest in settling and quieting

4   litigation," and this is "particularly true in class action suits."[44] In deciding whether to approve the

5   settlement of a class action under Federal Rule of Civil Procedure 23(e), the Court must find that

6   the proposed settlement is "fair, adequate and reasonable." The Ninth Circuit has set forth factors

7   which may be considered in evaluating the fairness of a class action settlement:

8           The district court's ultimate determination will necessarily involve a
    balancing of several factors which may include, among others, some

9           or all of the following: the strength of plaintiffs' case; the risk,
    expense, complexity, and likely duration of further litigation; the risk

10          of maintaining class action status throughout the trial; the amount
    offered in settlement; the extent of discovery completed, and the

11          stage of the proceedings; the experience and views of counsel; the
    presence of a governmental participant; and the reaction of the class

12          members to the proposed settlement.[45]

13  The importance of any one of these factors "will depend upon and be dictated by the nature of the

14  claims advanced, the types of relief sought, and the unique facts and circumstances presented by

15  each individual case."[46]

16       The district court exercises its "sound discretion" in approving a settlement.[47] In exercising

17  its discretion, "the court's intrusion upon what is otherwise a private consensual agreement

18  negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a

19  reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion

20  between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and

21

22       43   *The Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco*,
23  688 F.2d 615, 625 (9th Cir. 1982). All internal citations and quotations omitted, unless otherwise indicated.

24       44   *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976); *see also Util. Reform
25  Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989).

26       45   *Officers for Justice*, 688 F.2d at 625; *accord Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).

         46   *Officers for Justice*, 688 F.2d at 625.

27       47   *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939
28  (9th Cir. 1981); *Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

adequate to all concerned."[48] The Ninth Circuit defines the limits of the inquiry to be made by the court in the following manner:

> [T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators.[49]

As outlined below, applying these criteria demonstrates that this settlement warrants the Court's approval.

Moreover, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness."[50] Here, it is the considered judgment of experienced counsel after extensive hard-fought settlement negotiations that the settlement is a very good result for the class and should be approved.

In sum, the Court is now asked to ascertain whether the settlement is within a range that responsible and experienced attorneys could accept, considering all relevant risk factors of litigation.[51] This range recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion. Here, the proposed settlement falls well within this range of reasonableness.

**B.      The Settlement Is the Non-Collusive Product of Extensive Arm's-Length Negotiations**

Experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses, negotiated this settlement at arm's length.[52] The parties reached this agreement only after over four years of litigation,

---

[48]   *Officers for Justice*, 688 F.2d at 625.

[49]   *Id.* (Emphasis in original.)

[50]   *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979); *Ellis*, 87 F.R.D. at 18 ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

[51]   *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974), *abrogated on other grounds*, *Mba v. World Airways, Inc.*, 369 Fed. Appx.194 (2d Cir. 2010).

[52]   Scarlett Decl. in Support of Attorneys' Fees, ¶ 22; Berman Decl., ¶¶ 4-7.

discovery and investigation, two formal mediations, and multiple conferrals of counsel concerning

settlement constructs and amounts. The mediations were run by neutral mediators, which is a factor

in favor of a finding of non-collusiveness,[53] one of whom is also a retired judge (the Honorable

U.S. District Court Judge Layn R. Phillips). This prolonged process reflects the vigor with which

both sides represented their interests, including those of the class as whole.

In addition, the settlement itself, taken as a whole, bears no signs of collusion or conflict. In

*Bluetooth*, the Ninth Circuit recently explained that courts must, at the final approval stage, ensure

that the settlement taken as a whole is free of collusion or any indication that the pursuit of the

interests of the class counsel or the named plaintiffs "infected" the negotiations.[54] The Ninth

Circuit outlined three factors that were particularly troubling as signs of a potential disregard for

the class' interests during the course of negotiation:

> 1)     when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> 2)     when the parties negotiate a "clear sailing" arrangement providing for payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> 3)     when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.[55]

District courts applying *Bluetooth* have refused to approve settlements where the class counsel's

compensation exceeds that of the class or far outstrips the benchmark, where the final payout to the

class is limited by opt-in procedures while the class counsel's recovery is unaffected, and where

undistributed or unawarded funds revert to defendant.[56] In those cases, courts have found that the

---

[53]     *See In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 948 (9th Cir. 2011).

[54]     *Id.* at 946-48.

[55]     *Id.* at 947.

[56]     *See, e.g., Ferrington v. McAfee, Inc.*, No. 10-CV-01455, 2012 U.S. Dist. LEXIS 49160, at *36 (N.D. Cal. April 6, 2012) (claim-in class where low participation rate yielded an actual payout of $67,825, compared to attorneys' fees of $350,000); *Harris v. Vector Mktg. Corp.*, No. C-08-5198, 2011 U.S. Dist. LEXIS 117927, at *6, *17 (N.D. Cal. Oct. 12, 2011) (settlement provided for $4 million dollar award to class counsel, but required class members to claim in with unclaimed

interests of counsel were no longer coincident with the interests of the class, and therefore approval was not warranted.

Here, none of those signs are present. *First,* the proposed settlement here is a common fund, all-in settlement with no possibility of reversion. The entire fund will be used to cover costs and fees and compensate class members based on set amounts. In the event that some funds cannot be distributed, they do not revert to defendant, but are to be distributed to a *cy pres* entity.

*Second*, while defendant agreed not to object to a request for attorneys' fees within certain limits, there is no provision for a payment of fees separate and apart from the class funds; to the contrary, plaintiffs' counsel have applied for fees of twenty-seven percent of the settlement – only slightly above the Ninth Circuit benchmark of twenty-five percent.[57] The settlement directs the benefit of Electronic Arts' "overall willingness to pay" to the class as a whole, in the form a comprehensive $27 million settlement fund, and only allows plaintiffs' counsel the opportunity to apply for a portion of those funds as fees and costs.[58]

*Third,* the settlement is non-reversionary – no monies will revert to Electronic Arts. If any portion of the fee request is not approved by this Court, the money will revert to the class. In short, the settlement was negotiated at arm's length, and the terms so reflect. None of the hallmarks of collusion are present, as warned by the Ninth Circuit in *Bluetooth*.

**C.     For Purposes of Settlement Only, the Settlement Class Meets the Requirements of Rule 23**

The Court has already conditionally certified the settlement class and appointed the class representatives and class counsel to represent the settlement class members.[59] As set forth in plaintiffs' motion for preliminary approval, the settlement class satisfies the requirements of class certification set forth in Rule 23(a) and Rule 23(b)(3).

---

funds reverting to defendant, and the actual payout to the class was only $999,138 due to the low claims rate).

[57]     *See* Plaintiffs' Notice of Motion and Motion for Attorneys' Fees, Expenses and Participation Awards, Nov. 26, 2012, ECF No. 389.

[58]     *See Bluetooth*, 654 F.3d at 948-49.

[59]     *See* Order Granting Class Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ("Prelim. App. Order") at 2, Oct. 5, 2012, ECF No. 385.

1    The settlement class satisfies the Rule 23(a) prerequisites of numerosity, commonality,

2    typicality, and adequacy for purposes of settlement. It is undisputed that millions of people in the

3    United States purchased Electronic Arts' interactive football software, thus readily satisfying the

4    numerosity requirement.[60]

5    Commonality is satisfied because the claims of plaintiffs and the settlement class members

6    each seek to demonstrate that they purchased the league-branded interactive football software at

7    prices inflated by Electronic Arts' alleged ability to exclude competitors from the market, and that

8    these prices were the product of unfair business practices under the California's Cartwright Act and

9    Unfair Competition Law, as well as the federal Sherman Act. This presents a common question to

10   all class members.

11   Plaintiffs contend, and defendant does not oppose for purposes of settlement, that the

12   typicality requirements is met because the claims of the named plaintiffs and the settlement class

13   members are all based primarily on the same alleged core facts and underlying legal theories:

14   defendant's use of exclusive licensing agreements to allegedly restrain trade and monopolize an

15   alleged market for interactive football software in violation of state and federal consumer

16   protection laws.

17   In addition, plaintiffs contend, and defendant does not oppose for purposes of settlement,

18   that the named plaintiffs are adequate to represent the settlement class, and that there is no conflict

19   between the named plaintiffs' interests and those of the settlement class. Finally, with respect to

20   Rule 23(a), class counsel Hagens Berman Sobol Shapiro LLP and the Paynter Law Firm PLLC are

21   indisputably qualified and experienced in class action litigation, as the Court found at class

22   certification and at the preliminary approval stage.[61]

23   Plaintiffs contend, and defendant does not dispute for purposes of settlement, that the

24   settlement class also satisfies the requirements for certification under Rule 23(b)(3) that common

25   [60]   *See* Solorzano Decl., ¶¶ 6-7.

26   [61]   *See* Prelim. App. Order at 2; Unopposed  Notice of Motion and Motion for Preliminary
     Approval of Class Action Settlement ("Mot. for Prelim. App.") at 2, July 20, 2012, ECF No. 376;
27   Scarlett Decl. in Support of Attorneys' Fees, ¶¶ 28-31; Declaration of Stuart Paynter in Support of
     Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards, at ¶¶ 3-
28   9, Nov. 26, 2012, ECF No. 391.

1    questions predominate because many of the same alleged operative facts and legal issues apply to

2    all of the settlement class members' claims. Each class member purchased Electronic Arts'

3    *Madden NFL, NCAA Football* or *Arena Football League* brand interactive football software at least

4    one time. Plaintiffs contend that the allegedly supra-competitive price each class member paid for

5    this software was the result of Electronic Arts' alleged "licensing lockout" that excluded

6    competitors from the football video game market, in violation of state and federal consumer laws.

7    And, given the small size of the overcharges at issue ($1.95 and $6.79), a class action is the

8    superior method of adjudicating these claims.

9         Accordingly, plaintiffs respectfully request that the Court grant final approval of

10   certification of the settlement classes.

11   **D.    The Settlement Is Fair, Reasonable and Adequate**

12        In evaluating the fairness, reasonableness and adequacy of a class action settlement, courts

13   consider and balance a number of factors under Rule 23, including: (1) the strength of plaintiffs'

14   case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of

15   maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the

16   extent of discovery completed and the stage of the proceedings; (6) the experience and views of

17   counsel; and (7) the reaction of the class to the proposed settlement.[62]

18        The Court has already initially considered all the relevant factors in deciding to grant

19   preliminary approval of the settlement (with the exception of the reaction of class members), and

20   found that the settlement falls within the range of reasonableness meriting possible final approval.[63]

21   As outlined in the motion for preliminary approval, each of these factors supports final approval of

22   settlement here.

23        **1.    The Strength of Plaintiffs' Case and the Risk of Continued Litigation Supports
                  Final Approval**

24

25        The strengths and weaknesses of plaintiffs' case, as well as the risk, expense, complexity

26   and likely duration of further litigation, all weigh in favor of approval of the settlement. This case,

27   [62]   *See Churchill Village L.L.C. v. Beckwith Place Ltd. P'ship*, 361 F.3d 566, 575-76 (9th Cir. 2004); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

28   [63]   *See* Prelim. App. Order at 1.

1   like every class action, involves uncertainty on the merits. The parties' settlement resolves that

2   inherent uncertainty; for this reason, settlements are thus strongly favored by the courts,

3   particularly in class actions such as this one.[64]

4          This action is not unique in this regard – the parties disagree about every material aspect of

5   the merits, including but not limited to, whether plaintiffs' claims can be litigated as a nationwide

6   class action; whether plaintiffs properly defined the relevant market with respect to their antitrust

7   claims; and the amount – and even the existence – of damages. A number of issues made the

8   continued litigation of this action a risk.

9          **Antitrust Claims**: Some amount of uncertainty existed regarding whether this Court (and

10  subsequent appellate courts) would agree with a key element of plaintiffs' antitrust claims: the

11  definition of the "relevant market." Plaintiffs would be required to undergo time consuming and

12  costly efforts to delineate the relevant market as limited to "league-branded, interactive football

13  video games." Electronic Arts claims that plaintiffs' characterization of the market does not reflect

14  the reality of the video game industry, and that instead the "relevant market" is much broader and

15  intensely competitive. There is some risk that Electronic Arts could prevail on a challenge to

16  plaintiffs' narrow market definition, undercutting plaintiff's entire theory of liability.[65]

17         **Liability:** Some amount of uncertainty existed regarding whether this Court or the jury

18  would agree that Electronic Arts was the driving force behind the exclusive licenses at the heart of

19  the litigation. Although plaintiffs believe there is evidence to support this contention, Electronic

20  Arts argues that the record shows that it was in fact the licensors – and specifically the NFL – who

21  drove the adoption of the exclusive licensing agreements in order to maximize the value of the

22  licensors' intellectual property rights. There is always the risk that the Court or a jury will credit

23  Electronic Arts' version over plaintiffs' version of events.[66]

24

25

26  _____
    [64]   *See Van Bronkhorst*, 529 F.2d at 950; *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977).

27  [65]   Scarlett Decl. in Support of Attorneys' Fees, ¶ 25.

28  [66]   *Id.*, ¶ 27.

**Damages:** Some amount of uncertainty existed regarding whether plaintiffs would prevail on two damages related-contentions. *First*, there is the risk that the Court or the jury would disagree that class members should be compensated for seventh generation purchases, where the provable overcharge, according to plaintiffs' economic expert, was significantly less than the provable overcharge for sixth generation purchases. According to Electronic Arts' economic and industry experts, seventh generation games conform to industry standardized launch pricing and are discounted in $10 increments as the games age, which – according to Electronic Arts – shows that an alleged $1.95 overcharge is contrary to real world pricing dynamics.  Consequently, the risk of proceeding includes the possibility that class members would receive nothing for seventh generation purchases.

*Second*, Electronic Arts has challenged the basic premise of the alleged antitrust violation – that there is any proof that it charged above-market prices for its football video games. In particular, Electronic Arts maintains that third party pricing data shows that (a) Electronic Arts has never charged more than the industry standard launch prices for the titles at issue, and (b) the overwhelming majority of games in this industry, are sold at or around launch at those standard prices. While plaintiffs contend that expert analysis shows that the class was damaged by paying higher prices than they would have absent the exclusive agreements, there is the risk that the Court or the jury will disagree, effectively eliminating any damages for the class.[67]

Each of these issues presented substantial risk to the class. Given these risks, there is no doubt that continued litigation would be expensive, complex, and time consuming**.** This factor should weigh heavily in favor of approving the settlement.

### 2.     The Risk of Maintaining Class Action Status Through Trial

Plaintiffs faced a number of risks regarding the maintenance of a class action in this litigation. Although a nationwide class was already certified under California law, in the time since certification, the Ninth Circuit issued its opinion in *Mazza v. American Honda Motor Co.*, in which the court held that, under the facts in that case, California's consumer protection and unjust

---

[67]   *Id.*, ¶ 26.

1   enrichment laws could not be applied to a nationwide class.[68] Electronic Arts has said that if the

2   litigation were to proceed, it intended to file a motion to decertify the class in part on the basis of

3   *Mazza*'s holding.[69]

4           An additional basis for Electronic Arts' decertification motion will be the Supreme Court's

5   decision in *Wal-Mart Stores, Inc. v. Dukes*,[70] and the Ninth Circuit's subsequent decision in *Ellis v.*

6   *Costco Wholesale Corp.*,[71] in which those courts held that a district court judge is required, on a

7   class certification motion, to "resolve any factual disputes necessary to determine" whether the

8   requirements of Rule 23 have been met.[72] Electronic Arts contended that these cases undermined

9   Chief Judge Walker's certification decision in this case because Judge Walker certified the class

10  based on plaintiffs' expert's "conceivable" theory of common impact, rather than engaging in a full

11  "battle of the experts" on the issue.[73]

12          These cases pose significant risk that the Court could decide to decertify the class if the

13  litigation continues. And, because of the small size of their individual claims, such a ruling could

14  foreclose recovery completely for most – if not all – class members. The risk faced by the class that

15  any recovery would need to be sought on an individualized basis further supports final approval of

16  the settlement.

17          **3.      The Relief Provided to the Class in the Settlement Is Substantial**

18                  **a.      Twenty-Seven Million Dollars Provides Substantial Financial Relief to
                            the Class**

19

20          The financial relief available here to the class is substantial. Electronic Arts has agreed to

21  pay $27 million into a settlement fund.[74] This represents the total amount that Electronic Arts will

22  pay, and includes all payments to class members, any attorneys' fees and costs, costs of class

---

23      [68]   666 F.3d 581, 590-94 (9th Cir. 2012).

24      [69]   Scarlett Decl. in Support of Attorneys' Fees, ¶ 23.

25      [70]   _U.S._, 131 S.Ct. 2541 (2011).

26      [71]   657 F.3d 970 (9th Cir. 2011).

        [72]   *Id.* at 982-83.

27      [73]   Class Cert. Order at 5, 48-49; Scarlett Decl. in Support of Attorneys' Fees, ¶ 24.

28      [74]   Settlement Agreement at 11-12, ¶ 8.

administration, and potential participation awards to the named plaintiffs.[75] There is no reversion allowed under the Settlement Agreement unless the settlement does not become final; the full amount of the settlement, after costs and fees, will be distributed to class members.[76] In the event that funds cannot be distributed to class members after two rounds of distribution, or checks remain uncashed after six months of mailing, the Settlement Agreement provides for the funds to be distributed to the mutually acceptable *cy pres* entity, Child's Play.[77]

Each class member who files a valid claim is entitled to a payment of up to $6.79 for each sixth generation title, up to a maximum of eight units ($54.32), and $1.95 for each seventh generation title, up to a maximum of eight units ($15.60) – these amounts represent 100 percent of the damages on a per unit basis, as calculated by plaintiffs' damages expert.[78] If the claims filed exceed the settlement fund, the payments shall be reduced on a *pro rata* basis so that all claims may be paid out of the net proceeds of the settlement (the amount available after deducting payment of the costs of administering the settlement, including the costs of notice, attorneys' fees, costs of litigation, and any payments allowed by the Court to the named plaintiffs).[79]

If the settlement fund is not exhausted by the claims filed, the parties will initiate a second distribution, attempting in good faith to identify class members (i) who purchased sixth generation titles; and (ii) have not submitted a claim. These individuals will be sent payment in an amount that equals the average claim paid to a sixth generation purchaser.[80] All in all, class members – even some who fail to file a claim – will receive a substantial recovery.

**b.    The Injunctive Relief Will Allow Competitive Conditions to Return to the Alleged Interactive Football Video Game Market**

Electronic Arts has also agreed to a substantial equitable relief as part of the settlement. Electronic Arts has agreed not to renew its football trademark license with the CLC on an exclusive

---

[75]    *Id.*

[76]    *Id.*

[77]    *Id.* at 15, ¶14.

[78]    *Id.*; Scarlett Decl. in Support of Attorneys' Fees, ¶ 19.

[79]    Settlement Agreement at 15, ¶14.

[80]    *Id.*

1    basis after that license expires in 2014, or seek any new exclusive trademark license regarding

2    football video games with the NCAA, the CLC or any NCAA-member institution covered by the

3    current exclusive license for a period of five years thereafter.[81] Electronic Arts has also agreed not

4    to enter into an exclusive license with the AFL for a period of five years after final approval of this

5    settlement.

6           Plaintiffs believe the agreement to forgo licenses in two of the three football leagues here

7    represents a significant amount of injunctive relief and will allow competitive conditions to once

8    again reign in the interactive football video game market. It was this concession, along with other

9    unique details of the existing exclusive licenses with the NFL which allowed plaintiffs to settle this

10   litigation. The injunctive portion of this settlement provides relief in several meaningful ways.

11          The premise underlying plaintiffs' claims and the premise underlying this Court's June 5,

12   2009, denial of Electronic Arts' motion to dismiss was not that each individual exclusive license

13   agreement violated the antitrust laws but that the web of exclusive agreements taken as a whole

14   violated the antitrust laws.[82] By forbidding EA from entering into an exclusive with the AFL or

15   renewing its exclusive with the NCAA, the settlement unravels this alleged web of exclusives.

16   Even one of the objectors concedes that this injunctive relief "represents a significant victory for

17   the class."[83]

18          This relief to class members is being afforded as soon as possible given software

19   development cycles. Electronic Arts has agreed not to renew its exclusive license with the CLC (or

20   its NCAA member institutions) beginning in 2014. It takes months – if not years – to develop the

21   software for video games given the ever increasing complexity of developing graphics and physics

22   engines, acquiring and tuning motion capture and animation data for player avatars, and modeling

23   player avatar appearances using sophisticated shading and lighting techniques. Thus, the cessation

24

25          [81]   Settlement Agreement at ¶ 15.

26          [82]   First Amended Complaint, ¶ 12. *Cf. Pecover v. Electronics Arts Inc.*, 633 F. Supp. 2d 976,
       984 (N.D. Cal. 2009) (focusing on the "aggregation of multiple exclusive agreements to choke off
       competition").

27          [83]   Brett Gibb's Objection to Class Action Settlement and Notice of Intent to Appear  at 1,
28     Dec. 10, 2012, ECF No. 401.

of exclusivity in collegiate football video games in 2014 (less than a year away at this point) will allow market entrants the time to develop new games. An immediate termination of the exclusive license will not provide any more immediate benefit to class members, given the lengthy cycle to develop and test video game software.

Finally, although the settlement does not disturb the terms of the license between Electronic Arts and the NFL, the passage of time and the specific provisions of this license will serve to introduce competition into professional football video games. The current license between the NFL and Electronic Arts states that any football games on (i) the Internet; (ii) table devices (including the iPad); or (iii) social media platforms (such as Facebook), are **non-exclusive**.[84] These platforms are playing an increasing role in the video game industry, providing the opportunity for competition in the professional football video game area.[85]

### 4. The Extent of Discovery and the State of the Proceedings

The stage of the proceedings and the experience and views of counsel also weigh in favor of approving the settlement. The case has been pending for four years. A large amount of discovery has proceeded over the course of nearly three years. Between them, the parties have produced and reviewed, and catalogued approximately 2,000,000 pages of documents. Third parties produced an additional 227,325 pages of documents. Plaintiffs served twenty-nine interrogatories and thirty requests for production of documents upon Electronic Arts, reviewed and analyzed Electronic Arts' responses to those interrogatories and requests, responded to approximately 1,295 requests for admission, and took twenty-two depositions.[86] Moreover, plaintiffs were served with and

---

[84]   *See* Scarlett Decl., Ex. B.

[85]   *See, e.g.*, Scarlett Decl., Ex. C (Oct. 2012 Interview of Electronic Arts' Chief Operating Officer discussing the increasing importance of the tablet as a gaming platform: "I think there's an evolution that will go on where at some point we'll get to the next generation of console hardware, but more and more we're seeing huge opportunities here on smartphones and tablets. I'm very interested to see where the tablet market goes now, with my former employer Microsoft at some point ready to talk about Surface, and you know you've got to believe that they'll try and tie Windows 8 to that. And then even smartphones — we're seeing the Galaxy chase after the iPhone. Kindle Fire, developing games on the HD Kindle Fire. All of these devices are creating games as a service. To your point, that's where we see these things. Less of a thing you buy, more of a place you go.").

[86]   Scarlett Decl. in Support of Attorneys' Fees, ¶ 6.

1    responded to twenty-three interrogatories and twenty-eight requests for production of documents,

2    and defended three depositions.[87]

3           Extensive briefing also occurred in this action. The parties fully briefed Electronic Arts'

4    motion to dismiss[88] and plaintiffs' motion for class certification.[89] In addition to the extensive

5    briefing, the parties filed voluminous evidence related to the motion for class certification,

6    including declarations from two economists, one industry expert, multiple fact witnesses, and

7    thousands of pages of exhibits.[90] After a class was certified, and in preparation for trial, the parties

8    exchanged hundreds of additional pages of merits expert reports, including multiple reports from

9    three economists and two industry experts regarding the relevant market definition, the effects of

10   Electronic Arts' exclusive licenses on the price of video games in the alleged market, and the

11   extent of damages the plaintiffs would seek to prove at trial.[91] The well-developed state of these

12   proceedings supports approval of this settlement, given that both parties were well-educated on

13   both the claims and defenses available in this action.

14          **5.      The Recommendations of Experienced Counsel Favor Approval of the
                      Settlement**

15          "Great weight is accorded to the recommendations of counsel, who are most closely

16   acquainted with the facts of the underlying litigation."[92] Here, experienced and capable class

17   counsel who are actively involved in complex federal civil litigation have weighed all of the above

18   factors and have concluded that the settlement is a favorable result which is in the best interests of

19   the class.[93] Where, as here, the settlement is the product of serious, informed and non-collusive

20

21

22

23   ─────────────────

     [87]   *Id.*

24   [88]   *See* Defendant Electronic Arts' Motion to Dismiss.

25   [89]   *See* Class Cert. Motion.

     [90]   Scarlett Decl. in Support of Attorneys' Fees, ¶¶ 2-3, 12, 15.

26   [91]   *Id.*, ¶ 6

27   [92]   *Nat'l Rural Telecomm. Coop. v. Direct TV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).

28   [93]   Berman Decl., ¶ 7.

1    negotiations, "the trial judge . . . should be hesitant to substitute its own judgment for that of

2    counsel."[94]

3        **6.      The Reaction of the Class to the Proposed Settlement**

4        Finally, the overwhelmingly positive reaction of the class to the proposed settlement, the

5    only relevant factor not considered by the Court in granting the preliminary approval of settlement,

6    further weighs heavily in favor of the final approval of settlement. As demonstrated by the sworn

7    declaration of Tricia M. Solorzano of Gilardi & Co. LLC, the settlement class has now been

8    provided with notice of the settlement.[95] Only a *de minimis* number have objected or sought

9    exclusion; in contrast, approximately 37,666 class members have submitted claims to date.[96] The

10   claims period does not close until March 5, 2013, and more claims are anticipated, in addition to a

11   second round of distribution. The positive reaction of the class is an important factor in evaluating

12   the fairness, reasonableness and adequacy of the settlement and supports approval.[97]

13   **E.      Notice to the Settlement Class Was Adequate and Satisfied Due Process**

14       The notice to the settlement class was adequate and satisfied both Rule 23 and due process.

15   Under Rule 23(e)(1), the court must direct notice in a reasonable manner to all class members who

16   would be bound by the proposal.[98] Rule 23 requires only that the best notice practicable rather than

17   actual notice is provided.[99] "Notice is satisfactory if it generally describes the terms of the

18

---

19       94    *Nat'l Rural*, 221 F.R.D. at 528; *see also Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D.
20   Cal. 1988) ("The recommendation of experienced counsel carries significant weight in the court's
     determination of the reasonableness of the settlement."); *Ellis*, 87 F.R.D. at 18 ("the fact that
21   experienced counsel involved in the case approved the settlement after hard-fought negotiations is
     entitled to considerable weight").

22       95    Solorzano Decl., ¶¶ 2-8.

         96    *Id.*, ¶¶ 9-10.
23
         97    *Detroit*, 495 F.2d at 463 (small number of objectors favors approval of settlement); *In re
24   Warner Comm'cns Sec. Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985) (same); *Milstein v. Huck*,
     600 F. Supp. 254, 267 (E.D.N.Y 1984) (same); *In re Mfrs. Life Ins. Co. Premium Litig.*, No. 96-
25   CV-230, 1998 U.S. Dist. LEXIS 23217, at *24 (S.D. Cal. Dec. 21, 1998) (same).

26       98    *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009); Fed. R. Civ. P.
     23(e)(1).
27
         99    *Siber v. Mabon*, 18 F.3d 1449, 1453 (9th Cir. 1994) (holding that the best notice
28   practicable, rather than actual notice, is the proper standard for providing notice of a proposed
     settlement to absent class members).

settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."[100]

Here, in granting preliminary approval, this Court previously approved the settlement class notice and ordered notice as follows:

**Direct Notice**: The notice administrator sent electronically mailed notice to over 12.9 million class members. Although some "bounced back" (or were returned as undeliverable), postcard notice was then mailed to an additional 1.077 million class members, including those for whom e-mail notice bounced-back. Where postcard notices were returned as undeliverable mail, updated addresses were found and the notice was re-sent, as possible.[101]

**Publication to Settlement Website**: Shortly after receiving preliminary approval, the claims administrator posted information about the settlement, including relevant pleadings, to a settlement website: www.easportslitigation.com. At this website, class members can view and print copies of the claim form, long-form notice in English and Spanish, postcard notice, the operative complaint, and the order certifying the class, as well as settlement documents (including the preliminary approval order, the Settlement Agreement, the motion for attorneys' fees, and frequently asked questions).[102]

**Publication in the Newspaper**: A summary notice was published in USA Today, national edition of the newspaper, on October 18, 2012.[103]

**Online campaign**: There was an online campaign, including sponsored links to the website through the search engines Google, Bing, Yahoo and AOL, link impressions served through Google's display network, a display advertising component that utilized the Yahoo Network, Pulsepoint and Facebook, including a dedicated social media case page. The notice administrator states that to date, the notice plan has generated over 4.7 million impressions through sponsored

---

[100] *Rodriguez*, 563 F.3d at 962.

[101] Solorzano Decl., ¶¶ 6-7.

[102] *Id.*, ¶ 5.

[103] *Id.*, ¶ 3.

1   link advertising, over 57 million impressions through display advertising and over 15 million

2   impressions through contextual banners.[104] This is a total of over 77 million impressions.

3       **CAFA Notice**: Electronic Arts provided notice by mail to state agencies and the U.S.

4   Attorney General pursuant to the Class Action Fairness Act on July 30, 2012.[105]

5                                   **IV.    CONCLUSION**

6       The proposed settlement represents a fair and reasonable resolution of class members'

7   claims after four years of litigation, and is supported by the named plaintiffs and experienced class

8   counsel. Plaintiffs respectfully request that this Court approve the proposed $27 million settlement.

9   DATED: January 3, 2013                      HAGENS BERMAN SOBOL SHAPIRO LLP

10

11                                              By _____/s/ Shana E. Scarlett_____
                                                     SHANA E. SCARLETT

12                                              Jeff D. Friedman

13                                              715 Hearst Avenue, Suite 202
                                                Berkeley, CA 94710
14                                              Telephone: (510) 725-3000
                                                Facsimile:  (510) 725-3001
15                                              jefff@hbsslaw.com
                                                shanas@hbsslaw.com

16                                              Stuart M. Paynter (226147)

17                                              THE PAYNTER LAW FIRM PLLC
                                                1200 G Street N.W., Suite 800
18                                              Washington, DC 20005
                                                Telephone: (202) 626-4486
19                                              Facsimile:  (866) 734-0622
                                                stuart@smplegal.com

20                                              Steve W. Berman (*Pro Hac Vice*)
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
21                                              1918 Eighth Avenue, Suite 3300
                                                Seattle, WA 98101
22                                              Telephone: (206) 623-7292
                                                Facsimile:  (206) 623-0594
23                                              steve@hbsslaw.com

24                                              Class Counsel

25

26

27   _____
     [104] *Id.*, ¶ 4.

28   [105] *See* Proof of Service of CAFA Notice, Dec. 21, 2012, ECF No. 413.

     PLS.' MOT. FOR FINAL APPROVAL OF CLASS ACTION          - 25 -
     SETTLEMENT –No. 08-cv-02820 CW
     010017-11  566341 V1

1

**CERTIFICATE OF SERVICE**

2

      I hereby certify that on January 3, 2013, I electronically filed the foregoing document using

3

the CM/ECF system which will send notification of such filing to the e-mail addresses registered in

4

the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have

5

caused to be mailed a paper copy of the foregoing document via the United States Postal Service to

6

the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF

7

system.

8

                      /s/ Shana E. Scarlett

9

                      SHANA E. SCARLETT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28