Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile:  (866) 734-0622
stuart@smplegal.com

Steve W. Berman (Pro Hac Vice)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Class Counsel

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GEOFFREY PECOVER and ANDREW OWENS, on behalf of themselves and a class of person similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ELECTRONIC ARTS INC., a Delaware Corporation,<br><br>Defendant. | No. 08-cv-02820 CW<br><br>PLAINTIFFS' RESPONSE TO OBJECTIONS TO CLASS ACTION SETTLEMENT<br><br>Date: February 7, 2013<br>Time: 2:00 p.m.<br>Dept: Courtroom 2 - 4th Floor<br>Judge: Hon. Claudia Wilken<br><br>ACTION FILED: June 5, 2008 |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ...................................................................................................... 1

    A.   The Proposed *Cy Pres* Distribution Matches the Underlying Objectives of this Lawsuit, Are Aligned with the Interests of Class Members, and Will Benefit the Class .......................................................................................... 1

        1.   The Objection to the *Cy Pres* Recipient Is Speculative – Distribution Will Only Be Made After Multiple Rounds of Distribution to Class Members .................................................... 2

        2.   The Class Received Constitutional Notice of the *Cy Pres* Provisions and Were Provided an Opportunity to Opt-Out ............................. 4

        3.   The Proposed *Cy Pres* Recipient Meets the Required Nexus to the Class .................................................................................................. 5

            a.   The Proposed *Cy Pres* Distribution Returns Monies to Gamers Who Are Almost Certainly Members of the Class ................. 6

            b.   The Proposed Distribution Will Benefit the Settlement Class ................................................................................................ 7

        4.   In the Alternative, the *Cy Pres* Recipient Is Proper Because It Is a "Child Advocacy Organization" Under Cal. Code of Civ. Proc., Section 384 ........................................................................................... 8

    B.   Objections to the Amount of Attorneys' Fees Lack Merit .......................... 9

        1.   The Requested Fees Are Reasonable Under the Lodestar Method ................. 9

        2.   The Requested Fees Are Reasonable As a Percentage of the Common Fund ............................................................................... 10

            a.   In Calculating the Common Fund Value, the Ninth Circuit Does Not Require that Notice and Administrative Costs First Be Subtracted ......................................................... 11

            b.   The Ninth Circuit's Twenty-Five Percent "Benchmark" Is Calculated as Fees as a Percentage of the Gross Settlement Amount ........................................................ 13

            c.   *Cy Pres* Funds Are Properly Considered as Part of Settlement Value ...................................................................... 17

    C.   The Timing of the Claims Period Is Proper ............................................. 18

    D.   The Parties Have Correctly Agreed to Settle a Nationwide Class – the Same Class Certified by Judge Walker ................................................. 19

        1.   Settlement of a Nationwide Class Does Not Render the Settlement Unfair ................................................................................. 19

2.      The Settlement Does Not Violate the Rules Enabling Act and Principles of Federalism Because a Private Agreement Cannot Expand Substantive Rights ................................................................................20

E.      The Scope of Release Is Clearly Communicated and Is Not Overly Broad ...............21

F.      The Preliminary Approval Order Sufficiently Defined the Class, Claims and Defenses ...........................................................................................................21

G.      The Settlement Provides Adequate Monetary and Injunctive Relief .........................22

H.      The "Clear Sailing" Provision Is the Product of Arm's Length Negotiations ...................................................................................................................23

III.    CONCLUSION ...........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Dennis v. Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) ...................................................................3, 5, 6, 8

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012) .............................................................................3

*Dragor Shipping Corp. v. Union Tank Car Co.*,
  371 F.2d 722 (9th Cir. 1967) ...........................................................................12

*Dukes v. Wal-Mart Stores, Inc.*,
  603 F.3d 571 (9th Cir. 2010) .............................................................................3

*Galloway v. Kan. City Landsmen, LLC*,
  2012 U.S. Dist. LEXIS 147148 (W.D. Mo. Oct. 12, 2012) ......................................5

*Garner v. State Farm Mut. Auto. Ins. Co.*,
  2010 WL 1687829 (N.D. Cal. Apr. 22, 2010).............................................10, 11

*Glass v. UBS Financial Servs., Inc.*,
  331 Fed. Appx. 452, 457 (9th Cir. 2009) ...........................................................18

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .........................................................................18

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ......................................................................................19

*In re AT&T Corp. Secs. Litig.*,
  455 F.3d 160 (3d Cir. 2006) ...........................................................................15

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ..........................................................6, 18, 19, 24

*In Re Enron Corp. Secs., Derivative & "ERISA" Litig.*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008).................................................................19

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liability Litig.*,
  55 F.3d 768 (3d Cir. 1995) ...............................................................................6

*Klier v. Elf Atochem N. Am., Inc.*,
  658 F.3d 468 (5th Cir. 2011) .........................................................................3, 4

*Lane v. Facebook*,
  696 F.3d 811(9th Cir. 2012) ..........................................................................5, 6

*Malchman v. Davis*,
   761 F.2d 893 (2d Cir.1985) ................................................................................24

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*,
   834 F.2d 677 (7th Cir. 1987) ..........................................................................6, 7

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................10

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) ..............................................................................3

*Murray v. Sullivan*,
   _U.S._, 132 S. Ct. 1876 (2012) ........................................................................19

*Pecover v. Elec. Arts Inc.*,
   2010 U.S. Dist. LEXIS 140632 (N.D. Cal. Dec. 21, 2010) ..............................20

*Pecover v. Electronics Arts Inc.*,
   633 F. Supp. 2d 976 (N.D. Cal. 2009) ..............................................................23

*Phillips Petroleum Co. v Shutts*,
   472 U.S. 797 (1985) ..........................................................................................20

*Powers v. Eichen*,
   229 F.3d 1249 (9th Cir. 2000) ....................................................................14, 15

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ............................................................................24

*Shaffer v. Cont'l Cas. Co.*,
   362 Fed. Appx. 627 (9th Cir. 2010) ..................................................................15

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir.1990) ...........................................................................3, 4

*Smith v. Levine Leichtman Capital Partners, Inc.*,
   2012 U.S. Dist. LEXIS 163672 (N.D. Cal. Nov. 15, 2012) ................................5

*Stanton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ..............................................................11, 12, 13

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) ..................................................................19, 20, 21

*True v. Am. Honda Motor Co.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010) ..............................................................3

*Wal-Mart Stores, Inc. v. Dukes*,
   _U.S._, 131 S.Ct. 2541 (2011) ..........................................................................10

*Zeisel v. Diamond Foods, Inc.*,
   2012 U.S. Dist. LEXIS 148893 (N.D. Cal. Oct. 16, 2012) .................................... 6

### STATE CASES

*Hurtado v. Superior Court*,
   522 P.2d 666 (Cal. 1974) .................................................................................... 20

### STATE STATUTES

California Code of Civil Procedure section 384(b) ................................................ 8, 9

# I.   INTRODUCTION

Although the overwhelming response of class members to this settlement was positive, nine class members have served objections to this settlement and the related attorneys' fees and costs request. Steve Miller and Joseph Palmer – "professional" objectors – represent three class members. One class member, Theodore Frank, is himself a serial objector, and yet another, John Flynn, appears affiliated with Mr. Frank. Regardless, none of the objections provides a ground to deny final approval of the settlement or plaintiffs' request for attorneys' fees and costs. Through aggressive and unfailing advocacy, plaintiffs here have recovered a substantial amount of money on behalf of the class, as well as obtained injunctive relief that goes to the very heart of the claims in this case. The objectors do not present any reasonable grounds to withhold this money from the class and require the class to take on the significant risk of continued litigation. Respectfully, plaintiffs request that this Court approve the settlement.

# II.   ARGUMENT

## A.   The Proposed *Cy Pres* Distribution Matches the Underlying Objectives of this Lawsuit, Are Aligned with the Interests of Class Members, and Will Benefit the Class

Five objectors – Ted Frank, Brett Gibbs, John Flynn, Joseph Rugo and Matthew Klesken[1] – (hereafter "*Cy Pres* Objectors") object to the *cy pres* distribution and the designated beneficiary. Their objections, however, fail to deal with the terms of the settlement and misapprehend the nature of the *cy pres* beneficiary. Not only do these objectors fail to recognize that the proposed *cy pres* beneficiary will recover only after (and if) amounts remain in the settlement fund after multiple rounds of distribution to class members, but they also fail to recognize how this non-profit organization is targeted to the purpose of the litigation and the settlement class.

---

[1]   *See* Objection to Class Action Settlement and Notice of Intent to Appear by Brett Gibbs ("Gibbs Obj."), December 10, 2012, ECF No. 401; Objection to Proposed Settlement and Opposition to Motion for Attorneys' Fees, Expenses and Participation Awards by Theodore Frank ("Frank Obj.") at 4-8, Dec. 10, 2012, ECF No. 404; Objections Joseph Rugo and Matthew Klesken to Proposed Settlement and Notice of Intent to Appear and Notice of Joinder ("Rugo-Klesken Obj") at 2-3, Dec. 17, 2012, ECF No. 410; John Flynn's Objection to the Proposed Settlement ("Flynn Obj.") at 2, Dec. 17, 2012, ECF No. 411. Two additional objectors, Messrs. David B. Waxman and Matthew B. Waxman, sent identical objections to the Court dated December 24, 2012,  ECF No. 414 and ECF No. 415, respectively. Not only are the Waxman objections 14 days late, they add no substance and only join in the objections of Mr. Frank.

### 1. The Objection to the *Cy Pres* Recipient Is Speculative – Distribution Will Only Be Made After Multiple Rounds of Distribution to Class Members

Under this settlement, monies will only be given to a *cy pres* recipient after diligent and repeated efforts to distribute the entire common fund directly to class members. *First*, class members are able to file claims. Unless the settlement fund is exhausted (which, given its substantial size is unlikely), ***every claimant will receive a cash payment equal to 100 percent of their alleged damages***. Consequently, the cash payout to claimants is – by definition – identical to the best case, actual damages award that could be achieved by a victorious jury verdict.  In effect, claiming class members lose only the possibility of receiving treble damages, which could only be obtained if plaintiffs prevailed after a full trial on the merits. *Second*, if the filed claims do not exhaust the settlement fund, the parties will initiate a second round of distribution to sixth generation purchaser class members with known addresses who did not submit claims. They automatically will be sent checks in the amount of the average claim paid. *Finally*, if the common fund has not been exhausted six months after the second distribution, the *cy pres* beneficiary will be awarded the amount remaining in the settlement fund.[2]

The *Cy Pres* Objectors argue that because seventh generation purchasers are not included in the second distribution, the settlement improperly awards the *cy pres* recipient before class members.[3] This analysis overlooks critical factual information. According to plaintiffs' economist, sixth generation purchasers suffered alleged damages over ***four times greater*** than seventh generation purchasers.[4] Indeed, the alleged damages for seventh generation purchasers are so modest, a mere $1.95 per title purchased, that the cost of a second distribution outweighs the amount that each seventh generation would receive.[5] Simply put, a second distribution to seventh

---

[2]   Stipulation and Agreement of Class Action Settlement and Release, ("Settlement Agreement"), ¶ 14, July 20, 2012, ECF No. 375.

[3]   *See* Frank Obj. at 4-8; Rugo-Klesken Obj. at 5 (expressly adopting and joining in the Frank objection); Flynn Obj. at 2 (expressly adopting and joining in the Frank objection).

[4]   Declaration of Shana E. Scarlett in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses and Participation Awards ("Scarlett Decl. in Support of Attys' Fees") at ¶ 19, November 26, 2012, ECF No. 390.

[5]   Declaration of Tricia Solorzano on Behalf of Settlement Administrator Regarding Notice and Administration ("Solorzano Decl."), ¶ 12, concurrently filed herewith.

generation is not economically feasible. Gilardi & Co. LLC, the notice and claims administrator in this case, estimates that it will cost approximately $0.78 per person to send checks to sixth generation purchasers in the second round of distribution.[6] Given these facts, the parties developed a plan of allocation that included distribution of funds directly to those class members most harmed, to be followed, if necessary, by an indirect *cy pres* distribution targeted to the class.

Although the *Cy Pres* Objectors complain generally that *cy pres* is a much-abused tool, they fail to explain how this is true in this case where every effort has been made to return money to the class members. The cases cited by objectors are all instances where a subset of the class was denied recovery in an initial distribution[7] or the *cy pres* distribution vehicle was used in place of distribution to class members.[8] Neither of those scenarios has any application to this settlement. Relying on *Klier v. Elf Atochem N. Am., Inc.*,[9] objector Frank goes so far as to argue that any *cy pres* distribution is "unjustifiable" unless "reasonable measures are taken to ensure that the class members are completely compensated."[10] Objector Frank mischaracterizes *Klier*. In *Klier*, the Fifth Circuit reversed the district court's *cy pres* distribution order because it violated the bargained-for terms of the settlement agreement, which required residual funds to be distributed within the

---

[6]   *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir.1990).

[7]   *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) (finding the settlement inappropriately excluded part of the class from relief where a subclass was required to wait to file claims against a residual fund); *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1066 (C.D. Cal. 2010) (holding that the class action settlement was not fair, reasonable and adequate where one group of class members received a cash award while another received only rebate coupons). All internal citations and quotations omitted and all emphasis added, unless otherwise indicated.

[8]   *See Dennis v. Kellogg Co.*, 697 F.3d 858, 862-63 (9th Cir. 2012) (where the settlement agreement included a $5.5 million *cy pres* award reserved for unspecified "charities that feed the indigent," rather than paid to class members); *Six (6) Mexican Workers*, 904 F.2d at 1304 (where the majority of the settlement fund was to convert into unclaimed funds subject to *cy pres* distribution due to an inability to locate the undocumented, farm worker class members); *Molski v. Gleich*, 318 F.3d 937, 954-56 (9th Cir. 2003*), overruled in part by, Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) (settlement found unfair where *cy pres* award was in lieu of damages to class members without any demonstration of administrative infeasibility).

[9]   658 F.3d 468 (5th Cir. 2011).

[10]   Frank Obj. at 6; *see also* Flynn Obj. at 2 ("the *cy pres* component is inappropriate. All monies should be paid to the class.").

class.[11] That holding has no application here, where the settlement agreement expressly provides for a *cy pres* distribution in discrete circumstances.

The *Cy Pres* Objectors also speculate wildly about the size of the prospective *cy pres* award, stressing the gravity of their objections because more than half of the settlement fund weighs in the balance.[12] Point in fact, the claims period is not yet closed. Further, the size of the second round distribution to class members is also not yet known. Even if one were to estimate how much money the two direct distributions might draw down, it is unknown how many checks will go uncashed. As Objector Gibbs points out, "even a rough estimate is impossible."[13]

The *cy pres* provision is meant only to provide some finality to the settlement process in the event of excess funds. The alternatives to a *cy pres* recipient would be that the money escheats to the government or the money reverts to the defendant.[14] Escheating to the state or federal government does nothing to further the claims and objectives of this litigation. And reversion to the defendant only further harms class members by lessening the settlement's deterrent power. Plaintiffs have made the most economically sensible choice here in choosing a *cy pres* recipient.

### 2. The Class Received Constitutional Notice of the *Cy Pres* Provisions and Were Provided an Opportunity to Opt-Out

Objector John Flynn claims that notice was defective because the class was not advised of the *cy pres* distribution. This is factually incorrect. The Settlement Agreement in its entirety, including the *cy pres* distribution provision, was made available on the settlement website, the URL of which was included in the long-form notice, postcard notice, and in all media outreach to

---

[11]   *Klier*, 658 F.3d at 468 (reversing the district court's *cy pres* distribution order and remanding the case with instructions that funds be distributed to class members, per the settlement agreement).

[12]   Frank Obj. at 6 ("Here, it is likely that that [sic] after claims are paid, there will be $15 million remaining for nonclaimant payments."); Flynn Obj. at 2 ("It appears that the *cy pres* component is half the total award to the class."); Gibbs Obj. at 2 ("Current estimates show that the *cy pres* distribution will total at least $12.2 million. . . .").

[13]   Brett Gibb's Supplement to Objection at 2, December 10, 2012, ECF No. 405.

[14]   *Six Mexican Workers*, 904 F.2d at 1307.

1    class members.[15] Mr. Flynn also misunderstands how the *cy pres* distribution, if any, will operate.

2    As discussed above, a *cy pres* distribution will only be undertaken if, after two rounds of direct

3    distribution to class members, the settlement fund is not exhausted. It does not impact – let alone

4    limit – the direct distribution to class members in any way.

5          Objector Frank argues that the objection and opt-out procedures detailed in the notice were

6    "unnecessarily onerous" because they required mailing and, therefore, "artificially reduced the

7    number of objections."[16] *First*, this Court approved the notice served on class members – including

8    the objection and opt-out procedures.[17] *Second*, the cases cited by Mr. Frank provide no support for

9    his theory that mailing in an objection or opt-out is unduly burdensome.[18] *Third*, opt-outs (as well

10   as claims) could be submitted by e-mail in this case, minimizing any alleged burden.

11       **3.**    **The Proposed *Cy Pres* Recipient Meets the Required Nexus to the Class**

12         The Ninth Circuit recently clarified the standards for approval of *cy pres* distribution in

13   *Kellogg* and *Lane v. Facebook*.[19] In order "[t]o ensure that the settlement retains some connection

14   to the plaintiff class and the underlying claims . . . a *cy pres* award must qualify as the 'next best

15   distribution' to giving the funds directly to the class members."[20] Further, any *cy pres* award must

16   be guided by the objectives of the underlying statute(s) and the interests of the silent class

17   members, and must not benefit a group too remote from the plaintiff class.[21]

18

19      [15]   Exhibits A-C to the Order Granting Class Plaintiffs' Unopposed Motion for Preliminary
     Approval of Class Action Settlement ("Preliminary Approval Order"), October 5, 2012, ECF No.

20   385.

        [16]   Frank Obj. at 21-23.

21      [17]   Preliminary Approval Order at 5.

22      [18]   *See Galloway v. Kan. City Landsmen, LLC*, No 4:11-1020, 2012 U.S. Dist. LEXIS 147148,
     at *13 (W.D. Mo. Oct. 12, 2012) (the Court found the opt-out form burdensome where it had to be

23   ***both*** emailed and either sent by first class mail or hand-delivered to both plaintiffs' counsel and
     defense counsel); *Smith v. Levine Leichtman Capital Partners, Inc.*, No. C 10-00010, 2012 U.S.

24   Dist. LEXIS 163672, at *8-*9 (N.D. Cal. Nov. 15, 2012) (procedures for filing objections found
     unduly burdensome where objectors were required to mail their objections to three different

25   locations and submit detailed information to prove class membership, even though defendants
     controlled the records of class membership).

26      [19]   *Kellogg*, 697 F.3d at 858; *see also Lane v. Facebook*, 696 F.3d 811(9th Cir. 2012).

27      [20]   *Kellogg*, 697 F.3d at 865.

28      [21]   *Id.*; *see also Lane*, 696 F.3d 819-20.

1    Given the status of this case, concerns over the *cy pres* distribution are lessened. As Judge

2    White recently noted in *Zeisel v. Diamond Foods, Inc*., because the Court has already certified a

3    nationwide class, heightened scrutiny of a *cy pres* beneficiary is not required.[22] This is a different

4    posture than faced by the Ninth Circuit in *Lane* and *Kellogg*, where the parties settled early in the

5    case – before class certification.[23] In *Lane,* the Ninth Circuit specifically noted that when the

6    "settlement takes place before formal class certification, settlement approval requires a higher

7    standard of fairness."[24] These concerns simply do not apply in this long-running case with a

8    certified class.

9    Regardless, the proposed *cy pres* recipient here: (1) addresses the objectives of this case, by

10   redirecting monies Electronic Arts allegedly earned unjustly back to the gaming community; (2)

11   targets the nationwide class with both the demographic and geographic distribution of its charitable

12   work; and (3) provides reasonable certainty that members of the class will benefit, given the

13   existence of over eight million individuals in the class, and the reach of the proposed *cy pres*

14   recipient throughout the country.[25] Under all Ninth Circuit standards, the parties' proposed *cy pres*

15   beneficiary is proper.

16          a.    **The Proposed *Cy Pres* Distribution Returns Monies to Gamers Who Are Almost Certainly Members of the Class**

17   The designated recipient meets the objectives of the underlying antitrust statutes in this case

18   and the interests of silent class members. This case challenged defendant's exclusive licensing

19

20      [22]   *Zeisel v. Diamond Foods, Inc.*, No. C 10-01192, 2012 U.S. Dist. LEXIS 148893, at *5-*9 (N.D. Cal. Oct. 16, 2012) (noting that the heightened scrutiny of *cy pres* beneficiary is not required where Court certified the class before settlement).

21      [23]   *Lane*, 696 F.3d at 817; *Kellogg*, 697 F.3d 866-67.

22      [24]   *Lane*, 696 F.3d at 819. *See also In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935,

23   946-47 (9th Cir. 2011) ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must

24   with-stand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."); *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liability Litig*., 55 F.3d 768, 805 (3d Cir.

25   1995) (courts must be "even more scrupulous than usual in approving settlements where no class has yet been formally certified"); *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of*

26   *Chicago*, 834 F.2d 677, 681 (7th Cir. 1987) ("[W]hen class certification is deferred, a more careful scrutiny of the fairness of the settlement is required.").

27      [25]   Declaration of Jamie Dillion in Response to Objections to Class Action Settlement ("Dillion Decl."), ¶ 3, filed concurrently herewith.

28

agreements that allegedly locked competitors out of the market and permitted Electronic Arts to allegedly maintain supra-competitive pricing on its football video game software. Regardless of how either side would characterize the legality of the licenses, the gravamen of plaintiffs' claims was that gamers across the country were overcharged for video game software. The proposed *cy pres* recipient, Child's Play, would direct the alleged overcharge on video games back to gamers.

Child's Play is a nonprofit founded by gamers and dedicated to improving the lives of hospitalized youth, their families and their visitors by providing them with video game entertainment.[26] Working with a network of hospital and therapy facilities, Child's Play uses donations to purchase and distribute video games and gaming consoles. The organization also sets up gaming wish lists, enabling donors to purchase video games for donation directly.[27] Youth, their family, friends, and the medical professionals assisting them – most of whom are already gamers and likely class members – will have free access to video games when they are away from home, and also receive a vital distraction from an otherwise generally unpleasant hospital experience. Plaintiffs alleged that defendant's conduct drove up prices and gamers paid more than they should have for their video game hobby. Child's Play returns money to gamers in a hospital setting. This is a sufficient nexus to the objectives in the case.

### b.    The Proposed Distribution Will Benefit the Settlement Class

The *cy pres* recipient also must not benefit a group too remote from the plaintiff class. Child's Play, a charity that serves gamers around the world, has expressly agreed to limit the use of any *cy pres* funds it is awarded to serve United States beneficiaries, per the Court's directions.[28] This nationwide service commitment reflects the fact that the Court approved a nationwide class and ensures that any residual funds would benefit "areas where the class members may live."[29] The *cy pres* recipient also actively targets the same demographic group as the settlement class – young gamers, their parents, family members and friends. Research show that individuals who own or

---

[26]   *Id.*, ¶ 2.

[27]   *Id.*, ¶ 4.

[28]   *Id.*, ¶ 3;  Sept. 27, 2012 Hearing Tr. at 15-16.

[29]   *Kellogg*, 697 F.3d at 865.

play sport video games, such as the class in this case, are either parents or are relatively young themselves.[30] This describes the community of gamers Child's Play serves.

The *cy pres* recipient was a conflict-free, mutually acceptable selection identified by plaintiffs' counsel after lengthy discussions with industry participants and the defendant over possible *cy pres* beneficiaries.[31] Plaintiffs would not accept a non-profit entity in the gaming industry where Electronic Arts was a board member, founding partner or frequent donor, and would not accept other proposed charities related to education (but lacking any nexus to the class). As the objectors note, Electronic Arts did make a small, one-time donation to Child's Play in 2009, but Child's Play is not affiliated with Electronic Arts in any way, and never was.[32]

### 4. In the Alternative, the *Cy Pres* Recipient Is Proper Because It Is a "Child Advocacy Organization" Under Cal. Code of Civ. Proc., Section 384

In addition to permitting distribution of unclaimed funds "to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons," California Code of Civil Procedure section 384(b) permits distribution of unclaimed funds to "child advocacy programs." The *cy pres* recipient here, Child's Play, clearly meets this requirement. Child's Play's mission is to "improv[e] the lives of hospitalized youth" by providing them with video game entertainment to relieve the stress and boredom of hospitalization.[33] Child's Play actively advocates on behalf of these hospitalized children by conducting public fundraiser, media events, and actively recruiting new hospitals into its network.[34] Child's Play's status as a child advocacy organization within the meaning of section 384 provides an independent basis for approving it as the *cy pres* recipient here.

---

[30]   Declaration of Daniel Burke re Dissemination of Class Notice, ¶ 24 (chart with industry facts shows that "ninety-three percent of the time parents are present at the time games are purchased or rented" and "sixty-four percent of parents believe games are a positive part of their children's lives.") and ¶ 20 (estimated thirty-one percent of class is under 25 years old and another fifty-seven percent is under 45), July 20, 2012, ECF No. 379.

[31]   Declaration of Stuart M. Paynter in Support of Plaintiffs' Response to Objections to Class Action Settlement ("Paynter Decl."), ¶ 2, filed concurrently herewith.

[32]   Gibbs Obj. at 6, 11 (pointing out that Electronic Arts has made prior donations to Child's Play); Dillion Decl., ¶ 7.

[33]   Dillion Decl., ¶¶ 2, 6.

[34]   *Id.*, ¶ 5.

1

**B.**      **Objections to the Amount of Attorneys' Fees Lack Merit**

2          Objectors Frank, Aaron Miller, David Marlow, and Rugo/Klesen ("Fee Objectors") object

3    to the request for attorneys' fees. The requested fees are entirely justified. As outlined in Class

4    Counsel's Motion for Fees and Expenses,[35] this Court has discretion to award fees either as a

5    percentage of the common fund established or pursuant to the lodestar method. Here, regardless of

6    the methodology chosen, Class Counsel's fee request is entirely reasonable.

7          **1.**      **The Requested Fees Are Reasonable Under the Lodestar Method**

8          To date, Class Counsel has expended over 13,878 hours, representing a lodestar of

9    $6,327,319.75. Class Counsel's request fee of $7,290,000 represents a mere 1.15 multiplier of that

10   lodestar. With a single exception, the objectors concede, by failing to contest, that this modest fee

11   request is reasonable under the lodestar method. The single exception is the combined Objection of

12   Messrs. Rugo and Klesken.[36] Even the Rugo-Klesen Objection does not attack, and therefore

13   concedes, that the hours and hourly rates of counsel are reasonable. Instead, the Rugo-Klesen

14   Objection claims that Class Counsel's requested multiplier of 1.15 is unjustified because Class

15   Counsel has provided "no evidence of what was at stake for Defendants, what value this settlement

16   is in comparison to the value of a victorious jury verdict or the probable chances of such a

17   verdict."[37] In fact, all these factors were meticulously addressed in Class Counsel's request for fees

18   and expenses.

19         Specifically, Class Counsel explicitly outlined the overcharge for both sixth and seventh

20   generation titles ($6.79 and $1.95 respectively).[38] This, by definition, represents the best case

21   actual damages that would be awarded by a "victorious jury verdict." Based on the current claims

22   rate, all claiming class members will receive 100 percent of these damages. Claiming class

23   members in effect lose only their right to treble damages – a remarkable result by any measure. In

24          [35]   "Motion for Fees and Expenses" or "Mot. for Fees and Expenses" refers to Plaintiffs'
25   Notice of Motion and Motion for Attorneys' Fees, Expenses and Participation Awards, Nov. 26,
     2012, ECF No. 389.

26          [36]   *See* Rugo-Klesken Obj.

27          [37]   *Id.* at 5.

28          [38]   Mot. for Fees and Expenses at 9. These damages correct for an error in the Leitzinger report
     that would have been the subject of a Rule 26 supplemental report had the case not settled.

1    addition, the settlement prohibits Electronic Arts from renewing its exclusive football licenses with

2    the Arena Football League, the CLC (the licensing arm of the NCAA) or any NCAA-member

3    institution for a period of five years after the expiration of the current license in 2014.[39] Class

4    Counsel's moving papers also expressly addressed the "probable chances" of a successful verdict

5    by outlining in great detail the significant legal and factual risks to their claims, including but not

6    limited to: (i) the risk of decertification of the nationwide class following the Ninth Circuit's

7    decision in *Mazza*;[40]  (ii) the risk of decertification in light of the Supreme Court's opinion in

8    *Dukes*;[41] (iii) the risk of summary judgment or loss at trial based on market definition; (iv) the risk

9    of summary judgment or loss at trial based on Electronic Arts' defense that "standardized" launch

10    prices for "premium" video games meant no class member was charged above-market prices;

11    (v) *Daubert* challenges to plaintiffs' experts; and (vi) Electronic Arts' defense that all the licenses

12    were proposed and sought by third parties.[42] Because the requested multiplier of 1.15 is "well

13    within the range of multipliers applied in common fund cases," Rugo-Klesen's Objection should be

14    rejected.[43]

15           **2.      The Requested Fees Are Reasonable As a Percentage of the Common Fund**

16           The Fee Objectors also object to the award because it slightly exceeds the twenty-five

17    percent "benchmark" established by the Ninth Circuit for attorneys' fees calculated as a percentage

18    of the common fund.[44] The arguments can be grouped in three categories. *First*, ignoring clear

19    Ninth Circuit precedent, Objector Frank joined by the other Fee Objectors argues that "as a matter

20    of law" and "public policy," notice and administrative costs should be excluded from the value of

21    the settlement in determining the proper percentage. *Second*, again ignoring clear Ninth Circuit

22    precedent, Objector Frank joined by the other Fee Objectors argues that expenses incurred by Class

---

[39]    *Id.* at 12.

[40]    *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).

[41]    *Wal-Mart Stores, Inc. v. Dukes*, _U.S._, 131 S.Ct. 2541 (2011).

[42]    Mot. for Fees and Expenses at 13-14.

[43]    *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365, 2010 WL 1687829, at *2 (N.D. Cal. Apr. 22, 2010).

[44]    *See id.* (noting that while the "benchmark" is 25% fee, an "award of 30 percent is within the usual range of fee awards . . . in common fund cases").

1    Counsel must be added onto Class Counsel's fees when determining the appropriate percentage to

2    award in fees. *Third*, Objector Frank joined by the Other Fee Objectors argues that the value of the

3    *cy pres* must be "discounted" even though there is no *cy pres* until every claimant receives 100

4    percent of their damages. *Finally*, Objector Miller, oblivious to the significant injunctive relief in

5    this case, claims that the result achieved does not justify a twenty-seven percent attorneys' fee

6    award because it does "nothing to reduce the price" of the *Madden NFL* title or "open the door to

7    competition." As discussed above, Class Counsel's requested fees can be affirmed on the basis of

8    the lodestar method alone. But assuming the Court adopts the common fund methodology, the

9    objections to the request award are meritless.

                   a.       **In Calculating the Common Fund Value, the Ninth Circuit Does Not**
10                          **Require that Notice and Administrative Costs First Be Subtracted**

11            Here, the Settlement Agreement provides for the creation of an all cash $27 million fund,

12   none of which will revert back to Electronic Arts.[45] Plaintiffs have requested approval of

13   approximately one million in notice and administrative costs. According to Objector Frank,

14   inclusion of that sum in the calculation of the common fund amount is wrong "as a matter of

15   law."[46] To the contrary, the Ninth Circuit has expressly approved the inclusion of notice and

16   administrative costs in the settlement value. Specifically, the Ninth Circuit directly addressed this

17   issue in *Stanton v. Boeing Co.*[47] *Stanton* involved a settlement of an employment discrimination

18   action against Boeing Company.[48] The settlement required Boeing to pay $7.3 million to class

19   members, less reversions and a credit for opt-outs.[49] Unlike this settlement, settlement in *Stanton*

20   "conditioned the merits settlement upon judicial approval of the agreed-upon fees," an "all or

21   nothing approach" that the Ninth Circuit found impermissible.[50] Key to this case, as an alternative

22   holding – not "dicta" as Mr. Frank claims – the Ninth Circuit held that the fee award constituted

23

24   _____

     45   *Id.* (noting that common fund was "non-reversionary" in approving fee award).

25   46   Frank Obj. at 11.

26   47   327 F.3d 938 (9th Cir. 2003).

     48   *Id.* at 944.

27   49   *Id.*

28   50   *Id.* at 969.

too great a percentage of the class recovery to be justified.[51] In reaching this conclusion, the Ninth

Circuit expressly addressed whether the district court "abuse[d] its discretion by including the cost

of providing notice to the class . . . as part of its putative fund valuation."[52] Categorically rejecting

Objector Frank's assertion that such costs must be excluded "as a matter of law," the Ninth Circuit,

in fact, held that the "post-settlement cost of providing notice to the class can reasonably be

considered a benefit to the class." Therefore, it was "reasonable" for the district court to decline to

exclude the cost of notice from the "common fund" for "all purposes, ***including the calculation of

attorneys' fees***."[53]

Implicitly recognizing that his assertion that notice and administrative costs must be

excluded "as a matter of law," is baseless, Objector Frank argues that, in any case, a failure to

exclude such costs is "poor public policy."[54] Even if this Court were inclined to ignore the Ninth

Circuit, Objector Frank's "public policy" argument for excluding the cost of notice and

administration from the settlement value lacks rigor and substance. His argument consists of

nothing more than his conclusion that if the cost of notice is included in the settlement value then it

must "be considered 'consideration' even if class members get nothing in exchange for waiving

their rights."[55] From this nonsensical premise,[56] Mr. Frank then constructs two *reductio ad

absurdum* hypotheticals. *First*, he posits "a settlement that requires the defendant to spend $30

million to provide personal service to every class member, hand-delivering an eight-page letter that

informs class members that all of their claims will be waived and the class will receive nothing, but

the attorneys will get $10 million because they provided such good notice."[57] *Second*, he posits a

---

[51] *Id.* at 973; *Dragor Shipping Corp. v. Union Tank Car Co.*, 371 F.2d 722, 726 (9th Cir. 1967) ("Where an appellate court decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*.").

[52] *Stanton*, 327 F.3d at 975.

[53] *Id.*

[54] Frank Obj. at 11.

[55] *Id.* at 12.

[56] Mr. Frank's premise is nonsensical because it assumes that a notification of the existence of valuable benefits is equivalent to a notification of no benefits.

[57] Frank Obj. at 12.

1    "nationwide zero-dollar settlement" where the defendant would be "entitled to deduct half the cost

2    of notice from individual customers' accounts."[58] These bizarre examples, Mr. Frank concludes,

3    "demonstrate the absurdity of counting notice as a class benefit."[59]

4           In fact, these hypotheticals demonstrate nothing. Mr. Frank's argument is akin to arguing

5    that notice and administrative costs always benefit the class by posing a hypothetical $30 million

6    settlement in which no notice is provided to class members and therefore no money is claimed. The

7    answer to both that hypothetical and Mr. Frank's hypotheticals is that class members have twin

8    interests in both the amount of the settlement and the efficacy and cost of the notice. It is the

9    responsibility of Class Counsel, as fiduciaries to the class, to balance these twin concerns. Neither

10   the $30 million settlement consisting entirely of notice nor the $30 million settlement providing no

11   notice would adequately balance these concerns. Neither would be negotiated by competent Class

12   Counsel and if negotiated, neither would be approved by this Court.

13          **b.    The Ninth Circuit's Twenty-Five Percent "Benchmark" Is Calculated as Fees as a Percentage of the Gross Settlement Amount**

14          Class Counsel seek reimbursement of $2 million in expenses (although their actual

15   expenses were slightly more). Significantly, not a single objector challenges the reasonableness of

16   these expenses. The vast majority (over $1.57 million) of these expenses were expert economists'

17   fees.[60] Such expenses were necessary given the complex economic issues generally raised by

18   monopoly cases and raised by this case in particular. When added to Class Counsel's requested

19   fees, the total (fees plus costs) is $9,290,000. According to Mr. Frank, this larger total must be used

20   as the "numerator" when calculating Class Counsel's recovery as a percentage of the common

21   fund. Mr. Frank then takes this percentage, 34.4, which is obviously much larger than counsel's

22   requested fees as a percentage of the settlement, and compares it against the Ninth Circuit's

23   "benchmark" of twenty-five percent. In the alternative, Mr. Frank suggests that costs must be

24

25   _____

        [58]   *Id.*

26      [59]   *Id.*

27      [60]   Scarlett Decl. in Support of Attys' Fees, ¶ 35 ($956,856.54 paid in expert fees); Declaration of Stuart Paynter in Support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards , ¶ 14, Nov. 26, 2012, ECF No. 391 ($615,287.72 paid in expert fees).

28

PLS.' RESP. TO OBJECTIONS TO CLASS ACTION                          - 13 -
SETTLEMENT – No. 08-cv-02820 CW

010017-11  577243 V1

1    excluded from the "denominator," e.g., the value of the common fund, which results in a

2    percentage of twenty-nine percent, again giving the misleading impression that Class Counsel's

3    fees represent a larger portion of the fund than they do. Both approaches simply ignore controlling

4    Ninth Circuit precedent by comparing apples to oranges. Specifically, both approaches artificially

5    inflate Class Counsel's percentage recovery – either by adding cost to the numerator or subtracting

6    costs from the denominator, and then comparing that percentage to a benchmark that the Ninth

7    Circuit has made clear is not calculated that way.

8         The Ninth Circuit made clear in *Powers v. Eichen*[61] that its twenty-five percent benchmark

9    represents fees as a percentage of the total settlement. There, the objector (like objectors here)

10   argued that fees should be calculated as a "percentage of the recovery minus expenses" rather than

11   as a percentage of the gross recovery.[62] The Ninth Circuit began by sensibly dismissing the

12   objector's obsessive "mechanistic" focus on what should be included in the "denominator" noting

13   that "case law teaches that the reasonableness of attorneys' fees is not measured by the choice of

14   the denominator."[63] Rather, the Ninth Circuit held that the ultimate focus should be on whether the

15   "end result is reasonable."[64] Critically, the Ninth Circuit then noted: "If twenty-five percent of

16   gross is reasonable, perhaps thirty-five percent of net would be reasonable."[65] In so noting, the

17   Ninth Circuit made crystal clear that its twenty-five percent benchmark is calculated as fees as a

18   percentage of the gross settlement amount. This Court is not prohibited from considering fees plus

19   costs as a percentage of the total settlement, but it should not compare it to a twenty-five percent

20   benchmark. Significantly, under either of Mr. Frank's suggested approaches, the resulting

21   percentage is lower than the "thirty-five percent" that the Ninth Circuit expressly suggested could

22   be reasonable in *Eichen*.

---

61   229 F.3d 1249, 1258 (9th Cir. 2000).

62   *Id.*

63   *Id.*

64   *Id.*

65   *Id.*

1    The Ninth Circuit recently again rejected the approach advocated by Mr. Frank in an

2    unpublished decision *Shaffer v. Cont'l Cas. Co.*[66] There several objectors challenged a $5 million

3    award for costs, attorneys' fees and incentive payments.[67] In affirming approval, the Ninth Circuit

4    explicitly noted that only "about $4.4 million" represented attorneys' fees. Using this amount, not

5    the total of fees plus costs, the Ninth Circuit determined that the "attorneys' fees represent[ed]" a

6    multiplier of 1.4 and "about 13-18% of the value of class benefits" which it found "well below the

7    25% benchmark."[68] Again, the Ninth Circuit made clear that the "apples to apples comparison"

8    takes the twenty-five percent benchmark and compares it to fees as a percentage of the gross

9    settlement value – not fees plus costs as a percentage of the settlement value or fees as a percentage

10   of net settlement value. These latter comparisons are simply "misleading" because they artificially

11   inflate Class Counsel's recovery by including costs and then comparing that to a benchmark that

12   does not do so.[69]

13   Here, Objector Frank adopts precisely such a "misleading" approach. The flaw in his

14   argument is not that this Court cannot consider fees as a percentage of the net settlement or fees

15   plus costs as a percentage of the gross settlement when assessing the reasonableness of Class

16   Counsel's fees or costs. The Court is perfectly free to do so, and indeed should review Class

17   Counsel's costs for reasonableness. But what the Court may not do under controlling Ninth Circuit

18   precedent is what objectors urge, which is to reduce Class Counsel's fees by inflating Class

19   Counsel's percent of recovery (by either adding costs to the numerator or subtracting costs from

20   the denominator) and then "mechanically" compare that inflated percentage to a twenty-five

21   percent benchmark.

22   Lacking any actual case law to support his argument, Mr. Frank again falls back on the

23   half-baked policy arguments. Mr. Frank asserts that costs generally should be excluded from the

24   calculation of settlement value because Class Counsel will otherwise be "incentivized" to run up

---

[66]   362 Fed. Appx. 627 (9th Cir. 2010).

[67]   *Id.* at 632.

[68]   *Id.*

[69]   *In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 172 n.8 (3d Cir. 2006).

1    expenses "because they will be reimbursed."[70] Nonsense. Class Counsel had every incentive to

2    control costs during the litigation because if plaintiffs lost, Class Counsel could not have recouped

3    any of these costs. Class Counsel therefore had zero incentive to inflate out-of-pocket costs. It

4    would be economically irrational for Class Counsel to inflate costs that they risk never recouping

5    when the size of the common fund upon which their fee is based remains the same regardless of the

6    amount of costs. Class Counsel is certainly not receiving a twenty-seven percent "commission" on

7    these costs, as Mr. Frank claims, unless that word is drained of all meaning. Class Counsel simply

8    receives a dollar for dollar reimbursement for costs actually paid to third party vendors for the

9    benefit of the class. Nor does it represent "double count[ing]" in any intelligible mathematical

10   sense to exclude costs from the numerator (the amount of fees) while including them in the

11   denominator (the value of the settlement). The purpose of creating the fraction in the first place is

12   to determine the appropriateness of Class Counsel's compensation. Costs are properly excluded

13   from the numerator because they do not compensate Class Counsel and are properly included in the

14   denominator because they were incurred for the class's benefit.

15          Critically here, Mr. Frank's theorizing about Class Counsel's incentives is simply

16   untethered to any actual analysis of plaintiffs' handling of costs in this case. Class Counsel has

17   vigorously policed all costs in this case including notice and administrative costs, expert costs, and

18   cost of deposition transcripts.[71] Notably, the vast majority of costs involved here – nearly eighty

19   percent – were paid to expert economists.[72] Indeed, plaintiffs' economists generated six detailed

20   reports in this litigation.[73] These costs are entirely reasonable in a monopoly case where both

21   common impact and market definition were hotly disputed. Not only are these costs entirely

22   reasonable but, consistent with their fiduciary duty to the class, Class Counsel have disallowed and

23   are actively disputing an additional $500,000 in expert fees.[74] Thus, far from putting their own

---

[70]   Frank Obj. at 15.

[71]   Paynter Decl., ¶ 4.

[72]   *Id.*

[73]   *Id.*, Exs. A-F; *id.*, ¶¶ 7-12.

[74]   *Id.*, ¶ 5.

1   interests before those of class members, Class Counsel are bearing the risk that they may be

2   required to pay an additional $500,000 above and beyond the $2 million sought for reimbursement

3   in disallowed expert costs.[75] Class Counsel could have simply included these additional fees in the

4   Settlement Agreement but did not because they determined that the costs were not justified.[76]

5          A rule that sets a benchmark of fees and costs at twenty-five percent of a common fund

6   would deter lawyers from pursuing expensive difficult cases on contingency. This case is a perfect

7   example. Monopoly cases are notoriously expensive because a plaintiff always will be required to

8   define the relevant market and demonstrate the anticompetitive effects of the conduct in that

9   market. This requires enormous time and effort from an expert economist. In fact, the expert issues

10   in this case were so complex that the Court appointed its own expert witness.[77]

11          c.    *Cy Pres* **Funds Are Properly Considered as Part of Settlement Value**

12          Generally, *cy pres* provisions take two forms. In the first, a specific amount, or occasionally

13   the entire fund, is committed to a qualified non-profit or governmental entity as a *cy pres* recipient.

14   In the second, the entire fund is made available to class members (after subtraction of costs and

15   fees) and only unclaimed monies are distributed to a qualified *cy pres* recipient. This case is an

16   example of the latter. Here, $27 million has been recovered for class members. Under the

17   Settlement Agreement, if class members were to claim the entire amount, no funds would be

18   distributed to the *cy pres* recipient.

19          Citing a case from the Southern District of Texas and another from the Eastern District of

20   Pennsylvania, Objector Frank argues that the Court should estimate the amount of unclaimed funds

21   that will be distributed to *cy pres* and then "discount" this amount when determining the value of

22   the common fund.[78] Citing nothing, Mr. Frank claims that this "discount" is appropriate because a

23   "Rule 23(h) attorney award should be primarily based on the amounts class members actually

24

25   [75]   *Id.*

26   [76]   *Id.*

27   [77]   Amended Order Concerning Duties and Instructions for Court-Appointed Technical Advisor and Modifying the Case Schedule, April 6, 2012, ECF No. 364.

28   [78]   Frank Obj. at 15.

1    receive."[79] Again, Objector Frank's argument simply ignores long standing Ninth Circuit precedent

2    that pointblank rejects his arguments.

3            In a "common fund" case, Ninth Circuit law provides that "where the settlement or award

4    creates a large fund for distribution to the class," the district court "simply awards the attorneys a

5    percentage of the fund" not a percentage of the amount "class members actually receive" as Mr.

6    Frank claims.[80] The Ninth Circuit recently affirmed its adherence to this long-standing rule when it

7    held that Judge Chesney's decision in *Glass v. UBS Financial Servs., Inc.* to award "25% of the

8    total award, rather than 25% of the amount actually collected by the class was proper, and was in

9    line with Ninth Circuit precedent."[81]

10   **C.      The Timing of the Claims Period Is Proper**

11           Objector Frank alleges that Class Counsel deliberately forestalled analysis of their fees

12   request by setting the claims deadline a month after the fairness hearing.[82] Stretching *Bluetooth*

13   beyond recognition, he argues that this is an indicia of self-dealing because without precise

14   valuation of amounts paid to class members, "the total amount of claims paid, or the total amount

15   of non-claimant payments,"[83] it is not possible to analyze whether the attorneys' fees are fair

16   relative to class recovery. *Bluetooth*, however, calls for a "comparison between the settlement's

17   attorneys' fees award and the benefit to the class or degree of success in the litigation,"[84] among

18   numerous others considerations in evaluating the reasonableness of an attorneys' fees request.

19   Objector Frank cites to cases where the court is able to analyze complete data sets, but offers no

20   supporting case law for the notion that the claims period must be closed or the claims figures

21   finalized before the court may enter final judgment and award fees. An unsupported objection

22   alleging that Class Counsel is hiding the ball and "self-dealing" is not a sufficient ground to

23   withhold recovery to the remainder of class members – including, again, 100 percent recovery for

24   ───────────────

     [79]   *Id.* at 18.

25   [80]   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).

     [81]   331 Fed. Appx. 452, 457 (9th Cir. 2009).

26   [82]   Frank Obj. at 19-20.

27   [83]   *Id.* at 19.

     [84]   *Bluetooth*, 654 F.3d at 943.

28

each and every claimant.[85] Mr. Frank also ignores the obvious reason for the longer time period for claims – simply to allow more class members the opportunity to submit a claim.

**D.      The Parties Have Correctly Agreed to Settle a Nationwide Class – the Same Class Certified by Judge Walker**

One objector – Marlow – argues that the settlement of a nationwide class has unfairly diluted the claims of class members from *Illinois Brick* repealer states – approximately thirty states which allow indirect purchasers to have standing under the state antitrust.[86] Each of Mr. Marlow's arguments on this issue have already been thoroughly addressed and rejected by the Third Circuit in *Sullivan v. DB Invs., Inc.*[87]

**1.      Settlement of a Nationwide Class Does Not Render the Settlement Unfair**

Objector Marlow's main concern is that the certification of a nationwide indirect purchaser class purportedly dilutes the claims of citizens of *Illinois Brick* repealer states by also allowing claims from non-repealer states. Mr. Marlow raises a host of concerns based on this one argument – including that: (i) the terms of the settlement are unfair and unreasonable;[88] (ii) the settlement class lacks commonality;[89] and (iii) plaintiffs and Class Counsel are not adequate.[90]

The Third Circuit addressed these exact concerns in *Sullivan*,[91] in an exhaustive *en banc* opinion involving the settlement of a nationwide indirect purchaser class action. The Third Circuit rejected the argument that differences in state law treatment of claims defeated class certification, and confirmed that the "correct outcome is even clearer for certification of a settlement class because the concern for manageability that is a central tenet in the certification of a litigation class

---

[85]    *In Re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 804 (S.D. Tex. 2008).

[86]    *Illinois Brick* repealer state refers to states which "repealed" the Supreme Court opinion in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) by providing standing under state law for indirect purchasers.

[87]    667 F.3d 273 (3d Cir. 2011) *cert. denied*, *Murray v. Sullivan*, _U.S._, 132 S. Ct. 1876 (2012).

[88]    Marlow Obj. at 7.

[89]    *Id.* at 8.

[90]    *Id.* at 13-14.

[91]    667 F.3d at 273.

is removed from the equation."[92] *Sullivan* demonstrates that a nationwide settlement class is appropriate even if it involved the laws of the fifty states. But the record in this case is even more clear. Here, the parties extensively litigated the issue of commonality and predominance at class certification, with Judge Walker certifying a nationwide class under California law. The Court examined California's interest in entertaining claims by nonresident plaintiffs against resident defendants under the California Supreme Court's opinion in *Hurtado v. Superior Court*,[93] and its progeny, as well as examining the constitutionality of applying California law under the Supreme Court's opinion in *Phillips Petroleum Co. v Shutts*.[94] Electronic Arts requested interlocutory appeal of the class certification opinion, which the Ninth Circuit denied on March 17, 2011.

But even putting aside the legal invalidity of Marlow's objection to the settlement class based on the record of this case – his real complaint that the recovery of *Illinois Brick*-repealer state residents is diluted due to the inclusion of non-repealer states is factually inaccurate. Again, class members are entitled to 100 percent of their alleged damages in this case – as determined by plaintiffs' own expert economist in this case. Only if the settlement is fully subscribed, are damages then reduced on a *pro rata* basis. And Marlow's objection overlooks the obvious logical point that if the settlement included only half of the states (and thus, provided defendant with a release for only half the states), the settlement would have been at an absolute minimum fifty percent less. Because Marlow has not demonstrated that his share of the settlement has been diluted, his objection fails on this additional ground.

### 2. The Settlement Does Not Violate the Rules Enabling Act and Principles of Federalism Because a Private Agreement Cannot Expand Substantive Rights

Objector Marlow next suggests that the certification of the settlement class in this case violates the Rules Enabling Act, as the certification of a nationwide class of indirect purchasers "endorses the enlargement of substantive rights."[95] This objection fails because the parties had a

---

92   *Id.* at 302.

93   522 P.2d 666, 670 (Cal. 1974); *see also Pecover v. Elec. Arts Inc.*, No. 08-2820 CW, 2010 U.S. Dist. LEXIS 140632, at *55 (N.D. Cal. Dec. 21, 2010).

94   472 U.S. 797, 818 (1985); *see also Pecover*, 2010 U.S. Dist. LEXIS 140632, at *47.

95   Marlow Obj. at 14.

1 right to stipulate to a nationwide settlement class. As the Third Circuit explained in *Sullivan*, a

2 settlement agreement is a creature of private contract law. A district court's approval of a

3 settlement "simply recognizes the parties' deliberate decision to bind themselves according to

4 mutually agreed-upon terms without engaging in any substantive adjudication of the underlying

5 causes of action."[96] Because the court does not make a finding that plaintiffs are actually entitled to

6 relief under substantive state law, there can be no enlargement of substantive rights by approving a

7 voluntary class settlement.[97]

8 **E. The Scope of Release Is Clearly Communicated and Is Not Overly Broad**

9   Objector Marlow also complains that the scope of release is unfair because it fails to

10 describe what claims were brought by class members and what claims are being released. Again,

11 Objector Marlow is factually incorrect – the Settlement Agreement clearly defines "Released

12 Claims."[98] Although Objector Marlow states that the release includes "past, present, or ***hereafter***

13 claims,"[99] that language is nowhere found in the definition of released claims. Rather, plaintiffs

14 have negotiated a narrow release that impacts only the alleged overcharges tied to the exclusive

15 licenses for games purchased during the class period.

16 **F. The Preliminary Approval Order Sufficiently Defined the Class, Claims and Defenses**

17   Objector Marlow suggests that the Preliminary Approval Order failed to define the claims,

18 issues, defenses or the contours of class certification. Objector Marlow devotes only five lines to

19 this objection, with no specific cite to the record or any particularized discussion of the order and

20 notice in this case. Respectfully, plaintiffs believe that Objector Marlow is mistaken. Paragraph

21 three of the Preliminary Approval Order defines the class, the class period, and those excluded

22 from the class.[100] The notices to the class are attached to the Preliminary Approval Order, each of

---

[96] *Sullivan*, 667 F.3d at 312.

[97] *Id.*

[98] Settlement Agreement, ¶ 1(a)(a).

[99] Marlow Obj. at 16.

[100] Preliminary Approval Order, ¶ 3.

1   which describe the claims, issues and defenses in detail.[101] These notices were amended with the

2   guidance of the Court after the preliminary approval hearing to add specific language regarding the

3   claims in the case, including the existence of Electronic Arts' license with ESPN. Objector Marlow

4   is simply wrong to suggest that the Preliminary Approval Order fails to sufficiently outline the

5   claims, issues, defenses, and the contours of settlement class certification.

6   **G.      The Settlement Provides Adequate Monetary and Injunctive Relief**

7           A few of the objectors vaguely complain that the settlement is inadequate because it fails to

8   disallow Electronic Arts' license with the NFL, "reduce price" or increase "competition."[102] These

9   objections also fail. *First*, the monetary relief provided by the settlement is adequate. The $1.95 in

10   damages to Objector Marlow and all class members who purchased seventh generation games

11   represents 100 percent of their alleged damages, as calculated by plaintiffs' own economist.[103] One

12   hundred percent of damages is certainly adequate.

13           *Second*, the objection that the injunctive relief is not sufficient ignores basic principles of

14   antitrust law. The premise underlying plaintiffs' claims and the premise underlying this Court's

15   June 5, 2009 denial of Electronic Arts' motion to dismiss was emphatically not that Electronic

16   Arts' agreement with the NFL standing alone was unlawful. Instead, plaintiffs alleged a "series of

17   exclusive agreements with the only viable sports football associations and leagues in the United

18   States" and that this web of agreements violated the antitrust laws.[104] This Court agreed. It denied

19   Electronic Arts' motion to dismiss because plaintiffs' focus on the "aggregation of multiple

20   exclusive agreements to choke off competition" stated a claim under the antitrust laws and

21   distinguished this case from cases where the defendant entered into an "exclusive agreement

22   involving a single patent."[105]

23

24           [101]   *Id.*, Exhibits A-C.

25           [102]   Marlow Obj. at 17; Declaration of Shana E. Scarlett in Support of Plaintiffs' Motion for
    Final Approval of Class Action Settlement ("Scarlett Decl."), Ex. D (Keith Kodosky's Letter
26   Objection, dated Dec.10, 2012), concurrently filed herewith;  Miller Obj. at 3.
           [103]   Scarlett Decl. in Support of Attys' Fees, ¶ 19.
27           [104]   First Amended Complaint, ¶ 12, May 9, 2011, ECF No. 252.
           [105]   *Pecover v. Electronics Arts Inc*., 633 F. Supp. 2d 976, 984 (N.D. Cal. 2009).

28

1       The settlement unravels this web. Specifically, Electronic Arts cannot enter an exclusive

2  with the AFL and must refrain from renewing its exclusive football license with the NCAA (or any

3  member institutions) starting in 2014 and continuing for a period of five years. In the words of

4  another objector, this injunctive relief "represents a significant victory for the class."[106] Objector

5  Miller's assertion that this settlement does nothing to "open the door to competition" is therefore

6  demonstrably false. Since it is a basic assumption of antitrust law that increased competition leads

7  to lower prices and/or higher quality, Objector Miller's assertion that the settlement does nothing to

8  address the "price" of Electronic Arts' *Madden NFL* title is likewise incorrect. The potential of new

9  entrants alone will impose new competitive restraints on Electronic Arts and inevitably influence

10 both Electronic Arts' pricing and its investments in the *Madden NFL* title.

11 **H.     The "Clear Sailing" Provision Is the Product of Arm's Length Negotiations**

12      Objector Frank's allegation that the "clear-sailing" provision in the Settlement Agreement

13 demonstrates that "class counsel put its own fees ahead of the interests of the class" is not well

14 taken.[107] After extensive and sometimes contentious mediation proceedings, Electronic Arts agreed

15 not to oppose Class Counsel's request for attorneys' fees up to thirty percent of the settlement fund

16 and costs not exceeding $2 million.[108] In *Bluetooth,* the Court found that the payment of attorneys'

17 fees *separate and apart* from class funds carries "'the potential of enabling a defendant to pay class

18 counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf

19 of the class.'"[109] Here, however, the attorney's fees and even class representative participation

20 awards are to be made *from* the settlement fund. This scenario does not signal the possibility of

21 collusion because, by agreeing to a sum certain, defendant was acting consistently with its own

22 interests in minimizing liability.[110] Class Counsel vigorously and actively represented the rights of

---

23     [106]  Gibbs Obj. at 1.

24     [107]  Frank Obj. at 24-25.

25     [108]  Settlement Agreement, ¶ 13; Unopposed Notice of Motion and Motion for Preliminary

26 Approval of Class Action Settlement at 4-5, July 20, 2012, ECF. No. 376.

    [109]  *Bluetooth*, 654 F.3d at 947.

27     [110]  *See e.g. Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) (holding that a

28 "clear sailing" provision where the attorneys' fees were paid from the settlement fund did not evince collusion); *Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir.1985) ("an agreement not to

the plaintiffs and absent class members in this litigation, including negotiating the settlement, and

Objector Frank has not offered any evidence otherwise.

### III.    CONCLUSION

After four years of litigation, Electronic Arts has agreed to make available $27 million to

settle the claims of the class. The Objectors present no grounds why this settlement is not adequate,

fair and reasonable or the attorneys' fees request reasonable. Respectfully, plaintiffs request that

this Court grant final approval.

DATED: January 3, 2013                    HAGENS BERMAN SOBOL SHAPIRO LLP


                                          By _____/s/ Shana E. Scarlett_____
                                                 SHANA E. SCARLETT

                                          Jeff D. Friedman (173886)
                                          715 Hearst Avenue, Suite 202
                                          Berkeley, CA 94710
                                          Telephone: (510) 725-3000
                                          Facsimile:  (510) 725-3001
                                          jefff@hbsslaw.com
                                          shanas@hbsslaw.com

                                          Stuart M. Paynter (226147)
                                          THE PAYNTER LAW FIRM PLLC
                                          1200 G Street N.W., Suite 800
                                          Washington, DC 20005
                                          Telephone: (202) 626-4486
                                          Facsimile:  (866) 734-0622
                                          stuart@smplegal.com

                                          Steve W. Berman (*Pro Hac Vice*)
                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                          1918 Eighth Avenue, Suite 3300
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile:  (206) 623-0594
                                          steve@hbsslaw.com

                                          Class Counsel

_____

oppose an application for fees up to a point is essential to the completion of the settlement, because
the defendants want to know their total maximum exposure and the plaintiffs do not want to be
sandbagged").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 3, 2013, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Shana E. Scarlett
SHANA E. SCARLETT
