LATHAM & WATKINS LLP
　Daniel M. Wall (Bar No. 102580)
　Timothy L. O'Mara (Bar No. 212731)
　Kirsten M. Ferguson (Bar No. 252781)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
Email: Dan.Wall@lw.com
Email: Tim.OMara@lw.com
Email: Kirsten.Ferguson@lw.com

Attorneys for Defendant
ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GEOFFREY PECOVER and ANDREW OWENS, on behalf of themselves and a class of person similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>ELECTRONIC ARTS INC., a Delaware Corporation,<br><br>　　　　　　Defendant. | CASE NO. C 08-02820 CW<br><br>**DEFENDANT ELECTRONIC ARTS INC.'S RESPONSE TO PLAINTIFFS' PROPOSED MODIFIED DISTRIBUTION OF SETTLEMENT FUND**<br><br>ACTION FILED: June 5, 2008 |

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

**TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................................... 1

II. BACKGROUND ......................................................................................................... 3

III. ANALYSIS .................................................................................................................. 5

    A. "Impermissible Windfall" Distributions Are Improper. ......................................... 5

    B. Treble Awards in this Case would be Unjust and Inequitable to EA. ................. 12

IV. CONCLUSION.......................................................................................................... 13

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

i

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

# TABLE OF AUTHORITIES

*Fears v. Wilhelmina Model Agency, Inc.*,
   315 Fed. Appx. 333 (2d Cir. 2009) ............................................................................................. 9

*Fears v. Wilhelmina Model Agency, Inc.*,
   No. 02 Civ. 4911, 2007 U.S. Dist. LEXIS 48151 (S.D.N.Y. July 5, 2007) ..................... 9, 12

*In re Easysaver Rewards Litig.*,
   No. 09-cv-2094, 2013 U.S. Dist. LEXIS 15738 (S.D. Cal. Feb. 4, 2013) ......................... 8, 11

*In re Folding Carton Antitrust Litig.*,
   557 F. Supp. 1091 (N.D. Ill. 1983) ..................................................................................... 8, 11

*In re Folding Carton Antitrust Litig.*,
   744 F.2d 1252 (7th Cir. 1984) ................................................................................................. 8

*In re Lease Oil Antitrust Litig.*,
   MDL No. 1206, 2007 U.S. Dist. LEXIS 91467 (S.D. Tex. Dec. 12, 2007) ........................... 9

*In re Lloyds' Am. Trust Fund Litig.*,
   No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ...................... 11

*In re Lupron Mktg. & Sales Practices Litig.*,
   677 F.3d 21 (1st Cir. 2012) ..................................................................................... 7, 9, 10, 11

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................................................... 11

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   588 F.3d 24 (1st Cir. 2009) .................................................................................................... 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. MDL 3:07-md-1827, 2011 U.S. Dist. LEXIS 154288 (N.D. Cal. Dec. 27, 2011) ........ 11

*In re Vitamins Antitrust Litig.*,
   No. 99-197, 2000 U.S. Dist. LEXIS 8931 (D.D.C. Mar. 31, 2000) ..................................... 11

*Klier v. Elf Atochem N. Am., Inc.*,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

658 F.3d 468 (5th Cir. 2011) .............................................................................................. 10

*Nelson v. Mead Johnson & Johnson Co.*,
    484 Fed. Appx. 429 (11th Cir. 2012) .................................................................................. 10

*Perkins v. Am. Nat'l Ins. Co.*,
    No. 3:05-CV-100, 2012 U.S. Dist. LEXIS 95039 (M.D. Ga. July 10, 2012) ...................... 10

*Powell v. Georgia-Pacific Corp.*,
    843 F. Supp. 491 (W.D. Ark. 1994) ..................................................................................... 8

*Van Gemert v. Boeing Co.*,
    553 F.2d 812 (2d Cir. 1977) ................................................................................................. 8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

## I. INTRODUCTION

On July 17, 2013, the parties in this case entered into a Settlement Agreement, which created a settlement fund (a $27,000,000, "all-in" settlement), and provided for a three-tiered "Plan of Allocation."[1] On October 5, 2012, the Court granted preliminary approval of the Settlement Agreement, and on February 7, 2013, the Court held a fairness hearing for final approval. At the fairness hearing, the Court directed the parties to meet and confer regarding potential revisions to the Plan of Allocation. In particular, the Court directed the parties to consider the amount of the settlement fund that would be paid to settlement class members relative to any residual funds that would be allocated to a *cy pres* recipient or, potentially, escheat to the federal government. Electronic Arts Inc. ("EA") and Plaintiffs conferred in good faith, but could not reach agreement on an amended plan of distribution.

The settlement in this case presents an uncommon set of facts: (i) the settlement fund is significant, (ii) the per unit alleged damages are relatively small, (iii) few settlement class members have elected to submit claims, despite the opportunity to claim 100-percent of their alleged damages, and despite the *de minimus* effort that was required to submit a claim electronically by e-mail, and (iv) EA can only identify a modest number of non-claimant class members (i.e., those who have previously registered their name and address with EA voluntarily). As a result, all claimants and all identifiable class members can (and will) receive 100-percent of their alleged damages; nevertheless, a multi-million dollar residual will remain in the settlement fund. The question presented here is, what is the most fair, equitable, and proper disposition of the residual funds under these circumstances?

On March 19, 2013, Plaintiffs filed a Proposed Modified Distribution of Settlement Fund (Doc. No. 446). Plaintiffs propose two options for amending the Plan of Allocation. Option 1—opposed by EA—allows all claimants and all identifiable class members to receive treble "damages." Option 2—supported by EA—provides for automatic payments (at 100-percent of

---

[1] Stipulation and Agreement of Class Action Settlement and Release at ¶¶ 8, 14, Sept. 20, 2012 (Doc. No. 381-1) ("Settlement Agreement").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

1

alleged damages) to non-claiming, identifiable seventh-generation class members. Option 1 is completely divorced from any term currently in the Plan of Allocation. Option 2, by contrast, mirrors an agreed-to settlement term providing for automatic payments to non-claiming, identifiable sixth generation class members. Plaintiffs also propose (and EA concurs) that after attempts to distribute the settlement funds to class members have been exhausted, any remaining settlement funds escheat to the federal government—rather than be paid to the previously proposed *cy pres* recipient, Child's Play.

Plaintiffs' Option 1 is flawed and contrary to law. Numerous courts have held that redistribution of residual funds to claimants above-and-beyond 100-percent recovery of alleged damages constitutes an "impermissible windfall," favoring claimants at the expense of silent class members. That concern is particularly relevant (and acute) here, because the windfall would likely be awarded to less than 1-percent of the total class.[2] Courts analyzing whether to use residual funds to pay treble "damages" have also concluded that equity counsels against this approach where (as here) the settling defendant has denied liability and damages. Furthermore, Option 1 not only contravenes well-established case law, it is diametrically opposed to the parameters on which EA agreed to settle this case. It is inconsistent with the express, bargained-for terms of the Settlement Agreement (which do not provide for awards in excess of 100-percent of alleged damages), and is likely to lead to grossly inaccurate and unfair perceptions regarding the alleged value of the claims that were settled. For these reasons, Option 1 should be rejected.

Plaintiffs' Option 2, by contrast, is equitable to all settlement class members, serves the goal of increasing the payout to class members (by 33-percent), and is consistent with the negotiated-for terms in the Settlement Agreement. In the first instance, Option 2 is the only

---

[2] *Compare* Decl. of Tricia M. Solorzano on Behalf of Settlement Administrator Re Estimate for Supp. Notice ¶ 3, Mar. 19, 2013 (Doc. No. 446-1) (estimating "a total of 216,000 checks" will be mailed to class members) *with* Decl. of Daniel Burke Re Dissemination of Class Notice ¶¶ 14, 15, July 20, 2012 (Doc. No. 379) (finding 16,137,256 unique class member email addresses account for approximately 28 million units sold during the class period, and also stating that approximately 53 million total units were sold during the class period).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

1 approach that both Plaintiffs and EA agree upon and, therefore, is the logical and fair option that
2 the Court should accept since this is a modification to a negotiated settlement agreement. More
3 importantly, although Option 1 would result in more money being paid to settlement class
4 members (overall), it achieves that result only by grossly over-compensating a small minority of
5 the total class, and providing no benefit to silent, unidentified class members—even though the
6 case law is clear that silent, unidentified class members have a superior, equitable interest in any
7 residual funds. Option 2 avoids these inequities, yet still insures that ***all claimants and all***
8 ***identifiable class members receive 100-percent of their alleged damages***. It is indisputable—as
9 Plaintiffs' themselves have acknowledged, repeatedly—that 100-percent recovery is fair,
10 reasonable, and adequate, meriting final approval of this settlement. Moreover, it is also
11 indisputable that where (as here) all claimants and all identifiable class members are receiving
12 100-percent of their alleged damages (per the Plan of Allocation, as amended by Option 2),
13 excess funds should be distributed in a manner that will best benefit the class as a whole, and not
14 in a manner that will provide an arbitrary, undeserved windfall to a few class members.
15 Therefore, the residual funds in this case should either (i) be paid to a *cy pres* recipient that
16 benefits the class as a whole, or (ii) if no adequate *cy pres* recipient exists, escheat to the federal
17 government, the entity principally charged with enforcing the antitrust laws of the United States.

18 Consequently, EA respectfully requests that the Court reject Option 1 and adopt Option
19 2. EA does not oppose Plaintiffs' proposed modification to the *cy pres* recipient—i.e., providing
20 that any residual funds escheat to the federal government, rather than be paid to the non-profit
21 charity, Child's Play. Similarly, EA does not oppose the proposed schedule, the supplemental
22 notice, the plan of notice, or the additional 30 day claim period outlined in Plaintiffs' Proposed
23 Modified Distribution of Settlement Fund.

## II. BACKGROUND

25 The procedural background is not in dispute. The July 17, 2013 Settlement Agreement
26 provided for a three-tiered "Plan of Allocation" for the net settlement fund (i.e., the amount
27 available after deducting payment of the costs of administering the settlement, including the cost

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

of notice, attorneys' fees, cost of the litigation, and any payments allowed by the Court to the named Plaintiffs):

- First Distribution: (i) Cash payment to all sixth-generation claimants of $6.79 for each sixth-generation title purchased, up to a maximum of eight units ($54.32), and (ii) cash payment to all seventh-generation claimants of $1.95 for each seventh-generation title purchased, up to a maximum of eight units ($15.60).
- Second Distribution: If the first distribution did not exhaust the net settlement fund, then automatic cash payment will be made to all non-claimant, sixth-generation purchasers who have provided EA with a physical address (i.e., identifiable purchasers who did not submit a claim form) in an amount equal to the average claim paid to sixth-generation purchasers in the first distribution; the second distribution, as currently defined in the Plan of Allocation, does not include seventh-generation purchasers.
- *Cy Pres* Distribution: If—six months after the first and second distributions have been made—the net settlement fund is not exhausted, a *cy pres* payment will be made to Child's Play, a videogame industry charity, in the amount that will exhaust the settlement fund.[3]

On October 5, 2012, the Court granted preliminary approval of the Settlement Agreement, and on February 7, 2013, the Court held a fairness hearing for final approval of the settlement. At this hearing, the Court expressed concern regarding the Settlement Agreement's Plan of Allocation—specifically, (i) the amount of the net settlement fund that was likely to be paid to settlement class members relative to the amount that was likely to be allocated to the *cy pres* recipient, and (ii) the nexus between the designated *cy pres* recipient and the harm alleged in Plaintiffs' complaint. To that end, the Court directed the parties to meet-and-confer and submit a joint proposal (or separate proposals) addressing these issues.

---

[3] Settlement Agreement at ¶ 14.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

The claims submission period closed on March 5, 2013. As of the date of this filing, the claims administrator has informed that parties that 92,491 sixth-generation units have been claimed, and 155,435 seventh-generation units have been claimed. The average sixth-generation claim is $25.51, and the average seventh-generation claim is $7.75. After extensive effort, EA has identified in its records 48,649 sixth-generation purchasers and 92,539 seventh-generation purchasers for whom its believes it has physical addresses.[4] Under the current Plan of Allocation, this would result in the following distributions being made to settlement class members:

- First Distribution: $931,112.14 paid to sixth- and seventh-generation claimants.
- Second Distribution: $1,241,035.99 paid to all identifiable non-claimant, sixth-generation purchasers.
- Total Distribution to Class Members: $2,172,148.13.

If the current Plan of Allocation were revised to include all identifiable non-claimant, seventh-generation purchasers (i.e., Plaintiffs' Option 2, addressed in further detail in Part III, below), this would result in a **33% increase in the payout to settlement class members**. The distributions to settlement class members would be as follows:

- First Distribution: $931,112.14 paid to sixth- and seventh-generation claimants.
- Second Distribution: $1,958,213.24 paid to all identifiable non-claimant, sixth- and seventh-generation purchasers.
- Total Distribution to Class Members: $2,889,325.38.

## III. ANALYSIS

### A. "Impermissible Windfall" Distributions Are Improper.

In the Settlement Agreement, the parties agreed to a plan of allocation that would fully-compensate sixth- and seventh-generation purchaser claimants (as well as all non-claimant,

---

[4] Consumers who purchase certain EA games can register them online with EA. Registration is voluntary, and many consumers elect to provide incomplete information. As a result, EA has physical addresses *and* associated names for only approximately 141,188 class members.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

sixth-generation purchasers who have provided EA with a physical address) for their alleged damages, as calculated by Plaintiffs' own damages expert. Specifically, Plaintiffs' damages expert, Dr. Jeffery Leitzinger, calculated sixth-generation purchasers damages as $6.79 per title, and seventh-generation purchasers' damages as $1.95 per title. *See* Mot. for Final Approval of Class Settlement at 9, Jan. 3, 2013 (Doc. No. 417) ("Mot. for Final Approval"); Decl. of S. Scarlett in Supp. of Pls.' Mot. for Attorneys' Fees, Expenses and Participation Awards at 6, Nov. 26, 2012 (Doc. No. 390) ("Decl. of S. Scarlett"). That is precisely what the current Plan of Allocation will distribute to sixth- and seventh-generation purchaser claimants, and to all identifiable non-claimant, sixth-generation purchasers. In short, the Plan of Allocation will fully-compensate (i.e., *provide 100-percent recovery*) all sixth- and seventh-generation purchaser claimants, and all identifiable non-claimant, sixth-generation purchasers, for their alleged damages.

Under the agreed to Plan of Allocation, the only identifiable class members who are not fully-compensated are non-claimant, seventh-generation purchasers who have provided EA with a physical address. The Plan of Allocation does not compensate these class members for their alleged damages, because—from EA's perspective—their estimated (alleged) damages amount to little more than a rounding error, not an actual injury. Indeed, Plaintiffs' own expert calculated that the retail prices of videogames move in $10 increments; therefore, calculation of these *de minimus* (i.e., less than $2) damage claims constitutes an implicit concession that seventh-generation purchasers were not, in fact, injured by the alleged anticompetitive behavior. *Compare* J. MacKie-Mason Expert Rep. at 7, Mar 8, 2012 (explaining that videogames "retail at a price near one of several 'standard' price points, separated by $10 increments: $60, $50, $40, $30 or $20."), *with* Mot. for Final Approval at 9 *and* Decl. of S. Scarlett at 6 (explaining that Plaintiffs' damages expert calculated seventh-generation purchasers' alleged damages as $1.95 per title); *see also* J. Leitzinger Expert Rep. at 43, Mar. 8, 2012 (underscoring the lack of merit in any claim for an alleged overcharge for seventh-generation games by acknowledging that the competitive pricing anomaly at the center of Plaintiffs' case did not carry forward to seventh

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

1 generation titles; "Take-Two's pricing behavior changed with respect to seventh generation games ... It abandoned its aggressive pricing strategy, choosing instead to align its MSRPs with EA's MSRPs for seventh generation football games. Other game manufacturers followed this approach.").

Regardless of the relative weakness of such claims, EA believes that adding identifiable, non-claimant seventh-generation purchasers to the second round of distribution is the best (and only equitable) way to revise the Plan of Allocation. As set out in Plaintiffs' Option 2, all identifiable, non-claimant seventh-generation purchasers (i.e., those who have provided EA with a physical address) will automatically be sent payment in an amount equal to the average claim paid to seventh-generation purchasers in the first distribution. As detailed above, this will increase the pay-out to settlement class members by 33-percent. Moreover, this results in ***all claimants and all identifiable settlement class members receiving a cash payment equal to 100-percent of their alleged damages***—and, therefore, being fully compensated—according to Plaintiffs' own damages expert's damage calculations. As Plaintiffs' counsel stated in the Motion for Final Approval, "[o]ne hundred percent recovery is fair, reasonable and adequate, meriting final approval of this settlement." Mot. for Final Approval at 9.

Plaintiffs' Option 1, on the other hand, should be rejected. It goes beyond including identifiable, non-claimant seventh-generation purchasers in the second round of distribution, and asks the Court to use excess funds to treble awards. EA respectfully submits that the case law unequivocally does not support this proposal. It is well-established that additional distribution of residual funds to claimants above-and-beyond 100-percent recovery of their alleged damages constitutes an undeserved windfall at the expense of silent, unidentified class members. *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 34–35 (1st Cir. 2012) (affirming denial of additional distributions to fully-compensated claimants, and affirming distribution of $11.5 million in unclaimed settlement funds to *cy pres* recipient, on grounds that "[i]t is well accepted that protesting class members are not entitled to windfalls in preference to *cy pres* distributions."); *In re Easysaver Rewards Litig.*, No. 09-cv-2094, 2013 U.S. Dist. LEXIS 15738,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

at *33-34 (S.D. Cal. Feb. 4, 2013) (granting final approval to settlement agreement over objections regarding the fact that unclaimed settlement funds would be distributed to *cy pres* recipient: "[the objector] asks the Court to distribute the cy pres leftovers to the class members in addition to the cash settlement fund reimbursements and $20 credits. … [T]his would constitute an impermissible windfall for the claimant class members at the expense of the silent class members.").[5]

Such "windfall" distributions are disfavored as a matter of sound public policy. As the Second Circuit explained, redistributing residual funds to allow for above 100-percent recovery might (i) encourage the bringing of class actions likely to result in large, unclaimed settlement funds, and (ii) create conflicts of interest among the named plaintiffs and other class members. *See Van Gemert v. Boeing Co.*, 553 F.2d 812, 815-16 (2d Cir. 1977) ("The problems inherent in appellants' proposal [to distribute unclaimed settlement funds to claimants] are readily apparent. This method expressly contemplates that silent class members will not receive any compensation, even indirectly. The claims of the silent class members would be expropriated and a windfall might result for those who appeared and collected their share of the damages. Consequently, this procedure might encourage the bringing of class actions likely to result in large uncollected damage pools. It also raises serious questions as to the adequacy of

---

[5] *See also Powell v. Georgia-Pacific Corp.*, 843 F. Supp. 491, 496 (W.D. Ark. 1994), *aff'd*, 119 F.3d 703 (8th Cir. 1997) (declining to distribute the remaining funds to class members, who had already been fully compensated per the settlement agreement, and noting that "[t]his method provides no benefit to nonclaiming or unidentified class members, who would appear to have superior equitable interests in the remaining fund," and instead ordering that the remaining funds be distributed to the cy pres recipient); *In re Folding Carton Antitrust Litig.*, 557 F. Supp. 1091, 1106 (N.D. Ill. 1983) (plaintiffs sought to distribute a $6,000,000 surplus in the settlement fund to already-compensated class members on grounds that that "they have not been properly compensated … [because] they could have recovered treble damages"; district court held that, "[i]n light of the terms of the settlement and the even more generous distribution already made, it is apparent that a further distribution to class members who voluntarily settled their claims for the substantial amount they have already received, would be an undeserved windfall."), *rev'd in part on other grounds*, *aff'd in pertinent part, In re Folding Carton Antitrust Litig.*, 744 F.2d 1252, 1254 (7th Cir. 1984) ("agree[ing] that neither the plaintiff class nor the settling defendants have any right to the reserve fund," and "that under these circumstances, it was appropriate for the district court to consider the cy pres doctrine … to achieve an equitable disposition of the reserve fund").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

representation where the interests of the named plaintiffs lie in keeping the other class members uninformed.").[6]

Furthermore, in the antitrust context, using unclaimed settlement funds to pay treble "damages" to fully-compensated class members is inappropriate, because "the [antitrust] policy rationale of deterrence is not achievable at this stage of this case," and because plaintiffs have not "proven the requisite 'actual injury' that normally underlies an award of treble damages for antitrust violations"; payment of treble "damages" under such circumstances, therefore, does not serve "the punitive and compensatory policies of the antitrust laws," but rather simply grants a "windfall" to claimants. *See Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2007 U.S. Dist. LEXIS 48151, at *29-34 (S.D.N.Y. July 5, 2007) (distributing residual, unclaimed settlement funds to *cy pres* recipient, rather than to claimants as treble damages, and noting that "Plaintiffs' voluntary settlement and Defendants' concomitant disclaimers of liability or damage counsel against Plaintiffs receiving treble damages as a matter of equity"), *rev'd in part on other grounds*, *aff'd in pertinent part, Fears v. Wilhelmina Model Agency, Inc.*, 315 Fed. Appx. 333, 336 (2d Cir. 2009) (reversing the district court's denial of further attorneys' fees, but expressly upholding the district court's refusal to use residual funds to pay treble damages).

*In re Lupron Mktg. & Sales Practices Litigation* is instructive. There, the claiming class members had "received their full damages," but argued that "they were entitled to greater distributions in preference to distributions for the benefit of absent class members [i.e., to the *cy pres* recipient] because they have not received treble damages." *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d at 32. The First Circuit—in affirming the district court's (i) denial of additional distributions to fully-compensated claimants, and (ii) approval of a $11.5 million distribution in unclaimed settlement funds to the cy pres recipient—acknowledged that the

---

[6] *See also In re Lease Oil Antitrust Litig.*, MDL No. 1206, 2007 U.S. Dist. LEXIS 91467, at *51, *66-68 (S.D. Tex. Dec. 12, 2007) ("[D]istributing the unclaimed funds pro rata to the located or claiming Class Members would be inappropriate because it would give these Class Members a windfall; it might also (a) encourage the bringing of class actions likely to result in a large amount of unclaimed funds, and (b) create conflicts of interest between named plaintiffs and other class members.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

American Law Institutes Principles "express a policy preference that unclaimed funds be redistributed to ensure class members recover their full losses. This policy preference was motivated by a concern that 'few settlements award 100 percent of a class member's losses, and thus it is unlikely in most cases that further distributions to class members would result in more than 100 percent recovery.'" *Id*. The First Circuit, however, emphasized that "[w]here class members have been fully compensated for their losses, *this presumption does not apply*." *Id.* (emphasis added).[7] Under such circumstances, the court explained, "[i]t is well accepted that protesting class members are not entitled to windfalls in preference to *cy pres* distributions." *Id.* at 35; *see also Nelson v. Mead Johnson & Johnson Co*., 484 Fed. Appx. 429, 435 (11th Cir. 2012) (finding that, because "each class member will receive the 'full compensation' provided by the settlement before a cy pres distribution occurs," "[t]he cy pres distribution was a permissible method to distribute unclaimed settlement funds."); *Perkins v. Am. Nat'l Ins. Co.*, No. 3:05-CV-100, 2012 U.S. Dist. LEXIS 95039, at *11 (M.D. Ga. July 10, 2012) (finding that the $3.6 million in unclaimed funds should be distributed to *cy pres* recipients: "The Court finds that all reasonably identifiable class members have been fully compensated for their losses that form the basis for their claims in this class action. Therefore, the *cy pres* funds should not be redistributed to the existing identifiable class members who have already been fully compensated.").

Likewise, the current plan of allocation in this case will fully-compensate (i.e., provide 100-percent recovery) to all sixth- and seventh-generation purchaser claimants, and all identifiable non-claimant, sixth-generation purchasers, for their alleged damages. If this Court—as EA proposes—revises the Plan of Allocation to include all identifiable, non-claimant seventh-generation purchasers in the second distribution, the settlement agreement will fully-compensate

---

[7] *See also Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011) ("Where it is still logistically feasible and economically viable to make additional pro rata distributions to class members, the district court should do so, *except where an additional distribution would provide a windfall to class members with liquidated-damages claims that were 100 percent satisfied by the initial distribution*.") (emphasis added).

1    all claiming and located settlement class members. Under such circumstances, the case law is
2    clear that additional distributions to claiming and/or located class members will result in an
3    "impermissible windfall." *In re Easysaver*, 2013 U.S. Dist. LEXIS 15738, at *33-34; *In re*
4    *Folding Carton*, 557 F. Supp. at 1106. "[P]rotesting class members are not entitled to windfalls
5    in preference to *cy pres* distributions." *In re Lupron*, 677 F.3d at 35.

6         Plaintiffs, in their Proposed Modified Distribution of Settlement Fund, claim that
7    "allowing compensation to class members of greater than 100 percent of damages is well
8    supported by case law." Pls.' Proposed Modified Distribution of Settlement Fund at 5, Mar, 19,
9    2013 (Doc. No. 446). Plaintiffs, however, address none of the cases discussed above, and cite no
10   cases with a factual setting similar to the present case. Instead, Plaintiffs cite a handful of cases
11   that are clearly inapposite. Each of the cases cited by Plaintiffs involve (i) settlement agreements
12   where the *parties agreed* to pay double, treble, or pro rata awards to class members, and/or
13   (ii) settlements that apportioned settlement funds on a pro rata basis, but did not fully
14   compensate class members for their alleged damages. *See*, *e.g.*, *In re Vitamins Antitrust Litig.*,
15   No. 99-197, 2000 U.S. Dist. LEXIS 8931, at *32 (D.D.C. Mar. 31, 2000) (plan of distribution
16   "apportion[ed] funds according to the relative amount of damages suffered by class members";
17   no indication that damages were paid to class members above-and-beyond 100-percent of their
18   alleged damages); *In re Lloyds' Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS
19   22663, at *25, *54-56 (S.D.N.Y. Nov. 26, 2002) (settlement agreement provided that funds
20   would be distributed pro rata, i.e., the parties agreed to this plan of distribution; no indication that
21   damages were paid to class members above-and-beyond 100-percent of their alleged damages;
22   rather, objectors claimed that they would not receive 100-percent recovery); *In re PaineWebber*
23   *Ltd. P'ships Litig.*, 171 F.R.D. 104, 106-07, 117-22, 132-35 (S.D.N.Y. 1997) (same); *In re TFT-*
24   *LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07-md-1827, 2011 U.S. Dist. LEXIS 154288, at
25   *8-9 (N.D. Cal. Dec. 27, 2011) (same); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588
26   F.3d 24, 31-32 (1st Cir. 2009) (parties agreed in settlement agreement to double damages, i.e., in
27   excess of 100-percent recovery; subsequently agreed-to modification to pay treble damages not
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

inconsistent with initial plan of distribution).

Therefore, EA respectfully submits that the Court should not allow treble awards in this case; rather, any unclaimed funds in the net settlement fund should be distributed to the cy pres recipient or escheat to the government, at the Court's discretion.

### B. Treble Awards in this Case would be Unjust and Inequitable to EA.

Payment of treble "damages" to claimants and identifiable settlement class members would not only constitute an impermissible windfall, it also would violate the spirit of the Settlement Agreement between the parties and (moreover) be inequitable to EA.

As the Settlement Agreement and final approval papers demonstrate, EA strongly disputes the merits of Plaintiffs' claims. *See* Mot. for Final Approval at 15-16; *see also* Settlement Agreement at 4-5 ("EA denies that it has committed any act or omission giving rise to any liability and/or violation of law, and states that it is entering into this Settlement Agreement solely to eliminate the uncertainties, burden, and expense of further protracted litigation."). Indeed, EA believes that the record in this case—including, critically, the third-party deposition testimony of executives at each of the football leagues, ESPN, and even rival publisher Take-Two (i.e., the very company that Plaintiffs claim was illegally excluded from their alleged market)—is unequivocal: (i) the relevant market is not limited to "league-branded, interactive football videogames," but rather is much broader and intensely competitive; (ii) the licensor leagues, not EA, drove the adoption of the exclusive agreements at issue in order to maximize the value of their intellectual property rights; and (iii) EA adhered to (and never charged more than) the industry standard launch prices for its videogames, meaning that class members were not injured and suffered zero damages. *See*, *e.g.*, Mot. for Final Approval at 15-16. Under these circumstances, courts have rightly concluded that: "Plaintiffs' voluntary settlement and Defendants' concomitant disclaimers of liability or damage counsel against Plaintiffs receiving treble damages *as a matter of equity*." *Fears*, 2007 U.S. Dist. LEXIS 48151, at *29-34 (emphasis added).

Moreover, although EA settled this case to avoid the uncertainty and burden of further

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW

litigation, a compromise was reached only after Plaintiffs' submitted an expert report on damages. Once EA was finally provided with Plaintiffs' own estimate of damages, EA concluded that the per unit alleged damages amounted to a tacit admission that there was in fact no overcharge in this case (for either generation of games). The alleged overcharges—as calculated by Plaintiffs' own damages expert—are contrary to real world pricing dynamics in this industry, and leave little or no doubt, for anyone familiar with the videogame industry, that Plaintiffs' claims are a litigation fiction. If this Court revises the Plan of Allocation to artificially increase the per unit payout in an effort to compensate for the fact that class members have overwhelming shown no interest in availing themselves of the opportunity to claim 100-percent of their alleged damages—despite the *de minimus* effort that was required to submit a claim electronically by e-mail—the revised plan, awarding treble "damages," would have a very different public relations impact on EA. The Settlement Agreement was extensively negotiated, and nothing in it contemplates that per unit awards might exceed Plaintiffs' own estimate of 100-percent "damages," let alone be increased to treble awards. Adopting Plaintiffs' Option 1 would amount to a significant revision to the carefully negotiated terms of the Settlement Agreement, and is squarely at odds with the parameters on which EA agreed to settle this case. For these reasons as well, EA respectfully submits that increasing the per unit payout would be unfair and inappropriate under the circumstances presented by this settlement.

## IV. CONCLUSION

For the foregoing reasons, EA respectfully submits that the Court should reject Plaintiffs' Option 1, and adopt Plaintiffs' Option 2 to revise the Plan of Allocation. Further, any residual funds in the net settlement fund should be awarded to the *cy pres* recipient, or escheat to the

\ \ \

1 | government, at the Court's discretion.

3 | Dated: March 19, 2013  Respectfully Submitted,

LATHAM & WATKINS LLP
   Daniel M. Wall
   Timothy L. O'Mara
   Kirsten M. Ferguson

By    /s/ Timothy L. O'Mara
   Timothy L. O'Mara
   Attorneys for Defendant
   ELECTRONIC ARTS INC.

SF\4462221

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14    EA'S RESPONSE TO PLS.' PROPOSED MODIFIED
DISTRIBUTION OF SETTLEMENT FUND
CASE NO. C 08-02820 CW